**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

                                    Plaintiff,

                    v.                                          17-cv-01789 (DLC)

LEK SECURITIES CORPORATION, SAMUEL LEK,
VALI MANAGEMENT PARTNERS d/b/a AVALON
FA LTD, NATHAN FAYYER, and SERGEY
PUSTELNIK a/k/a/ SERGE PUSTELNIK,

                                    Defendants.


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS LEK SECURITIES**
**CORPORATION AND SAMUEL LEK'S MOTION TO DISMISS THE COMPLAINT**

Steve M. Dollar
David B. Schwartz
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY  10103
Tel. (212) 318-3000
Fax. (212) 318-3400
steve.dollar@nortonrosefulbright.com
david.schwartz@nortonrosefulbright.com

Kevin J. Harnisch
799 9th Street NW, Suite 1000
Washington, DC 20001-4501
Tel. (202) 662-4520
Fax (202) 662-4643
kevin.harnisch@nortonrosefulbright.com

*Attorneys for Defendants Lek Securities*
*Corporation and Samuel Lek*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS ........................................................................... 2

    I.     TRADING ON THE SECURITIES MARKETS ................................. 2

    II.    AVALON'S PURPORTED "LAYERING" .......................................... 4

    III.   AVALON'S PURPORTED "CROSS-MARKET MANIPULATION" ............... 5

    IV.   ALLEGATIONS OF THE LEK DEFENDANTS' ASSISTANCE ..................... 6

    V.    ALLEGATIONS OF THE LEK DEFENDANTS' KNOWLEDGE ................... 7

ARGUMENT .............................................................................................. 8

    I.     THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT THE
          AVALON DEFENDANTS VIOLATED THE SECURITIES LAWS .............. 10

       A.    The Complaint Fails To Allege that Avalon's "Layering"
             Constitutes Market Manipulation ........................................... 10

           1.    Market Manipulation Under the Securities Laws ....................... 10

           2.    The Complaint Fails to Sufficiently Allege that Avalon's
                 Trading Injected False Information Into The Marketplace ......... 12

               a.    Avalon's Orders Were Subject to Market Risk and
                    Tightened the Spread ......................................... 13

               b.    Avalon's Orders Did Not Create a False Impression
                    of Supply and Demand ....................................... 14

               c.    Avalon's Orders Did Not Send False Pricing
                    Signals ............................................................. 15

               d.    The So-Called Non-Bona Fide Orders Had an
                    Economic Purpose:  Avalon Was Trying to Earn the
                    Spread ............................................................. 16

       B.    The Complaint Fails To Allege that Avalon's Liquidity Arbitrage
             Strategy Constitutes Manipulation ........................................ 18

           1.    Changes in Stock and Option Prices Following Purchases
                 and Sales Are a Natural, Non-Manipulative Occurrence ............. 18

           2.    Trading with Unaffiliated Parties for Purposes of
                 Benefitting Other Holdings Is Not Manipulative ....................... 19

           3.    The Complaint Fails to Allege that the Avalon Traders
                 Were Doing Anything Other than Reacting to Bids and
                 Offers Others Had Placed Into the Marketplace ....................... 21

# TABLE OF CONTENTS
(continued)

Page

4.    The Stock Component Hedged the Risk of the Options Position ........................................................................ 21

C.    The Complaint Fails To Allege that Avalon's Purported "Layering" Violated Section 9(a)(2) of the Exchange Act Because That Restriction Does Not Encompass Unexecuted Orders ................... 22

    1.    Section 9(a)(2) Applies Only to Executed Securities Transactions ................................................................. 22

    2.    The Case Cited by the Commission in Support of Its Flawed Interpretation of Section 9(a)(2) Does Not Apply to the Allegations in this Case ......................................... 24

D.    The Complaint Fails to Allege with Particularity that Avalon's Traders Acted with the Necessary Scienter .............................. 25

II.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT LSC AND MR. LEK AIDED AND ABETTED AVALON'S ALLEGED MANIPULATION ............................................................................. 26

A.    The Complaint Fails to Sufficiently Allege a Primary Violation of the Federal Securities Laws ................................................... 26

B.    The Complaint Contains Numerous Non-Conclusory Allegations that LSC and Mr. Lek Did Not Act With the Necessary Scienter .......... 27

    1.    LSC Designed and Implemented a Control to Prevent "Layering" ......................................................................... 27

    2.    Avalon Provided Multiple Explanations as to Why Its Trading Strategies Were Not Manipulative ................................. 29

    3.    The Receipt of Fact-Finding Regulatory Requests Does Not Translate to Scienter .................................................... 30

        a.    The References to Correspondence from Regulators Demonstrate that LSC and Mr. Lek were Responsive to Questions Raised ...................................... 31

        b.    Recipients of Regulatory Requests Are Directed not to Make Adverse Inferences About Entities and Individuals Referenced Therein ...................................... 31

    4.    Mr. Lek Refused to Open an Account for a Potential Customer Who Said that He Wanted to Engage in Layering ...... 33

C.    The Complaint Fails to Allege that LSC or Mr. Lek Provided Substantial Assistance to the Avalon Defendants ................................. 34

# TABLE OF CONTENTS
(continued)

**Page**

1.    The Allegations About LSC not Having Sufficient Layering Controls, Exception Reports or Written Supervisory Procedures Are Passive Activities that Cannot Amount to Aiding and Abetting Liability................................... 34

2.    The Alleged Affirmative Acts by LSC and Mr. Lek Were Routine Services that Broker-Dealers Provide to Customers and Therefore Do Not Constitute Aiding and Abetting.............. 35

III.   THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT THE LSC AND MR. LEK VIOLATED SECTION 17(a)(3) OF THE SECURITIES ACT .............................................................................. 37

IV.   THE COMPLAINT'S ALLEGATIONS CONFIRM THAT LSC DID NOT CONTROL MR. PUSTELNIK FOR PURPOSES OF SECTION 20(a) OF THE EXCHANGE ACT ........................................................ 37

A.    The Complaint Fails to Allege an Underlying Violation of Section 10(b) or Rule 10(b)-5(a) and (c) by Mr. Pustelnik.................. 38

B.    The Complaint Alleges that Mr. Pustelnik Lied to and Deceived LSC About Critical Information and Acted Outside the Scope of His Employment ................................................................ 38

C.    The Complaint Does Not Sufficiently Allege that LSC was a Culpable Participant ............................................................. 39

CONCLUSION.................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Armstrong v. McAlpin,*
  699 F.2d 79 (2d Cir. 1983)............................................................................34

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................................8, 9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007)................................................................ *passim*

*Baxter v. A.R. Baron & Co.,*
  No. 94-Civ-3913, 1995 WL 600720 (S.D.N.Y. Oct. 6, 1995) ...............................14

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................................8

*Buckley v. Deloitte & Touche USA LLP,*
  No. 06-civ-329, 2007 WL 1491403 (S.D.N.Y. May 22, 2007) .............................29

*In re CBI Holding Co.,*
  529 F.3d 432 (2d Cir. 2008)................................................................29

*Christensen v. Harris Corp.,*
  529 U.S. 576 (2000)................................................................................32

*Cohen v. Stevanovich,*
  722 F. Supp. 2d 416 (S.D.N.Y. 2010)..........................................11, 12, 13

*Cruz-Miguel v. Holder,*
  650 F.3d 189 (2d Cir. 2011)................................................................23

*Deutschman v. Beneficial Corp.,*
  132 F.R.D. 359 (D. Del. 1990) ........................................................18, 19

*ECA, Local 134 IBEW v. JP Morgan Chase Co.,*
  553 F.3d 187 (2d Cir. 2009)................................................................27

*In re Eletrobras Sec. Litig.,*
  No. 15-CV-5754, 2017 WL 1157138 (S.D.N.Y. Mar. 27, 2017) ....................37, 40

*Ernst & Ernst v. Hochfelder,*
  425 U.S. 185 (1976)................................................................10, 23

*Frederick v. Mechel OAO,*
    475 Fed. Appx. 353 (2d Cir. 2012)......................................................................38

*Friedman v. JP Morgan Chase & Co.,*
    No. 15-CV-5899, 2016 WL 2903273 (S.D.N.Y. May 18, 2016) ......................................38, 40

*GFL Advantage Fund, Ltd. v. Colkitt,*
    272 F.3d 189 (3d Cir. 2001)........................................................................... *passim*

*Guray v. Winehouse,*
    190 F.3d 37 (2d Cir. 1999)...........................................................................11

*Moss v. Morgan Stanley, Inc.,*
    553 F. Supp. 1347 (S.D.N.Y. 1983).................................................................39

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt.,*
    No. 02-civ-0767, 2008 WL 1882702 (S.D.N.Y. Apr. 21, 2008) ...........................................11

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000)........................................................................27

*Olympia Brewing Co. Sec. Litig.,*
    613 F. Supp. 1286 (N.D. Ill 1985) ...........................................................11, 15, 18

*Randall v. Loftsgaarden,*
    478 U.S. 647 (1986)................................................................................23

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977)..............................................................................10, 23

*Sec. Exch. Comm'n v. Monarch Funding Corp.,*
    192 F.3d 295 (2d Cir. 1999).......................................................................10, 37

*SEC v. Apuzzo,*
    689 F.3d 204 (2d Cir. 2012)......................................................................26, 34

*SEC v. Badian,*
    No. 06 Civ. 2621, 2008 WL 3914872 (S.D.N.Y 2008) ........................................................26

*SEC v. Cedric Kushner Promotions, Inc.,*
    417 F. Supp. 2d 326 (S.D.N.Y. 2006)................................................................30

*SEC v. Collins & Aikman Corp.,*
    524 F. Supp. 2d 477 (S.D.N.Y. 2007)................................................................37

*SEC v. Ginder,*
    752 F.3d 569 (2d Cir. 2014).........................................................................37

*SEC v. Malenfant*,
   784 F. Supp. 141 (S.D.N.Y. 1992) ..................................................................................24, 25

*SEC v. Mudd*,
   885 F. Supp. 2d 654 (S.D.N.Y. 2012)..............................................................................34, 35

*SEC v. Pentagon Capital Mgmt. PLC*,
   612 F. Supp. 2d 241 (S.D.N.Y. Feb. 9, 2009)........................................................................9

*SEC v. Tecumseh Holdings Corp.*,
   No. 03-Civ-5490, 2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009) .........................................34

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004)..............................................................................................................23

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014)......................................................................................40

