UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                        Plaintiff,<br><br>             v.<br><br>LEK SECURITIES CORPORATION, SAMUEL LEK, VALI MANAGEMENT PARTNERS d/b/a AVALON FA LTD, NATHAN FAYYER, and SERGEY PUSTELNIK a/k/a/ SERGE PUSTELNIK,<br><br>                                        Defendants. | 17-cv-01789 (DLC) |

## REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF DEFENDANTS LEK SECURITIES
## CORPORATION AND SAMUEL LEK'S MOTION TO DISMISS THE COMPLAINT

Steve M. Dollar
David B. Schwartz
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY  10103
Tel. (212) 318-3000
Fax. (212) 318-3400
steve.dollar@nortonrosefulbright.com
david.schwartz@nortonrosefulbright.com

Kevin J. Harnisch (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001-4501
Tel. (202) 662-4520
Fax (202) 662-4643
kevin.harnisch@nortonrosefulbright.com

*Attorneys for Defendants Lek Securities
Corporation and Samuel Lek*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

I. THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT THE
AVALON DEFENDANTS VIOLATED THE SECURITIES LAWS .............................. 1

    A. The Complaint Fails to Plead Avalon's "Layering" Violated Securities
Laws ...................................................................................................................... 1

    B. The Complaint Fails to Plead Liquidity Arbitrage Violated Securities
Laws ...................................................................................................................... 5

II. THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT LSC AND
MR. LEK AIDED AND ABETTED AVALON'S ALLEGED MANIPULATION ......... 6

    A. The Complaint Fails to Plead LSC and Mr. Lek's Scienter ................................. 6

        1. Pustelnik's Scienter Cannot Be Imputed to LSC ....................................... 6

        2. LSC's Control to Prevent "Layering" Does Not Evince
Recklessness ............................................................................................... 7

        3. Inquiries from Regulators Cannot Create Scienter .................................... 8

        4. Mr. Lek's Receipt of a Single Email Does Not Constitute Scienter .......... 9

    B. The Complaint Fails to Sufficiently Allege that the Lek Defendants
Provided Substantial Assistance to the Avalon Defendants .................................. 9

III. THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT LSC IS
LIABLE AS A CONTROL PERSON FOR MR. PUSTELNIK UNDER
SECTION 20(A) .............................................................................................................. 10

CONCLUSION .............................................................................................................................. 10

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) .................................................................................................. 1, 3, 4, 5

*Buckley v. Deloitte & Touche USA LLP*,
    No. 06-civ-329, 2007 WL 1491403 (S.D.N.Y. May 22, 2007) .................................................. 7

*In re CBI Holding Co.*,
    529 F.3d 432 (2d Cir. 2008) ........................................................................................................ 7

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010) ......................................................................................... 3

*CP Stone Fort Holdings, LLC v. Doe*,
    No. 16-C-4991, 2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) .................................................... 2

*CP Stone Fort Holdings, LLC v. Does*,
    No. 16-C-4991, 2017 WL 1093166 (N.D. Ill. Mar. 22, 2017) ................................................... 2

*Friedman v. JP Morgan Chase & Co.*,
    No. 15-CV-5899, 2016 WL 2903273 (S.D.N.Y. May 18, 2016) ............................................. 10

*GFL Advantage Fund, Ltd. v. Colkitt*,
    272 F.3d 189 (3d Cir. 2001) ................................................................................................... 4, 5

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*,
    No. 02-civ-0767, 2008 WL 1882702 (S.D.N.Y. Apr. 21, 2008) ................................................ 3

*In re Olympia Brewing Co. Sec. Litig.*,
    613 F. Supp. 1286 (N.D. Ill 1985) .............................................................................................. 5

*SEC v. Cedric Kushner Promotions, Inc.*,
    417 F. Supp. 2d 326 (S.D.N.Y. 2006) ......................................................................................... 8

*SEC v. Malenfant*,
    784 F. Supp. 141 (S.D.N.Y. 1992) .............................................................................................. 4

*SEC v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007) ................................................................................. 2, 3, 4

