UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
SECURITIES AND EXCHANGE COMMISSION,    :        17cv1789 (DLC)
                                       :
                    Plaintiff,         :        OPINION AND ORDER
                                       :
        -v-                            :
                                       :
LEK SECURITIES CORPORATION, SAMUEL     :
LEK, VALI MANAGEMENT PARTNERS d/b/a    :
AVALON FA LTD, NATHAN FAYYER, and      :
SERGEY PUSTELNIK a/k/a SERGE PUSTELNIK :
                                       :
                    Defendants.        :
-------------------------------------- X

APPEARANCES

For the Securities and Exchange Commission:
David J. Gottesman
Robert A. Cohen
Olivia S. Choe
Sarah S. Nilson
U.S. Securities and Exchange Commission
100 F Street N.E.
Washington, DC 20549

For Lek Securities Corporation and Samuel Lek:
Steve M. Dollar
David B. Schwartz
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York 10103

For Lek Securities Corporation and Samuel Lek:
Kevin J. Harnisch
Norton Rose Fulbright US LLP
799 9th Street N.W., Suite 1000
Washington, DC 20001-4501

DENISE COTE, District Judge:

    Broker-dealer Lek Securities Corporation ("Lek") and its

principal Samuel Lek (collectively "the Lek Defendants") have

moved to dismiss the securities fraud action filed against them by the Securities and Exchange Commission ("SEC"). The SEC alleges that these defendants participated in unlawful layering and cross-market manipulation schemes.

In their motion to dismiss, the Lek Defendants do not contend that the complaint's allegations lack sufficient detail to give them fair notice of the SEC's theory of wrongdoing. Instead, they principally argue that neither the layering nor the cross-market trading described in the complaint can constitute market manipulation in violation of federal securities laws. They are wrong. For the following reasons, the motion to dismiss is denied.

## BACKGROUND

The following facts are taken from the complaint. Lek is a New York based registered broker-dealer. It provides foreign trading firms, including co-defendant Vali Management Partners d/b/a Avalon FA LTD ("Avalon"), with access to U.S. securities markets. The conduct at issue in this case occurred in large part through trading in the Avalon account at Lek ("Avalon Account"). Samuel Lek is Lek's Chief Executive Officer and Chief Compliance Officer.

Samuel Lek supervised his co-defendant Sergey Pustelnik ("Pustelnik"), who referred foreign customers to Lek, including

Avalon.  Pustelnik later became a registered representative at Lek and worked on the Avalon Account.  He received commissions and other payments from Lek on Avalon's trades through Lek.

Pustelnik is also alleged to be an undisclosed control person of Avalon.  Pustelnik was significantly involved in Avalon's management and operations and shares in Avalon's revenue or profits with Avalon's principal Nathan Fayyer ("Fayyer"), who is also a named defendant in this action.

Avalon is a foreign day-trading firm that uses mostly foreign traders based in Eastern Europe and Asia to conduct its trading.  Avalon is not registered with the SEC.  Fayyer is Avalon's sole disclosed owner and director.  During the relevant period, Fayyer oversaw Avalon's trade groups and had authority to restrict or terminate their trading in the Avalon Account.

The SEC's allegations concern two schemes to manipulate U.S. securities markets.  The first scheme involved Avalon's use of a trading strategy typically referred to as "layering" or "spoofing."  The second was a cross-market manipulation scheme. Together, Avalon's layering and cross-market manipulation activity generated profits of more than $28 million.  Lek also profited significantly from commissions and other fees it earned from Avalon's layering and cross-market manipulation activity. Between 2012 and 2016, Avalon produced more commissions, fees, and rebates for Lek than any other customer.

## I.    The Layering Scheme

In the alleged layering scheme, Avalon placed "non-bona fide orders" through Lek to buy or sell stock with the intent of injecting false information into the market about supply or demand for the stock.  The complaint characterizes non-bona fide orders as orders that Avalon did not intend to execute and that had no legitimate economic reason.  Avalon placed these orders to trick and induce other market participants to execute against orders that Avalon did intend to execute for the same stock on the opposite side of the market, which the complaint describes as its bona fide orders.  Through this scheme, Avalon obtained more favorable prices on the executions of its bona fide orders than otherwise would have been available.  Between December 2010 and September 2016 Avalon engaged in hundreds of thousands of instances of layering, involving hundreds of securities traded on U.S. exchanges.  The complaint describes three specific instances of layering in detail.

