# EXHIBIT A

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

| | |
|---|---|
| Securities and Exchange Commission | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   17-CV-01789 (DLC) |
| Lek Securities Corporation, et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.
                 20 Broad Street, New York, NY 10005
                 *(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
          See Schedule A, attached.

| Place: Norton Rose Fulbright US LLP<br>1301 Avenue of the Americas<br>New York, New York 10019-6022 | Date and Time:<br><br>11/22/2017 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     11/01/2017

| | | |
|---|---|---|
| *CLERK OF COURT* | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Lek Securities Corporation and Samuel Lek _____ , who issues or requests this subpoena, are:
Steve Dollar, Norton Rose Fulbright US LLP, 1031 Avenue of the Americas, New York, New York 10019
steve.dollar@nortonrosefulbright.com, (212) 318 3211

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## SCHEDULE A

Pursuant to Federal Rules of Civil Procedure 34 and 45, and subject to the Definitions and Instructions set forth below, Defendants Lek Securities Corporation and Samuel Lek, through their counsel, request the production of documents responsive to these Requests.

## DEFINITIONS

1.      The definitions and rules of construction set forth in Local Civil Rule 26.3 are incorporated by reference, including, but not limited to, the following:

        a.      Communication.  The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

        b.      Document.  The term "document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.

        c.      Identify (with respect to persons).  When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

        d.      Identify (with respect to documents).  When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).  In the alternative, the responding party may produce the documents, together with identifying information sufficient to satisfy Fed. R. Civ. P. 33(d).

      e.      Person.  The term "person" is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

      f.      Concerning.  The term "concerning" means relating to, referring to, describing, evidencing or constituting.

2.      "You" or "Your" or "FINRA" means Financial Industry Regulatory Authority, Inc. and any of its affiliates as well as any of its or its affiliates' agents or employees.

3.      "SEC" means the Securities and Exchange Commission and any of its agents or employees.

4.      "SEC Lawsuit" means the case filed by the Securities and Exchange Commission against the Lek Defendants and the Avalon Defendants in the United States District Court for the Southern District of New York, captioned *Securities and Exchange Commission v. Lek Securities Corporation et al.*, Case No. 17-cv-01789 (DLC).

5.      "SEC Complaint" means the Complaint in the SEC Lawsuit.  A copy of the SEC Complaint is attached hereto as Exhibit 1.

6.      "Gene DeMaio" means Gene DeMaio, Senior Vice President, Market Regulation, FINRA, identified as a person likely to have discoverable information that the SEC may use to support its claims.[1]

7.      "Max Tourtelot" means Max Tourtelot, Director – Market Regulation, FINRA identified as a person likely to have discoverable information that the SEC may use to support its claims.

8.      "Terrence Hendershott" means Terrence Hendershott, Ph.D., professor at the University of California and identified as an expert witness by the SEC in the SEC Lawsuit.

---

[1] A copy of the SEC's Initial Disclosures in the SEC Lawsuit are attached hereto as Exhibit 2.

9.     An "Exchange" means a current or former equities or options exchange, or its predecessor, successor, or affiliate, including, but not limited to, (1) the following equities exchanges:   Cboe BYX Exchange, Inc. (BYX Equities), Cboe BZX Exchange, Inc. (BZX Equities), Cboe EDGA Exchange, Inc. (EDGA Equities), Cboe EDGX Exchange, Inc. (EDGX Equities), Chicago Stock Exchange, Inc. (CHX), Investors Exchange LLC (IEX), Nasdaq Stock Market, LLC (NASDAQ), Nasdaq OMX BX, Inc. (NASDAQ OMX BX), Nasdaq OMX PHLX, Inc. (NASDAQ OMX PHLX), New York Stock Exchange LLC (NYSE), NYSE American LLC (AMEX), NYSE Arca, Inc. (ARCA), and NYSE National, Inc. (NSX); and (2) the following options exchanges:   BOX Options Exchange LLC (BOX Options Exchange), Cboe BZX Exchange, Inc. (BZX Options), Cboe C2 Exchange, Inc. (C2 Options Exchange), Cboe EDGX Exchange, Inc. (EDGX Options), Cboe Exchange, Inc. (CBOE), Nasdaq BX, Inc. (Nasdaq BX Options), Nasdaq ISE, LLC (Nasdaq ISE), Nasdaq Options Market, LLC (Nasdaq Options Market), Nasdaq PHLX, LLC (Nasdaq PHLX), NYSE American LLC (NYSE American Options), and NYSE Arca, Inc. (NYSE Arca Options).

10.     The "Avalon Defendants" means, collectively, Defendant Vali Management Partners d/b/a Avalon FA Ltd. ("Avalon"), Nathan Fayyer ("Fayyer"), and Sergey Pustelnik a/k/a Serge Pustelnik ("Pustelnik").

11.     The "Lek Defendants" means, collectively, Defendants Lek Securities Corporation and Samuel Lek.

12.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a particular Request all responses that might otherwise be construed to be outside of the Request's scope.

13.     The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

1.      These instructions incorporate by reference the Instructions set forth in the Local Rules of the United States District Court for the Southern District of New York.

2.      The documents covered by these Requests include all documents in Your possession, custody, or control, including any of Your employees, agents, attorneys, accountants, investigators, or other representatives.

3.      If an objection is made, You shall state the reasons for the objection.

4.      Pursuant to Rules 45(d)(2)(B) and 34(b)(2)(C), You must state whether any responsive material are being withheld on the basis of each objection.  If an objection is made to only a part of a Request, You must specify the part and permit inspection of the rest.

5.      No part of a Request shall be left unanswered merely because an objection is interposed to another part of the Request.  If You object to any of the Requests or any part(s) thereof, the objection shall be stated in accordance with the Federal Rules of Civil Procedure.

6.      If any privilege or other doctrine is claimed as to any Request set forth herein, You shall provide a privilege log of the withheld information with sufficient information to enable the Lek Defendants to make a determination about whether the claimed privilege or doctrine applies, in accordance with Federal Rule of Civil Procedure 45(e)(2) and Local Rule 26.2, including the nature of the privilege or doctrine, the type of document, the date of the document, the name and address of its author, the addressees of the document, and all recipients, the subject matter of the document, and the basis for the claim of privilege.

7.      Each Request shall be construed independently, and no Request shall be viewed as limiting the scope of the documents sought through any other Request.

8.      The fact that a document responsive to one or more of the Requests may also be in the possession, custody, or control of another party or may be produced by another party does not

relieve you of the obligation to produce your copy of the same document, even if the two documents are identical.

9.      Pursuant to Rule 45(e)(1), each document should be produced in the form in which it ordinarily is maintained, with the exception of electronically stored information which should be produced electronically as set forth below.

10.     All responsive electronically stored information should include any and all associated metadata and any and all associated files, including, but not limited to, attachments or hyperlinked files.   All responsive electronically stored documents shall be produced in the following electronic format:

      (a)     single page .tiff images with a corresponding Ipro load file;

      (b)     a Concordance .dat file with the following information: custodian, to, from, cc, bcc, date sent, time sent, subject, folder, attachment and text;

      (c)     document-level optical character recognition (OCR); and

      (d)     native files for any Excel, PowerPoint and/or database file types.

11.     You must produce the original of each document requested below or, if the original is not in Your custody, then a copy thereof, and in any event, all non-identical copies which differ from the original or from the other copies produced for any reason, including, but not limited to, the making of notes thereon.

12.     If a document responsive to these Requests was at any time in Your possession, custody or control but now is no longer available for production, as to each such document state the following information:

      (a)     Whether the document is missing or lost;

      (b)     Whether it has been destroyed;

      (c)     Whether the document has been transferred or delivered to another person or entity and, if so, at whose request;

      (d)     Whether the document has been otherwise disposed of; and

      (e)     A precise statement of the circumstances surrounding the disposition of

the document and the date of the document's disposition.

13.    Except as otherwise stated or required by the context of any specific Request, these

Requests seek information from September 1, 2010, through the present.

## REQUESTS

**REQUEST NO. 1:**

All documents, including, but not limited to, internal emails, instant messages, and other communications and communications with the SEC, an Exchange, or any other party, concerning possible manipulative trading, including "layering," "spoofing," or "cross-market manipulation" (as described in the SEC's Complaint), involving the Avalon Defendants or the Lek Defendants.

**REQUEST NO. 2:**

All complaints to FINRA concerning possible manipulative trading, including "layering," "spoofing," or "cross-market manipulation" (as described in the SEC's Complaint), involving the Avalon Defendants or the Lek Defendants.

**REQUEST NO. 3:**

All documents, including internal training materials prepared by or with the participation of the Fraud Surveillance Group within the Office of Fraud Detection and Market Intelligence (OFDMI) and/or the Market Regulation department, concerning the definition of or methods for identifying "layering," "spoofing," or "cross-market manipulation" (as described in the SEC's Complaint).

**REQUEST NO. 4:**

All documents, including internal training materials prepared by or with the participation of the Fraud Surveillance Group within the Office of Fraud Detection and Market Intelligence (OFDMI) and/or the Market Regulation department, concerning "layering," "spoofing," or "cross-market manipulation" (as described in the SEC's Complaint) in connection with Cross-Market Supervision Report Cards.

**REQUEST NO. 5:**

Documents sufficient to identify any order and/or execution imbalance ratios that FINRA identifies as consistent with "layering" or "spoofing" (as described in the SEC's Complaint) in connection with Cross-Market Supervision Report Cards.

**REQUEST NO. 6:**

All documents, including emails, instant messages, and minutes of calls, concerning internal or external discussions concerning the definition of or methods for identifying "layering," "spoofing," or "cross-market manipulation" (as described in the SEC's Complaint).

**REQUEST NO. 7:**

All documents concerning Terrence Hendershott's role at FINRA.

**REQUEST NO. 8:**

All communications between FINRA, including but not limited to, Thomas Gira and any other member of the Market Regulation department, and Terrence Hendershott concerning "layering," "spoofing," "cross-market manipulation" (as described in the SEC's Complaint), the definition of layering, the definition of spoofing, methods for identifying layering, methods of identifying spoofing, order and/or execution imbalance ratios used in connection with identifying layering or spoofing, the Avalon Defendants, or the Lek Defendants.

**REQUEST NO. 9:**

All communications between FINRA, including, but not limited to, communications involving Gene DeMaio and/or Max Tourtelot, and the SEC concerning the subject matter of the SEC Lawsuit.

# EXHIBIT 1

JUDGE COTE

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

17-CV-____ (___)

Plaintiff,

v.

COMPLAINT

LEK SECURITIES CORPORATION,
SAMUEL LEK,
VALI MANAGEMENT PARTNERS dba
  AVALON FA LTD,
NATHAN FAYYER, and
SERGEY PUSTELNIK a/k/a SERGE
  PUSTELNIK,

JURY TRIAL DEMANDED

Defendants.



17 CV 1789

RECEIVED
MAR 10 2017
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint

against Defendants Lek Securities Corporation ("LEK"), Samuel Lek ("Sam Lek"), Vali

Management Partners dba Avalon FA Ltd ("Avalon"), Nathan Fayyer ("Fayyer"), and Sergey

Pustelnik a/k/a Serge Pustelnik ("Pustelnik"), and alleges as follows:

### SUMMARY

1.      This case involves two schemes to manipulate the securities markets perpetrated

by Avalon, a foreign trading firm.  Fayyer (Avalon's disclosed principal) and Pustelnik (an

undisclosed control person of Avalon and a former registered representative at LEK) directly

participated in and assisted the manipulative schemes.  The schemes were made possible through

and with the participation and assistance of LEK, a U.S. broker-dealer based in New York, and

Sam Lek, LEK's Chief Executive Officer ("CEO").  LEK and Sam Lek provided Avalon with

access to the U.S. securities markets to execute the schemes, and otherwise assisted in carrying out the schemes.

2.      The first manipulative trading scheme, known as "layering," involved manipulating the markets of U.S. stocks.  Under this scheme, Avalon placed "non-bona fide orders"—in other words, orders that Avalon did not intend to execute and that had no legitimate economic reason—to buy or sell stock with the intent of injecting false information into the marketplace about supply or demand for the stock.  Avalon did this to trick and induce other market participants to execute against Avalon's bona fide orders (*i.e.*, orders that Avalon did intend to execute) for the same stock on the opposite side of the market.  By placing the non-bona fide orders, Avalon was able to manipulate the market for the stocks and thereby obtain more favorable prices on the executions of its bona fide orders than otherwise would have been available.  Avalon engaged in hundreds of thousands of instances of layering in numerous securities from approximately December 2010 through at least September 2016, and Avalon made millions of dollars in profits from the scheme.

3.      The second manipulative trading scheme is referred to herein as the "cross-market manipulation," "cross-market scheme" or "cross-market strategy."  In this scheme, Avalon bought and sold U.S. stock at a loss for the purpose of moving the prices of corresponding options, so that Avalon could make a profit by trading those options at artificial prices that they would not have been able to obtain but for the manipulation.  Avalon's stock trades had no legitimate economic reason, and were intended to inject into the market false information about supply and demand in order to move the prices of corresponding options to artificial levels.  Although the strategy involved taking a loss on the stock transactions, such losses were far outweighed by Avalon's significant profits from trading the corresponding options whose prices

2

Avalon had manipulated. Avalon engaged in hundreds of instances of cross-market manipulation involving numerous stocks and options from at least August 2012 through at least December 2015, and Avalon made millions of dollars in profits from that scheme.

