UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

LEK SECURITIES CORPORATION,
SAMUEL LEK,
VALI MANAGEMENT PARTNERS dba
   AVALON FA LTD,
NATHAN FAYYER, and
SERGEY PUSTELNIK a/k/a SERGE
   PUSTELNIK,

Defendants.

CASE NO. 17-CV-1789 (DLC)

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
***DAUBERT* MOTION TO EXCLUDE THE TESTIMONY**
**AND OPINIONS OF ROGER S. BEGELMAN**

David J. Gottesman
Olivia S. Choe
Sarah S. Nilson
U.S. Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549
Tel.: (202) 551-4470 (Gottesman)
Fax: (202) 772-9292
Email:  gottesmand@sec.gov

October 5, 2018

*Counsel for Plaintiff*

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 2

      A.   The SEC's Claims Against Defendants ................................................... 2

      B.   Facts and Begelman's Opinions ............................................................. 3

III.  GOVERNING LAW ........................................................................................... 5

IV.   ARGUMENT ...................................................................................................... 5

      A.   Begelman Has No Expertise Regarding How Broker-Dealers
           Surveil for or Prevent Market Manipulation Such as Layering ............. 5

      B.   Begelman Did Not Use a Reliable
           Methodology for Forming His Opinions ................................................ 9

           1.   Begelman Used No Methodology ................................................ 10

           2.   Begelman Could Not Explain How He Applied His Experience ........ 11

           3.   Begelman Used No Objective Criteria or Standards .................... 14

      C.   Begelman Failed to Consider Sufficient Data ...................................... 16

           1.   LSC's Q6 System ....................................................................... 17

           2.   Begelman Failed to Consider Sufficient
                Data Regarding LSC's Q6 Depth Control .................................... 17

           3.   Begelman Failed to Consider Sufficient Data ............................. 19
                Regarding LSC's Q6 Layering Control ........................................ 19

      D.   Begelman's Opinions Would Not Be Helpful to the Jury ...................... 23

V.    CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page**

*523 IP LLC v. CureMD.Com*,
   48 F. Supp. 3d 600 (S.D.N.Y. 2014) ............................................................... 11

*Algarin v. New York City Dep't of Correction*,
   460 F. Supp. 2d 469 (S.D.N.Y. 2006) ........................................................ 13, 14

*Amorgianos v. Amtrak*,
   303 F.3d 256 (2d Cir. 2002) ............................................................................. 9

*Arista Records LLC v. Lime Group LLC*,
   No. 06 CV 5936(KMW), 2011 WL 1674796 (S.D.N.Y. May 2, 2011) ......................... 6, 25

*CFTC v. Moncada*,
   No. 12 Civ. 8791(CM), 2014 WL 2945793 (S.D.N.Y. June 30, 2014) ........................ 1, 16

*CFTC v. Oystacher*,
   No. 15-CV-9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016) ............................... 6

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ......................................................................................... 5

*Dev. Specialists, Inc. v. Weiser Realty Advisors LLC*,
   No. 09-cv-4084(KBF), 2012 WL 242835 (S.D.N.Y. Jan 24. 2012) ........................... 5

*DiBella v. Hopkins*,
   403 F.3d 102 (2d Cir. 2005) ........................................................................... 23

*Donnelly v. Ford Motor Co.*,
   80 F. Supp. 2d 45 (E.D.N.Y. 1999) ................................................................. 14

*Faulkner v. Arista Records LLC*,
   46 F. Supp. 3d 365 (S.D.N.Y. 2014) ............................................................... 11

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ....................................................................................... 10

*In re Refco Inc. Sec. Litig.*,
   2013 WL 12191891 (S.D.N.Y. Mar. 11, 2013) ................................................. 23

*In re Rezulin Prod. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................. 23

*Linkco, Inc. v. Fujitsu Ltd.*,
   2002 WL 1585551 (S.D.N.Y. July 16, 2002) ................................................... 12

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) ............................................................... 6

*Nimely v. City of N.Y.*,
  414 F.3d 381 (2d Cir. 2005) ........................................................................... 5, 8, 9

*Penn. Mftrs. Assoc. Ins. Co. v. Riccelli Enterprises*,
  2016 WL 6876109 (S.D.N.Y. May 6, 2016) ........................................................ 14

*River Light V, L.P. v. Lin & J Int'l, Inc.*,
  No. 13cv3669(DLC), 2015 WL 3916271 (S.D.N.Y. June 25, 2015) ................... 17

*Ruggiero v. Warner–Lambert Co.*,
  424 F.3d 249 (2d Cir. 2005) ............................................................................... 22

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) ......................................................................... 10

*SEC v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013) .................................................................. 5

*United States v. Dukagjini*,
  326 F.3d 45 (2d Cir.2003) .................................................................................. 23

*United States v. Ulbrecht*,
  2015 WL 413318 (S.D.N.Y. Feb. 1, 2015) ......................................................... 14

## Rules

Federal Rule of Evidence 702 ................................................................................. 5

## I. **INTRODUCTION**

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in support of its Motion to Exclude Testimony and Opinions of the Lek Defendants' Expert Witness Roger S. Begelman ("Begelman").  Defendants Lek Securities Corporation ("LSC") and Samuel Lek (collectively, the "Lek Defendants") have proffered Begelman as an expert witness to testify at trial, and they rely on his report as the sole support for large swaths of their pending motion for summary judgment and Rule 56.1 Statement of Facts (ECF Nos. 214, 218, 219).[1]

Begelman should be precluded from offering opinions and testifying in this case, and his report and opinions should be disregarded in connection with the Lek Defendants' motion for summary judgment.[2]  First, Begelman lacks expertise about the main subject on which he offers opinions:  the "compliance, surveillance, and risk controls related to layering" used by broker-dealers.  Second, Begelman used no reliable methodology to form his opinions.  He cites no objective criteria or standards, and instead relies on numerous conclusory references such as "in my experience" to offer what amount to nothing but *ipse dixit* opinions.  This was demonstrated when he was asked to explain how he applied his experience, and all he could say was "my experience is my experience."

Third, Begelman did not consider sufficient data, and did not consider data in a reliable manner.  While he purportedly considered LSC's computerized system for preventing layering, he ignored LSC's years-long failure to implement key parts of the system that would have

---

[1] *See, e.g.,* Lek Defendants' Rule 56.1 Statement of Material Facts ¶¶ 22, 111-112, 120-121; 124; 127-128; 142-144; 146-148; 150-152;154; 158-160; 164; 414-419; 421-423; 425-427; 432; 434-436; 445-451; 453-455; 457-459; 470-471; 490; 513-514; 518; 523-526; 528; 539; 660; 662-663; 737-738; 742-750; 753-754; 757.

