```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
                                        :         17cv1789 (DLC)
SECURITIES AND EXCHANGE COMMISSION,     :
                                        :         OPINION AND ORDER
               Plaintiff,               :
                                        :
                                        :
          -v-                           :
                                        :
LEK SECURITIES CORPORATION, SAMUEL      :
LEK, VALI MANAGEMENT PARTNERS d/b/a     :
AVALON FA, LTD., NATHAN FAYYER, and     :
SERGEY PUSTELNIK a/k/a SERGE            :
PUSTELNIK,                              :
                                        :
               Defendants.              :
                                        :
----------------------------------------X
```

APPEARANCES

For plaintiff Securities and Exchange Commission
David J. Gottesman
Olivia S. Choe
Sarah S. Nilson
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

For defendants Lek Securities Corporation and Samuel Lek:
Steve M. Dollar
David B. Schwartz
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10103

Kevin J. Harnisch
Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001

Ronald D. Smith
Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201

DENISE COTE, District Judge:

This Opinion addresses the motion of plaintiff U.S. Securities and Exchange Commission ("SEC") to exclude expert testimony based on the report of Roger Begelman ("Begelman"), offered by defendants Lek Securities Corporation ("Lek Securities") and Samuel Lek ("Lek; and together with Lek Securities, the "Lek Defendants"). For the following reasons, the SEC's motion is granted.

On March 10, 2017, the SEC sued the Lek Defendants, Avalon FA Ltd. ("Avalon"), Nathan Fayyer, and Sergey Pustelnik (together with Avalon and Fayyer, the "Avalon Defendants"), principally alleging that traders at Avalon engaged in two schemes to manipulate the securities markets and that they did so through trading at Lek Securities, a broker-dealer based in New York. Avalon is a foreign day-trading firm whose traders are largely based in Eastern Europe and Asia. Avalon is not a registered broker-dealer and relies on registered firms like Lek Securities to conduct trading in U.S. securities markets.

The SEC brought claims for violations of several provisions of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act"). The SEC's claims against the Lek Defendants are principally for aiding and abetting the Avalon Defendants' violations of Sections 10(b) and 9(a) of the Exchange Act and Section 17(a) of the Securities

Act.  See SEC v. Lek Sec. Corp., 276 F. Supp. 3d 49, 57-58 (S.D.N.Y. 2017).

Following the close of discovery, on October 5, 2018, the SEC moved to exclude Begelman as an expert at trial.  On October 5, the SEC also moved to exclude the testimony of four other experts that the defendants intend to call as rebuttal expert witnesses to the SEC's experts, Terrance Hendershott and Neil Pearson.  The Lek Defendants' motions to exclude testimony by Hendershott and Pearson, and the SEC's motions to exclude testimony from the four rebuttal expert witnesses offered by the defendants were addressed in two recently filed Opinions.  See SEC v. Lek Sec. Corp., No. 17cv1789(DLC), 2019 WL 1304452 (S.D.N.Y. Mar. 21, 2019) (the "March 21 Opinion"); SEC v. Lek Sec. Corp., No. 17cv1789(DLC), 2019 WL 1198599 (S.D.N.Y. Mar. 14, 2019) (the "March 14 Opinion").

A detailed recitation of the factual and procedural background to this motion, including descriptions of the two market manipulation schemes alleged by the SEC -- a layering scheme and a Cross-Market Strategy -- is provided in the March 14 Opinion.  In brief, layering involves placing non-bona fide limit orders on one side of the market in order to influence a trader's ability to execute favorable trades on the opposite side of the market.  See Lek Sec. Corp., 2019 WL 1198599, at *2-3.  The March 14 Opinion also describes the legal framework for

3

addressing a Daubert motion.  Familiarity with the March 14 Opinion is assumed; it is incorporated by reference.

I. Summary of Begelman Report

Begelman's expert report, dated March 16, 2018, purports to evaluate Lek Securities' compliance and surveillance practices in light of industry standards.  The substance of the report is divided into four sections.

In the first section, Begelman states that "[i]ndustry and regulatory standards for the supervision and compliance obligations on a broker-dealer, such as Lek [Securities], are based on a reasonableness standard."  He briefly describes Lek Securities' role as a broker-dealer and provides a few high-level comments about Lek Securities' compliance practices.  For example, he notes that Lek Securities processed approximately 1 million orders per day.  He explains that, "like most modern broker-dealers," Lek Securities used both automated systems and manual post-hoc reviews to support its compliance, supervision, and surveillance efforts.

In the second section of the report, Begelman describes what are, in his view, some of the difficulties that broker-dealers face when trying to surveil for manipulative layering in the equities markets.  He provides three descriptions of layering -- one from 2010 and two from 2012 -- from the Financial Industry Regulatory Authority ("FINRA") or the SEC.