*Stander v. Fin. Clearing & Servs. Corp.*,
   730 F. Supp. 1282 (S.D.N.Y. 1990).......................................................................................35

*Sullivan & Long, Inc. v. Scattered Corp.*,
   47 F.3d 857 (7th Cir. 1995) .............................................................................................11, 21

*Trane Co. v. O'Connor Sec.*,
   561 F. Supp. 301 (S.D.N.Y. Mar. 31, 1983) ....................................................................10, 11

*United States SEC v. Wey*,
   No. 15-cv-7116, 2017 U.S. Dist. LEXIS 44575 (S.D.N.Y. Mar. 27, 2017)............................9

*United States v. Peoni*,
   100 F.2d 401 (2d Cir. 1938)...................................................................................................34

*WHX Corp. v. SEC*,
   362 F.3d 854 (D.C. Cir. 2004) ...............................................................................................32

*Wilson v. Merrill Lynch & Co.*,
   671 F.3d 120 (2d Cir. 2011)...................................................................................................17

*Yoshikawa v. SEC*,
   192 F.3d 1209 (9th Cir. 1999) ...............................................................................................13

**Rules and Statutes**

7 U.S.C. § 6c(a)(5)(C).................................................................................................................16

15 U.S.C. § 78i(a)(1)...................................................................................................................23

15 U.S.C. § 78i(a)(2)........................................................................................................11, 23, 24

15 U.S.C. § 78u(d)(1) ....................................................................................................25

15 U.S.C. § 78t(e) .........................................................................................................27

Fed. R. Civ. P. 12(b)(6).............................................................................................1, 9

Fed. R. Civ. P. 9(b) ...........................................................................................9, 25, 40

**Other Authorities**

Concept Release on Equity Market Structure,
  Exchange Act Release No. 61358 (Jan. 14, 2010) .....................................17, 36, 37

*Dep't of Mkt Regulation v. Respondent*,
  NASD Redacted Decision, Complaint No. CMS030257 (Oct. 12, 2005).............................12

Disclosure of Order Execution and Routing Practices,
  Exchange Act Release No. 43590 (Nov. 17, 2000) .........................................3, 14

*In re Hold Brothers On-Line Investment Services, LLC et al.*,
  Exchange Act Release No. 67924 (Sept. 25, 2012) ........................................28

Proposed Rule Change by the CBOE Relating Margin Treatment on Stock
  Transactions Effected by an Options Market Maker to Hedge Options
  Positions, Release No. 51497 (April 6, 2005) ...............................................22

Risk Management Controls for Brokers or Dealers with Market Access,
  Exchange Act Release No. 63241 (Nov. 3, 2010) ..............................................36

Rule 611 of Regulation NMS, 17 C.F.R. § 242.611 .......................................................3

Defendants Lek Securities Corporation ("LSC") and Samuel Lek (together with LSC, the "Lek Defendants") respectfully submit this Memorandum of Law in support of their Motion to Dismiss the complaint (the "Complaint") of the Securities and Exchange Commission (the "Commission") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

In this action, the Commission seeks to hold LSC, a small self-clearing broker-dealer, and Mr. Lek, LSC's Chief Executive Officer, Chief Compliance Officer and majority owner, responsible for two purported trading schemes of its former customer, Avalon FA Ltd ("Avalon"), and Avalon's disclosed and undisclosed principals (together with Avalon, the "Avalon Defendants"). It does so despite numerous specific allegations in the Complaint that the Lek Defendants were lied to and mislead by the Avalon Defendants as to their activities.

As an initial matter, neither purported scheme constitutes market manipulation. The first purported scheme is a newly-created theory of market manipulation—which the Commission calls "layering"—that cannot be found in any applicable statutes, rules or regulations. The purported manipulation is predicated on Avalon's entry of orders to buy and sell securities that: (1) were subject to market risk, and (2) enabled other market participants to purchase stock at lower prices or sell stock at higher prices than otherwise possible without the existence of Avalon's orders. This is precisely the type of competitive, market-driven result that the Commission encourages. The second purported scheme, which the Commission calls "cross-market manipulation," amounts to nothing more than reactive trading to bids and offers for stock and options that others have placed in the marketplace and thus cannot amount to manipulation.

Although neither LSC nor Mr. Lek controlled or directed Avalon's trading, the Commission seeks to hold them responsible for Avalon's purported manipulative behavior. The Lek Defendants' conduct alleged in the Complaint amounts to nothing more than the normal

services of an execution and clearing firm and mirrors the services they offer to any of their customers.  In addition, the Complaint fails to plead either LSC's or Mr. Lek's knowledge of the scheme with any particularity.  Instead, the Complaint recounts numerous instances in which LSC and Mr. Lek took action to prevent the possibility of manipulation by Avalon and sought assurances from the Avalon Defendants that manipulation was not occurring in either of the strategies.  The Complaint attempts and fails to turn purported deficiencies in these prevention efforts into securities fraud.  Any alleged deficiencies in LSC's controls were the result of the Avalon Defendants' repeated false statements to LSC and Mr. Lek that, as alleged in the Complaint, facilitated the manipulation.

For the reasons described herein, the Commission has failed to allege a cause of action against LSC and Mr. Lek and the Court should dismiss the Complaint.

## STATEMENT OF FACTS

### I.   TRADING ON THE SECURITIES MARKETS

Given the changes in the securities markets, an understanding of certain securities trading terms is important when assessing this matter.  A "bid" is an order to purchase a security at a specified price.  An "offer" is an order to sell a security at a specified price.  Bids and offers (and the amount of shares associated with each) are generally displayed to the marketplace.  An order remains open and executable until it is either cancelled or accepted by another market participant (meaning it was executed).

The highest displayed bid on any of the national securities exchanges is the National Best Bid ("NBB").  (*See* Compl. ¶ 25).  The lowest displayed offer is the National Best Offer ("NBO").  (*Id.*).  The National Best Bid and Offer ("NBBO") is the NBB and NBO.  (*Id.*).  The difference between the NBB and the NBO is the spread.  At any given time, for any given stock, there are numerous bids and offers outstanding at a variety of different prices, including at many

pricing increments outside of the NBBO.  Pursuant to the Commission's order protection rule, securities exchanges are generally prohibited from executing orders at prices outside of the prevailing NBBO at the time.  *See* Rule 611 of Regulation NMS, 17 C.F.R. § 242.611.  Thus, persons posting orders at the NBB or NBO must have their orders executed first if there is an interested buyer or seller at those prices.  The Commission has long advocated that having stocks quoted in tighter spreads (*i.e.*, higher bids and lower offers) is a benefit to investors because it results in investors buying at lower prices and selling at higher prices.  *See e.g.*, Disclosure of Order Execution and Routing Practices, Exchange Act Release No. 43590, at 5-6 (Nov. 17, 2000) ("Release 43590") ("[T]he overriding objective of the Commission's inquiry has been quite pragmatic—to assure that investors receive the best possible prices for their orders . . .  If improved disclosure leads to the tightening of effective spreads across market centers, the savings to investors could be quite substantial.").[1]

The cancellation of orders on the securities markets is unremarkable and consistent with normal trading behavior.  For example, in the last quarter of 2012 and the first two quarters of 2013, only 3.5%, 3.7% and 3.2% of equity orders were filled meaning that 96.5%, 96.3% and 96.8% of orders were cancelled.  *See Trade to Order Volume Ratios*, SEC Data Highlight 2013-01 (October 9, 2013) *available at* https://www.sec.gov/marketstructure/research/highlight-2013-01.html ("SEC Data Highlight 2013-01").  Given the speed of today's markets, orders are typically cancelled shortly after they are entered.  For example, in the second quarter of 2013,

---

[1]      *See also* Luis A. Aguilar, Commissioner, Sec. & Exch. Comm'n, Public Statement, U.S. Equity Market Structure: Making Our Markets Work Better for Investors (May 11, 2015) *available at* https://www.sec.gov/news/statement/us-equity-market-structure.html (citing study showing that competition has benefitted investors by tightening spreads and noting with approval that "today's markets enjoy historically narrow spreads, low transaction costs, and increased displayed liquidity")*;* Kara M. Stein, Commissioner, Sec. & Exch. Comm'n, Remarks Before Trader Forum 2014 Equity Trading Summit (Feb. 6, 2014), *available at* https://www.sec.gov/news/speech/2014-spch020614kms ("Today, we have more stocks available for trading at more venues at tighter spreads than ever before.").

45.9% of cancelled orders were cancelled within one second of being made, 38.7% of cancelled orders were cancelled within half a second of being made, and 23.2% of cancelled orders were cancelled within 50 milliseconds (one twentieth of a second) of being made. *See The Speed of the Equity Markets*, SEC Data Highlight 2013-05 (October 9, 2013) *available at* https://www.sec.gov/marketstructure/research/highlight-2013-05.html ("SEC Data Highlight 2013-05"). Millions of orders each day are cancelled within 50 microseconds (one twenty thousandth of a second) of being made. *See id.*

## II.   AVALON'S PURPORTED "LAYERING"

The Complaint alleges that Avalon was engaged in what the Commission has labelled as "layering." (Compl. ¶ 35). According to the Complaint, Avalon's supposed layering strategy involved placing an order on one side of the market (*e.g.*, a buy order) while also placing multiple orders in the same stock on the other side of the market (*e.g.*, sell orders). (*Id.* ¶ 36). The Commission refers to the single order as a "bona fide order" and the multiple orders on the other side of the market as "non-bona fide orders." (*Id.*). The Commission uses the term "non-bona fide orders" to "refer[] to orders that a trader does not intend to have executed and that have no legitimate economic reason." (*Id.*). The Commission contends that the purpose of the so-called non-bona fide orders was to induce trading interest in the so-called bona fide orders. (*Id.*).

The Complaint alleges that "[t]he manner in which Avalon conducted layering varied by trader and over time, often in ways apparently intended to avoid detection . . . ." (*Id.* ¶ 40). Nevertheless, in support of conclusory allegations that Avalon engaged in "hundreds of thousands" of instances of layering (*id.* ¶ 48), the Commission references only four specific examples (*id.* ¶¶ 43-47). Assuming, as alleged in the Complaint, Avalon's trading had any effect on prices at all, Avalon tightened the spread on both sides of the market in each of the examples of layering cited in the Complaint:

- For the first set of orders for CAB, the Avalon trader is alleged to have improved the NBB by entering bids at prices higher than the then prevailing NBB and entering offers that were executed—meaning they were at the then NBO, the lowest priced offer to sell. (*Id.* ¶ 44). Thus, Avalon allegedly tightened the spread.