*Spicer v. Chicago Bd. Options Exch., Inc.*,
    No. 88 C 2139, 1990 WL 172712 (N.D. Ill. Oct. 30, 1990) ...................................................... 4

*Stander v. Fin. Clearing & Servs. Corp.*,
    730 F. Supp. 1282 (S.D.N.Y. 1990) ..............................................................................10

*Sullivan & Long, Inc. v. Scattered Corp.*,
    47 F.3d 857 (7th Cir. 1995) .............................................................................................5

*T.H.C., Inc. v. Fortune Petrol. Corp.*,
    No. 96 Civ. 2690(DAB), 1999 WL 182593 (S.D.N.Y. Mar. 31, 1999) ...................................4

*United States v. Coscia*,
    177 F. Supp. 3d 1087 (N.D. Ill. 2016) ............................................................................2

**Rules and Statutes**

15 U.S.C. § 78i(a)(2) ................................................................................................................4

Fed. R. Civ. P. 9(b) ..............................................................................................................2, 4

Fed. R. Civ. P. 12(b)(6) ...........................................................................................................1

Defendants Lek Securities Corporation and Samuel Lek respectfully submit this Reply Memorandum of Law in further support of their Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## I.   THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT THE AVALON DEFENDANTS VIOLATED THE SECURITIES LAWS

### A.   The Complaint Fails to Plead Avalon's "Layering" Violated Securities Laws

In an effort to salvage its legally deficient Complaint, the Commission resorts to mischaracterizing the Lek Defendants' argument as "orders placed in the open market can never be manipulative." (Opp. at 12). As the Lek Defendants have explained, while open market activity can be manipulative, in order to be actionable, the trading "'must be willfully combined with something more to create a false impression of how market participants value a security.'" (Br. at 11 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007)). The Complaint, however, fails to plead that Avalon's trading—directed by over a thousand individual traders—was willfully combined with the required "something more" that injected false information into the market. Therefore, the Court should dismiss the Complaint.

None of Avalon's purported layering trading is, in and of itself, manipulative. The Complaint alleges that Avalon canceled a large percentage of its orders while bidding on both sides of the market. Cancellations, however, are the norm—more than 95% of all orders are cancelled prior to execution—and nearly half of all orders are cancelled within one second of being made. (*See* Br. at 3-4, 16-17).[2] Trading on both sides of the market is also a normal practice. (*See id.* at 16-18). The effect of Avalon's alleged trading—tightening of the bid/ask spread—benefits

---

[1]   All capitalized terms used but not defined herein have the meanings ascribed to them in the Memorandum of Law in Support of the Motion ("Moving Brief" or "Br.").
[2]   Commission asserts that Avalon's cancellations consistently occurred on the "non-bona fide side," (Opp. at 15, n.7), but as with all its allegations of manipulation, this presupposes the intent of the individual traders.

investors. (*See id.* at 2-5, 13-14).[3] Rather than supporting an inference of intent to inject false information in the market, the characteristics of Avalon's trading as alleged in the Complaint—placing bids inside the NBBO—made execution of those bids *more* likely and suggests Avalon's traders wanted those bids to execute. (*See id.* at 14).[4] Avalon's alleged trading was entirely routine, and cannot, in and of itself, suggest manipulation through the creation of a false impression of supply and demand or the sending of a false pricing signal absent the "something more" required by the Second Circuit.[5]

The Commission asserts this additional factor is met because the cancelled orders, which it characterizes as "non-bona fide," are "orders that the trader does not intend to have executed and that have no legitimate economic reason." (Opp. at 2; *see id.* at 12-13). The Commission inaccurately cites *Masri* for the proposition that manipulative intent alone can constitute the

---

[3]     The Commission's arguments regarding tightening of the spread ignore the reality that tightening the spread makes the best price for both sides better. (*See* Br. at 3, 13-14). Assume a scenario where the NBB is $10.10 and the NBO is $10.20, meaning that the best price at which a seller of the stock could execute is $10.10, and the best price at which a purchaser of the stock could execute is $10.20. If the spread is tightened such that the NBB is $10.13 and the NBO is $10.17, then a seller of the stock could now execute at 3 cents higher per share and the purchaser of the stock can now execute at 3 cents lower per share. The exchange rules cited by the Commission on tightening the spread, do not, as the Commission represents, identify such actions as "manipulative," but describe them merely as "disruptive." (*See* Opp. at 16). In any event, these rules were adopted in 2016 when Avalon's purported manipulative trading was effectively finished.