As described by a trader who later became one of Avalon's trade group leaders in a 2012 email to Samuel Lek, layering is a "special" trading strategy:

> For example, the bid and ask of symbol X is 90.09 and 90.14, we put buy orders in 90.10, 90.11, 90.12, 90.13 and so on, then push the price to 90.20, right now the bid and ask is 90.20 and 90.21, we put a big size short order in 90.20 to get a short position, then we cancel all of the buy orders in 90.10, 90.11, 90.12 and so on.  And we put sell orders in 90.20, 90.19,

> 90.18, 90.17 and so on, to push the price to 90.05,
> then put a big size buy order in 90.05 to cover
> position, and cancel all of the sell orders . . <u>so we
> will put hundre[d]s of orders to push stock price and
> then cancel them</u>.

(Emphasis supplied.)

As described in the complaint, Samuel Lek had ample notice that regulators considered layering a manipulative practice. Indeed, in response to the email quoted above Samuel Lek stated, "regulators have argued that your trading strategy 'layering' is manipulative and illegal.  This is of concern to us even though I do not agree with their position."  Between 2012 and 2016, regulators, exchanges, and other market participants repeatedly notified the Lek Defendants that Avalon may be engaged in manipulative layering through its trading at Lek.  In September 2012, the Financial Industry Regulatory Authority ("FINRA") informed Lek that Avalon's trading "appears consistent with a manipulative practice called layering."  In July 2013, Bats Global Markets exchange ("BATS") advised the Lek Defendants that it was seeing a "clear-cut cross-market layering strategy" by Avalon, including "1,700 instances [of layering] over the last two days."  BATS later sent Lek a letter identifying specific instances of Avalon's layering activity.  Following these communications, Lek stopped sending Avalon's orders to BATS and instead routed Avalon's orders to other exchanges and venues. In November 2013, a New York Stock Exchange ("NYSE") Hearing

Board found that Lek had violated various exchange rules by, among other things, failing to supervise and implement adequate risk controls for trading strategies including spoofing and layering. The Lek Defendants continued to receive numerous regulatory inquiries and warnings through 2016. Samuel Lek and others at Lek informed Pustelnik of a number of these communications.

Fayyer was also well aware of the regulatory disapproval of layering, or as he sometimes termed it, multi-key trading. He marketed Avalon to prospective traders as one of the few remaining destinations willing to allow layering and touted Avalon's relationship with Lek, one of the only brokers that still permitted layering. For example, in March 2013, Fayyer explained:

> the broker is not a cheap one, but this is because they do tolerate and protect us from many issues such as multi-key trading, which is not allowed anywhere pretty much anymore, and other dark pool and scalping strategies which can be described as wash orders by many other firms. So you get what you pay for here.

The Lek Defendants never instituted effective controls to prevent layering from occurring, and quickly relaxed any controls Lek did implement in response to Avalon's, Fayyer's, and Pustelnik's requests. In February 2013, Lek implemented a layering control that would block certain trading through its proprietary Q6 program ("Q6 Control"). The complaint asserts

that Q6 Control was "mere window-dressing." Q6 Control was triggered when a trader traded or attempted to trade on both sides of the market with a disproportionate number of orders on one side. The difference in the number of orders between the two sides was referred to as the delta. Q6 Control was initially triggered by a delta of 10. Pustelnik encouraged Lek to relax the Q6 Control for Avalon. On February 6, 2013, Pustelnik urged a Lek officer to increase the delta on the Avalon Account to 75. Within a week of implementing Q6 Control, Lek relaxed the delta on the Avalon Account to 100. At all times thereafter the delta on the Avalon Account remained between 50 and 100.

## II.  The Cross-Market Manipulation Scheme

In a cross-market manipulation scheme that it began to execute in August 2012, Avalon purchased and sold U.S. stock at a loss to move the prices of corresponding options, so that Avalon could make a profit by trading those options at prices that it would not otherwise have been able to obtain. The profits that Avalon achieved through its options trading more than offset the losses it sustained on its allegedly manipulative trading of stock. The SEC alleges that Avalon engaged in over 600 instances of cross-market manipulation through Lek between August 2012 and December 2015. The

complaint describes in detail a specific example of Avalon's cross-market manipulation activity.