4.     Together, the layering and cross-market manipulation schemes orchestrated by Avalon through LEK generated illicit profits of more than $28 million.

5.     Fayyer, as a principal of Avalon, participated in and substantially assisted those schemes, as detailed more fully below.

6.     The schemes were made possible through the participation and substantial assistance of LEK and Sam Lek, the majority owner and CEO of LEK, and of Pustelnik, an undisclosed control person of Avalon who also served as a registered representative of LEK for much of the relevant period. LEK, as a registered broker-dealer, provided Avalon with direct access to the U.S. securities markets and, along with Sam Lek as CEO, approved, permitted and facilitated Avalon's schemes even though they knew or were reckless in not knowing that Avalon was engaging in market manipulation.

7.     LEK and Sam Lek had ample motive to assist and allow Avalon's manipulative trading. Between 2012 and 2016, Avalon was LEK's highest producing customer in terms of commissions and fees and rebates generated. LEK made significant profits from commissions and other amounts it earned from Avalon's layering and cross-market manipulation.

8.     Beginning in late 2010, Pustelnik embedded himself at LEK, first as a foreign finder and then as a registered representative, thus enabling him to facilitate Avalon's manipulative trading through LEK. Pustelnik received a share of Avalon's profits directly from Avalon, including profits from the layering and cross-market manipulation. Moreover, as a registered representative at LEK who handled the Avalon account, Pustelnik received

commissions and other payments from the manipulative trading by Avalon, and thereby increased his share of illicit profits beyond what he received as a control person of Avalon.

9.     Pustelnik played a central role in ensuring the success of the layering and cross-market schemes.  Pustelnik recruited Avalon traders for the purpose of carrying out the schemes and worked closely with LEK to ensure the success and effectiveness of the strategies.  When Avalon encountered technical or other difficulties in carrying out the cross-market manipulation through LEK, for example, Pustelnik arranged for the Avalon traders who executed the trading in the cross-market manipulation to conduct the scheme through an investment management firm ("Investment Management Firm") that traded through a different broker-dealer ("Other Broker-Dealer").  When the Other Broker-Dealer observed the manipulative nature of the cross-market scheme and objected to it, Pustelnik arranged to move the scheme back to LEK.  Throughout, Pustelnik used his position at LEK to facilitate and further the cross-market scheme.

10.     By engaging in the conduct alleged herein, Avalon, Fayyer, LEK, Sam Lek, and Pustelnik violated and are liable for the violations of the securities laws identified in the Claims for Relief section below.

11.     Based on the Defendants' violations, the Commission seeks:  (1) entry of a permanent injunction prohibiting the Defendants from further violations of the relevant provisions of the federal securities laws; (2) disgorgement of ill-gotten gains, plus pre-judgment interest; (3) the imposition of civil monetary penalties; and (4) such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to Sections 15(b), 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77o(b), 77t(b) and (d)] and Sections

4

20(a), 20(e), 21(d)(1), 21(d)(3) and 21(d)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78t(a), 78t(e), 78u(d)(1), 78u(d)(3), and 78u(d)(5)].

13.　　This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §§ 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

14.　　Venue is proper in this district pursuant to Sections 20(b) and 22 of the Securities Act [15 U.S.C. §§ 77t(b) and 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain acts, practices, transactions, and courses of business constituting the violations occurred in the Southern District of New York.

15.　　Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce or the mails, or a facility of a national securities exchange, in connection with the conduct alleged herein.

16.　　Unless enjoined, the Defendants are reasonably likely to again engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

## DEFENDANTS

17.　　**Lek Securities Corporation** is a broker-dealer based in New York, New York and is registered with the Commission. LEK provides market access to its customers, including Avalon and other foreign trading firms. LEK markets itself as the "Gateway to the Markets" by providing access to exchanges and other trading venues. LEK has previously been sanctioned by the Financial Industry Regulatory Authority ("FINRA") and the New York Stock Exchange ("NYSE") for failing to identify, prevent, or stop manipulative trading.

18.  **Samuel Lek**, age 65, founded LEK in 1990.  He indirectly owns almost 70% of LEK.  Sam Lek exercises overall and day-to-day control over LEK's operations as its CEO, Secretary, sole Director, Chief Compliance Officer, and Anti-Money Laundering Compliance Officer.  Sam Lek holds Series 3, 7, 8, 14, 24, 53, and 63 licenses in the securities industry and is an experienced options trader.  Sam Lek supervised LEK registered representative Pustelnik at all times while he was associated with LEK, and Sam Lek also supervised any other registered representatives assigned to the Avalon account.

19.  **Vali Management Partners dba Avalon FA Ltd** is a Seychelles-incorporated entity with headquarters in Kiev, Ukraine.  It is not registered with the Commission in any capacity.  Corporate documents state that Fayyer is its sole owner and director.  Pustelnik is an undisclosed control person of Avalon and shares in its revenue or profits with Fayyer.  Avalon operates as a day-trading firm and uses mostly foreign traders in Eastern Europe and Asia to conduct its trading.  The layering scheme discussed herein was conducted through Avalon's account at LEK.  Except as noted below, the cross-market manipulation scheme discussed herein was conducted through Avalon's account at LEK.

20.  **Sergey Pustelnik,** a/k/a Serge Pustelnik, age 35, is an undisclosed control person of Avalon.  He is a close friend of Fayyer's.  Pustelnik was initially a foreign finder for LEK between October 2010 and March 2011, after which he became a registered representative at LEK.  Pustelnik remained a registered representative of LEK until January 2015, when he agreed to be permanently barred from being associated with any FINRA member rather than produce email from his personal email account to FINRA in connection with a FINRA investigation.  Pustelnik held Series 7, 24, 55, and 63 licenses in the securities industry.  Pustelnik was born in

Ukraine and is now a U.S. citizen. Pustelnik maintains residences in New Jersey and Massachusetts, where he currently is a second-year law student.

21. **Nathan Fayyer**, age 34, is the sole owner and director of Avalon according to Avalon corporate documents. Fayyer handles day-to-day and back-office functions for Avalon. Fayyer is also the owner (along with his wife) of Avalon Fund Aktiv, LLC, a New Jersey entity that operates as the U.S. arm of Avalon, and was the owner of San Fleur Ltd dba Blaise Greys Partners, an entity described further below. Fayyer was born in Moldova and is now a U.S. citizen. Fayyer maintains residences in and splits his time between New Jersey and Kiev, Ukraine.

## RELATED PERSONS AND ENTITIES

22. **Avalon Fund Aktiv, LLC** ("Avalon Fund") is a limited liability company incorporated in New Jersey and owned by Fayyer. It operates as the U.S. arm of Avalon. Among other things, it is used to pay Fayyer a salary and other expenses associated with Avalon's operations. Fayyer became an owner of Avalon Fund in 2010.

23. **San Fleur Ltd dba Blaise Greys Partners Ltd ("Blaise Greys")** is a Seychelles-incorporated entity that, according to corporate documents, Fayyer owned. In 2013, Pustelnik used Blaise Greys as part of a scheme to execute the cross-market manipulation through accounts held in the name of Investment Management Firm at Other Broker-Dealer.

## TERMS USED IN THIS COMPLAINT

24. The terms *call* and *put* options, as used herein, refer to contracts that give their holders the right, but not the obligation, to buy (a call option) or sell (a put option) a fixed number of shares of the underlying security at a specific price—called the strike or exercise

price—until the expiration date. Each contract in a given put or call option series represents 100 shares of the underlying security.

25. The term *national best bid* ("NBB"), as used herein, means the highest price a buyer is willing to pay to buy a security. The term *national best offer* ("NBO"), as used herein, means the lowest price that a seller is willing to accept to sell a security. Collectively, the NBB and NBO are referred to as the "NBBO." The mid-point of the NBBO is the price between the NBB and NBO.

## FACTS

### A. Avalon and Its Formation by Pustelnik and Fayyer

26. Pustelnik and Fayyer created Avalon in 2010 after disbanding another day-trading firm that they controlled. Pustelnik and Fayyer each contributed $100,000 to fund Avalon's trading account at LEK.

27. During the relevant period, Avalon was primarily a foreign day-trading firm that employed overseas traders, most of whom were based in Asia and Eastern Europe. Avalon entered into agreements with trade groups comprised of individual traders who traded for Avalon's account. The traders traded Avalon funds, using margin lending provided by LEK to Avalon, through sub-accounts within Avalon's master account at LEK. The traders acted as agents of Avalon in all of their trading and the conduct described herein. Avalon trade groups received access to the U.S. securities markets through Avalon's account at LEK. By reason of the foregoing, Avalon is liable for all of the trading and conduct of its traders and trade groups alleged herein.

28. Profits from the manipulative trading described herein flowed directly to Avalon, less commissions and fees charged by Lek.

8

29.     At all relevant times, Fayyer was a principal of Avalon and handled its day-to-day operations.  Among other things, Fayyer oversaw Avalon's trade groups and had the authority to restrict, place limitations on, or terminate their trading in Avalon's account at LEK. Accordingly, Avalon is liable for all of Fayyer's conduct alleged herein.

30.     At all relevant times, Pustelnik was significantly involved in Avalon's management and operations, including but not necessarily limited to the following activities. Pustelnik—who was listed as an "Exec" in internal Avalon documents—at times instructed and directed Fayyer's actions concerning the management of Avalon and its communications with third parties.  Pustelnik also received a share of Avalon's trading profits and held an Avalon Fund credit card, which he freely used and which was paid by Avalon.  Pustelnik personally conducted substantial work for Avalon, including preparing accounting statements, developing and managing the risk management program used by Avalon's traders, providing technology services and support for its back-office operations, including maintaining Avalon's server at his personal residence, and recruiting and meeting with Avalon traders.  Pustelnik communicated directly with various Avalon traders and with LEK about Avalon's trading strategies (including the layering and cross-market manipulation schemes at issue in this complaint), and Pustelnik engaged in other activities related to Avalon's manipulative trading, as further described below. Accordingly, Avalon is liable for Pustelnik's conduct alleged herein.

**B.      Relationship Among Avalon, Pustelnik, and LEK**

31.     In late 2010, Pustelnik contacted Sam Lek to discuss a proposed business arrangement.  Pustelnik and Sam Lek reached an agreement in which Pustelnik, acting as a foreign finder, would bring high-volume, high-commission customers to LEK in exchange for

50% of commissions generated by these foreign customers. Avalon was one of the customers that Pustelnik referred to LEK in his role as a foreign finder.

32.     Pustelnik used his relationship with LEK and Sam Lek to facilitate Avalon's trading schemes. For example, Pustelnik caused LEK to hire personnel whose interests were aligned with Avalon. In late 2010, Pustelnik asked Sam Lek to hire his brother-in-law—who was affiliated with Avalon Fund—as a registered representative to oversee the Avalon account at LEK ("Avalon Rep 2"). LEK complied, and by December 2010, Avalon Rep 2 had become associated with LEK. LEK paid Avalon Rep 2 a portion of Pustelnik's share of Avalon's commissions in an amount determined by Pustelnik on a monthly basis. Like Pustelnik, Avalon Rep 2 used his position as a LEK registered representative to further Avalon's interests.

33.     Also in late 2010, at Pustelnik's request, LEK hired an independent contractor ("Administrative Assistant") to handle administrative functions related to both Avalon and Pustelnik's other customers at LEK. The Administrative Assistant previously had been employed by Avalon and also used her position at LEK to further Avalon's interests. The Administrative Assistant conducted work for Avalon directly from her desk at LEK, including keeping an Avalon Fund checkbook on her desk that she used to pay Avalon expenses, executing and processing documents for Avalon and Fayyer, and communicating directly with Avalon traders. A portion of her salary was deducted from Pustelnik's compensation. Avalon then reimbursed Pustelnik for that amount, thereby effectively paying the salary of someone ostensibly working for LEK.

34.     In March 2011, after LEK discovered that Pustelnik did not qualify as a "foreign finder" under FINRA rules because he was a U.S. citizen, Pustelnik agreed to become a LEK registered representative based upon assurances from Sam Lek that he would have few

responsibilities and would not be required to work from LEK's offices. Pustelnik kept Avalon and the other customers referred by him at LEK, but negotiated even higher profits: 50% of commissions *and* trading rebates (which were significant) generated by Avalon and his other customers. From March 2011 to January 2015, Pustelnik was a registered representative associated with LEK. He served as one of the registered representatives on the Avalon account, and held the title "managing director" of LEK. At all times when Pustelnik was associated with LEK, Sam Lek was Pustelnik's supervisor, had the ability to direct his actions with respect to the Avalon account and his role as a LEK registered representative, and had the authority to hire, fire, and discipline him. LEK is liable for the actions of Pustelnik described herein.

### C. Avalon's Layering Scheme

#### 1. Description of the Layering Scheme

35.     From approximately December 2010 through at least September 2016, Avalon repeatedly manipulated the markets of U.S. stocks by engaging in a manipulative trading strategy typically referred to as "layering" or "spoofing" (hereafter, "layering"). Avalon's layering yielded profits of more than $21 million.