[2] To the extent that Begelman offers opinions not addressed in this motion, "[w]hen you take out all the objectionable portions …, there is simply not much left to it."  *CFTC v. Moncada*, No. 12 Civ. 8791(CM), 2014 WL 2945793, at *6 (S.D.N.Y. June 30, 2014).  His opinions should therefore be excluded in their entirety.

prevented much of the layering.  As far as the parts of LSC's system that Begelman supposedly did consider, he failed to look at enough data to support any of his conclusions, and he revealed that he cannot even interpret or understand the tiny amount of data that he did look at and that he cited as sole support for certain opinions.

Fourth, most of Begelman's report is merely a narrative of alleged facts with his running commentary and spin on what occurred.  This is impermissible for an expert witness, and would not be helpful to the jury.

## II.   **BACKGROUND**

### A.   **The SEC's Claims Against Defendants**

This case involves two manipulative strategies:  layering and cross-market manipulation. From late 2010 and through late 2016, Avalon-a foreign trading firm trading through its brokerage account at LSC-used these strategies to manipulate the U.S. securities markets.  In March 2017, the SEC filed suit against Avalon, LSC, and their principals, alleging violations of various provisions of the securities laws. ECF No. 1 (Complaint).

Layering involves the use of multiple non-bona fide orders (also called "Loud-side orders") that the trader does not intend to have executed.  Instead, the trader uses these non-bona fide, or Loud-side, orders to inject false information about supply or demand into the marketplace, in order to trick and induce other market participants to provide better execution of the trader's bona fide orders (also called "Quiet-side" orders) on the other side of the market. See ECF No. 1 ¶¶ 35-41.

Begelman only offers opinions about Lek's "compliance, surveillance, and risk controls related to 'layering.'"  Ex. 1 (Begelman Rep.) ¶¶ 9-10.

B.    **Facts and Begelman's Opinions**

LSC is a registered broker-dealer that provides execution and clearing services to its customers, including Avalon.  Ex. 1 (Begelman Rep.) ¶¶ 14, 16.[3]  LSC provided direct market access to Avalon.  Ex. 2 (Andrew Shapiro Dep. Tr.) at 32:17-33:12.  Avalon organized its traders into individual "subaccounts," several hundred of which were active in any given quarter.  Ex. 1 (Begelman Rep.) ¶ 16.

Begelman retired in 2016 from working for a wholesale bank that is part of Goldman Sachs.  Ex. 3 (Begelman Dep. Tr.) at 89:21-:23; 94:19-95:23; Ex. 1 (Begelman Rep.) c.v. at 1.  A wholesale bank is different from a broker-dealer.  Ex. 3 (Begelman Dep. Tr.) at 95:18-23.  As detailed below, Begelman has little if any experience in surveillance systems used by broker-dealers to detect market manipulation including layering or spoofing.[4]

Begelman only spent about a month working on this case.[5]  As shown below, Begelman's work in this case consisted primarily of looking at some documents that defense counsel selected for him, and talking to officials at LSC (although he refused in deposition to disclose what they told him).  Although the record in this case includes millions of documents and numerous depositions, each of which is hundreds of pages long, he spent a total of about 30 hours on this case by the time he finished his report on March 16, 2018.  *Id.* at 35:25-36:8.

Begelman asserts that he considered information about LSC's computerized system (known as "Q6") for blocking potential layering, and other supposed mechanisms used at LSC for reviewing trading.  Ex. 1 (Begelman Rep.) ¶¶ 17 & 33.  Begelman  opines that "Lek's

---

[3] The exhibits cited herein are attached to the Declaration of David J. Gottesman, filed herewith.

[4] Begelman agreed that layering is a form of market manipulation.  Ex. 3 (Begelman Dep. Tr.) at 68:23-69:3.  He also stated that another form of manipulation is "spoofing," which is entering orders into the market with a view towards enticing other activity surrounding that order."  Ex. 3 (Begelman Dep. Tr.) at 116:13 – 116:16.

[5] Begelman was engaged to work in this case in about February, 2018.  Ex. 3 (Begelman Dep. Tr.) at 21:23 – 22:7, and he filed his report on March 16, 2018.

compliance, surveillance, and risk controls related to 'layering' from 2012 through 2016 were: (1) consistent with a compliance framework to prevent potential manipulative trading; (2) not in conflict with communications from regulators and exchanges; and (3) consistent with industry standards for reasonable controls to manage risks." Ex. 1 (Begelman Rep.) ¶ 10.

As discussed below, the only standards Begelman could point to were generalized references to "reasonableness" or "reasonably designed" controls or procedures (Ex. 1 (Begelman Rep.) ¶ 13), but he could not identify any objective or measurable criteria to determine what was reasonable. All he could say was that he relied on his "experience." He was unable to explain how he applied his experience to reach any of his opinions.

In evaluating the sufficiency of LSC's computerized system to prevent layering, he failed to consider the fact that LSC failed to implement until 2016 a simple control (known as the "depth control") that would have prevented the large majority of Avalon's layering. LSC planned to implement the depth control on the Avalon account in 2013 but inexplicably failed to do so. Avalon finally implemented the depth control in 2016, and it indeed stopped much of Avalon's layering, which had been going on for years. *See* Ex. 1 (Begelman Rep.) ¶ 53 (LSC implemented restriction on the number of orders that could be placed on one side of the market). In deposition, Begelman was unfamiliar with LSC's actions involving the depth control. For example, he did not look into whether LSC could have stopped the layering in 2013 if it had implemented the depth control. Ex. 3 (Begelman Dep. Tr.) at 261:23-262:1; 276:6-17.

Begelman's report asserts that LSC's Q6 had a layering control in place that imposed particular limits on Avalon's trading in order to prevent layering. Ex. 1 ¶¶ 36-38. He did not, however, look into whether that control was actually in place as to all of Avalon's sub-accounts that traded through LSC. *See*, *e.g.,* Ex. 3 (Begelman Dep. Tr.) at 211:25- 212:2; 222:14 -223:12.