4

Begelman opines that the regulatory descriptions are inadequate; he complains that broker-dealers "have received little guidance from regulators concerning what constitutes layering and how to detect it." To the extent regulators have provided guidance, Begelman opines that such guidance would be difficult to implement. For example, he asserts that, because legitimate strategies can involve trading on both sides of the market and many market orders are cancelled, "simply looking for two-sided markets that also involve cancelled orders would not be particularly informative." He also asserts that, to the extent layering turns on the intent of the trader, broker-dealers "typically ha[ve] limited knowledge of a trading client's proprietary strategies."

In the third section of the report, Begelman asserts that "broker-dealers typically undertake an incremental process of adjusting their compliance regime" in response to new types of manipulative trading. The remainder of the section then provides a narrative description of times at which Lek Securities adjusted configurations of its Q6 Layering Control system, the surveillance system it used to detect market manipulation. For example, after Lek Securities first implemented the Q6 Layering Control system on February 1, 2013, Begelman explains that Lek Securities relaxed Avalon's controls at the "parent" level and implemented new controls at the "sub-

5

account" level.  He asserts that such "revisions and updates to compliance programs" are "common" in the securities industry.  He concludes that Avalon's Q6 Layering Control system, together with its back-end review of certain trading, were "consistent with a compliance framework to prevent potential manipulative trading."

In the fourth section of his report, Begelman provides a narrative of Lek Securities' communications with various regulators.  He describes several instances in which Lek Securities requested guidance from regulators about how to configure its controls to prevent layering.  He notes that while Lek Securities continued to receive inquiries from regulators regarding potentially manipulative trading within Avalon accounts, Lek Securities received "no additional input from FINRA or other exchanges as to what its settings [on the Q6 Layering Control system] should be."  Begelman explains that this "leads him to conclude" that Avalon's settings were not in conflict with regulators' communications.

The fourth section of the report further describes Lek Securities' decision in 2016 and 2017 to implement a "new restriction preventing a trader from entering more than 4 orders on one side of the market at any time."  Begelman explains that Lek Securities implemented this control by utilizing newly-issued cross-market reports from FINRA.  He asserts that Lek

6

Securities' implementation of the new control was "precisely the sort of action that a compliance department should undertake in such circumstances." Begelman concludes that Lek Securities' "compliance, surveillance, and risk controls were consistent with the industry standard."

II. The Motion to Exclude

The SEC moves to exclude Begelman's expert testimony. The SEC contends that Begelman is unqualified to provide the expert opinions contained in his report. It also contends that Begelman's report provides little more than a narrative of Lek Securities' compliance practices and that it is unhelpful to the jury. The SEC is correct and its motion is granted.

To testify as an expert witness, an individual must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004); see also Lek Sec. Corp., 2019 WL 1198599, at *13-14.

Moreover, to be admitted under Rule 702, expert testimony must be relevant and rest on a reliable foundation. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993); United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007). An

7

expert's opinion is reliable if it has "a reliable basis in the knowledge and experience of his discipline." Daubert, 509 U.S. at 592. An expert's opinion is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Expert testimony will be helpful only if it assists the jury in "comprehending and deciding issues beyond the understanding of a layperson." DiBella v. Hopkins, 403 F.3d 102, 121 (2d Cir. 2005).

### A. Begelman Lacks Relevant Expertise

Begelman is unqualified to give an opinion about the adequacy of a broker-dealer's systems and procedures to detect and prevent manipulative layering. Begelman's experience is grounded in his work at a wholesale bank; he does not have relevant experience at a broker-dealer. As Begelman admitted in his deposition, he has no experience related to the detection or surveillance of layering in the equities markets.

Begelman has a Bachelor of Arts in political science from the University of Vermont and a Juris Doctor from New York Law School. He worked as trial counsel for the New York Stock Exchange from 1988 to 1993. From 1993 to 2016, Begelman held positions at Goldman Sachs. From 1993 to 2008, he was the Global Head of Control Rooms and Regulatory Reporting; he was also the Co-Head of the Compliance Surveillance and Strategy division. From 2008 to 2016, he was the Co-Chief Compliance

8

Officer of GS Bank USA -- the wholesale banking division of Goldman Sachs.  None of these roles provided Begelman with experience on the systems used by broker-dealers to detect and prevent manipulative layering schemes in the equities markets.

Begelman's experience at GS Bank USA in particular is inapposite to his proffered testimony.  A wholesale bank is not a broker-dealer.  The clients of GS Bank USA do not have direct access to the equities markets through GS Bank USA.  The regulations that govern GS Bank USA are different from those that govern a broker-dealer.  While Begelman speculated at his deposition that GS Bank USA "could have had or may or probably had a manipulations surveillance," he admitted that GS Bank USA did not have surveillance designed to detect layering in the equities markets.  To the extent GS Bank USA surveils for "spoofing" or layering in other markets, Begelman acknowledged that, aside from a five- to ten-minute conversation in 2010, he had no personal involvement in the design or development of any such surveillance system.