- For the second set of orders for CAB, the Avalon trader is alleged to have improved the NBO by entering orders at prices lower than the then prevailing NBO and entering a bid that was executed—meaning it was then at the then NBB, the highest price bid to purchase. (*Id.* ¶ 45). Thus, Avalon allegedly tightened the spread.

- For the orders for IBM, the Avalon trader is alleged to have improved the NBB by entering bids at prices higher than the then prevailing NBB and entered an offer that was executed—meaning it was then at the then NBO, the lowest priced offer to sell. (*Id.* ¶ 46). Thus, Avalon allegedly tightened the spread.

- For the orders for CERN, the Avalon trader is alleged to have improved the NBO by entering offers at prices lower than the then prevailing NBO and entering a bid that was executed—meaning it was then at the then NBB, the highest price bid to purchase. (*Id.* ¶ 47). Thus, Avalon allegedly tightened the spread.

The purported non-bona fide orders were live, real and actionable by other parties at any time. In fact, the Complaint alleges that some of the so-called non-bona fide orders were executed. (*Id.* ¶¶ 44, 47).

## III. AVALON'S PURPORTED "CROSS-MARKET MANIPULATION"

The Commission also alleges that Avalon engaged in a "cross-market manipulation" scheme, referred to herein as liquidity arbitrage. (Compl. ¶ 86). According to the Complaint, Avalon: (1) purchased stock for the purpose of increasing the stock price; (2) purchased put

options[2] which had decreased in price because of the increase in the stock price; (3) predicted that options market makers would sell stock to hedge their risk associated with their sales of put options to Avalon, thereby putting downward pressure on the stock price; (4) sold the put options for a gain and the stock at a loss when they accurately anticipated market behavior.  (*Id.* ¶ 87).[3]

## IV.  ALLEGATIONS OF THE LEK DEFENDANTS' ASSISTANCE

LSC, as a broker-dealer, "provides market access to its customers."  (Compl. ¶ 17; *see id.* ¶ 67).  The oft-repeated allegation in the Complaint about LSC's and Mr. Lek's involvement in Avalon's purported wrongdoing is that they provided market access for Avalon, as they do for any other customer.  (*See id.* ¶¶ 1, 6, 17, 66-68).  There is no allegation in the Complaint that the Lek Defendants directed either of the purported manipulative trading strategies.  Instead, LSC and Mr. Lek are alleged to have failed to implement reasonable controls or implemented ineffective ones to prevent Avalon's purported manipulative activity.  (*Id.* ¶ 66).  In addition, LSC and Mr. Lek are alleged to have provided technology for the liquidity arbitrage strategy. (*Id.* ¶ 99).

In February 2013, LSC implemented a control intended to block trades that a regulator might consider consistent with a manipulative strategy from ever reaching the market.  (*Id.* ¶ 70). The control was "triggered in certain instances when a trader traded or attempted to trade on both sides of the market and did so with a disproportionate number of orders on one of those sides." (*Id.*).  With the benefit of a post-hoc review of all Avalon traders' activity, the Complaint alleges that this nearly instantaneous processing and analysis of substantial numbers of trades was insufficient to prevent Avalon's purported "layering" activity for two reasons.  (*Id.* ¶¶ 71-72).

---

[2]      A put option gives the purchaser the right to sell the underlying stock at a predetermined price to the person who wrote the option.  (Compl. ¶ 24).  Thus, as the stock price increases, the price of the put option decreases.
[3]      The strategy could also be accomplished by selling the stock and then purchasing call options.

First, the Complaint alleges that the control was only triggered when a customer input the so-called bona fide order prior to the so-called non-bona fide orders.  (*Id.* ¶ 72(a)).  Second, the Complaint alleges that LSC "relaxed" the threshold for the layering control for Avalon, (*id.* ¶ 72(b)), after receiving allegedly false assurances that Avalon was not engaged in layering (*id.* ¶¶ 73, 75).  The Complaint also alleges that there were additional actions the Lek Defendants could have taken, including implementing an exception report and additional written supervisory procedures, that may have allowed the Lek Defendants to detect layering.  (*Id.* ¶¶ 76-77).

With regard to the liquidity arbitrage strategy, the Complaint alleges that the Lek Defendants improved the technology of LSC's options trading systems and "hous[ed]" an Avalon server in an effort to "decrease latency (the time between the traders entering the order on the trading platform and the order arriving at the exchange)."  (*Id.* ¶ 100).

## V.  ALLEGATIONS OF THE LEK DEFENDANTS' KNOWLEDGE

The Complaint makes only conclusory allegations of LSC's or Mr. Lek's knowledge of Avalon's purported schemes.  These allegations are undermined by the Complaint's pervasive allegations that LSC and Mr. Lek were repeatedly lied to and misled by Defendant Sergey Pustelnik.  Mr. Pustelnik, formerly an independent contractor of LSC (Compl. ¶ 20), was a secret owner of Avalon who "share[d] in its revenue or profits" (*id.* ¶ 19) and was "significantly involved in Avalon's management and operations" (*id.* ¶ 30).  The Complaint alleges that Mr. Pustelnik  "falsely represent[ed]" to the Lek Defendants "that Avalon was not engaged in layering" (*id.* ¶ 73) and "through his efforts to persuade other [LSC] personnel that layering was not occurring, Pustelnik participated in and substantially assisted the scheme" (*id.* ¶  84(d)).

The Complaint also alleges that Mr. Pustelnik explained the liquidity arbitrage strategy to Mr. Lek and others at LSC multiple times, "particularly in response to regulatory inquiries about the strategy directed to [LSC], and he assured them it was not manipulative . . . ."  (*Id.* ¶ 104).

Mr. Pustelnik is also alleged to have provided LSC with a written description of the liquidity arbitrage strategy with an analysis, informed by discussions with the traders, about why the strategy was not manipulative. (*Id.* ¶ 109). In addition to these affirmative misrepresentations, the Complaint alleges that Mr. Pustelnik "without informing [LSC]—orchestrated the move of the [liquidity arbitrage] strategy from Avalon's accounts at [LSC] to accounts held in the name of [another management firm] at [another broker dealer]." (*Id.* ¶ 111).

The only specific allegation that Mr. Lek had knowledge of Avalon's layering is based on a single unsolicited email sent in 2012 by a party unconnected to Avalon at the time. (*Id.* ¶¶ 52-53). In response to the email, Mr. Lek responded that "regulators have argued that your strategy 'layering' is manipulative and illegal. This is of concern to us even though I do not agree with their position." (*Id.* ¶ 62). The Complaint also alleges that LSC and Mr. Lek knew of Avalon's layering as a result of inquiries by regulators (*id.* ¶ 64), but there is no allegation that LSC failed to respond to these inquiries or that regulators expressed disagreement with its responses. On the contrary, LSC implemented its layering controls in February 2013 in response to the inquiries made late in 2012 (*see* ¶¶ 64(a)-(c)), 70) and made further inquiries of Avalon in November 2013 following the receipt of additional requests (*see, e.g.*, *id.* ¶ 64(e)).

## ARGUMENT

Pursuant to Rule 12(b)(6), the Court must dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted if the plaintiff fails to set forth sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff's allegations must therefore contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The Court must

examine only the well-pleaded factual allegations, ignoring any legal conclusions, 'and then determine whether they plausibly give rise to an entitlement to relief.'" *United States SEC v. Wey*, No. 15-cv-7116, 2017 U.S. Dist. LEXIS 44575, at *20 (S.D.N.Y. Mar. 27, 2017) (citing *Iqbal*, 556 U.S. at 679). "Because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b)." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007); *SEC v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 257 (S.D.N.Y. Feb. 9, 2009) ("Because an action alleging violation of section 10(b) or 17(a)(1) sounds in fraud, the [complaint] 'must state with particularity the circumstances constituting fraud or mistake.'") (citing Fed. R. Civ. P. 9(b)).[4]

Each of the Commission's claims against the Lek Defendants is premised on the Complaint having sufficiently alleged a violation of the securities law by the Avalon Defendants through their layering or liquidity arbitrage trading. Because such allegations are insufficient to state a claim against the Avalon Defendants, all claims against the Lek Defendants should be dismissed.

Counts Six, Eight and Nine for aiding and abetting the Avalon Defendants' violations and Count Three alleging the Lek Defendants violated Section 17(a)(3) of the Securities Act should be dismissed because the Commission fails to sufficiently allege LSC or Mr. Lek acted with the necessary scienter or provided substantial assistance to the Avalon Defendants. Count Eleven fails to sufficiently allege that LSC had control of Mr. Pustelnik's purported securities violations or was a culpable participant and should also be dismissed.

---

[4]     On a motion to dismiss pursuant to Rule 12(b)(6), "a court 'may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.'" *Wey*, 2017 U.S. Dist. LEXIS 44575, at *20 (quoting *ATSI*, 493 F.3d at 98).

I.     **THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT THE AVALON DEFENDANTS VIOLATED THE SECURITIES LAWS**

The Commission alleges that the Avalon Defendants' "layering" and liquidity arbitrage strategies constituted market manipulation in violation of Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Exchange Act Rule 10b-5 and Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act").  To establish a claim under Section 10(b), the Commission must allege that Avalon engaged in (1) "manipulative acts," (2) with "scienter," (3) "in connection with the purchase or sale of securities [and] furthered by the defendant's use of mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101.  "Essentially the same elements are required under Section 17(a)(1)-(3)" as are required under 10(b) with the exception that "no showing of scienter is required for the SEC to obtain an injunction under subsection[] [17](a)(3)." *Sec. Exch. Comm'n v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (citation omitted).  A claim under Section 9(a)(2) requires a similar allegation of manipulation based on "'a series of transactions in any security . . . creating actual or apparent active trading . . . or raising or depressing the price . . . for the purpose of inducing the purchase or sale of such security by others.'" *Trane Co. v. O'Connor Sec.*, 561 F. Supp. 301, 304, n.1 (S.D.N.Y. Mar. 31, 1983) (quoting 15 U.S.C. § 78i(a)(2)).

A.     **The Complaint Fails To Allege that Avalon's "Layering" Constitutes Market Manipulation**

1.     *Market Manipulation Under the Securities Laws*

Market manipulation is "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199 (1976).  As the Supreme Court has explained, market manipulation "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus.,*

*Inc. v. Green*, 430 U.S. 462, 476 (1977).  Thus, "[t]he gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators."  *Guray v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999).