[4]     This in direct contrast to the manipulation cases relied on by the Commission. In *Coscia*, the defendant utilized a computer program designed to "cancel the large orders as soon as they started to fill." *United States v. Coscia*, 177 F. Supp. 3d 1087, 1091 (N.D. Ill. 2016). Similarly, in *CP Stone,* the court found manipulation had been sufficiently plead because the amended complaint alleged "a pattern of essentially parking the Deceptive Orders behind legitimate but much smaller orders" such that they would not be executed. *CP Stone Fort Holdings, LLC v. Does*, No. 16-C-4991, 2017 WL 1093166, at *4 (N.D. Ill. Mar. 22, 2017). The initial complaint in that action had been dismissed precisely because it had been devoid of such specific allegations. *See CP Stone Fort Holdings, LLC v. Doe*, No. 16-C-4991, 2016 WL 5934096, at *6 (N.D. Ill. Oct. 11, 2016) ("[T]he complaint fails to allege anything more than legitimate trading activity that permissibly influences price.").

[5]     The Commission would like the Court to rely on the hypothetical example of Avalon's layering asserted in the Complaint to stand in for the hundreds of thousands of alleged instances of layering. (Compl. ¶ 41). This hypothetical gives the Complaint's allegations a veneer of the particularity required by Rule 9(b), when in fact the Complaint simultaneously alleges that "[t]he manner in which Avalon conducted layering varied by trader and over time, often in ways apparently intended to avoid detection . . . ." (*Id.* ¶ 40). This misleading approach allows the Commission to argue its allegations are particular while encompassing entirely different conduct within its claims. For instance, despite the Complaint's definition of a non-bona fide order being one the trader "did not intend to have executed," (*id.* ¶ 36), the Commission argues that "Avalon may well have incorporated the occasional execution of non-bona fide orders into its layering strategy." (Opp. at 13, n.5). The Commission cannot have it both ways.

"something more" that the Second Circuit requires. (Opp. at 12). The Commission ignores that *Masri* included the following important caveat—that the transaction at issue was undertaken without "*any* legitimate economic reason." *SEC v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007) (emphasis added). The Complaint contains only conclusory allegations as to the lack of economic reason behind Avalon's trading, and the Commission makes no attempt in its Opposition to articulate why the purported non-bona fide orders have no legitimate economic purpose except to rely on conclusory allegations about the intent of the traders. (*See* Opp. at 15). As detailed in the Moving Brief, not only is Avalon's trading on both sides of the market a common and economically rational trading strategy, but that trading is consistent with strategies that the Commission itself has recognized as appropriate. (Br. at 16-18).[6]

Even if intent alone were enough to transform otherwise legal and commonplace market activity into manipulation, the Complaint fails to sufficiently allege such intent. In its Opposition, the Commission disclaims any responsibility to allege with particularity the intent of more than a thousand individual traders—the intent behind the non-bona fide orders—because "none of the claims asserted in the Complaint are against the individual traders." (Opp. at 17, n.9). As such,

---

[6] The Commission also cites *ATSI* for the proposition that manipulative intent alone can constitute the "something more." (Opp. at 12). But the language cited by the Commission comes from the court's articulation of the heightened pleading standard for scienter:

> [T]he complaint must plead with particularly facts giving rise to a strong inference that the defendant intended to deceive investors by artificially affecting the market price of securities. This pleading requirement is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation.