The Lek Defendants and Pustelnik were well aware that regulators objected to Avalon's cross-market trading activity as potentially manipulative. For example, within a week of Avalon initiating its cross-market strategy through Lek, FINRA advised the Lek Defendants that it viewed the trading as potentially manipulative. In June 2014, FINRA again requested that Lek "continue to review activity [of the cross-market strategy] and address any potential manipulative activity involving both option and stock trading in the same underlying effected by the same account holder." Fayyer was also aware of regulatory inquiries involving Avalon's cross-market manipulation activity.

The Lek Defendants and Pustelnik not only permitted Avalon to engage in cross-market manipulation activity through Lek but took steps to advance it. For instance, at the request of Fayyer and Pustelnik, Lek undertook significant work and expense to improve the speed of its options trading technology.

## PROCEDURAL HISTORY

The SEC filed this action on March 10, 2017. That same day, it obtained an ex parte temporary restraining order ("TRO") against Avalon. On March 29, the Court denied Avalon's request

to modify the TRO.  <u>SEC v. Lek Sec. Corp.</u>, 17cv1789 (DLC), 2017
WL 1184318 (S.D.N.Y. Mar. 29, 2017).

At a conference held with all of the parties on March 13, a
schedule was set for discovery and pretrial proceedings.  The
SEC and Avalon agreed to a preliminary injunction hearing to
begin on August 2.

On July 7, the SEC and Avalon filed their preliminary
injunction papers, which included the direct testimony of the
SEC's hearing witnesses and its hearing exhibits.  Avalon
declined to offer any witnesses at the hearing, but presented
legal arguments in opposition to the motion.  On July 28, Avalon
withdrew its opposition to the SEC's motion for a preliminary
injunction.  A July 31 preliminary injunction continued the
March 10 freeze of Avalon's assets pending trial.

Meanwhile, the Lek Defendants filed this motion on dismiss
on June 2.  It became fully submitted on July 31.  Discovery in
this action is scheduled to conclude on May 18, 2018.

## DISCUSSION

When deciding a motion to dismiss under Rule 12(b)(6), a
court must accept all factual allegations in the complaint as
true and draw all reasonable inferences in the non-moving
party's favor.  <u>Loginovskaya v. Batratchenko</u>, 764 F.3d 266, 269-
70 (2d Cir. 2014).  "To survive a motion to dismiss under Rule

12(b)(6), a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 68 (2d Cir. 2014). A claim has facial plausibility when the factual content of the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted). A complaint must do more, however, than offer "naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

Rule 9(b) of the Federal Rules of Civil Procedure imposes a heightened pleading standard on complaints alleging fraud. ATSI Commc'ns., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Under Rule 9(b), parties alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." Id. Because market manipulation claims can involve facts that are "solely within the defendant's knowledge," the Second Circuit has recognized that the plaintiff "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." ATSI, 493 F.3d at 102. A plaintiff alleging market manipulation need only "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of

the defendants." Id. The complaint must set forth, to the extent possible, "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." Id. (citation omitted). "General allegations not tied to the defendants or resting upon speculation are insufficient." Id.

The SEC asserts five claims against the Lek Defendants.[1] First, the SEC alleges that the Lek Defendants violated § 20(e) of the Securities Exchange Act of 1934 ("§ 20(e)" and "Exchange Act"), 15 U.S.C. § 78t(e), by aiding and abetting Avalon's, Fayyer's, and Pustelnik's violations of § 10(b) of the Exchange Act ("§ 10(b)"), 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder ("Rule 10b-5"), 17 C.F.R. § 240.10b-5(a) and (c). Second, the SEC alleges that the Lek Defendants violated § 15(b) of the Securities Act of 1933 ("§ 15(b)" and "Securities Act"), 15 U.S.C. § 77o(b), by aiding and abetting Avalon's, Fayyer's, and Pustelnik's violations of §§ 17(a)(1) and (3) of the Securities Act ("§ 17(a)"), 15 U.S.C. §§ 77q(a)(1) and (3). Third, the SEC alleges that the Lek Defendants violated § 20(e) by aiding and abetting Avalon's violations of § 9(a)(2) of the Exchange Act ("§ 9(a)(2)"), 15

---

[1] As addressed below, they appear in claims 6, 8, 9, 3, and 11 of the SEC's complaint.