36.     Layering refers to the use of multiple non-bona fide orders in a particular security in order to manipulate the market for that security and obtain a more favorable execution of bona fide orders on the opposite side of the market (*e.g.*, the use of non-bona fide buy orders to obtain a more favorable execution of bona fide sell orders for the same security, and vice versa). The term "non-bona fide orders," as the term is used herein, refers to orders that a trader does not intend to have executed and that have no legitimate economic reason. The non-bona fide orders are intended to inject false information into the marketplace about supply or demand for the security at issue and thereby to induce other market participants to execute against the trader's

bona fide orders (*i.e.*, orders that the trader intends to have executed) for the same security on the opposite side of the market at an artificial price.

37.     Layering is typically accomplished by entering non-bona fide orders at successive levels (or "layers") of price – either increasingly higher levels (if the non-bona fide orders are being placed on the buy side) or decreasing levels (if on the sell side).  In other instances, layering involves placing multiple non-bona fide orders at the same or varying prices across multiple exchanges or other trading venues.

38.     By entering non-bona fide orders on one side of the market (for example, to buy), the trader is able to trick and induce market participants to provide the trader with better execution of the trader's bona fide orders on the other side of the market (for example, to sell). The false appearance of supply or demand created by the trader's non-bona fide orders typically pushes the price in a direction favorable to the trader, and permits the trader to obtain better prices on the bona fide orders, or better prices for that quantity and at that point in time, than would otherwise be available.  The manipulation that results from placement of the non-bona fide orders enables the bona fide orders to execute profitably, on average, and makes the bona fide orders more profitable than they would have been absent the manipulation.

39.     Once the trader's bona fide orders are executed, the trader typically cancels the non-bona fide orders promptly.  By that time, the non-bona fide orders have fulfilled the trader's illicit purpose of manipulating supply and demand for that particular security to receive more favorable execution of the bona fide orders.  Layering typically occurs over very short time frames, often just seconds.

40.     In some instances, Avalon's layering involved placing non-bona fide orders on the buy side, and bona fide orders on the sell side, while in other instances it involved placing

non-bona fide orders on the sell side, and bona fide orders on the buy side. The manner in which Avalon conducted layering varied by trader and over time, often in ways apparently intended to avoid detection both by regulators and by other market participants who might modify their behavior in response to the layering. Despite these variations, the trading had a similar theme: create a false impression of supply or demand to trick and induce others to trade so that Avalon could obtain a more favorable execution.

41. As noted, Avalon varied the specific method of its layering. But the following is a typical illustration of Avalon's layering scheme:

(a) First, Avalon placed multiple, and increasingly higher, non-bona fide orders to buy a particular stock – while nearly simultaneously placing bona fide order(s) (*i.e.*, orders that Avalon *did* intend to have executed) on the opposite side of the market to sell the same stock. Avalon's non-bona fide orders were much higher in number of orders and shares than its bona fide orders; this imbalance contributed to Avalon's creation of a false appearance of demand for the stock.

(b) In this example, the purpose of the non-bona fide buy orders was to create a false appearance of buying interest and thus to trick and induce other market participants (often relying on algorithms to interpret changes in apparent supply and demand for a security) to conclude that there was increased buying interest and that the price of the stock was more likely to rise.

(c) The false indication of buying interest that resulted from Avalon's non-bona fide buy orders tricked and induced other market participants to enter their own buy orders, some of which executed against Avalon's bona fide sell orders at better prices for Avalon than would have been available without the manipulation.

(d)      Once the bona fide sell orders were executed, Avalon promptly cancelled all of its outstanding non-bona fide buy orders.  In short, the non-bona fide orders had no purpose other than to make it possible for Avalon to receive more favorable prices for the bona fide orders.

(e)      After obtaining favorable execution of its bona fide sell orders, Avalon often repeated the manipulation in the opposite direction through a second instance of layering to close out the position (*i.e.*, by using non-bona fide sell orders to obtain a more favorable execution of its bona fide buy orders).  In short, these instances of layering enabled Avalon to manipulate the market so that it could reap profits by buying low and selling high at artificial prices.

42.      By engaging in the pattern of layering described above, Avalon and its traders knew or were reckless in not knowing that they were engaged in manipulative and fraudulent conduct because their non-bona fide orders had no legitimate economic reason, were intended to inject into the market false information about supply and demand, and were entered for the purpose of moving the prices of the securities to artificial levels.

*2.      Examples of Layering by Avalon*

**July 20, 2015 Layering in CAB**

43.      On July 20, 2015, Avalon trader 128_102 engaged in two consecutive instances of layering in Cabela's Incorporated ("CAB").  First, Avalon used non-bona fide buy orders to manipulate the price of CAB up and then sold short at a higher price.  Second, after establishing the short position, Avalon reversed course and used non-bona fide sell orders to manipulate the price of CAB down and then bought at a lower price, and thus profitably covered Avalon's short

position. Thus, Avalon bought at an artificially low price and sold at an artificially high price, making approximately $230 in about one minute.

44.     At 9:34:32, Avalon began the first instance of layering in CAB stock in order to obtain a better sales price. At that time, the NBB for CAB (*i.e.*, the highest price a market participant was willing to pay for the security) was $51.09. Over the next 21 seconds, Avalon entered 16 non-bona fide orders to buy a total of 3,500 shares at generally increasing prices. Only one of those orders for 100 shares executed. Avalon then entered two bona fide orders to sell short a total of 1,600 shares at $51.23. Avalon's non-bona fide buy orders created a false appearance of demand, which led other market participants to place higher priced buy orders that executed against Avalon's bona fide short sale orders. Avalon thus sold short 1,400 shares of CAB at $51.23, which was $0.14 higher than the NBB before Avalon placed its non-bona fide buy orders. Avalon then cancelled all outstanding orders.

45.     Avalon then reversed direction and engaged in the second instance of layering to buy CAB at artificially depressed prices, allowing it to profitably cover its short position. At this time, 9:35:10, the NBO for CAB (*i.e.*, the lowest price at which a market participant was willing to sell the security) was $51.23. Over the next 24 seconds, Avalon entered 13 non-bona fide sell orders totaling 3,500 shares at generally decreasing prices. During that time period, Avalon entered one bona fide buy order for 400 shares at $51.07, which executed. At 9:35:34, Avalon entered two more bona fide buy orders for a total of 1,400 shares at $51.04. Avalon's non-bona fide sell orders created a false appearance of supply, which led other market participants to place lower priced sell orders that executed against Avalon's bona fide buy orders. Avalon thus bought an additional 1,000 shares of CAB at $51.04, which was $0.19 lower than the NBO before Avalon placed its non-bona fide sell orders. Avalon then cancelled all outstanding orders.

Through these two instances of layering, Avalon bought 1,400 shares of CAB at an average price of $51.05 and sold those shares at $51.23.

### May 20, 2013 Layering in IBM

46.     On May 20, 2013, Avalon trader 208_101 held 730 shares of International Business Machines Corporation ("IBM") and, over a three second period, engaged in layering to manipulate the price of IBM up and enable Avalon to sell the 730 shares at a higher price. At 10:33:20, when Avalon began the layering, the NBB for IBM (*i.e.*, the highest price a market participant was willing to pay for the security) was $208.47. Over the next two seconds, Avalon placed 18 non-bona fide buy orders for a total of 1,800 shares at generally increasing prices. Avalon then placed one bona fide sell order for 730 shares of IBM at $208.54. Avalon's non-bona fide buy orders created a false appearance of demand, which led other market participants to place higher priced buy orders that executed against Avalon's bona fide sell order. Avalon thus sold a total of 730 shares of IBM at $208.54, which was $0.07 higher than the NBB before Avalon's non-bona fide orders. Avalon then cancelled all outstanding orders.

### November 1, 2012 Layering in CERN

47.     On November 1, 2012, Avalon trader 188_102S held a short position of 1,100 shares of Cerner Corporation ("CERN"), and, over a twenty-three second period, engaged in layering to manipulate the price of CERN down and buy to cover its short position. At 12:50:52, the NBO for CERN (*i.e.*, the lowest price at which a market participant was willing to sell the security) was $77.18. Over seventeen seconds, Avalon entered 67 non-bona fide sell orders, in quantities of 100 shares each, at generally decreasing prices. Only one sell order for 100 shares executed. During that time, at around 12:51:00, Avalon placed a bona fide order to buy 1,200 shares of CERN at $77.07, which was not executed and subsequently cancelled. Avalon then

16

placed another bona fide order to buy 1,200 shares of CERN at $77.10. Avalon's non-bona fide sell orders created a false appearance of supply, which led other market participants to place lower priced sell orders that executed against Avalon's bona fide buy order. Avalon thus bought 1,200 shares at an average price of $77.08, which was $0.10 lower than the NBO before Avalon's non-bona fide orders. Avalon then cancelled all outstanding orders.

### 3. Avalon's Layering Was Pervasive and Profitable

48.    Avalon repeatedly and systematically manipulated the U.S. stock markets by engaging in layering. Between December 2010 and at least September 2016, Avalon engaged in hundreds of thousands of instances of layering, involving hundreds of securities traded on numerous U.S. exchanges and other trading venues. Although Avalon's profit on any single instance of layering might have been small, when multiplied by the hundreds of thousands of instances of layering in which Avalon engaged, the profits totaled many millions of dollars.

49.    Avalon profited from the layering by retaining a portion of the profits and charging its traders commissions and other fees on each trade. As described below, Avalon believed and represented that it was one of the few places where traders could continue to engage in layering. As a result, Avalon explicitly charged higher commissions and provided lower payouts for layering than for other trading strategies.

50.    Avalon's layering through LEK garnered gross profits in excess of $21 million.

### 4. Avalon and Fayyer Knowingly or Recklessly Engaged in the Layering Scheme

51.    In engaging in the layering scheme described herein, Avalon and Fayyer knew or were reckless in not knowing that Avalon—by placing non-bona fide orders for certain securities—was injecting false information into the market about the supply of or demand for

those securities, that it was manipulating the market for those securities, and that it was thereby engaged in a scheme to defraud.

52.     In May 2012, an individual who shortly thereafter became an Avalon trade group leader ("Avalon Trade Group Leader 1") sent Sam Lek an email describing in detail the layering scheme:

> Layering trading is a special trading stratyge [sic]. For example, the bid and ask of symbol X is 90.09 and 90.14, we put buy orders in 90.10, 90.11, 90.12, 90.13 and so on, then push the price to 90.20, right now the bid and ask is 90.20 and 90.21, we put a big size short order in 90.20 to get a short position, then we cancel all of the buy orders in 90.10, 90.11, 90.12 and so on.  And we put sell orders in 90.20, 90.19, 90.18, 90.17 and so on, to push the price to 90.05, then put a big size buy order in 90.05 to cover position, and cancel all of the sell orders . . *so we will put hundre[d]s of orders to push stock price and then cancel them.*

(emphasis added).

53.     Within a month of sending this email, in June 2012, Avalon Trade Group Leader 1 opened sub-accounts through Avalon's account at LEK and began layering through its account. Indeed, a sub-account associated with Trade Group Leader 1 engaged in the November 1, 2012 layering in CERN described above.

54.     Avalon and Fayyer knew or were reckless in not knowing that Avalon's traders were engaged in layering.  Indeed, Avalon (acting through Fayyer) touted itself as a destination for traders who wanted to engage in layering, emphasizing in multiple communications that Avalon was one of the few trading firms that permitted layering:

(a)     In January 2013, Fayyer emailed a prospective Avalon trade group leader ("Avalon Trade Group Leader 2"), stating:  "My name is Nathan and I received your contact information from Serge [Pustelnik]. . . He told me that you had a group of traders and were interested in setting up some accounts for layering and other strategies . . . If

18

you are still interested in this, this is definitely something I can help you with . . . I am

one of the very few places that still allow layering."

      (b)     In March 2013, Fayyer emailed Avalon Trade Group Leader 2: "For none

[sic] layering orders you can send as many as you want.  For layering, you can send 50-

100 at a time on different ECN's."

      (c)     In July 2013, Fayyer emailed another Avalon trade group leader ("Avalon

Trade Group Leader 3"), stating:  "We allow layering and these sort of strategies only for

intra day use . . ."

      (d)     Until at least early 2013, Avalon's website contained the frequently-asked

question "Do you offer Multi-Key Capability and Allow this type of trading?," and

answered "Yes.  You can use multi-key type orders and our compliance has full backing

of traders utilizing this sort of strategy."  Avalon and its trade groups commonly referred

to the layering strategy as "multi-key" trading.

55.     Avalon also touted its relationship with one of the only brokers (*i.e.*, LEK) that

permitted layering.  For example:

      (a)     In March 2013, Fayyer emailed Avalon Trade Group Leader 2:  "the

broker is not a cheap one, but this is because they do tolerate and protect us from many

issues such as multi-key trading, which is not allowed anywhere pretty much anymore,

and other dark pool and scalping strategies which can be described as wash orders by

many other firms.  So you get what you pay for here."

      (b)     In October 2013, Fayyer emailed Avalon Trade Group Leader 1:  "They

are talking about the new rule 15-C [sic], of the SEC, I know It very well.  They want to

forbid any layering or permit any wash sales between the same company user accounts . . . looks like LEK is the only solution for now."