### III.    GOVERNING LAW

Under Federal Rule of Evidence 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The trial court acts as a gatekeeper in determining whether to admit expert testimony, *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993), "whether proffered at trial or on a motion for summary judgment."  *Dev. Specialists, Inc. v. Weiser Realty Advisors LLC*, No. 09-cv-4084(KBF), 2012 WL 242835, at *7 (S.D.N.Y. Jan 24. 2012).  "To determine whether a proposed expert's testimony passes muster under Rule 702, this Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact."  *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citing *Nimely v. City of N.Y.*, 414 F.3d 381, 396-97 (2d Cir. 2005)).  The party seeking to introduce the expert's testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Daubert,* 509 U.S. at 593 & n.10.

### IV.    ARGUMENT

#### A.    Begelman Has No Expertise Regarding How Broker-Dealers Surveil for or Prevent Market Manipulation Such as Layering

In fulfilling its "gatekeeping" role, the Court first assesses "whether a witness is qualified to be an 'expert.'"  *Nimely*, 414 F.3d at 396 n.11.  The Court must ascertain "whether the proffered expert has the educational background or training in a relevant field" and must

also "compare the area in which the witness has superior knowledge, education, experience or skill with the subject matter of the proffered testimony." *Arista Records LLC v. Lime Group LLC*, No. 06 CV 5936(KMW), 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011). "Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007).

Begelman is not qualified to be an expert in this case. His opinions center around whether LSC properly surveilled for and prevented market manipulation such as layering and spoofing, but Begelman has no experience or expertise on that topic. First, he has no relevant education, training, scholarship or teaching experience that qualify him to opine about the issues in his report. He has no formal education or training in economics, other than undergraduate courses, has had no formal training in econometrics, and does not know what the term "market microstructure" means.[6] Ex. 3 (Begelman Dep.) at 71:14-21. He has never published in the securities field. *Id.* at 71:22-25. He has given some internal training at Goldman Sachs, but not about detection or surveillance for market manipulation, layering or spoofing. *Id.* at 72:16 - 73:22. The only other teaching he has done in the securities field involved a course in approximately 1989 for paralegals, which included securities "at an extremely basic level." *Id.* at 72:2-15.

Second, although Begelman worked for various components of Goldman Sachs for many years, he had scant if any experience working on the relevant issue here – the surveillance and control systems used by broker-dealers (such as Lek) to surveil for and control for market manipulation. Begelman worked as "Co-Chief Compliance Officer" for GS Bank USA (also

---

[6] Market microstructure is the "study of trading," including "order submission strategies, market rules, [and] market liquidity[.]" *CFTC v. Oystacher*, No. 15-CV-9196, 2016 WL 3693429, at *22 (N.D. Ill. July 12, 2016). It concerns market structure and design, price formation and price discovery, transaction and timing cost, information and disclosure, and market maker and investor behavior. *See* https://en.wikipedia.org/wiki/Market_microstructure (last visited Aug. 28, 2018).

known as Goldman Sachs Bank, or GS Bank) from 2008 to 2016.  But GS Bank is a wholesale

bank, not a broker-dealer.  Ex. 3 (Begelman Dep. Tr.) at 94:13-95:23; 98:7-14.

Begelman could not identify or give any details of any system used by the bank to detect

layering in the equities markets.  Ex. 3 (Begelman Dep. Tr.) at 109:10-14; 111:4-112:18.  Thus,

Begelman stated, "we had other surveillances, but it didn't look at layering and spoofing in the

equity markets."  *Id*. at 112:16-18.  When asked if he personally had worked on any surveillance

systems' detection of layering or spoofing while at GS Bank, Begelman answered, "I may

have."  Ex. 3 (Begelman Dep. Tr.) at 115:20-24.  When pressed to give all of the details about

his personal involvement in that work, he admitted that his involvement was that he "spoke for

five, ten minutes" with someone in 2010.  *Id.* at 116:1-117:13.  Aside from his 5 to 10 minute

conversation in 2010, Begelman could not recall any other personal involvement in "any

surveillance systems at Goldman Sachs Bank to detect layering or spoofing."  *Id.* at 117:11-24

("I don't recollect any others.").

To the extent that GS Bank had surveillance for any type of manipulation, Begelman

himself had little if any involvement.  He could only state that the bank "could have had or

probably had a manipulations surveillance.  That's just not something that I necessarily looked

at."  *Id.*  112:23-25.

Moreover, whatever surveillance system GS Bank had is irrelevant to this case.  The

present case involves the surveillance systems and controls of a ***broker-dealer*** to prevent

manipulation, particularly by a broker-dealer  providing "direct market access" to its clients.

But Goldman Sachs Bank's surveillance system "did not look at direct market access to the

equity market."  *Id.* at 106:11-12.  And Begelman has not shown that controls and procedures at

a wholesale bank, such as GS Bank where he worked, are relevant to controls and procedures at

a broker-dealer that must surveil for and prevent manipulative trading.  *See Nimely*, 414 F.3d 381, 399 n.13 ("because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields").

Prior to working for GS Bank, Begelman worked for other Goldman Sachs components such as information "control rooms" and "regulatory reporting," but these also did not involve detection or surveillance for layering or spoofing in the equities markets.  Ex. 3 (Begelman Dep. Tr.) at 122:24-123:4; 124:2-7.  While Begelman believes that Goldman Sachs had systems to detect market manipulation and for "some type of spoofing," he cannot recall any specifics.  *Id.* at 127:20 - 128:2; 129:4 - 130:4.  In fact, before the present case, Begelman cannot recall any instances in which he ever examined layering or potential layering.  Ex. 3 (Begelman Dep. Tr.) at 173:18-174:4.

Third, with regard to his work history prior to Goldman Sachs, Begelman could not specifically identify personal involvement in working with broker-dealers' detection and prevention of market manipulation.  For example, he worked at the New York Stock Exchange ("NYSE") from 1988 to 1993.  Ex. 3 (Begelman Dep. Tr.) at 76:14-16.  And while he stated in deposition that he had a "distinct recollection" that "we looked at broker-dealers to make sure they had sufficient controls," he stated that he "can't at the moment [remember] if the matter involved manipulation or something else."  *Id.* at 80:5-9.  When asked if he could give any details about any work he did at the NYSE involving whether broker-dealers had sufficient systems and procedures for detecting market manipulation, his answer was, "I don't have a recollection.  I am sorry." *Id.* at 80:18-25.

In the early 2000s, Begelman participated in securities industry trade organizations, such

as "SIFMA" and "IOSCO," but he could not recall whether his work involved issues about whether broker-dealers had sufficient systems and procedures to detect market manipulation, layering or spoofing.  Ex. 3 (Begelman Dep. Tr.) at 83:4-10; 87:8 - 88:18.  Begelman also served on the NYSE hearing panel board in around the late 1990s or 2000, but could not recall specifically whether he worked on any matters involving market manipulation, layering or spoofing.  *Id.* at 86:3-87:6.