Begelman's earlier experience is also insufficient to qualify him as an expert in this case.  For example, Begelman asserts he previously worked in divisions at Goldman Sachs that

9

largely focused on Goldman Sach's broker-dealer operations.[1]  But Begelman readily admits in his deposition that his work as Global Head of Control Rooms and Regulatory Reporting did not involve detection or surveillance for layering or spoofing in the equities markets.  And while he asserted that the Compliance Surveillance and Strategy division addressed spoofing and layering issues, Begelman was unable to describe in his deposition any parameters that Goldman Sachs used to detect or surveil for layering, spoofing, or any other form of market manipulation.  Likewise, Begelman could not remember whether his experience at the New York Stock Exchange ever involved evaluating whether broker-dealers had sufficient systems and procedures to detect and prevent market manipulation.

Begelman appears to have taken no steps to remedy these deficiencies in his experience.  As he admitted at his deposition, Begelman did no research into how other broker-dealers surveil for market manipulation before concluding that Lek Securities' layering controls were "consistent with the industry standard."  He compiled no data; he did not contact any broker-dealers.  Nor did Begelman develop an adequate understanding of Lek Securities' layering controls prior to

---

[1] Begelman submitted a supplementary declaration on November 2, 2018 seeking to address deficiencies in his expertise that were evident from his deposition testimony.

rendering his opinion. At his deposition, Begelman was unable to understand or interpret the very documents that he cited in his report which describe the specific layering controls Lek Securities applied to particular Avalon sub-accounts. Although Begelman could not interpret during his deposition even a single report of the controls utilized by Lek Securities' Q6 Layering Control system, he affirmed that he nonetheless "stand[s] by" the description given in his report.[2]

Begelman's report is not grounded in data or statistics. It is not supported by citations to peer-reviewed literature. It is not based on a comparative study of other broker-dealers' compliance practices. The entire report is based on nothing more than Begelman's claim to expertise through experience. Indeed, Begelman cites "[his] experience" as the sole basis for the majority of the conclusions he offers in his report. These include his assertions that Lek Securities' "compliance, surveillance, and risk controls were consistent with the industry standard," that the Q6 Layering Control system was implemented "in accordance with" regulatory guidance, and that

---

[2] In the fourth section of his report, Begelman describes "depth control" as a "new restriction" that Lek Securities developed in or around 2016. In his deposition, however, Begelman displayed significant ignorance of the way in which the "depth control" feature operates. While not disqualifying, this ignorance is just one more example of the fact that Begelman's report does not reflect any expert knowledge that he possesses.

11

Lek Securities' controls were "consistent with . . . [his] expectations for an agent broker-dealer in surveilling for a novel form of potential manipulative activity." Begelman's experience provides no basis for this testimony. This deficiency is so extreme that it may not addressed solely through cross-examination. Pursuant to the requirements of <u>Daubert</u> and Rule 702, his report must be excluded because he is not qualified as an expert in the areas in which he offers opinions.

    B.  <u>Begelman's Opinions Are Largely Inadmissible</u>

Even if Begelman had relevant expertise, many of his opinions would still be inadmissible. The heart of Begelman's report is little more than a narrative of Lek Securities' communications with regulators and its adjustments to the Q6 Layering Control system. This is not admissible expert testimony. Business records and lay witnesses are the appropriate vehicle for providing such historical evidence to the jury.

Moreover, few of the issues Begelman addresses in his report concern issues beyond the ken of a layperson. A jury does not need an expert's assistance to understand when Lek Securities received guidance from regulators and when it did not. As an additional example, Begelman asserts that "revisions and updates to compliance programs . . . are common in the

securities industry." Although Begelman has sufficient expertise to draw this conclusion, it is tangential to the issue of whether Lek Securities developed a sufficiently robust compliance program. Moreover, it is obvious and likely undisputed that a corporation's response to a new regulatory issue will involve some calibration and adjustment. It would not help the jury for Begelman to alert it of this plainly common phenomenon.

The SEC's motion must be granted even though it would likely be helpful to the jury to hear testimony from an expert qualified in the design and implementation of broker-dealer compliance systems. Such testimony could, theoretically, provide a description of the industry standard in developing programs aimed at detecting and controlling for layering, including by explaining in some detail the challenges faced by broker-dealers in developing robust compliance systems and describing with some specificity the features of systems that broker-dealers commonly employ to detect and prevent layering. It would likely have been helpful to have an expert compare the components of Lek Securities' layering controls to those of well-regarded broker-dealers in the industry, mapping over time how the industry responded to the emergence of manipulative layering in the equities markets and how it upgraded and improved its compliance programs in response to that improved

13

understanding. Testimony that placed Lek Securities' compliance programs in the context of the broker-dealer industry's broader compliance efforts could have assisted the jury in assessing the soundness and rigor of Lek Securities' programs and its good faith in adopting them. Begelman, however, does not -- and could not -- provide this testimony. For the reasons set forth above, his opinions are excluded in their entirety.

## Conclusion

The SEC's October 5, 2018 motion to exclude Begelman's testimony is granted.

Dated:   New York, New York
         April 8, 2019

                                   _____
                                   DENISE COTE
                                   United States District Judge