In order for trading activity to be outside the natural interplay of supply and demand, "courts generally ask whether a transaction sends a *false* pricing signal to the market."  *ATSI*, 493 F.3d at 100 (emphasis added).  Simply purchasing or selling securities in the open market does not satisfy those requirements.  *Id.* at 101 ("To be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security."); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424-425 (S.D.N.Y. 2010) (naked shorting even with no intention to deliver the shares is not manipulation) (citing *Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*, No. 02-civ-0767, 2008 WL 1882702, at *2 (S.D.N.Y. Apr. 21, 2008) ("Mere sales do not inject false information into the marketplace, nor can a party inject false information into the marketplace . . . simply by selling stock on the open market.")).  Buying or selling in the open market is not manipulative because on the other side of every such trade is a willing buyer or seller.  *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 862 (7th Cir. 1995) ("But 'flooding' a market with short sales is not a rational formula for keeping price falling.  On the other side of each such sale is a buyer who thinks the market price will rise.").

Thus, "[w]here the trading volume and price simply reflect supply and demand based on accurate market information, this is lawful market behavior, not market manipulation."  *In re Olympia Brewing Co. Sec. Litig.*, 613 F. Supp. 1286, 1296 (N.D. Ill 1985); *see Trane*, 561 F. Supp. at 304 ("The central purpose of section 9(a) is not to prohibit market transactions which

- 11 -

may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price."). Trades executed at market prices, with market risk being transferred from the seller to the buyer, are not manipulative. *Dep't of Mkt Regulation v. Respondent*, NASD Redacted Decision, Complaint No. CMS030257. at 7 (Oct. 12, 2005) ("Where, as is the case here, trades executed between controlled accounts occur at market prices, with actual market risk being transferred from seller to buyer, we are unable to find, absent additional evidence, that such trades are inherently illicit in character."); *see also Cohen*, 722 F. Supp. 2d at 424 ("Even when the seller is unable to deliver the stock on the settlement date, both parties obtain contractual settlement and still bear the market risk of the transaction. This is far different from a wash sale or similar transaction in which a manipulator acts as both the buyer and seller in order to give the false appearance of actual trades without assuming any actual risk.").

2. *The Complaint Fails to Sufficiently Allege that Avalon's Trading Injected False Information Into The Marketplace*

The Complaint contains only conclusory allegations that Avalon's so-called non-bona fide orders injected false information into the market. (Compl. ¶ 36). Such allegations are insufficient to sustain a claim for market manipulation. Taken as true, the Commission's allegations show that Avalon's so-called non-bona fide orders were subject to market risk and rather than falsely manipulate the market, tightened the spread thereby enabling others to purchase stock at lower prices or sell stock at higher prices. The orders neither created a false impression of supply and demand nor sent a false pricing signal. Indeed, the orders have a clear economic purpose.

In addition, the Complaint fails to take into account any of the bids and offers of other market participants that were in the marketplace for the relevant stocks during the same time as

Avalon's orders.  The Complaint also ignores any other order activity Avalon was conducting in the relevant stocks on those same days.  The Commission instead wants to evaluate the allegedly manipulative Avalon trading in a complete and very narrow vacuum.  Even in the limited view provided by the Complaint's allegations, the combination of a routine and expected occurrence (the cancellation of orders) with an event that results in another market participant obtaining a better execution price (because Avalon tightened the spread) cannot amount to manipulation.

> a.  Avalon's Orders Were Subject to Market Risk and Tightened the Spread

The Commission must concede that once a person places a bid or offer, whether the order is executed is completely outside of his or her control.  Once an order is placed, it is live and subject to being executed unless and until the trader cancels the order.  Thus, until cancellation, such orders are subject to real and meaningful market risk, which is the antithesis of manipulation.  *See Cohen*, 722 F. Supp. 2d at 424 (describing manipulation as giving the false appearance of actual trades without assuming any risk); *see also Yoshikawa v. SEC*, 192 F.3d 1209, 1220 (9th Cir. 1999) (critical question is whether defendant's trades were "genuine, bona fide trades in which the economic consequences of ownership were meant to fall upon the buyer's account."); *Dep't of Mkt Regulation*, at 7, n.9 ("[W]e find nothing in the record to support the conclusion that these were non-bona fide transactions in which the economic consequences of ownership were not transferred in each trade.").

In fact, the likelihood of execution—and therefore the market risk associated with orders—is increased the closer the orders are to the NBBO, and an order is most likely to be executed when it establish NBB or NBO (because the order represents the highest price any trader is willing to pay for a stock or the lowest price a trader is willing to sell the stock at that particular moment in time).  *See* Release 43590, at 15 ("Particularly for inside-the-quote and at-

the-quote limit orders, the submitter of the order reasonably may expect that the order should be executed relatively quickly . . . .").

In each of the examples of "layering" cited in the Complaint, Avalon tightened the spread on both sides of the market, including on the so-called non-bona fide side.  (Compl. ¶¶ 43-47). The logical inference from these alleged facts is that the Avalon traders wanted the bids and offers *both executed*.  Otherwise, those traders would not have been improving both the NBB and the NBO because those orders, including the so-called non-bona fide orders, will necessarily be executed if there are interested buyers and sellers at those prices.

The undeniable fact that Avalon was tightening the spread is fatal to the Commission's case.  To survive a motion to dismiss, a complaint for market manipulation must "set[] forth, to the extent possible, 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'"  *ATSI,* 493 F.3d at 102 (quoting *Baxter v. A.R. Baron & Co.*, No. 94-Civ-3913, 1995 WL 600720, at *6 (S.D.N.Y. Oct. 6, 1995).  The effect of the supposed scheme was that the people who interacted with Avalon's orders (whether or not the Commission characterizes the particular orders as bona fide or otherwise) either paid less for stock they purchased or received more money for stock they sold than had Avalon not been in the market. Such allegations cannot sustain a claim for market manipulation.

          b.     **Avalon's Orders Did Not Create a False Impression of Supply and Demand**

The Commission's theory that the so-called non-bona fide orders created a false impression of the supply and demand for the stock is similarly flawed.  Each order on the "layered" side represented a price at which the Avalon trader was willing to buy or sell the specified amount of stock at that moment in time.  The "layered" orders were real, live and

actionable and therefore could not possibly be considered to be a false reflection of supply and demand.  They were, in fact, part of the supply and demand.  *See Olympia Brewing*, 613 F. Supp. at 1296 ("Where the trading volume and price simply reflect supply and demand based on accurate market information, this is lawful market behavior, not market manipulation.").  The Complaint makes this point by conceding that for two of the three stocks cited as examples of layering, some of the so-called non-bona fide orders were, indeed, executed.  (Compl. ¶¶ 44, 47).  To be sure, when market participants chose to execute orders on the layered side, Avalon fulfilled its obligations on those orders (at least the Commission does not allege otherwise).

Moreover, the Commission's unfounded contention that the so-called non-bona fide orders inaccurately reflected the supply and demand completely ignores the marketplace reality of hidden orders.  Traders often elect to keep their orders hidden, meaning they are not reflected in the NBBO and not visible to other market participants.  *See Hidden Volume Ratios*, SEC Data Highlight 2013-02 (Oct. 9, 2013), *available at* https://www.sec.gov/marketstructure/ research/highlight-2013-02.html.  For example, large traders routinely elect to hide all or portions of their orders to avoid moving the market before getting the orders executed.  As a result, the actual supply and demand at different price points is *never* actually known.  Therefore, it is a logical impossibility that Avalon traders could have misrepresented the status of something that is, by definition, unknowable.

### c.     Avalon's Orders Did Not Send False Pricing Signals

The Complaint's conclusory allegation that the so-called non-bona fide orders sent false pricing signals because the Avalon traders purportedly did not intend for them to be executed is

entirely without merit.  The fact that the orders were subject to market risk and available for execution necessarily means that any signal the orders sent was accurate. [5]

The Commission's theory appears to be that because the Avalon traders allegedly hoped that the layered side orders would not be executed, those orders were somehow illegitimate. That is a legally unsupportable position.  Participants in the securities market deal with each other at arm's-length.  A person who places a bid or offer has no obligation to disclose how any order fits into the trader's overall trading strategy.  The only thing the bid or offer represents is that the trader is prepared to buy or sell the security at the quoted price for the quoted amount unless and until the order is executed or cancelled.  Cancellations are the norm and occur within milliseconds, even microseconds.  *See* SEC Data Highlights 2013-01 and 2013-05.  There is no minimum time requirement to hold an order open, and market participants know that.  Should another market participant choose to read anything more into a bid or offer, the person does so on his or her own volition and at his or her own risk.  *See Wilson v. Merrill Lynch & Co.,* 671 F.3d 120, 130 (2d Cir. 2011) ("[T]he market is not misled when a transaction's terms are fully disclosed.").

        d.     The So-Called Non-Bona Fide Orders Had an Economic Purpose: Avalon Was Trying to Earn the Spread

Finally, the Complaint's conclusory allegation that Avalon's so-called non-bona fide orders had no legitimate economic purpose reflects a troubling misunderstanding of basic stock

---

[5]      That such activity is unlawful in commodities markets does not change this analysis.  Indeed, the Commission's attempt to legislate through enforcement in this case should not be permitted.   As part of the Dodd Frank Act in 2010, Congress amended the Commodity Exchange Act to add specific statutory language prohibiting a trader from entering an order in commodities (but not securities) that the trader intended to cancel prior to execution.  7 U.S.C. § 6c(a)(5)(C) ("It shall be unlawful for any person to engage in any trading, practice, or conduct on or subject to the rules of a registered entity that . . . is, is of the character of, or is commonly known to the trade as, 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution).").  Congress, despite also amended the Exchange Act through Dodd Frank, inserted *no similar provision* for securities.  Had Congress wanted to prohibit inputting bids or offers for securities that the trader intended to cancel before they could be executed, Congress would have done so.

market concepts.  The economic rationale is clear on its face—buy low and sell high.  For example, assume a scenario where the NBB is $10.10 and the NBO is $10.20.  Avalon then places an offer at $10.19 and bids at $10.11, $10.12 and $10.13.  The Commission alleges the bids have no economic purpose.  However, if another market participant hits those bids, Avalon has purchased the stock at $10.13 (or lower).  If a buyer then enters the market, Avalon will sell the stock at $10.19 because Avalon's offer is the NBO (assuming nobody has entered an offer at $10.18 or less).  If this happens, Avalon would have bought the stock at $10.13 and then sold the stock at $10.19, which is a common and economically rational trading strategy.[6]

Thus, quoting on both sides of the market in an effort to capture the spread makes perfect economic sense and reflects the age-old advice of buying low and selling high.  Not surprisingly, this logical and economically rational concept is something that the Commission has explicitly recognized and approved.  Concept Release on Equity Market Structure, Exchange Act Release No. 61358, at 48-49 (Jan. 14, 2010) ("Release 61358") ("[P]rimary sources of profits" for proprietary trading firms engaged in passive market making "are from earning the spread by buying at the bid and selling at the offer and capturing any liquidity rebates offered by trading centers to liquidity supplying orders.").  As the Commission further recognized—utilizing the term "layering"—proprietary trading firms like Avalon attempt to earn the spread by "layering the book with multiple bids and offers at different prices and sizes" resulting in "an enormous volume of orders and high cancellation rates of 90% o[r] more.  The orders also may have an extremely short duration before they are cancelled if not executed, often of a second or less."  *Id.* at 49.