*ATSI*, 493 F.3d at 102 (citation omitted). The court in *ATSI* held, separate from its analysis as to scienter, that allegations of open market transactions that moved the price of a security in a manner making the trader's convertible preferred stock more valuable were insufficient to allege manipulation. *Id.* at 100-04. This Court has relied on *ATSI* to dismiss complaints alleging open market activity without "something more." *See Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424-425 (S.D.N.Y. 2010) (naked shorting even with no intention to deliver the shares is not manipulation); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt.,* No. 02-civ-0767, 2008 WL 1882702, at *2 (S.D.N.Y. Apr. 21, 2008) ("Mere sales do not inject false information into the marketplace, nor can a party inject false information into the marketplace . . . simply by selling stock on the open market.").

the allegations as to the intent of Avalon's more than a thousand traders in undertaking the hundreds of thousands of instances of purported layering are entirely conclusory and wholly insufficient to meet Rule 9(b)'s heightened pleading standard.[7]

Because there is nothing inherently manipulative about Avalon's trading activity, the Court cannot infer an intent to manipulate from the activity itself.  *See ATSI*, 493 F.3d at 104 ("A strong inference of scienter is not raised by alleging that a legitimate investment vehicle . . . creates an opportunity for profit through manipulation."); *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207 (3d Cir. 2001) (citation omitted) ("[I]t is unreasonable 'to infer unlawful intent from lawful activity alone.'").[8]  As a result, the only specific allegations as to the intent of the individual traders, whose frame of mind is essential to plead manipulation, comes from at best, a handful of emails involving only *four* traders.  (*See* Opp. at 17, n.9).  Such allegations cannot specifically plead the intent of more than a thousand traders in executing hundreds of thousands of purported instances of manipulation.  Accordingly, the Complaint fails to sufficiently allege that Avalon's purported layering trading amounted to manipulation.[9]

---

[7]  While the Commission asserts it has sufficiently plead Avalon's scienter based primarily on Fayyer's emails (*see* Opp. at 17-19), the Complaint contains no allegation that Fayyer or Avalon as an entity directed even a single trade.  Moreover, the Commission asserts it need only plead Avalon's recklessness, which does not rise to the willful intent it argues would transform otherwise regular trading activity into manipulation.

[8]  The cases relied on by the Commission are not to the contrary because the findings of intent were not from "trading patterns" as the SEC incorrectly asserts (*see* Opp. at 19), but the totality of the allegations.  *See Masri*, 523 F. Supp. 2d at 372; *T.H.C., Inc. v. Fortune Petrol. Corp.*, No. 96 Civ. 2690(DAB), 1999 WL 182593, at *4 (S.D.N.Y. Mar. 31, 1999).

[9]  The Complaint also fails to allege that Avalon's purported layering violated Section 9(a)(2).  (Br. at 22-25).  The Commission's two responsive arguments in its Opposition are without merit.  First, the Commission urges that courts have in fact held that Section 9(a)(2) applies to cancelled bids and offers, but cites inapposite case law.  (Opp. at 19-20).  As explained in the Moving Brief (and as the Commission does not challenge), *Malenfant,* relied on by the Commission, involved a completely different set of facts and has no application here.  (*See* Br. at 24-25 (discussing *SEC v. Malenfant*, 784 F. Supp. 141 (S.D.N.Y. 1992))).  The Commission's reliance on dicta in *Spicer*, a case not binding on this Court in any event, is equally unavailing.  *See Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88 C 2139, 1990 WL 172712, at *2 (N.D. Ill. Oct. 30, 1990).  Second, the Commission argues that reading "transaction" in Section 9(a)(2) to include cancelled bids and offers comports with the "purpose" of the statute, which it contends is to proscribe creating "apparent" as well as "active" volume.  (Opp. at 20).  But the statute does not proscribe all conduct creating actual or apparent active trading or affecting prices; on its face, it proscribes only *transactions*—a word whose meaning is plain and familiar—that create those effects. 15 U.S.C. § 78i(a)(2).