U.S.C. § 78i(a)(2).  Fourth, the SEC alleges that the Lek

Defendants violated § 17(a)(3) of the Securities Act.  Finally,

the SEC alleges that Lek is liable for Pustelnik's violations of

§ 10(b) and Rule 10b-5 under § 20(a) of the Exchange Act ("§

20(a)"), 15 U.S.C. § 78t(a).

In their motion to dismiss, the Lek Defendants largely make

blanket objections that apply across the board to each of the

five claims against them.  Those objections are addressed at the

conclusion of this Opinion.  They also make two claim-specific

objections.  The first is to the third claim described here: the

claim that they violated § 20(e) by aiding and abetting Avalon's

violation of § 9(a)(2).  The second is to the claim against Lek

for its control of Pustelnik.  These components of the

defendants' motion are addressed in the context of the

discussion of § 9(a)(2) and § 20(a).

### III. Claim under § 20(e) of the Exchange Act for Aiding and Abetting Avalon's, Fayyer's, and Pustelnik's Violations of § 10(b) and Rule 10b-5

Section 20(e) of the Exchange Act establishes liability for

those who aid and abet others in securities violations.  15

U.S.C. § 78t(e).  Section 20(e) provides:

> any person that knowingly or recklessly provides
> substantial assistance to another person in violation
> of a provision of this chapter, or of any rule or
> regulation issued under this chapter, shall be deemed
> to be in violation of such provision to the same

extent as the person to whom such assistance is
provided.

15 U.S.C. § 78t(e) (emphasis supplied).  To survive a motion to
dismiss a claim of aiding and abetting liability, the SEC must
allege: "(1) the existence of a securities law violation by the
primary (as opposed to the aiding and abetting) party; (2)
knowledge of this violation on the part of the aider and
abettor; and (3) substantial assistance by the aider and abettor
in the achievement of the primary violation."  SEC v. Apuzzo,
689 F.3d 204, 211 (2d Cir. 2012) (citation omitted).
Substantial assistance, in turn, requires that the aider and
abettor "in some sort associated himself with the venture, that
he participated in it as in something that he wished to bring
about, and that he sought by his action to make it succeed."
Id. at 206 (citation omitted).

Section 10(b) and Rule 10b-5 thereunder prohibit
manipulative practices in connection with the purchase and sale
of securities.  Section 10(b) states:

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce or of the mails, or of any
> facility of any national securities exchange --
>
>  . . .
>
> (b) To use or employ, in connection with the purchase
> or sale of any security registered on a national
> securities exchange or any security not so registered,
> or any securities-based swap agreement any
> manipulative or deceptive device or contrivance in

13

contravention of such rules and regulations as the
Commission may prescribe as necessary or appropriate
in the public interest or for the protection of
investors.

15 U.S.C. § 78j(b) (emphasis supplied).

Rule 10b-5, in turn, provides in pertinent part:

It shall be unlawful for any person, directly or
indirectly, by the use of any means or instrumentality
of interstate commerce, or of the mails or of any
facility of any national securities exchange,

(a) To employ <u>any device, scheme, or artifice to
defraud</u>,

. . .

(c) To engage in <u>any act, practice, or course of
business which operates or would operate as a fraud or
deceit</u> upon any person,

in connection with the purchase or sale of any
security.

17 C.F.R. § 240.10b-5 (emphasis supplied).

To prevail on a claim of market manipulation under § 10(b)

and Rule 10b-5, the SEC must demonstrate that the defendant

engaged in manipulative acts with scienter in connection with

the purchase or sale of securities on any facility of a national

securities exchange.  Unlike private plaintiffs, the SEC is not

required to prove investor reliance, loss causation, or damages.

<u>SEC v. Boock</u>, 09cv8261 (DLC), 2011 WL 3792819, at *21 (S.D.N.Y.

Aug. 25, 2011); <u>SEC v. Credit Bancorp, Ltd.</u>, 195 F. Supp. 2d

475, 490-91 (S.D.N.Y. 2002).

In determining whether an act is manipulative, the Second
Circuit requires "a showing that an alleged manipulator engaged
in market activity aimed at deceiving investors as to how other
market participants have valued a security." Wilson v. Merrill
Lynch & Co., Inc., 671 F.3d 120, 130 (2d Cir. 2011) (citation
omitted). "The gravamen of manipulation is deception of
investors into believing that prices at which they purchase and
sell securities are determined by the natural interplay of
supply and demand, not rigged by manipulators." Id. (citation
omitted). In determining whether activity falls outside the
natural interplay of supply and demand, courts generally
consider whether it sends "a false pricing signal to the
market." Id. (citation omitted).