56.     Avalon charged its traders higher fees for layering through Avalon because of the legal perils that layering created.  For example:

(a)     In March 2013, Fayyer emailed Avalon Trade Group Leader 2:  "For layering strategy, the payout is what I have written below.  It is a set schedule as costs to protect layering are very high these days from our legal team.  Also, there are almost no places that allow this."

(b)     In March 2013, Fayyer emailed Avalon Trade Group Leader 2:  "layering [] is a bit more costly [than non-layering] as we pay very big legal bills every month to be protected."

(c)     In April 2013, Fayyer emailed Avalon Trade Group Leader 2:  "It costs a lot of money for legal expenses to keep this going these days as no other firms allow this."

(d)     In May 2013, Fayyer emailed another Avalon trade group leader ("Avalon Trade Group Leader 4"):  "commission is standard, layering is VERY expensive now, and we pay very big legal bills to protect this.  A lot of firms don't have this ability and kick traders out.  we do.  so the commission schedule is standard."

57.     Avalon and Fayyer closely monitored trading activity by its traders to ensure that Avalon collected higher fees for layering.  For example, in April 2013, Fayyer emailed Avalon Trade Group Leader 2:  "We know this business very well and we will see right away if you are layering.  Even if it is dark pool layering, we know all these strategies."

58.     LEK deducted 50% of the legal expenses it incurred due to regulatory inquiries and investigations concerning Avalon's trading from Pustelnik's LEK compensation. Avalon then reimbursed Pustelnik in full for the deducted legal expenses.

59.     Fayyer and Pustelnik each received a share of Avalon's profits from the manipulative trading. In addition, Pustelnik received a share of LEK's commissions and other fees and rebates from the manipulative trading.

**D.      LEK and Sam Lek Knowingly or Recklessly Participated In and Substantially Assisted the Layering Scheme**

> *1.      LEK and Sam Lek Knew or Were Reckless in Not Knowing that Avalon Was Layering Through LEK, and that the Layering Was Manipulative and Fraudulent*

60.     LEK and Sam Lek knew or were reckless in not knowing that Avalon was engaged in layering, that it was thereby manipulating the markets, and thus committing fraud, but LEK and Sam Lek nevertheless participated in and substantially assisted the scheme.

61.     As discussed above, in May 2012, Avalon Trade Group Leader 1 described the specifics of the layering scheme in an email to Sam Lek. As Trade Group Leader 1 phrased it, "*so we will put hundre[d]s of orders to push stock price and then cancel them.*" (emphasis added).

62.     Sam Lek responded to Avalon Trade Group Leader 1's email by stating, "regulators have argued that your trading strategy 'layering' is manipulative and illegal. This is of concern to us even though I do not agree with their position." Trade Group Leader 1 replied, "[w]e know it's illegal to trading 'layering', but it is not absolute . . . The most important is our lay[er]ing str[ategy] is softly compared to before.."

63.     Although LEK was already on notice through regulatory inquiries that layering was occurring in Avalon's account, in September 2014, Sam Lek learned that the specific traders

associated with Avalon Trade Group Leader 1 had opened sub-accounts with Avalon in or around June 2012 (within a month of the above communication) and begun trading through Avalon's account at LEK. Despite this notice, LEK and Sam Lek took no action to restrict or terminate trading by Avalon Trade Group Leader 1's traders. Those traders engaged in thousands of additional instances of layering through Avalon's account at LEK in 2015 and 2016.

64. Beginning at least as early as 2012, regulators, exchanges, and other market participants repeatedly notified LEK and Sam Lek that layering was occurring in the Avalon account, in multiple instances providing LEK and Sam Lek with detailed descriptions of the layering that was occurring and describing the manipulative effects, as reflected in the following examples:

(a) In July 2012, a broker-dealer informed LEK that FINRA had identified order flow from LEK as potentially manipulative, provided the specific dates and securities of the conduct, and explained that it "shows a series of transactions where a large trade is entered on one side of the market, then a series of orders are placed on the opposite side of the market that appeared to narrow the bid or offer. The large trade then executes, and then the smaller orders on the opposite side of the market are cancelled." The trading identified in this communication included actual instances of layering by Avalon through LEK.

(b) In September 2012, FINRA contacted LEK and informed it that trading activity by Avalon through LEK "appears consistent with a manipulative practice called layering." FINRA encouraged LEK to review FINRA's settlement with Trillium, which

described layering in detail.[1] The trading identified by FINRA in this communication included actual instances of layering by Avalon through LEK.

(c)     In December 2012, Bats Global Markets exchange ("Bats Exchange") brought possible layering through LEK to LEK and Sam Lek's attention, and advised them to look for "any types of patterns. . . where they're putting a tremendous amount of size on one side of the market or the other, and it looks like potentially they could be inducing or tricking somebody into trading [with their] hidden order [on the other side of the market]."

(d)     In July 2013, Bats Exchange informed LEK and Sam Lek that it was seeing a "clear cut cross-market layering strategy" by Avalon coming through LEK, including "1,700 instances [of layering] over the last two days." Bats Exchange described the strategy in detail: "we see a concentrated number of orders come in on one side of the market and the market moves in a downward motion, and then we see immediate deletion of those orders. And then when we do a cross-market analysis to see what happened in between the time the order book was filled to the time that all the orders were removed to see if anyone was executing to take advantage of that activity, we're seeing the concentration where Lek's CRD number is on the other side of those contra-side executions." Bats Exchange subsequently sent LEK a letter identifying specific instances of layering by Avalon through LEK. Following these communications, LEK stopped sending Avalon's orders to Bats Exchange and instead routed Avalon's

---

[1] *See Trillium Brokerage Services, LLC*, FINRA Letter of Acceptance, Waiver and Consent, No. 2007007678201 (August 5, 2010).

orders only to other exchanges and venues. The trading flagged by Bats Exchange included actual instances of layering by Avalon through LEK.

(e) In November 2013, Direct Edge exchange called LEK and, in the words of Sam Lek when he later described the call to Fayyer, "expressed great concern about some of the trading that Avalon has been doing through our firm. They told us that Avalon appears to be conducting manipulative trading strategies, such as wash sales and layering, by placing certain trades through our firm and other related trades through one or more broker-dealers."

(f) In November 2013, a NYSE Hearing Board found that LEK had violated various exchange rules by, among other things, failing to supervise and implement adequate risk controls for spoofing (which includes layering), wash trading, and marking the close.

(g) In July 2014, FINRA notified LEK and Sam Lek that it believed that they had failed to adequately monitor trading activity by Avalon and failed to implement procedures and systems designed to monitor and surveil for manipulative trading.

(h) In April 2015, FINRA again alerted LEK and Sam Lek that Avalon might be engaged in manipulative trading through LEK, and that LEK and Sam Lek's conduct may have aided the manipulative trading.

(i) From at least March 2016 through September 2016, FINRA advised LEK on a monthly basis that it continued to see substantial layering activity through LEK.

65. LEK and Sam Lek received numerous additional inquiry letters from regulators asking it to provide information on Avalon's trading, often asking for an explanation of the

trading strategy and how it was legitimate. Nonetheless, Avalon's layering through LEK persisted.

>  **2.**    ***LEK and Sam Lek Participated in and Provided Substantial Assistance to Avalon's Layering By Engaging in Acts or Omissions that Facilitated and Permitted the Layering***

66.    LEK and Sam Lek participated in and provided substantial assistance to Avalon's layering in several ways, including but not necessarily limited to providing Avalon with access to the markets that only a registered broker-dealer such as LEK could provide, implementing ineffective controls for layering and then relaxing even those controls as needed in order to permit Avalon to continue its layering, and failing to implement any reasonable controls to prevent or detect layering.

67.    As a registered broker-dealer, LEK was able to provide traders and trading firms with access to the markets, including the various exchanges and other venues.

68.    LEK, under Sam Lek's direction and with his consent, provided Avalon with market access to conduct trading—including the layering activity described herein—even though LEK and Sam Lek knew or were reckless in not knowing that Avalon was engaged in layering, and that Avalon's layering activity was manipulative and fraudulent.

69.    LEK and Sam Lek claimed that they took steps to attempt to prevent layering through the firm. But in fact, as described below, LEK's and Sam Lek's supposed efforts to prevent layering were mere window-dressing, and they knew or were reckless in not knowing that these purported efforts were not preventing layering and that layering was continuing on a massive scale.

70.    In February 2013, LEK implemented a supposed layering control through a portion of its proprietary Q6 program (hereafter "Q6 Control"). Sam Lek made all relevant

decisions concerning the design and implementation of the Q6 Control. The purported purpose of the Q6 Control was to prevent layering from occurring by blocking trading that fit a certain pattern. The Q6 Control was triggered in certain instances when a trader traded or attempted to trade on both sides of the market and did so with a disproportionate number of orders on one of those sides. Q6 counted the number of buys and sells, and blocked additional buys or sells if the difference in number of orders between the two (referred to as "delta") met a certain threshold set by LEK.

71.     As LEK and Sam Lek knew or were reckless in not knowing, the Q6 Control was insufficient to prevent layering in the Avalon account, and Avalon engaged in hundreds of thousands of instances of layering for years *after* LEK implemented its Q6 Control.

72.     LEK's Q6 Control failed to prevent layering for two primary reasons:

(a)     First, the Q6 Control only blocked non-bona fide orders when the trader had already placed a resting bona fide order; the Q6 Control was not triggered if the non-bona fide orders were placed before the bona fide order. Avalon could thus easily evade the Q6 Control simply by placing non-bona fide orders before entering any bona fide order(s). Indeed, the May 2012 email from Avalon Trade Group Leader 1 to Sam Lek, cited above, described layering as first placing non-bona fide orders to "push the price" and then entering the bona fide order. LEK and Sam Lek thus knew or were reckless in not knowing that layering would occur despite the Q6 Control, yet failed to modify the Q6 control to make it effective or to otherwise use any effective system to monitor for layering.

(b)     Second, in response to requests and complaints from Avalon, Fayyer, Pustelnik, and Avalon Rep 2, LEK quickly relaxed the threshold for Avalon's accounts to

levels at which layering could continue to occur more widely. The Q6 Control initially allowed a delta of 10. LEK, Sam Lek, and Pustelnik caused this number to be relaxed for Avalon specifically. Within one week of implementing the control, LEK moved the delta for the Avalon account to 100. At all times thereafter, the delta for the account was between 50 and 100, and, except for a three-month period in 2013, was above the threshold level of 10 for Avalon sub-accounts. Indeed, Fayyer reassured Avalon's traders that they could continue to layer after LEK relaxed the delta for the Q6 Control.

73.     As detailed below, Pustelnik, as a LEK registered representative and for whose conduct LEK is responsible, encouraged LEK to relax the Q6 Control delta for Avalon, falsely representing that Avalon was not engaged in layering. Pustelnik knew or was reckless in not knowing that Avalon was engaged in layering, and Pustelnik's advocacy for a less stringent threshold in the Q6 Control was part of Pustelnik's participation in and substantial assistance to Avalon's layering scheme.

74.     Sam Lek authorized modification of the Q6 Control specifically for Avalon.

75.     By relaxing the Q6 Control for Avalon's accounts, and despite repeated inquiries from regulators about Avalon's manipulative trading, LEK and Sam Lek allowed Avalon to continue engaging in layering and substantially assisted Avalon in carrying out its manipulative layering scheme. Despite Avalon's and Pustelnik's denials that Avalon was engaged in layering, LEK and Sam Lek knew, or were reckless in not knowing, that Avalon was engaged in layering and thus manipulating the markets. LEK and Sam Lek knew or were reckless in not knowing that relaxing the threshold levels in the Q6 Control facilitated and permitted Avalon's layering.

### 3. *LEK and Sam Lek Took No Adequate Steps to Monitor For and Prevent the Layering*

76.     Despite the fact that they knew or were reckless in not knowing that Avalon was conducting layering through its account at LEK, LEK and Sam Lek did not implement adequate systems or procedures to monitor and surveil for layering.  For example, despite repeated notice from regulators and others that Avalon was engaged in manipulative layering through LEK, at no time did LEK and Sam Lek implement an exception report or any other device through which they reasonably could have expected LEK personnel to identify potential layering or to ensure that the Q6 Control was working.  LEK personnel did not monitor Avalon's trading beyond sometimes purportedly viewing Avalon's trading in "real-time."  Given the number of trades and orders placed through LEK and the speed at which orders were placed and cancelled, monitoring for layering in real-time would have been an impossible task without systematic surveillance reports or similar tools, and Sam Lek could not reasonably have expected such efforts to be a meaningful way to detect layering.  Sam Lek himself conducted occasional ad hoc reviews of trading identified as layering in regulatory inquiries, but he attempted to justify the trading  to regulators and permitted it to continue, even though he knew or was reckless in not knowing that such trades were manipulative.

77.     LEK and Sam Lek did not add layering to LEK's internal Written Supervisory Procedures as conduct that the firm prohibited, nor did they provide LEK employees with training on layering, even after regulators, exchanges, and other market participants repeatedly notified LEK and Sam Lek that layering was occurring in the Avalon account.

78.     LEK profited from the layering scheme through its receipt of commissions, trading rebates and fees from Avalon's trading.