In short, Begelman has no training or experience that would qualify him to render any opinions about the adequacy of a broker-dealer's systems and procedures to detect and prevent market manipulation, including layering or spoofing, particularly by clients who have direct market access through the broker-dealer.  That is the subject on which he purports to offer opinions, and Begelman simply has no expertise in the area.  Whether Begelman might have expertise in other areas of the securities field or in banking is irrelevant.  *Nimely*, 414 F.3d at 399 n.13.  Without the needed relevant expertise, Begelman is in no position to offer opinions about the reasonableness or adequacy of LSC's systems.  His testimony and opinions should be excluded.

### B.    Begelman Did Not Use a Reliable Methodology for Forming His Opinions

In assessing whether a proffered expert's testimony is reliable, courts consider "the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002).  The Court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen.*

*Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Scott v. Chipotle Mexican Grill, Inc.*,

315 F.R.D. 33, 44 (S.D.N.Y. 2016) (*Daubert* applies to rebuttal experts).

### 1.  *Begelman Used No Methodology*

Begelman had no reliable methodology to reach his opinions in this case.  He made the

following concessions in his deposition:

> Q.  What methodology did you follow to develop your opinions in this
> case?
> A.   You recognize that this is not a statistical analysis, correct?

Ex. 3 (Begelman Dep. Tr.) at 142:5-8.

*        *        *

> Q.   In other words, how did you go about forming your opinions?  What
> steps did you take? What analysis did you go through?  How did you do
> it?
> A:  Okay.  So in going through, what I basically did is I looked at, read,
> reviewed a number of documents and was able to have some
> conversations with people from Lek.   I utilized my long history and
> experience in the securities industry to take that information and help me
> formulate my opinion as to whether or not the steps that were by the
> entity were indeed reasonable.
> Q.  Is that it?  Anything else?
> A:  No.  That was it.

*Id.* at 142:13-24.

Begelman's description of his work in this case leaves no doubt that he had no reliable

methodology.  The Lek Defendants' counsel, not Begelman, decided what documents Begelman

would review in this case.  Ex. 3 (Begelman Dep. Tr.) at 141:5-25.  Begelman did virtually no

research beyond looking at the materials that Lek Defendants' counsel gave him, or that LSC

officials told him (and that he refused to disclose in deposition).[7]  *See Faulkner v. Arista*

---

[7] In deposition, Begelman stated that he relied on, among other things, "conversations with people from Lek."  Ex. 3 (Begelman Dep. Tr.) at 142:13-24.  This apparently included two meetings, one of which was two hours long, and the second of which was one hour long.  Both meetings were with Sam Lek and Nicolas Louis (another LSC official), along with the Lek Defendants' counsel.  *Id.* at 143:9 -144:24.  When asked specifically "what was said by Mr. Lek or Mr. Louis that you in any way considered in forming your opinions," Lek Defendants' counsel instructed Begelman not to answer, and Begelman refused to answer.  *Id.* at 145:7-22.  Under

*Records LLC*, 46 F. Supp. 3d 365, 380-81 (S.D.N.Y. 2014) (excluding opinion where expert relied on counsel to choose documents for his review, did not ask for relevant records, and stated that his subsequent review of contradictory documents did not change his opinion).

He stated that he "may have looked up some FINRA releases or documents . . . but that was about it."  Ex. 3 (Begelman Dep. Tr.) at 146:1-3.  He did not contact any broker-dealers besides LSC, and did not do any research into how other broker-dealers surveil for market manipulation.  *Id.* at 146:10-146:18.  He did not compile any data reflecting how other broker-dealers surveil for spoofing or layering.  *Id.* at 147:11-21.  In short, Begelman used no methodology at all, save for offering a purely *ipse dixit* opinion.

### 2.  *Begelman Could Not Explain How He Applied His Experience*

Throughout his report, Begelman states the phrase "in my experience", and then offers an opinion, with no other support or analysis.  *See, e.g.,* Ex. 1 (Begelman Rep.) ¶¶ 34, 37, 38, 39, 41, 42, 48, 49, 50, 53, 54, 55, and 56.   Merely referring to one's "experience" in the abstract is not sufficient to establish that one is an expert,[8] nor is it sufficient to support any expert opinion.  As stated in *523 IP LLC*, 48 F. Supp. 3d at 643,

> an expert basing his opinion solely on his experience must do more than aver conclusorily that his experience led to his opinion.  .  .  .  "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."

---

Fed.R.Civ.P. 26(b)(4)(C)(ii) and (iii), no work product protection attaches to facts and data communicated to and considered by an expert, or assumptions relied on by the expert, even if transmitted by counsel.

[8] Merely referring to years of experience is insufficient to establish expertise.  *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 647 (S.D.N.Y. 2014) (rejecting expert who was "essentially asking the Court to accept his representation that he has expertise based on experience, without explaining what that experience is or how his expertise grew from it").

(quoting Advisory Committee Notes to 2000 Amendments to Rule 702 of the Federal Rules of Evidence).  *Linkco, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002) provides further guidance:

> [experts] must provide some explanation for their conclusions, rather than referring generally to their experience. Without good explanations, courts cannot assess the reliability of any conclusion drawn by an expert, even if he possesses relevant experience.

As shown above, Begelman lacks the necessary experience to opine on relevant issues. But even if he had relevant experience, he did not use a reliable methodology to apply it. Despite being given numerous opportunities in his deposition, Begelman was unable to provide any explanation for how he used his supposed experience to reach the broad conclusions or opinions he offered.  He at times claimed an inability to understand what it means to explain that.  Ex. 3 (Begelman Dep. Tr.) at 147:22-149:20 (*see, e.g., id.* at 149:19-20 ("Apply my experience?  I don't understand it.  I am sorry.  You are losing me.")).  He testified as follows:

> Q.     And how did you reach that conclusion?  What exactly did you do?  ***How did you apply your experience*** to get to that conclusion?
> A.     It was my-sorry.  ***It was my experience in the industry*** that allowed me to formulate those opinions.
> Q.     But exactly how?  How did you apply that experience?
> A.     ***How does one apply experience?  I don't understand the question.***

*Id. at* 302:1-12 (emphasis added; counsel's objection omitted).