---

[6]     The actual profit and loss calculation would need to include relevant expenses, such as commissions, and any pass-through revenues or expenses, such as rebates and exchange fees.

The type of trading described in the Complaint is indistinguishable from the type of "layering" that the Commission has acknowledged is a hallmark of passive market making activity.  Accordingly, the Complaint fails to sufficiently allege that Avalon's so-called layering scheme amounted to manipulation.

### B.   The Complaint Fails To Allege that Avalon's Liquidity Arbitrage Strategy Constitutes Manipulation

The Complaint contends that the liquidity arbitrage trading strategy was manipulative because the Commission believes the purpose of the stock purchase in that strategy was to enable the trader to purchase the put options at a lower price.  (*Id.* ¶ 86).  That contention is unsupported by specific factual allegations.  More fundamentally, the allegations of liquidity arbitrage trading, even taken as true, do not constitute manipulation because all of the trading is reactive to bids and offers for stock and options that others have placed into the marketplace—Avalon did not inject any arguably false information into the marketplace.

### 1.   Changes in Stock and Option Prices Following Purchases and Sales Are a Natural, Non-Manipulative Occurrence

Options prices are tied to the price of the underlying stock.  Therefore, if a stock price changes, it is expected that options prices will change as well.  *See, e.g.*, *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 370-71 (D. Del. 1990).  Those price changes, however, do not constitute manipulation.  *Olympia Brewing*, 613 F. Supp. at 1292 ("[F]luctuations in the market price of stock resulting from legitimate trading activities is a natural and lawful result of such activities.  For example, if traders determine that a stock is overpriced and substantial selling occurs, the resulting decline in price is not unlawful.").  There is nothing artificial about the price of a stock increasing after a purchase.  Nor is there anything artificial about the price of an option changing as a result of changes to the price of the underlying stock.  Indeed, options prices are

expected to change when the stock price changes given that they are highly correlated securities. *See, e.g.*, *Deutschman*, 132 F.R.D. at 370-71.

> ### 2. *Trading with Unaffiliated Parties for Purposes of Benefitting Other Holdings Is Not Manipulative*

Even if one were to assume that Avalon traders purchased the stock as part of the liquidity arbitrage with the desire to increase the price of the stock, which would naturally result in a decrease in the price of the put options, that would not constitute manipulation. Multiple Federal Courts of Appeal, including the Second Circuit, have held that trading done with the purpose of impacting the stock price is not manipulative absent evidence that the trader injected false information into the marketplace.

For example, in *ATSI*, the Second Circuit held that engaging in open market transactions to move the price of security in a manner that made the trader's convertible preferred stock more valuable did not constitute market manipulation. *ATSI*, 493 F.3d at 100-04. In that case, ATSI alleged that the defendants fraudulently induced it to sell them convertible preferred stock. *Id.* at 93. ATSI further claimed that the defendants then engaged in manipulation by "aggressively" shorting the common stock thereby causing the price to decrease and enabling them to convert their preferred stock to cover the short positions, resulting in a "death spiral" in the price of the common stock and an "enormous" profit for defendants. *Id.* In assessing the manipulation claims, the Court emphasized that the "critical question" is "what activity 'artificially' affects a security's price in a deceptive manner." *Id.* at 100. The Court explained that "[t]o be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security," and held that buying convertible securities coupled with short selling is not inherently manipulative. *Id.* at 101. Indeed, the Court

went so far as to characterize ATSI's position as "ludicrous," and pointed out that "[o]ne does not observe constant prices or trading volumes in the stock markets." *Id.* at 103.

The Third Circuit reached a similar conclusion in *GFL*. In that case, Colkitt, the founder and majority shareholder of two small capitalization companies, sought financing from GFL Advantage Fund. *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 195 (3d Cir. 2001). The loan agreement gave GFL the right to require Colkitt to repay the loan with stock in his companies at discounts of the average closing price for the prior five days. *Id.* at 195-96. Before requiring repayment, GFL began short selling the stocks, which resulted in declining stock prices. *Id.* Colkitt argued that GFL engaged in market manipulation by purposefully depressing the stock prices, thereby forcing Colkitt to provide GFL with more shares in order to retire the same amount of debt. *Id.* In upholding dismissal of Colkitt's manipulation claims, the Court noted that GFL's short sales were lawful transactions. *Id.* at 207. The Court stated, "[t]he fact that these short sales may have contributed to a decline in the stocks' prices is not evidence of deceptive or manipulative conduct, for there is no reason to believe these prices were depressed artificially." *Id.* The Court further noted that "short selling, even in large volumes, is not in and of itself unlawful and therefore cannot be regarded as evidence of market manipulation[]" and that any resulting changes in share prices "simply are natural consequences of a lawful and carefully regulated trading practice." *Id.* at 209. The Court concluded that "selling [stock] on the open market in legitimate transactions to real buyers does not *artificially* affect prices and therefore cannot be manipulative." *Id.* at 209, n.10 (emphasis added).

There is no suggestion that any of Avalon's stock or options trades in the liquidity arbitrage strategy were with anybody other than "real buyers" (or sellers) who were unaffiliated

with Avalon's traders.  Trading with such unaffiliated third parties in a manner that may benefit other positions in highly correlated securities is not manipulative.

> 3.  *The Complaint Fails to Allege that the Avalon Traders Were Doing Anything Other than Reacting to Bids and Offers Others Had Placed Into the Marketplace*

Importantly, instead of Avalon traders placing information into the marketplace, the liquidity arbitrage strategy, as alleged, consisted entirely of the Avalon traders reacting to information that others had placed in the market.  The traders transacted at bids and offers that others had displayed for the stock and options.  There is nothing false or deceitful about that.

The Avalon traders were simply predicting what would happen after they acquired the large quantity of put options.   The Complaint acknowledges that the Avalon traders were predicting that the market makers who sold the put options would hedge their risk exposure by selling the underlying stock, which would put downward pressure on the stock price, thereby making Avalon's put options more valuable.  (Compl. ¶ 87(f)).  Trading strategies that anticipate and respond to market forces are not manipulative.  *GFL Advantage*, 272 F.3d at 205 ("[C]ourts must distinguish between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and deceive purchasers and sellers."); *Sullivan & Long*, 47 F.3d at 862 ("The name for what Scattered did is not market manipulation, but arbitrage.  Arbitrageurs are traders who identify and eliminate disparities between price and value . . . .").  Avalon's prediction of whether and how the market makers would hedge their risk after selling the put options to Avalon (something over which Avalon had no control) was smart trading, not manipulation.

> 4.  *The Stock Component Hedged the Risk of the Options Position*

The Complaint's conclusory allegation that the stock purchase portion of the liquidity arbitrage strategy had no legitimate economic purpose because it lost money ignores basic

securities trading concepts.  The equity purchase was a partial hedge of the position taken in the put options.  This is a common, prudent and economically rational approach.  Market participants routinely hedge their risk by acquiring positions in correlated securities that will increase in price if the other securities decrease in price.  *See, e.g.*, Proposed Rule Change by the CBOE Relating Margin Treatment on Stock Transactions Effected by an Options Market Maker to Hedge Options Positions, Release No. 51497, at 4-6 (April 6, 2005) (acknowledging the hedging strategy of offsetting options with positions in the underlying securities).  A common way to hedge options exposure is by taking the opposite position in the underlying stock.  If Avalon's prediction turned out to be wrong, and the stock price increased and the put options decreased in price, the long stock position profit would offset the losses Avalon would have experienced in the put options.

The Complaint fails to sufficiently allege that Avalon's liquidity arbitrage strategy amounted to manipulation.

**C.     The Complaint Fails To Allege that Avalon's Purported "Layering" Violated Section 9(a)(2) of the Exchange Act Because That Restriction Does Not Encompass Unexecuted Orders**

The Complaint's contention that the so-called non-bona fide orders violated Section 9(a)(2) of the Exchange Act is contradicted by the plain language of that provision.  Unlike other portions of Section 9(a) that apply to "orders," Section 9(a)(2) applies only to "transactions."  Of course, canceled bids and offers never materialized into transactions.

*1.     Section 9(a)(2) Applies Only to Executed Securities Transactions*

It is bedrock Supreme Court law that questions of statutory construction must be

answered first and foremost by reference to the actual words in the statute,[7] and the language of Section 9(a)(2) is plain and unambiguous.  The statute makes it unlawful to effect "a series of *transactions* in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."  15 U.S.C. § 78i(a)(2) (emphasis added).  Thus, based on its plain language, the statute applies only to "transactions" in securities.  And it cannot reasonably be disputed that "transactions" means completed, executed purchases or sales.[8]  By contrast, an offer to purchase or sell (like a customer limit order) is just that:  an offer.

If there were any doubt that interpreting "transactions" in Section 9(a)(2) to include orders (bids or offers) cancelled before execution would be contrary to Congressional intent, it is dispelled by reading the adjacent provisions.  Section 9(a)(1) makes it unlawful "to *enter an order or orders* for the purchase" or "to *enter any order or orders* for the sale of any such security" under certain circumstances for the purpose of creating a false or misleading appearance with respect to the market for the security.  15 U.S.C. § 78i(a)(1) (emphasis added).  Congress's choice to use the term "orders" in Section 9(a)(1) and "transactions" in Section 9(a)(2) makes clear that the terms necessarily have different meanings.  *See, e.g.*, *Cruz-Miguel v. Holder*, 650 F.3d 189, 196 (2d Cir. 2011) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 & n.9 (2004)) ("[w]here, as here, Congress 'uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.''').  Therefore, any reading of "transactions" in Section 9(a)(2) to include unexecuted orders of the

---

[7]     *See, e.g.*, *Randall v. Loftsgaarden*, 478 U.S. 647, 656 (1986) (citing *Santa Fe*, 430 U.S. at 472); *Ernst*, 425 U.S. at 197.