B.     **The Complaint Fails to Plead Liquidity Arbitrage Violated Securities Laws**

As with the allegations related to layering, the Complaint fails to plead that the open-market trading in the liquidity arbitrage strategy was willfully combined with "something more." (*See* Opp. at 21-24). The Commission cannot dispute that price changes in options resulting from stock purchases are entirely expected and that capitalizing on such price changes does not constitute manipulation. *See In re Olympia Brewing Co. Sec. Litig.*, 613 F. Supp. 1286, 1292 (N.D. Ill 1985) ("[F]luctuations in the market price of stock resulting from legitimate trading activities is a natural and lawful result of such activities."). As plead, the purchase of the options in the liquidity arbitrage strategy is merely hedging risk, a well-accepted trading strategy with legitimate economic rationales. The Commission attempts to downplay this as a factual dispute, but the Commission has failed to plead, in anything but the most conclusory fashion, the "something more" that would transform this common trading strategy into market manipulation. Trading strategies that anticipate and respond to market forces are not manipulative. *GFL Advantage*, 272 F.3d at 205 ("[C]ourts must distinguish between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and deceive purchasers and sellers."); *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, at 862(7th Cir. 1995) ("The name for what Scattered did is not market manipulation, but arbitrage. Arbitrageurs are traders who identify and eliminate disparities between price and value . . . .").

The Commission attempts to distinguish *ATSI* (*see* Opp. at 22-23), but does not and can not dispute that the Second Circuit held that engaging in open market transactions to move the price of security in a manner that made the trader's convertible preferred stock more valuable did not constitute market manipulation. *ATSI*, 493 F.3d at 100-04; *see GFL Advantage*, 272 F. 3d at 209, n.10 ("[S]elling [stock] on the open market in legitimate transactions to real buyers does not *artificially* affect prices and therefore cannot be manipulative.") (emphasis added).

As with the allegations as to layering, the Commission makes nothing but conclusory allegations as to the intent of the individual traders.  Allegations of Pustelnik's assistance in the scheme (*see* Opp. at 23-24), cannot take place of specific allegations as to the individual trader's intent in making the stock purchases.  The Complaint fails to sufficiently allege that Avalon's liquidity arbitrage trading amounted to manipulation.

## II. THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT LSC AND MR. LEK AIDED AND ABETTED AVALON'S ALLEGED MANIPULATION[10]

### A. The Complaint Fails to Plead LSC and Mr. Lek's Scienter

#### 1. Pustelnik's Scienter Cannot Be Imputed to LSC

Pustelnik's scienter cannot be imputed to LSC for aiding and abetting purposes because his actions were outside the scope of his responsibilities as a registered representative and adverse to LSC's interests.  The Complaint references Pustelnik's "orchestrat[ing] the move of the [alleged cross-market] strategy from Avalon's accounts at [LSC] to accounts held in the name of [another management firm] at [another broker dealer]," all "without informing [LSC]."  (Compl. ¶ 111).  The Commission acknowledges this activity was outside the scope of Pustelnik's employment, but removes this activity from their analysis to suggest his remaining efforts were within his role at LSC.  (*See* Opp. at 26-28).  The Complaint alleges that Pustelnik was a secret owner of Avalon who "share[d] in its revenue or profits" (Compl. ¶ 19), was "significantly involved in Avalon's management and operations" (*id.* ¶ 30), and in this secret role, "recruited Avalon traders for the purpose of carrying out the schemes" (*id.* ¶ 9).  His conduct in aid of the purported schemes was well outside the scope of his employment at LSC.

---

[10] For the same reasons that the Court should dismiss the aiding and abetting claims, it should dismiss the allegations that the Lek Defendants violated Section 17(a)(3) of the Securities Act.  (Br. at 37).