While market manipulation has traditionally encompassed
practices such as wash sales, matched orders, or rigged prices,
manipulation is not limited to these practices. Id. It more
broadly includes those practices "that are intended to mislead
investors by artificially affecting market activity." Id.
(citation omitted). For instance, the Second Circuit has noted
that "trading engineered to stimulate demand can mislead
investors into believing that the market has discovered some
positive news and seeks to exploit it; the duped investors then
transact accordingly." ATSI, 493 F.3d at 101.

In considering whether an act injects false pricing signals into the market, courts recognize that one of the fundamental goals of the federal securities laws is to promote transparency -- that is, "to prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded." Id. at 100 (citation omitted). As the Supreme Court has repeatedly recognized, the "fundamental" purpose of the securities laws is "to substitute a philosophy of full disclosure for the philosophy of caveat emptor." Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477 (1977) (citation omitted); see Basic Inc. v. Levinson, 485 U.S. 224, 230 (1988). In passing securities laws, "Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." Santa Fe Indus., 430 U.S. at 477.

Market manipulation can be accomplished through otherwise legal means. As the Second Circuit has noted, "in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." ATSI, 493 F.3d at 102. Nor does manipulative conduct need to be successful in order to violate the securities laws. As the D.C. Circuit has noted, "intent -- not success -- is all that must accompany manipulative conduct to prove a violation of the Exchange Act."

Koch v. SEC, 793 F.3d 147, 153-54 (D.C. Cir. 2015); see also United States v. Weaver, 860 F.3d 90, 97 (2d Cir. 2017) (rejecting argument that liability under criminal mail and wire fraud statutes required fraudulent scheme to be successful).

At least one district court has found that a complaint against defendants engaged in layering sufficiently alleged manipulative conduct in violation of § 10(b) and Rule 10b-5.  CP Stone Fort Holdings, LLC v. Doe(s), No. 16 C 4991, 2017 WL 1093166, at *4 (N.D. Ill. Mar. 22, 2017).  Another district court has accepted a plea agreement in which a defendant engaged in layering pled guilty to a conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.  Plea Agreement, United States v. Milrud, No. 2:15-cr-00455-JLL (D.N.J. Sept. 10, 2015). The SEC has consistently found layering and spoofing activity to violate § 10(b) and Rule 10b-5.  See In the Matter of the Application of Terrance Yoshikawa for Review of Disciplinary Action Taken by NASD, SEC Release No. 53731, 87 S.E.C. Docket 2580, 2006 WL 1113518, at *7 n.36 (Apr. 26, 2006) (describing the SEC's history since 1998 of finding spoofing/layering to violate § 10(b) and Rule 10b-5).

Liability for securities fraud under § 10(b) and Rule 10b-5 also requires proof of scienter, which the Supreme Court has defined as an "intent to deceive, manipulate or defraud" or "knowing or intentional misconduct."  Ernst & Ernst v.

17

_Hochfelder_, 425 U.S. 185, 194 n.12, 197 (1976); see _Grandon v._
_Merrill Lynch & Co._, 147 F.3d 184, 194 (2d Cir. 1998).  The
Second Circuit has held that reckless conduct -- i.e. "conduct
which is highly unreasonable and which represents an extreme
departure from the standards of ordinary care" -- satisfies the
scienter requirement.  _SEC v. Obus_, 693 F.3d 276, 286 (2d Cir.
2012) (citation omitted).  Mere negligence, however, is
insufficient.  _Id_.  "Proof of scienter need not be direct, but
may be a matter of inference from circumstantial evidence."
_Wechsler v. Steinberg_, 733 F.2d 1054, 1058 (2d Cir. 1984)
(citation omitted).

The SEC has adequately alleged that the Lek Defendants
violated § 20(e) by aiding and abetting Avalon's, Fayyer's, and
Pustelnik's violations of § 10(b) and Rule 10b-5.  The complaint
alleges primary violations of § 10(b) and Rule 10b-5 by Avalon,
Fayyer, and Pustelnik with particularity.  It describes at
length and in detail two manipulation schemes, either one of
which if proven at trial would violate § 10(b).  The complaint
is also replete with allegations of scienter by Avalon, Fayyer,
and Pustelnik.