### E. Pustelnik Knowingly or Recklessly Participated In and Substantially Assisted the Layering Scheme

#### 1. Pustelnik Knew or Was Reckless in Not Knowing That Avalon Was Engaged in Layering and Thereby Manipulating the Market and Engaging in Fraud

79.     Pustelnik knew or was reckless in not knowing that Avalon was engaged in layering, that Avalon was thereby injecting false information into the market, that it was manipulating the market for the securities that were the targets of its layering scheme, and that it was thereby engaged in a scheme to defraud, and which operated as a fraud. Pustelnik also knew or was reckless in not knowing that his actions described herein facilitated and substantially assisted the fraud.

80.     As both a LEK registered representative and as an undisclosed control person of Avalon, Pustelnik had a significant financial interest in Avalon's trading on multiple levels. Avalon was Pustelnik's largest client at LEK, and as the registered representative, he earned millions of dollars in commissions and other rebates from Avalon's trading between 2011 and 2015. Pustelnik also had direct financial ties to Avalon. Pustelnik provided Avalon with $100,000 to fund its account at LEK in 2010, which Avalon repaid with interest. Avalon's internal records show that it allocated a substantial share of its profits to Pustelnik.

81.     Pustelnik was instrumental in bringing traders to Avalon to conduct layering through LEK. For example, in August 2011, Avalon Trade Group Leader 2, who was looking for a firm through which he could engage in layering, sent a chat message to Pustelnik asking "Do u know where can trade lawyering [sic] strategy." Between August 2011 and January 2013, Pustelnik discussed with Avalon Trade Group Leader 2 the possibility of moving his traders to LEK. Finally, in January 2013, Fayyer emailed Avalon Trade Group Leader 2, stating: "My name is Nathan and I received your contact information from Serge [Pustelnik]. . . He told me

that you had a group of traders and were interested in setting up some accounts for layering and other strategies . . ."

82.     A December 2012 email chain among Fayyer, Pustelnik and another Avalon trade group leader ("Avalon Trade Group Leader 5") includes an email from Avalon Trade Group Leader 5 stating:

> Serge introduce me to you and that is where it all began . . . I called thinking that there may be mutual business that we can do and NOT just layering. Also layering it is just one part of business what I was offering we do."

Fayyer replied to Avalon Trade Group Leader 5, with a copy to Pustelnik, stating, "$ is $."

83.     Pustelnik was also aware that regulators had characterized Avalon's trading as layering. Sam Lek and others at LEK informed Pustelnik of a number of the communications from FINRA and others expressing concern about manipulation of the market through layering by Avalon. For example:

(a)     On September 13, 2012, Sam Lek sent Pustelnik a FINRA inquiry concerning certain trading by Avalon and requesting, "[a] more fulsome explanation from Lek (or its customer, Avalon FA, LTD) as to what type of trading strategy is being employed and how this trading activity is not in any way manipulative or otherwise consistent with the manipulative practice commonly referred to as Layering."

(b)     On September 23, 2013, another LEK official sent Pustelnik an email concerning "16 cases involving Avalon" and attaching detail on those matters, including one concerning layering.

### 2. Pustelnik Participated in and Substantially Assisted the Layering Scheme

84.     Pustelnik participated in and substantially assisted the layering scheme in various ways, including but not necessarily limited to recruiting Avalon traders for the purpose of layering, falsely denying that Avalon was engaged in layering, and encouraging LEK to relax the Q6 Control, its sole system that supposedly was designed to prevent layering. Indeed, Pustelnik was instrumental in causing LEK to increase the delta threshold so that Avalon could more freely engage in layering. For example:

(a)     On February 1, 2013, in connection with LEK's introduction of the Q6 Control, Pustelnik emailed a LEK officer, stating that LEK's Q6 Control should ignore market on open and market on close orders. The LEK officer agreed and said, "[a]nything else you can think of?" Pustelnik replied: "They'll come up with time. Ave [Avalon] got really hurt by this today. We are on it." The LEK officer responded: "That's why I wanted you to test drive it . . . As discussed with Nathan [Fayyer], if you come up with explanation of the strategy and why it's not layering, I am happy to increase the threshold."

(b)     On February 6, 2013, Pustelnik emailed a LEK officer, urging him to increase the Q6 Control delta to 75 for Avalon's accounts. In the email, Pustelnik included a message from an Avalon trade group leader ("Avalon Trade Group Leader 6") to Pustelnik stating: "so, can you solve the problem? Or it will happen everyday????? We really can't go on to be like this, we get a lot loss because this." Sub-accounts associated with Avalon Trade Group Leader 6 had engaged in thousands of instances of layering through Avalon's accounts at LEK up to the date of Pustelnik's email. Following the

31

relaxation of the Q6 Control, sub-accounts associated with Avalon Trade Group Leader 6 engaged in tens of thousands of additional instances of layering.

(c)      Also on February 6, 2013, another LEK officer sent Fayyer and Pustelnik an email with a list of trades from the Q6 Control along with a note: "Please address Layering Detection issues with your Traders." Pustelnik responded "Nothing to address with the traders. Its not Layering."

(d)      Pustelnik knew or was reckless in not knowing that Avalon was engaged in layering, and through his efforts to persuade other LEK personnel that layering was not occurring, Pustelnik participated in and substantially assisted the scheme.

(e)      In response to Pustelnik's and Avalon's pleas to relax the Q6 Control delta, on or about February 13, 2013, LEK relaxed the delta for Avalon's account by increasing it from 10 to 100, and set the deltas for Avalon's sub-accounts at 20. These relaxed thresholds allowed Avalon's layering to continue.

(f)      After these changes, from February 13, 2013 through September 2016, Avalon engaged in hundreds of thousands of additional instances of layering through its account at LEK.

85.     Pustelnik profited from the continuation of the layering scheme by his receipt of profits from Avalon, and his receipt of commissions and other fees and rebates from LEK.

F.     **Avalon's Cross-Market Manipulation**

   1.     *Description of the Cross-Market Scheme*

86.     Between at least August 2012 and December 2015, Avalon engaged in a cross-market manipulation scheme whereby Avalon bought and sold U.S. stock at a loss for the purpose of artificially moving the prices of corresponding options, so that Avalon could

32

profitably trade those options. Avalon engaged in this strategy hundreds of times, reaping millions of dollars in profits from doing so.

87.     The cross-market scheme worked as follows:

(a)     Avalon employed the cross-market strategy by engaging in a series of transactions in stocks and corresponding options whose prices Avalon could significantly impact through its stock trading, such that Avalon's stock trades could and would artificially move the price of the stock and corresponding options.

(b)     Avalon began by buying or selling stock, not for any legitimate purpose but instead for the purpose of pushing the price of the stock higher (by buying) or lower (by selling). In fact, Avalon's trades did move the price of the stock.

(c)     Avalon's stock trades caused the price of corresponding options in that security also to move significantly, so that Avalon could take advantage of that change in the price of the options. For example, buying the stock would cause the price of the stock to rise, which would in turn cause the price of corresponding put options to decrease.

(d)     Avalon then bought or sold large quantities of the options at the artificially more favorable price that Avalon's stock trades had just caused. For example, when Avalon bought the stock in a particular security, it pushed the price of the stock up, and made the put options for that security cheaper. Avalon then bought large quantities of put options at a price lower than would have been available absent Avalon's stock trades.

(e)     After Avalon completed its initial, manipulative stock trades to push the price of the stock to artificial levels, as expected, the price of the stock generally moved back toward its original price level. This increased the profitability of Avalon's option position. For example, when Avalon bought stock and thereby pushed the stock price up

33

(and the corresponding put options price down), the price of the stock thereafter generally moved back down toward its original level (and the corresponding put options price moved up), thereby increasing the value of Avalon's large position in put options.

(f)     As Avalon further anticipated, planned and intended, in response to Avalon's large options purchases, (i) market makers for those options would typically hedge their risk in response to Avalon's large options trades by trading in the corresponding stock, and (ii) this stock trading impacted the stock price and thus resulted in pushing the price of the options further in a favorable direction for Avalon. For example, when Avalon had purchased large quantities of put options, market makers typically hedged by selling the corresponding stock, which further pushed the price of the stock down, and pushed the price of the put options up.

(g)     Avalon then further manipulated the price of the options by unwinding its own position in the stock (for example, selling stock if it had bought originally). Avalon did this as part of its manipulative strategy to further push the price of the options it had purchased in a more favorable direction. For example, after Avalon purchased put options at an artificially cheaper price caused by its purchase of stock, Avalon then sold its stock position, which pushed the price of the stock down further and pushed the price of the put options up. Indeed, Avalon sold the stock at a *loss* (*i.e.*, sold it for less than Avalon paid for it), but that loss was more than overcome by the substantial profits it made in trading in the options (see next subparagraph).

(h)     Avalon then unwound its option positions at more favorable prices, for a significant profit that resulted from its manipulative actions described above. For example, in instances in which Avalon bought stock (pushing the price of put options

34

down), then bought a larger position of the options at a cheaper price, then sold the stock (pushing the price of the options back up), Avalon would then sell the options at the higher price caused by Avalon's manipulation of the prices.

(i)     The examples described in the above subparagraphs involved instances in which Avalon carried out the scheme by initially purchasing and later selling stock in order to manipulate the prices of put options. Avalon carried out the scheme in varied ways through combinations of buying and selling stock and corresponding put and call options. But whatever the combination of purchases and sales of stock and options by Avalon, the fundamentals of the cross-market manipulation were the same: Avalon made purchases and sales of stock for the purpose of manipulating prices of options so that Avalon could buy options at lower prices and sell them at higher prices than if Avalon had not engaged in the manipulative stock transactions.

88.     By engaging in the cross-market manipulation, Avalon and its traders knew or were reckless in not knowing that they were engaged in manipulative and fraudulent conduct because Avalon's stock trades had no legitimate economic reason, Avalon intended them to inject into the market false information about supply and demand for the purpose of tricking and inducing other market participants to enter into transactions based on that false information, and for the purpose of moving stock and corresponding options prices to artificial levels.

### 2.     *Example of Cross-Market Manipulation by Avalon*

89.     The cross-market manipulation is illustrated by Avalon's trading in Deckers Outdoor Corporation ("DECK") stock and put options on October 3, 2014:

35

    (a)    Avalon began buying DECK stock at 12:56:25 p.m., when the midpoint of the NBBO for DECK stock was $94.36. By 1:04:57 p.m., Avalon had accumulated a position of 32,549 shares.

    (b)    Between 12:56:25 and 1:04:57 p.m., Avalon's purchases accounted for approximately 69.5% of the trading volume in DECK and the NBBO midpoint of DECK stock rose from $94.36 to $95.135, an increase of 0.82%. There were no material news events relevant to DECK during this period that would have caused the price increase. The artificial increase in the stock price of DECK caused the price of put options for DECK stock to decrease artificially (because the value of a put—the right to sell shares at a specific price—declines in value as the underlying stock price increases).

    (c)    At 1:04:57 p.m., shortly after its stock position reached its maximum during the manipulation of 32,549 shares and the NBBO midpoint of DECK had reached its maximum during the manipulation of $95.135, Avalon purchased 951 put options, the equivalent of 95,100 shares. Avalon's purchases of DECK put options were at artificially low prices as a result of Avalon's prior stock trade purchases.

    (d)    After Avalon purchased the puts, the NBBO midpoint of DECK stock fell from $95.135 to $94.72 between 1:04:57 and 1:08:14 p.m. (which would be the normal and expected result of the price moving back toward to its original level and market makers' hedging by selling stock in response to Avalon's options purchases). The decline in the stock price resulted in an increase in the value of the related put options (because, as the price of the stock declines, the put option to sell shares at a specific price increases).

(e)　　At 1:08:14 p.m., Avalon started selling shares to liquidate its long stock position, and completed liquidating its stock position by 1:48:00 p.m. During this period, Avalon's sales of DECK shares accounted for 26.1% of the total trading volume of 127,697 shares, and the price of DECK further declined from $94.72 to $93.98, or by -0.79%. There were no material news events relevant to DECK shares during this period to cause the decline. The stock price decline resulted in an increase in the related put options price during the same time period.

(f)　　Avalon sold 14 puts shortly after it began liquidating its stock position and then acquired an additional 68 puts at various times between 1:16:28.203 and 1:30:20.620, ending up with a position of 985 puts by 1:30:20.620. Avalon then sold the put options for a profit.

(g)　　In sum, in this trading example, Avalon purchased 1,019 puts at an average price of $2.513 per contract, and sold the same number of puts within 30 minutes at average price of $3.049 per contract, for an average profit of $0.536 per contract and a total profit of $54,640. Avalon generated these profits by (1) using stock trades to artificially depress the price of the corresponding put options contracts; (2) buying the put options at the artificially deflated price; (3) unwinding the stock trades which, combined with other anticipated and expected market maker activity described above, increased the price of the options contracts; and (4) selling the options contracts at a profit. Avalon's DECK stock trades resulted in a loss of $29,707 in this example, a loss that was outweighed by its $54,640 profits from the options trades. Avalon's net gross profits in this cross-market manipulation of DECK stock and options were $24,933.

> 3. **Avalon Repeatedly Manipulated the Prices of Securities and Induced Others to Trade at Artificial Prices Through the Cross-Market Manipulation**

90.     Avalon executed the cross-market manipulation through Avalon's account at LEK over 600 hundred times between August 2012 and December 2015.  The cross-market manipulation scheme generated profits for Avalon of more than $7 million.  The cross-market scheme was carried out primarily if not exclusively by a particular Avalon trade group identified as the number 038 sub-account.