Elsewhere in the deposition, Begelman simply refused or could not offer any explanation.  For example, Begelman was asked to explain what how he applied his experience to reach his opinion in paragraph 56 of his report that, "[b]ased on my experience, Lek's compliance, surveillance, and risk controls were consistent with the industry standard":

> Q.     What is the industry standard?
> A.     Reasonable.
> Q.     ***How do you measure what's reasonable in this context?***

A.     ***I don't think you do.***  I think you-like I mentioned any auditor that would come in from the SEC or from FINRA or any other regulator would take in totality the natures of the systems and the procedures and policies they have and look at it in its total and make a determination as to whether or not they thought that it was reasonable and consistent as a compliance framework

Q.     What criteria did you use in this case to measure whether Lek's compliance surveillance and risk controls were consistent with an industry standard of reasonableness?

A.     We have gone through a number of these [over] the course of the day, and again, I had the opportunity to look at a number of documents, testimony, et cetera, et cetera, et cetera, and ***based on my opinion and my experience in the industry and being an industry participant***, it was my conclusion and my opinion that it's consistent with the industry standard.

Ex. 3 (Begelman Dep. Tr.) at 296:6-297:4 (emphasis added; counsel's objections omitted).

*          *          *

Q.     And how did you apply your experience to get to that conclusion?

A.     Okay.  We have-we have also discussed this in the past. ***My experience is my experience***, and that's what helps formulate my judgment.

Q.     Are you able to put any more specifics on your answer?

A.     No.

*Id.* at 297:24-298:12 (emphasis added; counsel's objections omitted).

Begelman then summed up his refusal or inability to explain how he applied his experience:  "The notion of how I apply my experience is an esoteric sort of question that doesn't make full sense to me. ***My experience is my experience***."  *Id.* at 304:10-12 (emphasis added).

It would be hard to imagine a better example of an impermissible *ipse dixit* opinion.  An expert cannot simply say "my experience is my experience" in order to avoid having to use and explain a reliable method for reaching his opinion.  Begelman fails to articulate ***how*** his experience enables him to reach his sweeping opinions, and therefore his opinions are not admissible.  *Algarin v. New York City Dep't of Correction*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) (excluding expert opinion based solely on "subjective inference [the expert] has drawn from his own personal experience").

13

### 3.   *Begelman Used No Objective Criteria or Standards*

Experts must articulate objective criteria or standards that they used to reach their

opinions.  *See Penn. Mftrs. Assoc. Ins. Co. v. Riccelli Enterprises*, 2016 WL 6876109, at *6

(S.D.N.Y. May 6, 2016) (expert's opinion was defective because he "did not identify any

standards, rules or regulations on which he relied"); *United States v. Ulbrecht*, 2015 WL

413318, at *7 (S.D.N.Y. Feb. 1, 2015) ("When an expert witness fails to identify the objective

bases for his opinion, the district court cannot perform a proper assessment; a proffered opinion

deficit in this manner fails to meet the basic requirements of the Federal Rules of Evidence");

*see also Donnelly v. Ford Motor Co.*, 80 F. Supp. 2d 45, 50 (E.D.N.Y. 1999) (where expert

"does not identify any specific technique or method that he used, and cites no industry

standards, surveys or studies," his "reasoning and methodology, whatever they may be" cannot

be examined "to determine their reliability"); *Algarin*, 460 F. Supp. 2d 469, 476-77 (excluding

expert report that "never articulates, in any legally cognizable way, what are the standards of the

medical community regarding involuntary commitment").

Begelman revealed that he used no objective criteria or standards to reach his opinions.[9]

For example, in paragraph 41 of his report, Begelman states that LSC's "Q6 system along with

the back-end reviews of trading were, in my experience, consistent with a compliance

framework to prevent potential manipulative trading."  Aside from the fact that the phrase

"consistent with a compliance framework" is empty jargon that would not be helpful to the jury,

Begelman revealed that he used no standards or criteria to make that assessment:

> Q.    ***How do you measure whether a firm's practices are consistent*** with a
> compliance framework to prevent potential manipulative trading?
> A.    ***How do you measure?  You don't.  It is a subjective view and an***
> ***opinion***, just like an auditor would come in and look at the compliance

---

[9] Although Begelman cites "reasonableness" as the relevant standard, that is too vague to be sufficient for an expert's opinions, without further specific criteria to assess reasonableness.

framework of Lek, and they would make a-whether they are from the SEC or from FINRA-and they would make a judgment, and they would give reasons for their judgment and –

Q.     Well, ***what are the specific criteria*** that one would use to determine whether a firm's practices are consistent with a compliance framework to prevent potential manipulative trading?

A.     There could be a number of different criteria, depending on the nature of the firm.

Q.     Well, with a firm such as Lek, a broker-dealer firm such as Lek, what are the specific criteria?

A.     ***I wouldn't be able to answer that*** sitting here right now.

Q.     ***What specific criteria did you use*** to reach that opinion in paragraph 41 of your report?

Q.     I am asking ***what are the specific criteria you used*** to come up with that precise opinion that Lek's Q6 system , along with back-end reviews of trading, were, in your experience , consistent with the compliance framework to prevent potential manipulative trading?   The question on the table is:   What specific criteria did you use to reach that opinion?

A.     Mr. Gottesman, you may recall that earlier in the testimony that we asked today (sic) you were also asking about methodology, and we had a discussion on, you know, that this is not a statistical analysis.

I had the ability to look at a number of documents.  I had the ability to look at inquiries, responses to inquiries, even audits, and other document as well as testimony and some other pieces of information, including having the ability to talk to people who were at Lek; and through those I was able to formulate my judgment and my opinion that this was a reasonable, consistent compliance framework.

Q.     But the question is: ***What criteria did you use to reach that opinion?***

A.     ***I have given the best answer I can.***

Q.     You have nothing else to add.

A.     I have nothing else to add.

Ex. 3 (Begelman Dep. Tr.) at 284:3-286:7 (emphasis added; defense counsel's objections and

comments omitted).

Begelman gave similarly insufficient answers when asked about his opinions in

paragraph 10 of his report that "I conclude based on my 28 years of experience in surveillance

and compliance in the securities industry and in an analysis of the documents I have been

provided, that Lek's compliance surveillance and risk controls related to layering from 2012 to

2016 were . . .  consistent with industry standards for reasonable controls to manage risks."  He

testified as follows:

> Q.     ***What are those standards?***
> A.     I think we just went through them.  They are, you know, the type of
> systems and controls that an entity would have that are reasonably designed to
> control and manage risk.
> Q.     Where are those standards listed?
> Q.     Are they listed anywhere?
> A.     I don't know if they are listed anywhere.
> Q.     And what specifically do they say?
> A.     Like I said, ***I don't know if they are listed anywhere, so it's not
> something that you can read***.  ***An industry standard is a subjective term.***
> Q.     ***Well, how would you define it?***
> A.     ***I wouldn't.***
> Q.     You can't?
> A.     I didn't say that.  I said I wouldn't define it.  It's-I would have to think
> about what the-how to define it.
> Q.     As you are sitting here today, you can't?
> A.     I would hesitate to do it.
> Q.     Well, I am asking you to do it.  Would you do it, please.
> A.     ***I don't know that I could right now off the top of my head.***  I am not that
> glib.