[8]     *See, e.g.*, Merriam-Webster Online Dictionary, *available at* http://www.merriam-webster.com/dictionary/transact (defining "transact" as "to carry to completion"); Oxford Dictionaries, *available at* https://en.oxforddictionaries.com/definition/transaction (defining transaction as "an instance of buying or selling something").

type underlying the Commission's layering claims would be contrary to the statute's plain and unambiguous language.

Moreover, Section 9(a)(2) requires that the "series of transactions" raises or depresses the stock price "for the purpose of inducing the purchase or sale of such security by others."  15 U.S.C. § 78i(a)(2).  The language of the statute clearly envisions actual purchases (or sales) at successively higher (or lower) prices for the purpose of inducing others to trade.  Bids and offers, however, are not stock prices.  Instead, reported stock prices are determined by the last consummated sale.  As bids and offers are not stock prices, Section 9(a)(2) is inapplicable to the Commission's layering allegations and the Court should therefore dismiss those claims.

Furthermore, the Commission's theory of layering is that the so-called non-bona fide orders were for the purpose of inducing others to trade with the so-called bona fide orders.  The Commission does not contend that once the so-called bona fide orders were executed, resulting in new stock prices, that Avalon then used those prices to try to induce others to trade.  The absence of such an allegation puts the layering allegations well outside the scope of the plain language of Section 9(a)(2).  That is yet another reason the Court should dismiss the Section 9(a)(2) claims.

> 2. *The Case Cited by the Commission in Support of Its Flawed Interpretation of Section 9(a)(2) Does Not Apply to the Allegations in this Case*

On a different motion in this action, the Commission cited *SEC v. Malenfant*, 784 F. Supp. 141 (S.D.N.Y. 1992) for the proposition that Section 9(a)(2) extends to unexecuted orders. But *Malenfant* finds no application here as it involved a scheme to manipulate a company's stock price through the use of matched orders.  784 F. Supp. at 142-43.  In that case, after some, but not all, of the matched orders had been executed, trading in the shares was suspended and the Commission filed a lawsuit.  *Id.*  The defendants moved to dismiss the Commission's Section

9(a)(2) claims with respect to the planned matched orders that had not yet been executed.  *Id.* at 143-44.  The Court rejected that argument, concluding that "[it] was not necessary for the matched buy and sell orders to have been executed."  *Id.* at 145.  In so doing, however, the Court cited no authority of any kind concerning the definition of "transactions" in Section 9(a)(2); rather, it relied entirely on Section 21(d) of the Exchange Act, which empowers the Commission to obtain injunctive relief when a person "is engaged in *or is about to engage in* acts or practices constituting a violation of this chapter . . . ."  *See id*. (emphasis added) (citing 15 U.S.C. § 78u(d)(1)).

Here, the alleged manipulative conduct, Avalon's "layering," is fundamentally different. Specifically, the Commission contends that Avalon's mere entry and cancellation of unmatched orders constituted a "series of transactions" proscribed by Section 9(a)(2); it is not seeking to prevent a planned and imminent act that will result in a transaction.  In stark contrast, the claims in *Malenfant* arose out of matched order transactions that were planned but unexecuted only because the SEC's suspension of trading in the shares rendered the planned executions impossible.  Consequently, *Malenfant* provides no support for ignoring the plain language of Section 9(a)(2).  That part of the Exchange Act simply does not reach canceled bids and offers.

### D.    The Complaint Fails to Allege with Particularity that Avalon's Traders Acted with the Necessary Scienter

The Complaint's barebones allegations of Avalon's scienter fails to meet Rule 9(b)'s heightened pleading standard.  The Complaint alleges that Avalon's trades were planned and performed by "overseas traders" (Compl. ¶ 27), but makes no specific allegations as to any individual trader's specific intent to manipulate the securities markets through the purported "layering" or liquidity arbitrage strategies.  Intent cannot be inferred from the trading activity alone.  *See ATSI*, 493 F.3d at 104 ("A strong inference of scienter is not raised by alleging that a

legitimate investment vehicle . . . creates an opportunity for profit through manipulation."); *GFL Advantage*, 272 F. 3d at 207 (citation omitted) ("[I]t is unreasonable 'to infer unlawful intent from lawful activity alone.'").  Absent sufficient allegations of the individual traders' scienter, the Complaint fails to state a claim for market manipulation.

## II.   THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT LSC AND MR. LEK AIDED AND ABETTED AVALON'S ALLEGED MANIPULATION

To assert a cause of action for aiding and abetting, the Complaint must plead with particularity "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation."  *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012).  The factual allegations in the Complaint demonstrate the LSC and Mr. Lek did not aid and abet any of Avalon's allegedly manipulative trading.

### A.   The Complaint Fails to Sufficiently Allege a Primary Violation of the Federal Securities Laws

Where the Commission has failed to sufficiently allege a violation of the federal securities laws by a primary violator, the Commission's allegations for aiding and abetting must be dismissed.  *SEC v. Badian*, No. 06 Civ. 2621, 2008 WL 3914872, at *8 (S.D.N.Y 2008) (granting the defendants' motion to dismiss with respect to claim for aiding and abetting violations where Plaintiff failed to allege a violation by a primary violator as well as the requisite scienter).  The supposed primary violation in this case is market manipulation by the Avalon Defendants.  For the reasons described above, the Commission's allegations do not amount to a legally cognizable theory of manipulation.  Therefore, the Court should dismiss the aiding and abetting claims against LSC and Mr. Lek.

- 26 -

**B.** **The Complaint Contains Numerous Non-Conclusory Allegations that LSC and Mr. Lek Did Not Act With the Necessary Scienter**

Even if the Court were to conclude that the Commission sufficiently pled that Avalon committed market manipulation, the Commission's aiding and abetting allegations against LSC and Mr. Lek still fail because the Complaint demonstrates that LSC and Mr. Lek did not act with scienter.  Under Section 20(e) of the Exchange Act, scienter for aiding and abetting requires proof of actual knowledge or recklessness.  15 U.S.C. § 78t(e).  Recklessness is an extremely high standard as it must amount to "'at the least . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *ECA, Local 134 IBEW v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).  Importantly, "it is unreasonable 'to infer unlawful intent from lawful activity alone.'"  *GFL Advantage*, 272 F.3d at 207 (citation omitted).

The Complaint makes only conclusory allegations of LSC's or Mr. Lek's knowledge of Avalon's purported schemes that are contradicted by specific allegations that preclude a finding that LSC and Mr. Lek could have acted with scienter.

### 1.    *LSC Designed and Implemented a Control to Prevent "Layering"*

Although there is no definition of "layering" in any law, rule or regulation, LSC nevertheless implemented a control in February 2013 intended to block trades that a regulator might consider consistent with a manipulative strategy from ever reaching the market.  (Compl. ¶ 70).  That alone should foreclose any argument that LSC and Mr. Lek acted with scienter in an effort to substantially assist Avalon in carrying out a manipulation scheme.

The Commission incorrectly describes the layering control as "mere window-dressing" (*id.* ¶ 69) because it was only triggered when a customer input the so-called bona fide orders

prior to the so-called non-bona fide orders (*id.* ¶ 72(a)).  Both logic and the Commission's prior settlements regarding layering are contrary to these allegations.  The underpinning of the Commission's theory of layering is that the so-called non-bona fide orders were for the purpose of attracting interest to the bona fide orders.  Given the speed of today's markets, where orders are being filled or cancelled within milliseconds, and even microseconds, the absence of an Avalon order on the other side of the market at the time the so-called non-bona fide orders were entered logically means that those orders could not have been for the purpose of trying to trigger an execution of Avalon orders on the other side of the market because those orders were non-existent at the time.

From the perspective of prior settled Commission enforcement actions regarding layering, the Commission clearly stated in *Hold Brothers* that the so-called bona fide orders must be placed *first*, which makes logical sense for the reasons described above.  *In re Hold Brothers On-Line Investment Services, LLC et al.*, Exchange Act Release No. 67924, at 5 (Sept. 25, 2012) (describing layering as follows: "a trader places a buy (or sell) order that is intended to be executed, *and then* immediately enters numerous non-bona fide sell (or buy) orders for the purpose of attracting interest to the bona fide order.  These non-bona fide orders are not intended to be executed.  The nature of these orders is to induce, or trick, other market participants to execute against the *initial*, bona fide order." (emphasis added)).  The Commission cannot credibly argue that LSC and Mr. Lek acted with scienter by constructing a layering control shortly after the *Hold Brothers* settlement that was predicated on the same type of pattern described in that settlement.

2.     *Avalon Provided Multiple Explanations as to Why Its Trading Strategies Were Not Manipulative*

The Commission's argument that LSC "relaxed" the threshold for the layering control for Avalon in order to enable Avalon to continue layering is similarly unavailing.  (Compl. ¶ 72(b)).  As the Commission concedes, LSC only changed the control threshold after receiving assurances that Avalon was not engaged in layering.  (*Id.* ¶ 73).  According to the allegations, however, the information that LSC and Mr. Lek received was false.  (*Id.* ¶¶ 73, 75).  Indeed, Mr. Pustelnik's provision of that allegedly false information to LSC and Mr. Lek is one of the ways that Mr. Pustelnik allegedly provided substantial assistance to Avalon's allegedly manipulative trading scheme.  (*Id.* ¶ 84).  It strains credulity for the Commission to claim that LSC and Mr. Lek acted with scienter for the purpose of substantially assisting Avalon's supposedly manipulative scheme after being intentionally deceived about the key facts at issue.