Even if some of his wrongful actions were in the scope of his employment, Pustelnik's scienter cannot be imputed pursuant to the adverse interest exception. *See Buckley v. Deloitte & Touche USA LLP*, No. 06-civ-329, 2007 WL 1491403, at *6 (S.D.N.Y. May 22, 2007). The Commission argues the adverse interest exception is inapplicable because LSC may have incidentally profited from some of Pustelnik's wrongdoing and therefore Pustelnik cannot be said to have totally abandoned LSC. (Opp. at 27-28). However, "the 'total abandonment' standard looks principally to the intent of the [agent] engaged in misconduct" not whether the principal "actually benefitted" from the fraud. *In re CBI Holding Co.*, 529 F.3d 432, 451 (2d Cir. 2008) (emphasis removed). In this case, allegations of Pustelnik's actions in Complaint, including secretly owning and working for Avalon (Compl. ¶ 9, 19, 30), and sending Avalon's business to another broker-dealer (*id.* ¶ 111), evince an intent to enrich himself and not serve LSC.

### 2. LSC's Control to Prevent "Layering" Does Not Evince Recklessness

The Commission does not dispute that LSC implemented an automated control to prevent manipulative trading. Instead, it asserts that purported deficiencies in that protocol support an inference of scienter. (Opp. at 28-30). Even if the Commission's concerns about the sufficiency of LSC's layering control program are valid, such purported deficiencies do not amount to the actual knowledge or recklessness required to plead aiding and abetting liability. The Commission makes no argument, nor could it, why implementation of a protocol that the SEC concedes prevents manipulative trading can be evidence of the requisite scienter.[11] Taken to its logical conclusion, the Commission's argument would subject a broker-dealer to aiding and abetting liability anytime

---

[11] The Commission does not dispute that the control protocol was sufficient to prevent the activity described in the Commission's settlement in *Hold Brothers*. Instead, it argues that LSC is obligated "to explain why it was not reckless" to not update the protocol with every subsequent Commission settlement. (Opp. at 29-30).

its compliance program was not 100 percent effective in preventing potentially improper orders from a customer. In a self-regulating industry, that cannot be the standard.

The Commission also argues that LSC acted with scienter because it changed the threshold for its layering control despite the Commission's admission that these changes were based on false representations from the Avalon Defendants. (*Id.* at 30). The Commission asserts that these false statements do not "automatically relieve the Lek Defendants of liability" (*id.*), but fails to explain how or why the Avalon Defendants would lie to LSC on these issues if LSC were aiding and abetting in their schemes. LSC's seeking and receiving reassurance about the propriety of Avalon's trading is entirely incompatible with the recklessness necessary for aiding and abetting liability. *See SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 335 (S.D.N.Y. 2006) (Defendant's "caution in seeking assurance [and] subsequent reliance upon [that] reassurance, can by no means be termed reckless.").[12]

### 3. Inquiries from Regulators Cannot Create Scienter

The Commission tries to bootstrap allegations of scienter to LSC's receipt of requests for information from regulators by characterizing those requests as "red flags" that should have made the Lek Defendants question the falsehoods being told to them by Avalon and Pustelnik. (Opp. at 31-33). This argument impermissibly elevates regulatory inquiries to final determinations of wrongdoing. (*See* Br. at 31-32).[13] Because SEC investigations and investigations of other securities regulators are purely fact-finding inquiries and not allegations of wrongdoing (*see id.* at 32, n.10), they cannot serve as a basis for imposing scienter on the Lek Defendants.

---

[12] The Commission argues *Cedric Kushner* is inapplicable because there are other allegations of LSC's recklessness (*see* Opp. at 31, n.19), but in doing so, it concedes the point that seeking and receiving assurances does not amount to recklessness (*see* Br. at 30).

[13] The Commission fails to answer why, if regulatory inquiries constitute red flags, did such inquiries not prompt swifter action by the Commission. (*see* Br. at 32).

28545629.4                                  - 8 -

### 4. *Mr. Lek's Receipt of a Single Email Does Not Constitute Scienter*

The Commission also attempts to base scienter upon Mr. Lek's receipt of a single unsolicited email in May 2012 from an individual expressing a desire to engage in what the Commission characterized as layering. The Commission does not dispute that, despite the sender's request, LSC did not open an account for him. Instead, the Commission puts great weight on an the allegations that the individual subsequently became associated with Avalon and Mr. Lek learned in September 2014 that "specific traders associated with [the individual] had opened sub-accounts with Avalon in or around June 2012." (Opp. at 33 (quoting Compl. ¶ 63)). This cleverly drafted allegation attempts to imply but does not allege that Mr. Lek learned of the connection between these traders and the email he received two years earlier. Simply stated: the Complaint contains no allegation that Mr. Lek knew that the email's sender later traded through Avalon. In any event, the allegation that one trader of Avalon's more than a thousand traders sought to engage in layering cannot suffice to plead Mr. Lek's scienter for aiding and abetting liability.