The SEC also adequately pleads the Lek Defendants'
knowledge of Avalon's manipulative activity and substantial
assistance.  The Lek Defendants received multiple warnings
concerning Avalon's layering and cross-market manipulation

18

activity.  The activity at issue was conducted in large part through the Avalon Account.  In addition, the Lek Defendants actively facilitated Avalon's layering and cross-market manipulation activity by relaxing Q6 Control for Avalon and upgrading Lek's options trading technology in response to Fayyer's request.

### IV. Claim under § 15(b) of the Securities Act for Aiding and Abetting Avalon's, Fayyer's, and Pustelnik's Violations of § 17(a)(1) and § 17(a)(3)

Section 15(b) of the Securities Act likewise establishes aiding and abetting liability.  15 U.S.C. § 77o(b).  It provides:

> For purposes of any action brought by the Commission under subparagraph (b) or (d) of section 77t of this title, any person that <u>knowingly or recklessly provides substantial assistance</u> to another person in violation of a provision of this subchapter, or of any rule or regulation issued under this subchapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

15 U.S.C. § 77o(b) (emphasis supplied).  Because the operative language in § 15(b) is nearly identical to that in § 20(e), the standard for aiding and abetting liability is the same under both statutes.  <u>See, e.g.</u>, <u>SEC v. Wey</u>, 15cv7116 (PKC), 2017 WL 1157140, at *21 (S.D.N.Y. Mar. 27, 2017).

Section 17(a) of the Securities Act prohibits fraud in the offer or sale of a security, and provides in pertinent part:

(a) Use of interstate commerce for purpose of fraud or deceit

It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1) to employ <u>any device, scheme, or artifice to defraud</u>, or

    . . .

(3) to engage in <u>any transaction, practice, or course of business which operates or would operate as a fraud or deceit</u> upon the purchaser.

15 U.S.C. § 77q(a) (emphasis supplied).

To plead a violation of § 17(a), the SEC must allege that the defendant engaged in manipulative acts in connection with the offer or sale of securities.  <u>See</u> <u>SEC v. Pentagon Capital Mgmt. PLC</u>, 725 F.3d 279, 285 (2d Cir. 2013).  Scienter is a required element for a violation of § 17(a)(1).  <u>Aaron v. SEC</u>, 446 U.S. 680, 697 (1980).  No showing of scienter is required, however, under § 17(a)(3).  <u>Id.</u>; <u>Pentagon Capital</u>, 725 F.3d 279 at 285.

For the reasons stated above, the SEC adequately alleges that the Lek Defendants violated § 15(b) of the Securities Act by aiding and abetting Avalon's, Fayyer's, and Pustelnik's violations of §§ 17(a)(1) and 17(a)(3) of the Securities Act. The Lek Defendants' motion to dismiss this claim is also denied.

## V. Claim under § 20(e) of the Exchange Act for Aiding and Abetting Avalon's Violations of § 9(a)(2)

The governing standard regarding § 20(e) is recited above. Section 9(a)(2) prohibits a series of securities transactions that create active trading in a security, or raise or depress the price of a security, for the purpose of inducing others to purchase or sell the security. 15 U.S.C. § 78i(a)(2). It provides:

> (a) Transactions relating to purchase or sale of security
>
> It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange --
>
>  . . .
>
> (2) To effect, alone or with 1 or more other persons, a series of transactions in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

Id. (emphasis supplied). Section 9(a)(2), of course, does not proscribe all market transactions that raise or lower the price of a security. Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 383 (2d Cir. 1973). Rather, its purpose is to "outlaw every device used to persuade the public that

activity in a security is the reflection of a genuine demand instead of a mirage." Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 794 (2d Cir. 1969) (citation omitted).