91.     Through the cross-market manipulation, Avalon engaged in a series of transactions in securities that had the effect of creating actual or apparent volume or raising or depressing prices with the specific intent or purpose to induce others to trade in the security.  In doing so, Avalon knowingly and intentionally injected false information into the market and interfered with market forces.

> 4. **Avalon and Fayyer Knowingly or Recklessly Engaged in the Cross-Market Manipulation Scheme**

92.     In engaging in the cross-market manipulation scheme described herein, Avalon and Fayyer knew or were reckless in not knowing that Avalon was injecting false information into the market about the supply of or demand for those securities, that it was manipulating the market for those securities, and that it was thereby engaged in a scheme to defraud.

93.     Avalon and Fayyer knew that Avalon's traders were engaged in the cross-market manipulation.  Fayyer (acting on behalf of Avalon) took steps including but not limited to approving the execution of the cross-market manipulation strategy through Avalon's account, communicating and negotiating with the Avalon traders engaged in the strategy, and urging LEK to undertake technological upgrades to increase the effectiveness and profitability of the strategy. Fayyer understood that the strategy involved trading stocks and options and taking a loss on one

of those positions for the purpose of obtaining a profit on the other position, and knew of

regulatory inquiries regarding Avalon's cross-market manipulation.

94.     Avalon provided millions of dollars in trading capital to carry out this scheme.

Avalon also paid tens of thousands of dollars to obtain logistical support and technology

necessary for the execution of the strategy.

95.     Fayyer and Pustelnik each received a share of Avalon's profits from the

manipulative trading.  In addition, Pustelnik received a share of LEK's commissions from the

manipulative trading.

### G.   LEK and Sam Lek Knowingly or Recklessly Participated In and Substantially Assisted Avalon's Cross-Market Manipulation Scheme

> *1.     LEK and Sam Lek Knew or Were Reckless in Not Knowing that Avalon Was Engaged in the Cross-Market Strategy Through LEK, and that the Cross-Market Strategy Was Manipulative and Fraudulent*

96.     Avalon conducted the cross-market scheme through its account at LEK during

most of the period from August 2012 through approximately December 2015.

97.     LEK and Sam Lek knew or were reckless in not knowing that Avalon was

executing the cross-market manipulation through LEK.  Sam Lek was personally aware that

Avalon was employing the cross-market strategy, and he observed Avalon executing the stock

and options trades to carry out the cross-market strategy through LEK's trading system.  Thus,

LEK and Sam Lek knew or were reckless in not knowing how Avalon was carrying out the

cross-market manipulation and that the strategy was manipulative and fraudulent.  In addition,

Pustelnik, as a LEK registered representative acting on LEK's behalf, knew or was reckless in

not knowing that Avalon was engaged in the cross-market manipulation scheme and that the

trading was manipulative and fraudulent.

98. Shortly after Avalon began the cross-market strategy in or about August 2012, LEK and Sam Lek began to receive notice from regulators and others that the strategy was occurring through LEK and was manipulative or otherwise improper, including but not limited to the following notices:

(a) Within a week after Avalon began executing the cross-market strategy in August 2012, FINRA staff contacted LEK and Sam Lek, requested additional information about the trading, and advised LEK and Sam Lek that FINRA viewed the trading as potentially manipulative. LEK and Sam Lek reviewed the trading, and, after doing so, expressly approved Avalon's continued execution of the cross-market manipulation through LEK.

(b) In August and September 2012, a broker-dealer to which LEK routed orders flagged Avalon's trading as potentially manipulative and requested that LEK shut off order flow from the Avalon account.

(c) Over the next six months, FINRA followed up with additional inquiries and, in January 2013, met with LEK and Sam Lek and again expressed its views that the trading was manipulative.

(d) LEK and Sam Lek were aware that FINRA reached a settlement with HAP Trading (on behalf of multiple exchanges) in May 2014 based on a substantially similar strategy.[2] In June 2014, FINRA again requested that LEK "continue to review activity [of the cross-market strategy] and address any potential manipulative activity involving

---

[2] *See In re HAP Trading, LLC, et al.*, NYSE ARCA, Inc. Proc. No. 20100233913-02 (May 12, 2014).

both option and stock trading in the same underlying effected by the same account holder."

(e)     FINRA also included such behavior in its annual Regulatory and Examination Priorities Letters for every year between 2013 and the present, which LEK and Sam Lek purported to review and disseminate to LEK's registered representatives.

### 2.     *LEK and Sam Lek Participated and Substantially Assisted Avalon in Implementing the Cross-Market Strategy*

99.     Instead of taking steps to halt the cross-market strategy, LEK and Sam Lek in fact participated in the scheme and provided substantial assistance to Avalon in ways including but not limited to providing technology and other services needed to increase the effectiveness, and profitability, of the strategy.

100.     For example, throughout at least 2013 and 2014, at Avalon's request, LEK undertook significant work and expense to decrease latency (the time between the traders entering the order on the trading platform and the order arriving at the exchange) in trading options through LEK, which was crucial to the success of the strategy.  LEK's actions included upgrading its options gateways; providing a dedicated server for Avalon's sole use to route the trades; housing and maintaining Avalon servers that acted as a gateway for the strategy; moving the location of its servers to a proximity that allowed quicker connections for the options strategy, allowing Avalon a more direct route to exchanges and thereby reducing latency; and paying monthly fees for special options ports.  These actions were taken by LEK at the urging of Avalon, Fayyer, and Pustelnik, and were approved and authorized by Sam Lek.

101.     LEK and Sam Lek at all times had the authority and ability to terminate or restrict Avalon's execution of the cross-market manipulation through LEK's systems, but instead expressly approved the cross-market manipulation, and continued to provide market access and

margin lending that made it possible for Avalon to execute the strategy, even though LEK and

Sam Lek knew or were reckless in not knowing that the strategy was manipulative and

fraudulent. LEK and Sam Lek's actions and the assistance they provided made the strategy

possible and increased its effectiveness and profitability. As described in more detail below,

Pustelnik, as a LEK registered representative and for whose conduct LEK is responsible,

participated in and took additional acts to assist the cross-market manipulation.

102.    LEK profited from the cross-market scheme through its receipt of commissions,

trading rebates and fees from Avalon's trading.

**H.**     **Pustelnik Knowingly or Recklessly Participated in and Substantially Assisted the Cross-Market Manipulation**

*1.*     ***Pustelnik Knew or Was Reckless in Not Knowing That the Cross-Market Manipulation Scheme Was Fraudulent***

103.    Pustelnik knew or was reckless in not knowing that the cross-market manipulation

scheme was manipulative and fraudulent. Pustelnik discussed the strategy directly with the

Avalon traders who carried out the cross-market strategy, including but not limited to

discussions in August 2012, after Pustelnik learned that FINRA had flagged the trading as

manipulative. Pustelnik understood and had ample knowledge of how the strategy worked.

Indeed, Pustelnik knew that there was no economic rationale for the stock trades other than to

manipulate and move the prices of the stock and corresponding options and that the strategy

almost always involved taking a loss on the stock trades, in order to obtain a profit on the

options trades that was greater than the loss on the stock trades.

104.    Pustelnik served as the go-between for LEK and the Avalon traders who carried

out the cross-market strategy. Pustelnik met with those traders more than a dozen times.

Pustelnik explained the strategy to Sam Lek and other LEK officers at various times throughout

the relevant period, particularly in response to regulatory inquiries about the strategy directed to LEK, and he assured them it was not manipulative, even though he knew or was reckless in not knowing that it in fact was. Pustelnik enlisted LEK's and Sam Lek's help in improving LEK's technology to accommodate the strategy and maximize its effectiveness.

### 2. *Pustelnik's Role in the Cross-Market Manipulation Through LEK*

105. Pustelnik played a central role in bringing the cross-market manipulation to LEK and ensuring its success. The cross-market manipulation scheme was carried out by two particular Avalon traders primarily located in Moscow. Pustelnik recruited those traders in June 2012, at which time Pustelnik touted the speed of LEK's trading technology, and by August 2012, the traders began executing the strategy through Avalon and LEK.

106. Pustelnik helped LEK develop and institute the technological changes to its systems that were necessary for the cross-market manipulation to work, and continued to work with LEK throughout the relevant time period to improve its systems to increase the effectiveness of the strategy. The cross-market manipulation required high speed for entry and display of orders. Pustelnik—who has boasted of having considerable expertise in the relevant technology—worked with LEK to institute technology sufficient to accommodate the cross-market manipulation. Throughout late 2012 and early 2013, Pustelnik urged LEK to improve its options trading technology so that Avalon would continue to trade the cross-market strategy through LEK. In fact, Pustelnik personally paid a portion of the monthly cost of LEK's options ports to facilitate entry of Avalon's options orders.

107. Pustelnik provided on-site technological assistance to the traders at their Moscow office and at Avalon's Kiev office, where they sometimes came to trade.

108.    Through Pustelnik's role as a registered representative of LEK and the relationships he had with LEK employees, he aggressively encouraged and advocated for the cross-market strategy.

109.    After FINRA questioned the strategy as being potentially manipulative in August 2012, and again met with LEK to express its concerns about the strategy in January 2013, Pustelnik provided LEK with a written description of the strategy, representing that he had concluded that it was not manipulative after studying the strategy and speaking directly with the traders.  Pustelnik knew or was reckless in not knowing that this purported conclusion was false, because the cross-market strategy was inherently manipulative and fraudulent.

### 3.    *Pustelnik Moved the Cross-Market Manipulation to Investment Management Firm and Other Broker-Dealer*

110.    Pustelnik actively took steps, including but not necessarily limited to those described below, to ensure the continued success of the cross-market strategy, even when faced with regulatory inquiries and technological constraints, and even though he knew or was reckless in not knowing that the strategy was manipulative.

111.    In approximately February 2013, after FINRA had contacted LEK and raised concerns about the strategy, and in the midst of negotiating with LEK for technological improvements to facilitate the strategy, Pustelnik—rather than being deterred, and without informing LEK—orchestrated the move of the strategy from Avalon's accounts at LEK to accounts held in the name of Investment Management Firm at Other Broker-Dealer.

112.    Pustelnik played a central role in causing the cross-market strategy to trade through Investment Management Firm.  In or about February 2013, Pustelnik introduced the strategy to Investment Management Firm.  Pustelnik was one of just a few people who discussed the cross-market strategy and its risks with Investment Management Firm.  Yet Pustelnik did not

inform Investment Management Firm or Other Broker-Dealer that FINRA had flagged the activity as manipulative.

113.    Pustelnik negotiated with Investment Management Firm initially to determine and later to increase the amounts of margin lending or buying power that Investment Management Firm would provide to the traders for the cross-market strategy.

114.    Pustelnik then arranged for the Avalon traders who executed the trading in the cross-market strategy to operate through Blaise Greys (a Fayyer-owned entity), which in turn traded through accounts in the name of Investment Management Firm at Other Broker-Dealer. Pustelnik acted as the liaison between Investment Management Firm and the traders executing the strategy.

115.    Pustelnik was heavily involved in developing and setting up technology at Investment Management Firm so that the cross-market manipulation could trade there.  For example, in March 2013, Pustelnik worked with the cross-market traders to assist them first in testing and then actually trading the strategy through Investment Management Firm.  Pustelnik had access to and monitored the accounts at Investment Management Firm that the traders used to conduct the strategy.

116.    Within a month after the strategy started trading through Investment Management Firm's accounts at Other Broker-Dealer, Other Broker-Dealer flagged the conduct as potentially manipulative.

### 4.    *Pustelnik Participated in Moving the Cross-Market Manipulation Back to Lek*

117.    Pustelnik was actively involved in moving the cross-market strategy back to LEK in or about April 2013.

118.    Pustelnik strongly urged LEK to improve its options trading technology so that Avalon could resume its options trading at LEK, including the cross-market strategy.  For example, on April 3, 2013, Pustelnik emailed a LEK officer:  "Avalon has stopped completely trading that options strategy. They did their part – agreed to pay more + good faith.  Now they cant trade – so no comm, no anything on that strategy.  issue is only technology."  Pustelnik followed up with suggestions on how to improve the technology at LEK, noting that "yes they may cost a few hundred bucks – vs 10s of thousands missed commissions."  Also, in April 2013, Pustelnik actively encouraged LEK officers to "prioritize[e] upgrading" LEK's technology specifically for the cross-market strategy.

119.    At Pustelnik's suggestion, the cross-market strategy moved back to LEK in or about late April 2013, and the traders resumed executing the strategy through Avalon shortly thereafter.  The cross-market manipulation continued trading through Avalon's accounts at LEK until at least December 2015.

### 5.    *Pustelnik Profited From the Cross-Market Manipulation*

120.    Pustelnik profited from the cross market manipulation.  He received commissions and other payments from LEK for the transactions that occurred through LEK.  Avalon also paid him a share of profits received.