*Id.* at 298:25-300:5 (emphasis added; counsel's objections omitted).

Begelman gave similar nonsensical and vapid answers to other questions that sought to

probe exactly what standards he used and how he applied his experience to reach his opinions.

*See, e.g.,* Ex. 3 (Begelman Dep. Tr.) at 301:9-302:12.  Because Begelman did not and could not

identify anything even approaching objective standards or criteria, his opinions are unreliable

and should be excluded.

### C.     Begelman Failed to Consider Sufficient Data

An expert witness must base his opinion on sufficient data.  *Moncada*, 2014 WL

2945793, at *3-4 (excluding expert who had done "nothing at all except look at a fraction of the

data in his possession and conclude that [defendant's] activity had no impact on the market,"

and noting that "[t]he mere fact that so much relevant data was not even 'eye-balled,' let alone

analyzed, renders [the expert's] testimony about the lack of market impact … highly suspect");

*see also River Light V, L.P. v. Lin & J Int'l, Inc.*, No. 13cv3669(DLC), 2015 WL 3916271, at *4

(S.D.N.Y. June 25, 2015) (where expert did not examine financial records, his "data is not just

inadequate—it is nonexistent," and his calculations unreliable).   Begelman failed to meet these

requirements.

### 1.    *LSC's Q6 System*

 LSC used a computerized system known as "Q6" supposedly to prevent improper

transactions or trading by its customers.  Q6 had two particular controls that are pertinent here.

One was a layering control, which purportedly would block trades if there were too many trades

on one side of the market (say, to buy stock) at the same time that there were any trades on the

other side (say, to sell stock).  Ex. 1 (Begelman Rep.) ¶¶ 35-36.  LSC could set the limit for how

big that difference could be.  *Id.*  Different limits could be set for Avalon's account as a whole,

and for each of Avalon's sub-accounts.  *Id.*   For example, a limit of 20 applied to a particular

Avalon sub-account meant that orders in that sub-account could not have a difference greater

than 20 between the number of orders on one side of the market and the number of orders on the

other side at any given time.  *Id.* ¶ 36.  Different limits could also be set for the number of

orders per exchange (*e.g.*, the BATS exchange).  *Id.* ¶ 38.

The other important control in Q6 was known as the "depth control," and also was called

"max order count per side per symbol." Ex. 4 (Nicolas Louis Dep. Tr.) at 117:12-18.   The depth

control would block trades if there were too many orders on just one side of the market (say, too

many orders to buy stock).  *Id*. at 115:21-116:19; 198:20-24.

### 2.    *Begelman Failed to Consider Sufficient Data Regarding LSC's Q6 Depth Control*

In his report, Begelman states that in 2016, after receiving certain reports from FINRA, LSC "hypothesized" that a "new" restriction that involved "preventing a trader from entering more than 4 orders on one side of the market at any time would eliminate any potential manipulative layering activity." Ex. 1 (Begelman Rep.) ¶ 53. Begelman claims that as a result of implementing this "new" control on particular Avalon subaccounts, the number of potential layering instances dropped by 83%. *Id.*

Begelman failed to consider the fact that this restriction of preventing traders from entering more than a certain number of orders on one side was nothing "new" – it is the same "depth control" that LSC was supposed to have implemented (according to its own internal documents) to "high supervision accounts" such as Avalon (and actually told regulators it was instituting) in 2013. In 2013, LSC personnel planned to impose a depth control limit of 10 for "high supervision accounts." Ex. 4 (Nicolas Louis Dep. Tr.) at 117:3-118:23.[10] Avalon was just such an account. Ex. 5 (Sam Lek Dep. Tr.) at 261:24-263:20.

LSC represented to regulators that it had such a control in place that would "limit the number of open orders an account can have on one side of the market in a particular symbol." Ex. 6 (SEC Dep. Exhibit 59), at 3. Yet, except for a period of less than three hours of a single trading day in July of 2013, LSC failed to implement the depth control at meaningful levels for Avalon or its subaccounts until 2016.[11] Ex. 7 (Erin Smith Declaration, ¶ 25 & App. 4). Beginning in May 2016, LSC imposed a depth control limit of four for certain Avalon subaccounts. *Id.* ¶¶ 30-32 & App. 4.

When asked whether he considered the significance of LSC's failure to implement the

---

[10] Even though Nicolas Louis was the President of LSC, and had worked there for fourteen years, he claimed not to know what a "high supervision account" was, and that he could not remember what he meant by that term when he wrote it in a 2013 email. Ex. 4 (Louis Dep.) at 119:4 – 119:25.

[11] For the most part the depth control was at 100 between 2013 and 2016. Ex. 7 (Erin Smith Decl. ¶¶ 29 & App. 4).

depth control in 2013, Begelman could not remember if he ever heard of the "depth control." Ex. 3 (Begelman Dep. Tr.) at 261:23-262:1.  As noted above, the depth control was also called "max order count per side per symbol." Ex. 4 (Nicolas Louis Dep. Tr.) at 117:12-18.  Begelman was unfamiliar with this.  Ex. 3 (Begelman Dep. Tr.) at 267:10-17.  He was unable to remember if he had looked into whether LSC had implemented such a control in 2013.  *Id.* at 272:10-18.  When asked if he looked into whether, if LSC had implemented that control in 2013, that would have had an impact on how much layering LSC would have detected and prevented, he answered, "I didn't.  I have no way of knowing that.  I don't have the ability to look in the past at what the context of the market was and what they would-what it would do and not do." *Id.* at 276:6-17.

This was a serious failure by Begelman to consider an important fact, and one that renders unreliable all of his conclusions about the adequacy of LSC's systems and controls.