Similarly, with respect to the liquidity arbitrage strategy, the Commission acknowledges that Mr. Pustelnik met with the relevant Avalon traders "more than a dozen times" and explained the strategy to Mr. Lek and others at LSC multiple times, "particularly in response to regulatory inquiries about the strategy directed to [LSC], and he assured them it was not manipulative . . . ." (*Id.* ¶ 104).  According to the Commission, Mr. Pustelnik even provided LSC with a written description of the liquidity arbitrage strategy with an analysis, informed by discussions with the traders, about why the strategy was not manipulative.  (*Id.* ¶ 109).[9]

---

[9]     Mr. Pustelnik knowledge of Avalon's manipulation cannot be imputed to LSC.  An agent's acts and knowledge are not imputed to his principal if the agent is not acting (i) within the scope of his agency and (ii) for the benefit of the principal. *See Buckley v. Deloitte & Touche USA LLP*, No. 06-civ-329, 2007 WL 1491403, at *6 (S.D.N.Y. May 22, 2007).  Mr. Pustelnik's alleged wrongful conduct was outside the scope of his responsibilities at LSC, *see infra* at 38-39.  In addition, the "adverse interest" exception bars imputation when an agent's interests are adverse to the principal's and the agent acts not for the benefit of the principal.  *See id.* at *6; *see also In re CBI Holding Co.*, 529 F.3d 432, 449-53 (2d Cir. 2008) (upholding finding that adverse interest exception barred imputation of knowledge from agent to principal).  The Complaint alleges that Mr. Pustelnik took actions in support of the schemes "without informing [LSC]" (Compl. ¶ 111) and by "falsely representing that Avalon was not

- 29 -

Seeking reassurance about the propriety of the activity in question that is later determined to be violative of the federal securities laws cannot be reconciled with the scienter requirement for aiding and abetting liability. *See SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 335 (S.D.N.Y. 2006). In *Cedric Kushner Promotions*, the Commission charged an individual defendant with aiding and abetting the filing of financial statements that incorrectly stated that the company's auditors authorized the inclusion of their audit opinion. *Id.* at 327. Although the individual was in constant communication with the individuals who prepared financial statements, *id.* at 335, and the auditors informed him by email the night of the deadline for filing that they could not consent to the inclusion of their audit opinion, *id.* at 330, the Court dismissed the aiding and abetting claims. After receiving the auditors' email, the defendant called the company's principal Financial and Accounting Officer who falsely told him not to worry about the email and that the company had their permission to file. *Id.* The Court held that the defendant's "caution in seeking assurance" after receipt of the auditors' email "and his subsequent reliance upon [that] reassurance, can by no means be termed reckless." *Id.* at 335.

Likewise, the Complaint's allegations of the Lek Defendants' multiple instances of following up with Avalon about its trading strategies and obtaining explanations about why the trading was not manipulative trumps any conclusory allegation of their recklessness.

> 3.   *The Receipt of Fact-Finding Regulatory Requests Does Not Translate to Scienter*

The Complaint asserts that LSC and Mr. Lek acted with scienter because they permitted Avalon to continue trading "despite repeated inquiries from regulators about Avalon's

---

engaged in layering" (*id.* ¶ 73) for his own enrichment as a secret owner of Avalon (*see id.* ¶¶ 19, 30). Thus, his knowledge cannot be imputed to LSC.

manipulative trading."   (Compl. ¶ 75).   The cited examples, however, contradict the Commission's conclusion.

<div style="margin-left: 2em;">

a.      The References to Correspondence from Regulators Demonstrate that LSC and Mr. Lek were Responsive to Questions Raised

</div>

With respect to the alleged layering scheme, the Complaint references three regulatory inquiries from July, September and December 2012.   (Compl. ¶ 64(a)-(c)).   What the Commission overlooks in this timeline is that within just a few months of regulators asking about layering—by early February 2013—LSC was able to construct, test and implement a control that was intended to prevent orders that could be perceived as layering from even getting to the exchanges.   (*Id.* ¶ 70).   This reflects LSC and Mr. Lek being responsive to issues raised by regulators.   Similarly, the Complaint reflects that after receiving an inquiry from DirectEdge in November 2013, Mr. Lek followed up with Mr. Fayyer, Avalon's principal, yet again showing responsiveness to questions posed by regulators.   (*Id.* ¶ 64(e)).   With respect to the other referenced inquiries, the Commission is careful to avoid alleging that LSC did not provide responses to the regulators in addressing their questions or that the regulators sent any replies reflecting disagreement.

<div style="margin-left: 2em;">

b.      Recipients of Regulatory Requests Are Directed not to Make Adverse Inferences About Entities and Individuals Referenced Therein

</div>

Bootstrapping allegations of scienter to the receipt of regulatory requests ignores the well-known principle that SEC investigations (and investigations of other securities regulators) are fact-finding inquiries, are not allegations of wrongdoing by any person or entity, and the recipients of investigation requests are not supposed to make any adverse inferences with respect

to any third parties.[10]  Nevertheless, the Commission alleges that LSC and Mr. Lek should have disregarded these principals and assumed that Avalon was, indeed, engaged in market manipulation.  To find scienter based on receipt of regulatory requests would amount to improperly elevating SEC staff inquiries to final determinations of wrongdoing, a power that such inquiries plainly do not have.  *See Christensen v. Harris Corp.*, 529 U.S. 576, 587 (2000) (informal staff opinions lack the force of law); *WHX Corp. v. SEC*, 362 F.3d 854, 860 (D.C. Cir. 2004) (cease-and-desist order not warranted "simply because of a failure to comply immediately with the staff's interpretation").

The Commission's aiding and abetting allegations also beg the question that, if it was so clear to the Commission and its co-regulators since at least 2012 that Avalon was engaged in manipulation (*see* Compl. ¶ 64), why did the Commission and its co-regulators permit the trading to continue?  Unless the Commission is admitting that it knowingly permitted a manipulative scheme to continue for five years before taking action, the answer must be that the Commission has significantly overstated and mischaracterized the regulatory requests identified in the Complaint as informing LSC that Avalon was, indeed, engaged in manipulative trading.

The Commission's attempt to infer scienter based upon the receipt of regulatory requests for information also has broad policy implications.  By the Commission's reasoning, any broker-dealer that permits a customer to continue placing orders after the receipt of regulatory requests can be deemed to have aided and abetted that customer's violations of the federal securities laws. That cannot be the result.

---

[10]     *See* Securities and Exchange Commission, Division of Enforcement, Enforcement Manual, at 61 (October 28, 2016), *available at* https://www.sec.gov/divisions/enforce/enforcementmanual.pdf ("[T]he SEC does not have targets of its inquiries or investigations."); *Investigations by the Securities and Exchange Commission*, (January 19, 2012), *available at* https://www.sec.gov/fast-answers/answersinvestghtm.html (emphasizing that fact-finding investigations are kept confidential to "protect[] the reputations of companies and individuals where the SEC finds no wrongdoing by the firm or the individuals that were the subject of the investigation").

          4.    *Mr. Lek Refused to Open an Account for a Potential Customer Who Said that He Wanted to Engage in Layering*

The Commission points to a single unsolicited email to Mr. Lek in May 2012 in which the person described a desire to engage in what the Commission characterized as a layering scheme.  (Compl. ¶ 52).  According to the Commission, that person subsequently became affiliated with Avalon.  (*Id.* ¶ 53).  In claiming that this is evidence of scienter, the Commission overlooks several critical facts that preclude such a conclusion.

First, Mr. Lek wrote back, "regulators have argued that your strategy 'layering' is manipulative and illegal.  This is of concern to us even though I do not agree with their position." (*Id.* ¶ 62).

Second, the email chain ends without Mr. Lek agreeing to open an account and the Commission does not allege that LSC ever permitted that person to open an account.  If Mr. Lek and LSC wanted the type of business described in the email, they would have permitted the unsolicited email sender to open an account.

Third, although the Commission claims that the sender subsequently traded through Avalon, noticeably absent from the Complaint is any reference to a single fact that should have enabled LSC and Mr. Lek to have somehow known that the email's sender later traded through Avalon.  For example, there is no allegation that LSC ever received another email from that same email address or an email from Avalon informing LSC or Mr. Lek that somebody with that same email address was now trading through Avalon.

Finally, although the email states that the person's desired strategy consisted of placing "hundreds of orders to push the stock price," the Complaint does not allege a single fact stating that this person's subsequent trading through Avalon followed that pattern.  The Commission has the trading data so the absence of any facts comparing the trading to the email is striking.

Thus, this unsolicited email cannot support the Complaint's conclusory allegations of scienter and the aiding and abetting claim should be dismissed.

### C. The Complaint Fails to Allege that LSC or Mr. Lek Provided Substantial Assistance to the Avalon Defendants

Substantial assistance for aiding and abetting purposes requires the Commission to allege that the defendant "'in some sort associate[d] himself with the venture, that he participate[d] in it as something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed.'" *Apuzzo*, 689 F.3d at 206 (alterations in original) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). "In other words, the defendant must 'consciously assist[ ] the commission of the specific [violation] in some active way.'" *SEC v. Mudd*, 885 F. Supp. 2d 654, 670-71 (S.D.N.Y. 2012) (quoting *Apuzzo*, 689 F.3d at 212 n. 8).

#### 1. The Allegations About LSC not Having Sufficient Layering Controls, Exception Reports or Written Supervisory Procedures Are Passive Activities that Cannot Amount to Aiding and Abetting Liability

"It is well-established in the Second Circuit that 'mere awareness and approval of [a] primary violation is insufficient to make out a claim for substantial assistance.' Inaction is only sufficient if 'it was designed intentionally to aid the primary fraud or it was in conscious or reckless violation of a duty to act.'" *SEC v. Tecumseh Holdings Corp.*, No. 03-Civ-5490, 2009 WL 4975263, at *5 (S.D.N.Y. Dec. 22, 2009) (citations omitted) (no aiding and abetting liability for attorney who allegedly should have, but did not, advise client to retain required records); *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983).

The Commission's attempt to transform concerns about LSC allegedly not having sufficient layering controls, exception reports or written supervisory procedures into substantial assistance of Avalon's allegedly manipulative trading (Compl. ¶¶ 76-77) is directly contrary to the well-established principal described above that inaction is not a basis for imposing aiding and

abetting liability.  Whether LSC and Mr. Lek could have done something more to prevent what the Commission contends is improper trading is beside the point for aiding and abetting purposes.   Particularly since the Complaint alleges that "[t]he manner in which Avalon conducted layering varied by trader and over time, often in ways apparently intended to avoid detection . . . ."  (*Id.* ¶ 40).  Otherwise, every broker-dealer that is found to have deficient controls or procedures could be held liable for aiding and abetting a customer's improper trading. The Commission has other avenues for pursuing those types of claims, and allegations of deficient controls cannot sustain a claim for aiding and abetting liability.