### B. The Complaint Fails to Sufficiently Allege that the Lek Defendants Provided Substantial Assistance to the Avalon Defendants

The Commission does not dispute that inaction cannot constitute substantial assistance, but contorts its allegations about the Lek Defendants to try to characterize their purported inaction as active support. (Opp. at 34). The Commission goes so far as to argue that implementation of a control policy, which it acknowledges was effective in blocking some layering activity, constituted substantial assistance to the Avalon Defendants because it allegedly was not 100 percent effective. (*Id.*). These efforts are unavailing.

The Commission also argues that LSC's purported intentional involvement in the fraud turns its routine broker-dealer function into substantial assistance. (*Id.* at 35-36) But the Complaint fails to sufficiently allege LSC's intentional involvement in the scheme (*see supra* at 6-

9), and the provision of normal business services to a customer that then violates the law does not give rise to aiding and abetting liability. *See, e.g.*, *Stander v. Fin. Clearing & Servs. Corp.*, 730 F. Supp. 1282, 1288 (S.D.N.Y. 1990) ("[A] clearing broker cannot be held liable as an aider and abettor simply because it performed its contracted-for services.").

### III. THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT LSC IS LIABLE AS A CONTROL PERSON FOR MR. PUSTELNIK UNDER SECTION 20(A)

The Complaint fails to allege facts to support a cause of action for LSC's control person liability of Mr. Pustelnik. The Commission argues that claims for control person liability are fact based and should not be resolved on a motion to dismiss, Pustelnik's wrongdoing does not excuse the Lek Defendants from responsibility, and the allegations of LSC's culpable participate are sufficient. (Opp. at 37-39). A claim for control person liability can be resolved on a motion to dismiss. *See Friedman v. JP Morgan Chase & Co.*, No. 15-CV-5899, 2016 WL 2903273, at *11-12 (S.D.N.Y. May 18, 2016) (granting motion to dismiss Section 20(a) claim because "the complaint does not plausibly allege any facts that show [defendant] had specific control over the actions that are the basis of the securities violations by [the primary violators]"). Pustelnik's activities were outside the scope of his employment at LSC. (*See supra* at 6). For the same reasons the Complaint fails to sufficiently plead LSC's scienter for aiding and abetting, it has failed to plead culpable participation in Mr. Pustelnik's alleged securities law violations and the Section 20(a) claim should be dismissed. *Friedman*, 2016 WL 2903273, at *10-11 (Pleading "'culpable participation . . . "'requires particularized facts of the controlling person's conscious misbehavior or recklessness.'") (citation omitted).

### CONCLUSION

For the foregoing reasons, the Lek Defendants respectfully request that the Court dismiss this action against them for failure to state a claim upon which relief can be granted.

| | |
|---|---|
| Dated:  New York, New York<br>         July 31, 2017 | NORTON ROSE FULBRIGHT US LLP<br><br>By:  /s/  Steve M. Dollar<br>     Steve M. Dollar<br>     David B. Schwartz<br>1301 Avenue of the Americas<br>New York, NY  10103<br>Tel. (212) 318-3000<br>Fax. (212) 318-3400<br>steve.dollar@nortonrosefulbright.com<br>david.schwartz@nortonrosefulbright.com<br><br>Kevin J. Harnisch (*pro hac vice*)<br>799 9th Street NW, Suite 1000<br>Washington, DC 20001-4501<br>Tel. (202) 662-4520<br>Fax (202) 662-4643<br>kevin.harnisch@nortonrosefulbright.com<br><br>*Attorneys for Defendants Lek Securities*<br>*Corporation and Samuel Lek* |