Courts have held that a "series of transactions" includes not only completed purchases or sales but also bids and orders to purchase or sell securities. See SEC v. Malenfant, 784 F. Supp. 141, 145 (S.D.N.Y. 1992); Spicer v. Chicago Bd. Options Exch., Inc., No. 88 C 2139, 1990 WL 172712, at *2 (N.D. Ill. Oct. 30, 1990), aff'd sub nom. Spicer v. Chicago Bd. of Options Exch., Inc., 977 F.2d 255 (7th Cir. 1992). In considering the legislative history of § 9(a)(2), the SEC has concluded that Congress "clearly intended its prohibition against manipulation to extend beyond the actual consummation of purchases or sales." In the Matter of Kidder Peabody & Co., et al., SEC Release No. 3673, 18 S.E.C. 559, 1945 WL 332559, at *8 (Apr. 2, 1945); see In the Matter of Biremis, 105 S.E.C. 862, 2012 WL 6587520, at *2 (Dec. 18, 2012); Lewis D. Lowenfels, Sections 9(a)(1) and 9(a)(2) of the Securities Exchange Act of 1934: An Analysis of Two Important Anti-Manipulative Provisions Under the Federal Securities Laws, 85 NW. U. L. Rev. 698, 707-08 (1991). Proof of a violation of § 9(a)(2) requires evidence of "manipulative motive and willfulness," which are normally inferred from the circumstances of the case. Crane Co., 419 F.2d at 794.

The SEC adequately alleges that the Lek Defendants violated § 20(e) by aiding and abetting Avalon's violations of § 9(a)(2). The SEC alleges a primary violation by Avalon through the series of securities transactions in which it conducted both its layering and cross-market trading schemes.  Each of these schemes was designed to create a false impression of supply or demand for securities and to induce other market participants to purchase or sell securities.  As previously described, the SEC also adequately alleges that the Lek Defendants had knowledge of Avalon's layering and cross-market activities and provided Avalon substantial assistance.

In a claim-specific objection, the Lek Defendants argue that the complaint fails to allege a primary violation of § 9(a)(2) in connection with the layering scheme because cancelled bids and offers are not "transactions."  As previously described, courts and regulators have found that a "series of transactions" that create "actual or apparent" active trading encompasses not only executed trades but also bids and orders to purchase or sell securities.  The Lek Defendants' motion to dismiss this claim is denied.

### VI.  Claim under § 17(a)(3) of the Securities Act

The complaint also alleges that the Lek Defendants themselves violated § 17(a)(3) of the Securities Act.  Section

23

17(a)(3) and the relevant standards for applying that law have already been described.

The SEC has adequately alleged that the Lek Defendants themselves engaged in a course of business that operated as a fraud. They provided Avalon with access to U.S. securities markets, thereby enabling Avalon to conduct its layering and cross-market trading schemes. The Lek Defendants' motion to dismiss this claim is denied.

### VII. Claim under § 20(a) of the Exchange Act

The final claim at issue here is the claim that Lek controlled Pustelnik and is liable for his violations of § 10(b) and Rule 10b-5. Section 20(a) of the Exchange Act imposes derivative liability on entities that control individuals who violate the Exchange Act. In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 238 n.6 (2d Cir. 2016). It provides:

(a) Joint and several liability; good faith defense

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (emphasis supplied).

The statutory language identifies two components to a control person claim: (1) a primary violation by a controlled person and (2) direct or indirect control of the primary violator by the defendant.  It also provides for an affirmative defense of good faith.  The concept of "culpable participation," which is a regular fixture of the Second Circuit's jurisprudence, describes that degree of control which is sufficient to render a person liable under § 20(a).  In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003); cf. Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., 104 F. Supp. 3d 441, 575-78 (S.D.N.Y. 2015) (analyzing trial evidence of the nature of the controlled entity, the status of the alleged controlling entity, and the actions taken by the controlling entity on behalf of the controlled entity) (Section 15 of the Securities Act).  "[T]here is no required state of mind for a defendant's culpable participation in a Section 20(a) offense."  In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d at 415; see In re WorldCom, Inc. Sec. Litig., 02cv3288 (DLC), 2005 WL 638268, at *13 (S.D.N.Y. Mar. 21, 2005).

Control over a primary violator may be established by showing that the defendant possessed "the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise."  In re Lehman Bros.

25

Mortg.-Backed Sec. Litig., 650 F.3d 167, 185 (2d Cir. 2011) (citation omitted). Once the plaintiff makes out a prima facie case of liability under § 20(a), the burden shifts to the defendant "to show that he acted in good faith, and that he did not directly or indirectly induce the act or acts constituting the violation." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1473 (2d Cir. 1996) (citation omitted).

The SEC adequately pleads its claim under § 20(a). The SEC has alleged primary violations of § 10(b) and Rule 10b-5 by Pustelnik. The SEC also adequately alleges that Lek exercised control over Pustelnik. The complaint alleges that Pustelnik became a registered representative at Lek, that Samuel Lek supervised Pustelnik, and that Pustelnik received commissions and other payments from Lek on the trades that Avalon placed through Lek.