## CLAIMS FOR RELIEF

### First Claim for Relief

**(Against Avalon, Fayyer, and Pustelnik for
Violations of Section 10(b) of the Exchange Act and Rule 10b-5)**

121.    Paragraphs 1 through 120 are realleged and incorporated by reference.

122.    By reason of the conduct described above, Avalon, Fayyer, and Pustelnik, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or

sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities

of a national securities exchange or the mail:  (a) employed devices, schemes, or artifices to

defraud; and (b) engaged in acts, practices, or courses of business which operated or would

operate as a fraud or deceit upon other persons.

123.    Avalon, Fayyer, and Pustelnik acted knowingly or recklessly.

124.    By reason of the foregoing, Defendants Avalon, Fayyer, and Pustelnik violated

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17

C.F.R. § 240.10b-5(a) and (c)].

### Second Claim for Relief

### (Against Avalon, Fayyer, and Pustelnik for Violations of Section 17(a)(1) and (3) of the Securities Act)

125.    Paragraphs 1 through 120 are realleged and incorporated by reference.

126.    By reason of the conduct described above, Avalon, Fayyer, and Pustelnik, in the

offer or sale of securities, acting with the requisite degree of scienter, by the use of means and

instruments of transportation and communication in interstate commerce, and by use of the

mails, directly or indirectly:  (a) knowingly or recklessly, employed devices, schemes, or

artifices to defraud; and (b) with negligence, engaged in transactions, practices, or courses of

business which operated or would have operated as a fraud or deceit upon purchasers.

127.    Avalon, Fayyer, and Pustelnik acted knowingly, recklessly, or negligently.

128.    By reason of the foregoing, Avalon, Fayyer, and Pustelnik violated Sections

17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

### Third Claim for Relief

### (Against LEK and Sam Lek for Violations of Section 17(a)(3) of the Securities Act)

129.    Paragraphs 1 through 120 are realleged and incorporated by reference.

130.     By reason of the conduct described above, LEK and Sam Lek, in the offer or sale of securities, acting with the requisite degree of scienter, by the use of means and instruments of transportation and communication in interstate commerce, and by use of the mails, directly or indirectly, with negligence, engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon purchasers, including but not limited to LEK and Sam Lek's involvement and participation in a scheme to defraud the U.S. securities markets through the layering and cross-market manipulation strategies.

131.     LEK and Sam Lek acted knowingly, recklessly, or negligently.

132.     By reason of the foregoing, LEK and Sam Lek violated Section 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(3)].

## **Fourth Claim for Relief**

### **(Against Avalon and Fayyer for Violations of Section 9(a)(2) of the Exchange Act)**

133.     Paragraphs 1 through 120 are realleged and incorporated by reference.

134.     By reason of the conduct described above, Avalon and Fayyer, directly or indirectly, by the use of the mails or means or instrumentalities of interstate commerce, or of a facility of a national securities exchange, effected, alone or with one or more other persons, a series of transactions in securities creating actual or apparent active trading in such securities, or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others, including but not limited to Avalon's and Fayyer's actions, with Avalon, of engaging in the layering and cross-market manipulation strategies which affected the volume and prices of such securities for the purpose of inducing the purpose or sale of such securities by others.

135.     Avalon and Fayyer acted with the intent to induce trading by others.

48

136.    By reason of the foregoing, Avalon and Fayyer violated Section 9(a)(2) of the

Exchange Act [15 U.S.C. § 78i(a)(2)].

### Fifth Claim for Relief

### (Against Fayyer and Pustelnik for Aiding and Abetting Avalon's and Each Other's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)

137.    Paragraphs 1 through 120 are realleged and incorporated by reference.

138.    By reason of the conduct described above, Avalon, Fayyer, and Pustelnik violated

the federal securities laws.  Avalon, Fayyer, and Pustelnik, in connection with the purchase or

sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails,

or of the facilities of a national securities exchange, directly or indirectly, with scienter:  (a)

employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses

of business which operated or would operate as a fraud or deceit upon other persons, in violation

of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5].

139.    By reason of the conduct described above, Fayyer and Pustelnik, acting

knowingly or recklessly, provided substantial assistance to, and thereby aided and abetted,

Avalon's and each other's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

140.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)],

Fayyer and Pustelnik are liable for Avalon and each other's violations of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## Sixth Claim for Relief

**(Against LEK and Sam Lek for Aiding and Abetting Avalon's, Fayyer's, and Pustelnik's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)**

141.     Paragraphs 1 through 120 are realleged and incorporated by reference.

142.     By reason of the conduct described above, Avalon, Fayyer, and Pustelnik violated the federal securities laws.  Avalon, Fayyer, and Pustelnik, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly, with scienter:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

143.     By reason of the conduct described above, LEK and Sam Lek, acting knowingly or recklessly, provided substantial assistance to, and thereby aided and abetted, Avalon's, Fayyer's, and Pustelnik's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

144.     Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], LEK and Sam Lek are liable for Avalon's, Fayyer's, and Pustelnik's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## Seventh Claim for Relief

**(Against Fayyer and Pustelnik for Aiding and Abetting Avalon's and Each Other's Violations of Section 17(a)(1) and (3) of the Securities Act)**

145.     Paragraphs 1 through 120 are realleged and incorporated by reference.

146.    By reason of the conduct described above, Avalon, Fayyer, and Pustelnik, in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly: (a) with scienter, employed devices, schemes, or artifices to defraud; and (b) with negligence, engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon purchasers, in violation of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

147.    By reason of the conduct described above, Fayyer and Pustelnik, acting knowingly or recklessly, provided substantial assistance to, and thereby aided and abetted, Avalon's and each other's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

148.    Accordingly, Fayyer and Pustelnik, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], are liable for those violations.

## Eighth Claim for Relief

**(Against LEK and Sam Lek for Aiding and Abetting Avalon's, Fayyer's, and Pustelnik's Violations of 17(a)(1) and (3) of the Securities Act)**

149.    Paragraphs 1 through 120 are realleged and incorporated by reference.

150.    By reason of the conduct described above, Avalon, Fayyer, and Pustelnik, in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly: (a) with scienter, employed devices, schemes, or artifices to defraud; and (b) with negligence, engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon purchasers, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

151.    By reason of the conduct described above, LEK and Sam Lek, acting knowingly or recklessly, provided substantial assistance to, and thereby aided and abetted, Avalon's, Fayyer's, and Pustelnik's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

152.    Accordingly, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], LEK and Sam Lek are liable for Avalon's, Fayyer's, and Pustelnik's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### Ninth Claim for Relief

**(Against Fayyer, Pustelnik, LEK, and Sam Lek for**
**Aiding and Abetting Avalon's Violations of Section 9(a)(2) of the Exchange Act)**

153.    Paragraphs 1 through 120 are realleged and incorporated by reference.

154.    Based upon the conduct described above with regard to the layering scheme and the cross-market manipulation scheme, Avalon violated the federal securities laws. Avalon, directly or indirectly, by the use of the mails or means or instrumentalities of interstate commerce, or of a facility of a national securities exchange, effected, alone or with one or more other persons, a series of transactions in securities creating actual or apparent active trading in such securities, or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others, in violation of Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

155.    By reason of the conduct described above, Fayyer, Pustelnik, LEK, and Sam Lek, acting knowingly or recklessly, provided substantial assistance to, and thereby aided and abetted, Avalon's violations of Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

156.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)],

Fayyer, Pustelnik, LEK, and Sam Lek are liable for Avalon's violations of Section 9(a)(2) of the

Exchange Act [15 U.S.C. § 78i(a)(2)].

### Tenth Claim for Relief

**(Against Avalon and Fayyer Under Section 20(a) of the Exchange Act for Violations of
Exchange Act Sections 9(a)(2) and 10(b) and Rule 10b-5)**

157.    Paragraphs 1 through 120 are realleged and incorporated by reference.

158.    By reason of the conduct described above, certain traders under Avalon's and

Fayyer's control: (a) directly or indirectly, by the use of the mails or means or instrumentalities

of interstate commerce, or of a facility of a national securities exchange, effected, alone or with

one or more other persons, a series of transactions in securities creating actual or apparent active

trading in such securities, or raising or depressing the price of such securities, for the purpose of

inducing the purchase or sale of such securities by others; and (b) directly or indirectly, singly or

in concert with others, in connection with the purchase or sale of a security, with scienter, used

the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a

national securities exchange to employ devices, schemes, or artifices to defraud and to engage in

acts, practices, or courses of business which operated or would operate as a fraud or deceit upon

others.

159.    By reason of the conduct described above, the Avalon traders were control

persons of Avalon and Fayyer in that Avalon and Fayyer exercised actual power and control over

the Avalon traders and were culpable participants in the Avalon traders' violations of Sections

9(a) and 10(b) and Rule 10b-5.

160.    Accordingly, Avalon and Fayyer, pursuant to Section 20(a) of the Exchange Act

[15 U.S.C. § 78t(a)], are liable for the Avalon traders' violations of Sections 9(a)(2) and 10(b) of

the Exchange Act and Rules 10b-5(a) and (c) thereunder [15 U.S.C. §§ 78i(a)(2), 78j(b), 17 C.F.R. §§ 240.10b-5(a), (c)].

### Eleventh Claim for Relief

**(Against LEK Under Section 20(a) of the Exchange Act for Violations of Exchange Act Section 10(b) and Rule 10b-5)**

161. Paragraphs 1 through 120 are realleged and incorporated by reference.

162. By reason of the conduct described above, Pustelnik, a registered representative under LEK's control, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

163. By reason of the conduct described above, LEK was a control person of Pustelnik in that LEK exercised actual power and control over Pustelnik and was a culpable participant in his violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

164. Accordingly, LEK, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], is liable for Pustelnik's violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder [15 U.S.C. § 78j(b), 17 C.F.R. §§ 240.10b-5(a), (c)].

### Twelfth Claim for Relief

**(Against Pustelnik Under Section 20(a) of the Exchange Act for Violations of Exchange Act Sections 9(a)(2) and 10(b) and Rule 10b-5)**

165. Paragraphs 1 through 120 are realleged and incorporated by reference.

166. By reason of the conduct described above, Avalon, which was under Pustelnik's control: (a) directly or indirectly, by the use of the mails or means or instrumentalities of

54

interstate commerce, or of a facility of a national securities exchange, effected, alone or with one or more other persons, a series of transactions in securities creating actual or apparent active trading in such securities, or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others; and (b) directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

167.    By reason of the conduct described above, Pustelnik was a control person of Avalon, in that he exercised actual power and control over Avalon and was a culpable participant in its violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

168.    Accordingly, Pustelnik, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], is liable for Avalon's violations of Sections 9(a)(2) and 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder [15 U.S.C. §§ 78i(a)(2), 78j(b), 17 C.F.R. §§ 240.10b-5(a), (c)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A.    Finding that Defendants Avalon, Fayyer, LEK, Sam Lek, and Pustelnik violated the federal securities laws alleged in this complaint;

B.    Permanently restraining and enjoining Defendants Avalon, Fayyer, LEK, Sam Lek, Pustelnik, and all persons in active concert or participation with them, from violating the federal securities laws alleged in this complaint;

C.     Ordering Defendants Avalon, Fayyer, LEK, Sam Lek, and Pustelnik to disgorge all ill-gotten gains as a result of their unlawful conduct, plus pre-judgment interest;

D.     Ordering Defendants Avalon, Fayyer, LEK, Sam Lek, and Pustelnik to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

E.     Granting such other and further equitable relief to the Commission as the Court deems just and appropriate.

## JURY DEMAND

The Commission demands trial by jury.

Dated: March 10, 2017
       Washington D.C.

Respectfully submitted,

Robert A. Cohen
David J. Gottesman*
Olivia S. Choe*
Sarah S. Nilson*

U.S. Securities and Exchange Commission
100 F. Street NE
Washington, D.C. 20549-4010
Tel.: (202) 551-4470 (Gottesman)
Fax: (202) 772-9245 (Gottesman)
Email: gottesmand@sec.gov

*Of Counsel:*

Antonia Chion*
Melissa R. Hodgman*
Carolyn M. Welshhans*
Owen A. Granke*

*Not admitted in the Southern District of New York.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

         Plaintiff,

                v.

LEK SECURITIES CORPORATION,
SAMUEL LEK, VALI MANAGEMENT
PARTNERS dba AVALON FA LTD,
NATHAN FAYYER, and SERGEY
PUSTELNIK,

         Defendants.

Case No. 17-CV-1789(DLC)

---

## PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO
## FEDERAL RULE OF CIVIL PROCEDURE 26(a)(1)(A)

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") hereby makes

its initial disclosures pursuant to Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure

("Rules").

    1.     Pursuant to Rule 26(a)(1)(A)(i), the SEC provides, as Attachment A, a list of (a)

the names of individuals likely to have discoverable information that the SEC may use to support

its claims, other than solely for impeachment; (b) if known, their last known addresses and

telephone numbers; and (c) a description of the subject matter of such information.  Additional

individuals may become known later, as discovery progresses.

    2.     Pursuant to Rule 26(a)(1)(A)(ii), the SEC identifies the following categories of

documents, electronically stored information, and tangible things ("Documents") in its

possession, custody, or control that it may use to support its claims, unless such use would be solely for impeachment:

(a)  Documents identified in the SEC's Complaint.

(b)  Subpoenas and requests for information issued by the SEC during its investigation to the Defendants, and Documents produced in response to those subpoenas and requests, or otherwise provided to the Commission by Defendants.