### 3.  *Begelman Failed to Consider Sufficient Data Regarding LSC's Q6 Layering Control*

Begelman's report asserts that the Q6 system's layering control had various limits in place at different times.  For each of his assertions that a particular layering control limit was in place at a given time, he cited only a single computer printout.  *See* Ex. 1 (Begelman Rep.) at 10-11, nn.21, 23-30.  In deposition, Begelman was shown the printouts that he cited as support for his assertions that the Q6 system had certain limits in place at certain times.  Begelman was completely unfamiliar with the documents that he cited in his report, and he was unable to explain or interpret them at all.

For example, Begelman's report alleges that in mid-February 2013, LSC set a layering control limit of 20 for all Avalon sub-accounts.  Ex. 1 (Begelman Rep.) ¶ 37; Ex. 3 (Begelman Dep. Tr.) at 206:5-23.  He cites as support one document:  Lek_Def_05900091-

038_001R.N2E.TXT (which is marked as Ex. 10 hereto (SEC Dep. Exhibit 610)); *see* Ex. 1 (Begelman Rep.) ¶ 37 n.23; Ex. 3 (Begelman Dep. Tr.) at 206:19-206:23.  When shown that document, Begelman was unable to interpret it or explain it at all.  Ex. 3 at 207:4-17.  All he could identify as support for his assertion that a limit of 20 was in place for Avalon's sub-accounts was "documents that I have looked at," but he could not recall which documents because he "looked at a lot of documents."[12]  *Id.* at 207:23-208:8.

Begelman was shown other similar documents that were the only materials he specifically cited in his report as support for what layering control limits were in place at particular times.  In every instance, his response was the same:  He had no idea what the documents meant or how to interpret them.[13]  Even when SEC counsel tried to refresh Begelman's recollection by suggesting possible meanings of the documents, Begelman still was clueless about the documents.  Ex. 3 (Begelman Dep. Tr.) at 201:17-206:1.

Begelman thus was unable to explain or interpret the only documents he cited in his report as support for key assertions about LSC's Q6 layering control.[14]  His inability to answer basic questions about the support for his opinions speaks volumes about his failure to consider

---

[12] The Lek Defendants' motion for summary judgment illustrates the harm that would flow from allowing Begelman to offer opinions about subjects that he knows nothing about.  For example, in the Lek Defendants Rule 56.1 Statement of Material Facts (dated Aug. 24, 2018) paragraphs 445,446, 450-451, and 453 assert that LSC set certain limits in its Q6 layering control.  The only support cited is Begelman's report, ¶ 37, and in some instances, the very sort of computer printouts that, as shown above, he testified he cannot even interpret.  Aside from the fact that an expert witness is not permitted to give a narrative of alleged facts, Begelman has no reliable basis to offer testimony about this subject.  In short, the Lek Defendants are using Begelman to circumvent their obligation to come forward with competent factual evidence.

[13] *See* Ex. 3 (Begelman Dep. Tr.) at 200:21 – 202:5 (unable to interpret Ex. 8 hereto (SEC Dep. Exhibit 608), which is cited at paragraph 36 n.21 of his report, as the only authority for his assertion that LSC imposed a layering control limit of 10 on Feb. 1, 2013); *id.* at 224:4 – 225:15 (unable to interpret Ex. 11 hereto (SEC Dep. Exhibit 667), which is cited in paragraph 38 n.25 of Begelman's report as the sole support for his assertion that LSC imposed a limit of 10 per account per exchange).

[14] This was not a situation in which a knowledgeable expert simply forgot information because he had not prepared for his deposition.  Begelman spent the two business days before his deposition, for a total of about 16 hours, preparing with at least four of Lek Defendants' counsel.  Ex. 3 (Begelman Dep. Tr.) at 21:3-19.

relevant data, his lack of competency on the issues in this case, and whether he actually performed any meaningful analysis.

This was not a simple failure to understand technical documents. Begelman's report makes categorical statements that LSC imposed specific limits for Avalon's sub-accounts.[15] Yet he did nothing to determine exactly how many of the subaccounts actually had such controls. Ex. 3 (Begelman Dep. Tr.) at 211:25-212:2 ("Q. What did you do to determine how many of the subaccounts had the control of 20?  A.  I didn't.").

In fact, documents produced by LSC show that the Q6 layering control limits were not implemented for all Avalon sub-accounts as Begelman claimed. *See* Ex.7 (Erin Smith Decl., ¶ 22 & n.12, & App. 3).  When shown documents that revealed that, in fact, an Avalon subaccount had no such limit, Begelman also was completely unable to explain, interpret, or to refute them.  *See, e.g.,* Ex. 3 (Begelman Dep. Tr.) at 216:1-218:17.[16]

When asked to explain, Begelman walked back from his report, saying "my report doesn't quantify how many and how many not [had the limit].  It says subaccount-specific controls were put in place; doesn't say a number."  Ex. 3 (Begelman Dep. Tr.) at 222:5-8. Begelman asserted that "there are thousands of subaccounts," and then was asked:

> Q.    And how many of those had a sub-control of 20?
> A.    I didn't count.
> Q.    Don't you think that's something the reader of your report would want to know?
> A.    Probably not.

---

[15] *See, e.g.,* Ex. 1 (Begelman Rep.) ¶ 37 ("the sub-account specific control was put in place as set to 20") ¶ 38 ("In March 2013, Lek added a more restrictive by-exchange control with a limit of 10 orders per subaccount per exchange"; "In July 2013, Led . . . plac[ed] the subaccount limit at 10 and the subaccount per exchange limit at 5; "In October 2013, Lek . . . set[] the subaccount limit to 12").

[16] *See, e.g.,* Ex. 9 (SEC Dep. Exhibits 631 – 648), which are documents showing that from Feb. 15, 2013 to March 12, 2013, there was no sub-account specific limit for a particular sub-account (sub-account number 021_020L), even though Begelman's report (¶ 37) states that during that time there was a sub-account specific limit of 20.  *See* Ex. 7 (Erin Smith Decl., 22 & n.12).

Ex. 3 (Begelman Dep. Tr.) at 223:5-12 (counsel's objections omitted).

Begelman dismissively speculated that "if" there were "administrative or operational errors, which these appear to be, I would say that's de minimis and has little or no impact or materiality." *Id.* at 223:17-21.  But Begelman does not know whether LSC's failures to actually implement the controls were "de minimis" because he did nothing to quantify how many sub-accounts did not have a layering control limit in place.   He testified as follows:

> Q.  But you did nothing to quantify how many subaccounts had what you call ministerial errors [where] they did not have the 20 limit in place?
> A.  In light of the fact that I knew that there were thousands, I did not.