<div style="text-align:center">

**2.    *The Alleged Affirmative Acts by LSC and Mr. Lek Were Routine Services that Broker-Dealers Provide to Customers and Therefore Do Not Constitute Aiding and Abetting***

</div>

The provision of normal business services to a customer that then violates the law does not give rise to aiding and abetting liability.  *See, e.g.*, *Stander v. Fin. Clearing & Servs. Corp*., 730 F. Supp. 1282, 1288 (S.D.N.Y. 1990) ("[A] clearing broker cannot be held liable as an aider and abettor simply because it performed its contracted-for services.").

To the extent the Complaint alleges arguably affirmative acts that LSC and Mr. Lek undertook, those actions are limited to the liquidity arbitrage trading and simply consist of services that broker-dealers routinely provide to customers.  Those services do not amount to the type of actions consciously conducted to bring about the successful completion of a manipulative scheme.  *See, e.g.*, *Mudd*, 885 F. Supp. 2d at 670 (finding the requisite affirmative acts where the defendants drafted portions of SEC filings that they knew were inaccurate, signed the filings and repeated misleading disclosures to investors on conference calls).

For example, the Commission claims that LSC and Mr. Lek substantially assisted Avalon's allegedly manipulative liquidity arbitrage trading by improving the technology of LSC's options trading systems so as to reduce latency (*i.e.*, the time taken for an entered order to

<div style="text-align:center">

- 35 -

</div>

reach the exchange).  (Compl. ¶ 100).  First, given the "need for speed" in the modern securities markets, broker-dealers routinely engage in system upgrades as technology advances in order to improve the speed of order routing.  *See* Risk Management Controls for Brokers or Dealers with Market Access, Exchange Act Release No. 63241, at 121 (Nov. 3, 2010) (recognizing that "small broker-dealers are faced with significant competitive concerns from larger market participants" relating to speed advantages).  Thus, the fact that LSC made such an improvement that Avalon found useful is unremarkable.  Second, and importantly, the Complaint does not suggest that the technology was only useful in the liquidity arbitrage strategy—there are many other reasons to trade options.  Nor is there any suggestion that LSC only made the technology upgrade available to Avalon to the exclusion of other customers.  Indeed, the ability to provide low-latency order routing is something that LSC actively markets to all customers.

The other supposed act of substantial assistance consisted of LSC "housing" an Avalon server thereby "allowing Avalon a more direct route to exchanges and thereby reducing latency." (Compl. ¶ 100).  That particular service, known as co-location, is commonly provided by broker-dealers, and even securities exchanges themselves, to customers that are interested in reducing latency.  *See, e.g.*, Release 61358, at 57-58.  As the Commission explained:

> Speed matters both in the absolute sense of achieving very small latencies and in the relative sense of being faster than competitors, even if only by a microsecond.  Co-location is one means to save micro-seconds of latency.  Co-location is a service offered by trading centers that operate their own data centers and by third parties that host the matching engines of trading centers.  The trading center or third party rents rack space to market participants that enables them to place their servers in close physical proximity to a trading center's matching engine.  Co-location helps minimize network and other types of latencies between the matching engine of trading centers and the servers of market participants.

*Id.*

Tellingly absent from the Complaint is any suggestion that Avalon is the only customer that co-located servers with LSC.  Providing such routine, Commission-approved services cannot be construed as substantial assistance for aiding and abetting purposes.

## III.   THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT THE LSC AND MR. LEK VIOLATED SECTION 17(a)(3) OF THE SECURITIES ACT

For similar reasons as to why the Court should dismiss the aiding and abetting claims against LSC and Mr. Lek, so too should the Court dismiss the allegations that they violated Section 17(a)(3) of the Securities Act.  Section 17(a)(3) is similar to Section 10(b) of the Exchange Act except that negligence is sufficient to show scienter.  *See SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014); *Monarch Funding*, 192 F.3d at 308.  Liability under this provision requires actions or statements that were independently deceptive or fraudulent.  *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 486-487 (S.D.N.Y. 2007).  As described above, the Complaint fails to allege a cognizable claim of manipulation, *see supra* at 10-26, and, fails to allege that LSC and Mr. Lek took affirmative actions to facilitate any manipulative trading, *see supra* at 34-37.  Accordingly, the Court should dismiss the Section 17(a)(3) claim against LSC and Mr. Lek.

## IV.   THE COMPLAINT'S ALLEGATIONS CONFIRM THAT LSC DID NOT CONTROL MR. PUSTELNIK FOR PURPOSES OF SECTION 20(a) OF THE EXCHANGE ACT

The Commission seeks to hold LSC liable for Mr. Pustelnik's alleged violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder by alleging that LSC was a "control person" of Mr. Pustelnik pursuant to Section 20(a) of the Exchange Act.  (Compl. ¶¶ 161-64).  "'To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled

person's fraud.'"  *In re Eletrobras Sec. Litig.*, No. 15-CV-5754, 2017 WL 1157138, at *15 (S.D.N.Y. Mar. 27, 2017) (quoting *ATSI*, 493 at 108).  The Complaint fails to allege sufficient facts to support any of these requirements and indeed, the allegations confirm that LSC did not control Mr. Pustelnik.

## A.    The Complaint Fails to Allege an Underlying Violation of Section 10(b) or Rule 10(b)-5(a) and (c) by Mr. Pustelnik

The starting point for Section 20(a) is the need to allege a primary violation of the federal securities laws (*i.e.*, manipulation), which the Commission has failed to do for the reasons explained above.  This failure is fatal to the Section 20(a) claim against LSC.  *See Frederick v. Mechel OAO*, 475 Fed. Appx. 353, 357 (2d Cir. 2012) (affirming dismissal of control person claim because the underlying claim was inadequately plead); *ATSI*, 493 F.3d at 108 ("[Plaintiff] fails to allege any primary violation; thus, it cannot establish control person liability.").

## B.    The Complaint Alleges that Mr. Pustelnik Lied to and Deceived LSC About Critical Information and Acted Outside the Scope of His Employment

The Commission also fails to plead sufficiently that LSC controlled Mr. Pustelnik.  "To establish control person liability, actual control is essential, namely actual control over the transactions in question."  *Friedman v. JP Morgan Chase & Co.*, No. 15-CV-5899, 2016 WL 2903273, at *11-12 (S.D.N.Y. May 18, 2016) (granting motion to dismiss Section 20(a) claim because "the complaint does not plausibly allege any facts that show [defendant] had specific control over the actions that are the basis of the securities violations by [the primary violators]").

Instead of showing that LSC controlled Mr. Pustelnik with respect to the allegedly manipulative trades at issue, the Complaint confirms that any involvement Mr. Pustelnik had was accomplished by lying to and deceiving LSC, meaning that he was acting far outside the scope of any responsibilities he had at LSC.  Dismissal of the control person claim is therefore warranted because "no prima facie case of control can be made out under Section 20(a)" when the primary

party was acting "outside of the scope of his employment."  *See Moss v. Morgan Stanley, Inc.*, 553 F. Supp. 1347, 1357-58 (S.D.N.Y. 1983).

The Complaint contains numerous allegations demonstrating that Mr. Pustelnik was necessarily acting outside the scope of his responsibilities at LSC.  For example, the Complaint alleges that Mr. Pustelnik was a secret owner of Avalon who "share[d] in its revenue or profits" (Compl. ¶ 19) and was "significantly involved in Avalon's management and operations" (*id.* ¶ 30).  In this secret role for Avalon, and not as any part of his work with LSC, the Complaint alleges that Pustelnik "recruited Avalon traders for the purpose of carrying out the schemes" (*id.* ¶ 9) and "orchestrated the move of the [alleged cross-market] strategy from Avalon's accounts at [LSC] to accounts held in the name of [another management firm] at [another broker dealer]," all "without informing [LSC]" (*id.* ¶ 111).

In addition to concealing information from LSC, the Complaint also alleges that Mr. Pustelnik affirmatively lied to LSC.  For example, the Complaint alleges that Mr. Pustelnik "falsely represent[ed]" to LSC "that Avalon was not engaged in layering" (*id.* ¶ 73) and "through his efforts to persuade other [LSC] personnel that layering was not occurring, Pustelnik participated in and substantially assisted the scheme" (*id.* ¶  84(d)).

The Complaint alleges that Mr. Pustelnik was actively lying to and deceiving LSC about the very trading at issue.  Such conduct is necessarily outside the scope of what a registered representative is supposed to be doing on behalf on LSC.  Therefore, the Section 20(a) claim against LSC should be dismissed.

## C.     The Complaint Does Not Sufficiently Allege that LSC was a Culpable Participant

Finally, the Complaint fails to sufficiently plead LSC's culpable participation in Mr. Pustelnik's alleged securities law violations.  "The heightened pleading standard[] of

Rule 9(b) . . . appl[ies] to the pleading of culpable participation." *Friedman*, 2016 WL 2903273, at *10. "'[C]ulpable participation is an element of a Section 20(a) claim that must be pleaded with the same particularity as scienter'" and "'requires particularized facts of the controlling person's conscious misbehavior or recklessness.'" *Id.* at *10-12 (quoting *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437-39 (S.D.N.Y. 2014)). As detailed above, the Complaint fails to sufficiently plead such particularized facts. *See supra* at 27-34. Thus, the Court should dismiss the Section 20(a) claim against LSC. *See In re Eletrobras Sec. Litig.*, 2017 WL 1157138, at *15 (granting a motion to dismiss as to a Section 20(a) claim when plaintiff made "insufficient allegations concerning [defendant's] culpable participation").

## **CONCLUSION**

For the foregoing reasons, the Lek Defendants respectfully request that the Court dismiss this action against them for failure to state a claim upon which relief can be granted.

Dated:  New York, New York
        June 2, 2017

NORTON ROSE FULBRIGHT US LLP

By: /s/  Steve M. Dollar
    Steve M. Dollar
    David B. Schwartz
1301 Avenue of the Americas
New York, NY  10103
Tel. (212) 318-3000
Fax. (212) 318-3400
steve.dollar@nortonrosefulbright.com
david.schwartz@nortonrosefulbright.com

Kevin J. Harnisch
799 9th Street NW, Suite 1000
Washington, DC 20001-4501
Tel. (202) 662-4520
Fax (202) 662-4643
kevin.harnisch@nortonrosefulbright.com

*Attorneys for Defendants Lek Securities Corporation and Samuel Lek*