In response, Lek principally contends that the SEC fails to allege it controlled Pustelnik because Pustelnik acted outside the scope of his employment, operated as a secret owner of Avalon, and lied to Lek about Avalon's layering activity. This argument does not suggest that the pleading of control person liability is inadequate. Instead, it describes a defense of good faith that Lek will have the opportunity to present at trial. Lek's motion to dismiss this claim is denied.

## VIII. The Lek Defendants' General Arguments

In their motion to dismiss, the Lek Defendants principally present arguments addressed to the SEC's overarching theory of liability. They argue that Avalon's layering and cross-market trading activity do not constitute market manipulation. With respect to Avalon's layering activity, they argue that even Avalon's non-bona fide orders were "live, real, and actionable" orders that were subject to market risk and therefore could not create a false impression of supply and demand or send a false pricing signal. They contend that the "logical inference" from the alleged facts is that Avalon wanted its bids and offers executed. Likewise, the Lek Defendants argue that Avalon's cross-market trading activity did not inject false information into the market because the trading involved "real buyers" and was "reactive" to bids and offers for stock and options placed by others in the market. They argue as well that Avalon's stock trades were undertaken to hedge its risk from its options trading.

These arguments largely present factual assertions which are inappropriate for a motion to dismiss. This is particularly true when it comes to the intentions of either the Avalon defendants or the Lek Defendants. The complaint contains sufficiently detailed allegations to support its assertions as to each defendant's mens rea. Whether the SEC will present

sufficiently compelling evidence of scienter and whether any defendant offers a credible defense on this ground must await trial.

To the extent that the Lek Defendants argue that the entry of an order in the open market may never constitute manipulative conduct, they are wrong.  Moreover, this argument largely misses the mark.  It ignores the thrust of the SEC's claim, which concerns coordinated patterns of trading, indeed voluminous trading, designed to mislead the market.

The Lek Defendants' argument regarding the legality of Avalon's trading also overlooks the SEC's substantial allegations of manipulative intent.  As the Second Circuit has recognized, manipulative conduct may appear perfectly legal on its face.  "[I]n some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." ATSI, 493 F.3d at 102.  Here, the complaint is replete with allegations of scienter.[2]

The Lek Defendants next argue that the SEC fails to allege their scienter in connection with the aiding and abetting claims.  They emphasize that Lek implemented Q6 Control and deny

_____

[2]  The Lek Defendants do not argue that the complaint fails to plead scienter with respect to Avalon, Fayyer, and Pustelnik. They briefly argue, however, that it fails to plead the scienter of Avalon's day traders.  The SEC claims that Avalon, Fayyer, and Pustelnik are the principals who have violated § 10(b).  It is facts supporting their liability under the securities laws that must be pleaded, and the complaint meets that burden.

that it was mere window-dressing, despite the complaint's factual allegations that support its characterization that it was only that.  They also point out that they were assured by Pustelnik that Avalon was not engaged in manipulative conduct. They assert as well that the receipt of regulatory inquiries is insufficient to show scienter.  Again, these factual arguments may be raised at trial; they do not suggest that the pleading is deficient.  The SEC will have the burden of proving that the Lek Defendants acted with the requisite scienter, and the defendants may contest that evidence.  All that matters at this stage is whether the complaint meets the requirements imposed by Rule 9(b), and it does.

Finally, the Lek Defendants argue that the SEC fails to plead that they provided substantial assistance to Avalon.  They represent that the brokerage services that they provided to Avalon were "routine services" that broker-dealers regularly provide to all customers.  Providing brokerage services -- and with those services entrée to U.S. securities markets -- constitutes substantial assistance to a market manipulator. See, e.g., Graham v. SEC, 222 F.3d 994, 1004 (D.C. Cir. 2000). If done with the requisite knowledge, it is a violation of §§ 20(e) and 15(b).  In any event, the complaint also describes other acts taken specifically by the Lek Defendants to substantially assist Avalon's schemes.

## CONCLUSION

Lek and Samuel Lek's June 2, 2017 motion to dismiss the complaint is denied.

Dated:    New York, New York
          August 25, 2017

_____
                DENISE COTE
        United States District Judge