(c)  Subpoenas and requests for information issued by the SEC during its investigation to third parties, and Documents produced in response to those subpoenas and requests, or otherwise provided to the Commission by third parties, including but not limited to self-regulatory organizations, other governmental or regulatory agencies, exchanges, market participants, and others listed on Attachment A hereto.

(d)  Correspondence between the SEC and Defendants or third parties.

(e)  Transcripts of sworn testimony, taken by the Commission during its investigation, and the exhibits used therein.

The Documents described above are located at the Commission's offices at 100 F Street N.E., Washington, D.C. 20549.  The Commission may identify additional Documents later, as discovery progresses.[1]

3.     Rule 26(a)(1)(A)(iii) is inapplicable because the Commission does not seek damages.  The Commission seeks injunctive and other non-monetary relief identified in the Complaint, and it seeks (a) disgorgement of Defendants' ill-gotten gains, with pre-judgment interest, (b) civil monetary penalties pursuant to Section 20(d)(2) of the Securities Act of 1933

---

[1] The disclosures made in paragraphs 1 and 2 do not include any disclosures that are required under Rule 26(a)(2) or Rule 26(b)(4)(C), which have been or will be made pursuant to the Court's Scheduling Orders (ECF Nos. 18, 98).

[15 U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Securities Exchange Act of 1934 [15 U.S.C. § 78u(d)(3)], and (c) such other equitable relief as may be appropriate.

4.     Pursuant to Rule 26(a)(1)(A)(iv), the SEC is not aware of any insurance agreement under which any person carrying on an insurance business or any insurance carrier may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

5.     The SEC reserves the right to supplement or otherwise amend these initial disclosures as appropriate.

Dated:  August 16, 2017

Respectfully submitted,

David J. Gottesman
Robert A. Cohen
Olivia S. Choe
Sarah S. Nilson
U.S. Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549
Tel: (202) 551-4470 (Gottesman)
GottesmanD@sec.gov
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th of August, 2017, I served the foregoing document and all

attachments thereto upon the following counsel of record via the email addresses listed below:

James M. Wines
Law Office of James M Wines
1802 Stirrup Lane
Alexandria, VA 22308
winesj@wineslegal.com

Steven Karl Barentzen
The Law Office of Steven Barentzen
1575 Eye Street NW, Suite 300
Washington, DC 20005
steven@barentzenlaw.com

*Counsel for Defendants Avalon FA Ltd, Nathan Fayyer, and Sergey Pustelnik*

Stephen Mark Dollar
David Barry Schwartz
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York 10019
Steve.dollar@nortonrosefulbright.com
David.schwartz@nortonrosefulbright.com

Kevin Harnisch
Norton Rose Fulbright US LLP
799 9th St., NW, Ste. 1000
Washington, DC 20001
Kevin.harnisch@nortonrosefulbright.com

*Counsel for Defendants Lek Securities Corporation and Samuel Lek*

Sarah S. Nilson

<u>*SEC v. Lek*</u> <u>(S.D.N.Y. No. 17-cv-1789)</u>

<u>ATTACHMENT A</u>
**Plaintiff's Rule 26(a)(1)(A)(i) List of Individuals**

| *Name* | *Title/Role* | *Last Known Address and Phone Number* | *Subject Matter* |
|---|---|---|---|
| *DEFENDANTS* | | | |
| Lek Securities Corporation ("LEK") | Defendant; Broker-Dealer | c/o Kevin Harnisch Norton Rose Fulbright 799 9th Street NW Suite 1000 Washington DC 20001 202-662-4520<br><br>c/o Steve Dollar Norton Rose Fulbright 1301 Avenue of the Americas New York, NY 10019 212-318-3211 | Subject matter alleged in Complaint, or in Defendants' answers and affirmative defenses; general background and foundational matters |
| Samuel Lek | Defendant; Chief Executive Officer and Chief Compliance Officer ("CCO"), LEK | c/o Kevin Harnisch and Steve Dollar See above | See above |
| Vali Management Partners dba Avalon FA Ltd ("Avalon") | Defendant; Foreign Trading Firm | c/o James Wines Law Offices of James M. Wines 1802 Stirrup Lane Alexandria, VA 22308 202-297-6768<br><br>c/o Steven Barentzen The Law Office of Steven Barentzen 1575 Eye St. NW Suite 3000 Washington, DC 20005 202-289-4333 | See above |
| Nathan Fayyer | Defendant; Director | c/o James Wines and | See above |

| Name | Title/Role | Last Known Address and Phone Number | Subject Matter |
|---|---|---|---|
| | and owner, Avalon | Steven Barentzen See above | |
| Sergey Pustelnik | Defendant; Undisclosed control person of Avalon; former registered representative at Lek | c/o James Wines and Steven Barentzen See above | See above |
| **CURRENT AND FORMER LEK PERSONNEL** | | | |
| Nicolas Louis | President, LEK | c/o Kevin Harnisch and Steve Dollar See above | See above |
| Andrew Shapiro | Compliance Officer, LEK | c/o Kevin Harnisch and Steve Dollar See above | See above |
| Jeffrey Brandt | Former Compliance Officer, LEK | c/o Kevin Harnisch and Steve Dollar See above | See above |
| Dan Hanuka | Chief Financial Officer, LEK | c/o Kevin Harnisch and Steve Dollar See above | See above |
| Alexander Lubetsky | Former registered representative, LEK | c/o Kerry Brainard Verdi Verdi & Ogletree, PLLC 1325 G Street NW Suite 500 Washington, DC 20005 202-449-7703 | See above |
| Svetlana Pershinova | Former administrative assistant, LEK | c/o Kerry Brainard Verdi See above | See above |
| **AVALON TRADERS AND TRADE GROUP LEADERS** | | | |
| Dmitry | Trader, Avalon | Unknown | Cross-market |

| Name | Title/Role | Last Known Address and Phone Number | Subject Matter |
|---|---|---|---|
| Belousov | | | manipulation scheme; layering scheme; business activities and associates of Avalon; general background and foundational matters |
| Roman Vishnevsky a/k/a Roman Visnevskiy | Trader, Avalon | Unknown | See above |
| Aleksandr Milrud | Trade Group Leader or Participant, Avalon | c/o Michael Bachner 26 Broadway New York, NY 01004 213-344-7778 | Layering scheme; business activities and associates of Avalon; general background and foundational matters |
| Zhicheng Xia a/k/a Reggy Xia | Trade Group Leader, Avalon | Unknown | See above |
| Bin Li a/k/a Tim | Trade Group Leader, Avalon | Room 302 Qinzhou Building No. 6, Lane 108 Qinzhou Road Xuhui District Shanghai, China 8615710685396 | See above |
| *FORMER AND CURRENT COASTAL PERSONNEL* | | | |
| Craig Robertson | Former Managing Director, Coastal Management ("Coastal") | c/o Daniel Schulman The Schulman Law Firm LLP 11 Broadway, Suite 615 New York, NY 10004 646-688-5214 | Cross-market manipulation scheme through Coastal Securities accounts; general background and foundational matters |
| Marc Preston | Managing Partner, Coastal | c/o Daniel Viola Sadis Goldberg, LLP | See above |

| Name | Title/Role | Last Known Address and Phone Number | Subject Matter |
|---|---|---|---|
| | | 551 Fifth Avenue, 21st floor New York, NY 10176 212-573-8038 | |
| Sasha Szabo | Managing Partner, Coastal | c/o Daniel Viola See above | See above |
| *OTHER MARKET PARTICIPANTS* | | | |
| Jerry O'Connell | CCO, Susquehanna Securities ("Susquehanna") | 401 City Avenue Bala Cynwyd, PA 19004 610-617-2600 | Cross-market manipulation scheme; options trading, role of market makers, and harm caused by cross-market manipulation; general background and foundational matters |
| Todd Simkin | Associate Director, Susquehanna | See above | See above |
| Marin Nitzov | Citadel LLC | c/o Allison Baker Shealy Shulman Rogers 12505 Park Potomac Ave 6th Floor Potomac, MD 20854 301-230-5200 | See above |
| John Huth, Ph.D., FRM | Chief Technology Officer, Quantlab Securities LP ("Quantlab") | 3 Greenway Plaza, Suite 200 Houston, TX 77046 | Layering scheme; equities trading, algorithmic trading, and harm caused by layering; general background and foundational matters |
| William St. Laurent | CCO, Lime Brokerage, LLC | 625 Broadway, 12th Floor New York, NY 10012 | Cross-market manipulation scheme through Coastal accounts; general |

| Name | Title/Role | Last Known Address and Phone Number | Subject Matter |
|------|-----------|-------------------------------------|----------------|
| | | | background and foundational matters |
| **CURRENT AND FORMER EXCHANGE PERSONNEL** | | | |
| Jeff Connell | Vice President, Market Oversight, Bats Global Markets ("BATS") | 8050 Marshall Drive Lenexa, KS 66214 913-815-7098 | Layering scheme; equities trading and markets; general background and foundational matters |
| Andy Gordon | Senior Equities Regulatory Analyst, BATS | See above 913-815-7192 | See above |
| Tom McManus | Former Chief Compliance Officer and General Counsel, Direct Edge | ETrade Harbor Side II 200 Hudson Street, Suite 501 Jersey City, NJ 07311 201-793-0581 | See above |
| Gene DeMaio | Senior Vice President, Market Regulation, Financial Industry Regulatory Authority ("FINRA") | FINRA 20 Broad Street New York, New York 10005 212-457-5313 | Cross-market manipulation scheme; options trading and markets; background and foundational matters |
| Max Tourtelot | Director – Market Regulation, FINRA | FINRA 20 Broad Street New York, New York 10005 212-457-5366 | See above |
| **OTHER MISCELLANEOUS INDIVIDUALS** | | | |
| Alexander Shvarts a/k/a Alex Schwarts a/k/a Ponch | Unknown | c/o Daniel S. Newman Broad and Cassel 2 South Biscayne Boulevard, 21st Floor Miami, FL 33131 | Cross-market manipulation scheme through Coastal accounts; Avalon business activities and |

| Name | Title/Role | Last Known Address and Phone Number | Subject Matter |
|---|---|---|---|
| | | 305-373-9467 | associates; general background and foundational matters |
| Alex Kravets | Formerly at Singularity Technology Solutions | c/o Sandra Grannum Davidson & Grannum, LLP 30 Ramland Road Suite 201 Orangeburg, NY 10962 845-667-5160 | Layering scheme; Avalon business activities and associates; general background and foundational matters |
| **AUTHENTICATING WITNESSES** | | | |
| Patrick McCluskey | Securities Operations Specialist, Securities and Exchange Commission | Securities and Exchange Commission 1617 JFK Boulevard Suite 520 Philadelphia, PA 19103 215-861-9649 | Background and authentication of various documents received by the SEC during its investigation; summary of information and documents |
| Douglas Bond | Forensic Analyst, Securities and Exchange Commission | Securities and Exchange Commission 100 F St. NE Washington, DC 20549 202-551-4688 | Collection and contents of Avalon back-office server |
| Records Custodians | Various – to be determined | To be determined | Authentication of various records as necessary |
| **OTHER** | | | |
| Any and all persons identified by defendants pursuant to Rule 26(a)(1) | See defendants' disclosures pursuant to Rule 26(a)(1) | | Subject matters identified in defendants' disclosures |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
Attorney: NORTON ROSE FULBRIGHT US LLP
Address: 1301 Avenue of the Americas New York , NY 10019

Job #: 1425030

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | | Index Number: 17-CV-01789 (DLC) |
| | | Client's File No.: |
| *vs* | *Plaintiff* | Court Date: |
| LEK SECURITIES CORPORATION, et al., | | Court Time: |
| | *Defendant* | Date Filed: |

STATE OF NEW YORK, COUNTY OF ALBANY, SS.:

**AFFIDAVIT OF SERVICE**

James Boland , being sworn says:

Deponent is not a party herein; is over the age of 18 years and resides in the State of New York.

On 11/03/2017, at 11:45 AM at: **80 STATE STREET, ALBANY, NY 12207** Deponent served the within Subpoena To Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13), Schedule A Exhibit 1 Attached And Exhibit 2 Attached

On: **FINANCIAL INDUSTRY REGULATORY AUTHORITY C/O CORPORATION SERVICE COMPANY** ,  therein named.

Said documents were conformed with index number endorsed thereon.

☒ **#1 Corporation or Partnership or Trust or LLC or Agency or P.C.**
By delivering thereat a true copy of each to Kevin Vohnoutka personally. Deponent knew said corporation/partnership/trust/LLC/agency/P.C. so served to be the corporation/partnership/trust/LLC/agency/P.C. described in said aforementioned document as said party and knew said individual to be Service Clerk thereof, authorized to accept on behalf.

☒ **#2 DESCRIPTION**
Sex: Male          Color of skin: White          Color of hair: Brown     Glasses: Yes
Age: 39   Height: 5'10"                    Weight: 180          Other Features:

☐ **#3 WITNESS FEES**
Subpoena Fee Tendered in the amount of $

☐ **#4 OTHER**

Sworn to before me on 11/06/2017

PATRICIA A. BURKE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU4922372
Qualified in Albany County
My Commission Expires February 28, 2018

James Boland
DCA License#