*Id.* at 223:22-224:2.[17]

Begelman failed to find out or even consider in how many instances LSC failed to actually apply the layering control limit to Avalon's sub-accounts.  This shortcoming in Begelman's work is damning.  Begelman opines on the adequacy of Lek's controls.  If Lek purported to impose certain controls, but in fact did not actually do so for some sub-accounts, that is a crucial piece of information.  Begelman's opinions about the reasonableness or sufficiency of LSC's controls are not valid if he does not know how the number of instances in which the controls were not implemented and if he did not analyze the effect of that failure. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005).

---

[17] If Begelman was attempting to show that LSC's failures were de minimus because there were "thousands" of sub-accounts, his effort fails.  He acknowledged in his report that only "hundreds" of sub-accounts were active in any given quarter.  Ex. 1 (Begelman Rep.) ¶ 16.

**D.**   **Begelman's Opinions Would Not Be Helpful to the Jury**

Expert testimony must be helpful to the jury in comprehending and deciding issues beyond the understanding of a layperson.  *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005). Begelman's opinions are irrelevant or otherwise would not be helpful to the jury.

Begelman opines that LSC's "compliance, surveillance and risk controls related to 'layering' from 2012 through 2016 were . . .  not in conflict with communications from regulators and exchanges."  Ex. 1 (Begelman Rep.) ¶ 10 & p. 12 (heading V); *see also* ¶ 50 ("my experience leads me to conclude that the settings put in place in Lek's Q6 Layering Controls were not in conflict with regulator and exchange communications.").   Begelman's opinions in that regard are irrelevant and would not be helpful to the jury.  The jury is able to see the communications with regulators and decide whether LSC's response was in conflict.  No expert is needed to tell the jury how to answer that question.

As support for those opinions, Begelman simply provides a chronology of communications between LSC and regulators (primarily FINRA and regulators from exchanges), and a running commentary on those communications.  Ex. 1 (Begelman Rep.) ¶¶ 42-54.  Expert witnesses are not permitted to simply provide a narrative of facts.  *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (precluding expert from providing a "narrative reciting selected regulatory events" because such information "to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence"); *In re Refco Inc. Sec. Litig.,* 2013 WL 12191891*,* at *8 (S.D.N.Y. Mar. 11, 2013) (holding that expert's summarizing of the facts of the alleged fraud "is itself inadmissible because it does not assist the factfinder").

Such narratives by an expert are an improper effort to bolster the client's position.  *See*

*United States v. Dukagjini,* 326 F.3d 45, 53-56 (2d Cir.2003) (factual testimony of witness offered in dual role of case agent and expert likely to "attain[ ] unmerited credibility," bolster testimony of government fact-witnesses, and "stray from the scope of ... expertise.").[18]

Here, Begelman simply selectively restates information from correspondence between LSC and FINRA or other regulators.  To the extent admissible, such correspondence should come from percipient fact witnesses.  Accordingly, Begelman should not be permitted to offer his narrative of regulatory interactions or statements, as reflected in paragraphs 42 through 54.

Other sections of Begelman's report also contain improper narratives of alleged events. For example, in paragraphs 33 through 40 of his report, Begelman provides a narrative of alleged facts regarding LSC's Q6 system and other purported surveillance controls.  As discussed above, Begelman's allegations about the specific Q6 layering control limits in place are unreliable because he failed to consider sufficient data and is totally unfamiliar with the miniscule amount of documents that he cites for that topic.  The jury will not be helped by having Begelman provide a narrative based on documents he knows nothing about.

Third, Begelman's commentary about statements or actions of regulators are irrelevant to the issues in this case.  For example, Begelman comments that recommendations from regulators "are not unreasonable or uncommon," (Ex. 1 (Begelman Rep.) ¶ 45), that FINRA's Wells notices to LSC provided "mixed messages," and he offers a commentary on what "in my experience" regulators might do after receiving a "target's" response to a Wells notice.  *Id.* ¶ 48. He then opines that, for example, FINRA's actions were not "swift" enough, and that it is "unusual" for the SEC to not have issued a Wells notice before filing this case.  *Id.* ¶ 49.  As

---

[18] The Lek Defendants' summary judgment motion illustrates how they are attempting to misuse Begelman as their story-teller and advocate, masquerading as an expert, on these issues.  *See, e.g.,* Lek Defendants' Rule 56.1 Statement of Material Facts (ECF No. 219) ¶¶ 127-128 (characterizing and comparing FINRA documents to each other); 414-419 (describing and bolstering LSC's practices); 523-526, 528, 662, 663 (giving narrative and his spin on LSC's communications with regulators), 737-738 (characterizing FINRA actions); 742-750, 753-754 (giving narrative of regulators' actions and LSC responses).

another example, Begelman offers commentary on a public speech by a FINRA official, quotes

a passage from that speech, and makes several "notable observations" about its supposed

meaning.  *Id.* ¶ 52.

These and Begelman's other commentaries are merely advocacy to bolster the Lek

Defendants' arguments, and are unhelpful to the jury.  To the extent any of the issues on which

Begelman comments are even relevant, the jury can decide all of these things for itself, and does

not need an expert witness to tell it what to think.  *See Arista Records*, 2011 WL 1674796, at *4

("A court should not admit expert testimony that is directed solely to lay matters which a jury is

capable of understanding and deciding without the expert's help.").

## V.    <u>CONCLUSION</u>

Begelman's opinions and testimony should be excluded.  Begelman has no expertise on

how broker-dealers surveil for or prevent market manipulation including layering or spoofing.

He failed to use a reliable methodology, and his opinions are mere *ipse dixit.*   Begelman failed

to consider sufficient important data regarding the systems that LSC did or did not put into

effect to control layering.  He offers opinions that would not be helpful to the jury.

Accordingly, Begelman should be precluded from testifying at trial and his opinions

should be excluded in connection with the Lek Defendants' pending motion for summary

judgment.  Alternatively, if he is allowed to testify at all, his opinions as described in this

memorandum should be excluded.

Dated:  October 5, 2018                                    Respectfully submitted,


                                                           _____/s/ David J. Gottesman_____
                                                           David J. Gottesman
                                                           Olivia S. Choe
                                                           Sarah S. Nilson
                                                           U.S. Securities and Exchange Commission
                                                           100 F Street N.E.

Washington, D.C. 20549
Tel.: (202) 551-4470 (Gottesman)
Fax: (202) 772-9292
Email:  gottesmand@sec.gov
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2018, a true and correct copy of the above document was served on all counsel of record by filing this document using the CM/ECF system.

_____ /s/ David J. Gottesman _____
