**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>        v.<br><br>LEK SECURITIES CORPORATION, SAMUEL LEK, VALI MANAGEMENT PARTNERS d/b/a AVALON FA LTD, NATHAN FAYYER, and SERGEY PUSTELNIK a/k/a/ SERGE PUSTELNIK,<br><br>                              Defendants. | 17-cv-01789 (DLC) |

# DEFENDANTS LEK SECURITIES CORPORATION AND SAMUEL LEK'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION

Steve M. Dollar
David B. Schwartz
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019
Tel.:   (212) 318-3000
Fax:    (212) 318-3400
steve.dollar@nortonrosefulbright.com
david.schwartz@nortonrosefulbright.com

Kevin J. Harnisch (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, District of Columbia 20001
Tel.:   (202) 662-4520
Fax:    (202) 662-4643
kevin.harnisch@nortonrosefulbright.com

Ronald D. Smith (*pro hac vice*)
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel.:   (214) 855-8000
Fax:    (214) 855-8200
ron.smith@nortonrosefulbright.com

*Attorneys for Defendants*
*Lek Securities Corporation and Samuel Lek*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................................... 1

STATEMENT OF FACTS .............................................................................................................. 2

      I.     BEGELMAN'S EXPERIENCE ........................................................................... 2
      II.    BEGELMAN'S OPINIONS ................................................................................ 3

ARGUMENT ................................................................................................................................... 5

      I.     STANDARD FOR RECONSIDERATION ........................................................ 5
      II.    THE COURT SHOULD RECONSIDER ITS FINDING THAT
           BEGELMAN IS NOT QUALIFIED TO TESTIFY AS AN EXPERT ................. 6
           A.    The Standard for Expert Qualifications Is Not Overly Narrow. ................. 6
           B.    Begelman's Work Experience Provides Ample Expertise to
                 Qualify Him as an Expert. ........................................................................... 7
           C.    Begelman Would Be Qualified to Offer His First Two Opinions
                 Even If He Did Not Have Any Experience with Layering or
                 Spoofing. ..................................................................................................... 11
      III.   THE BASES FOR BEGELMAN'S OPINION ARE SOUND ............................ 12
           A.    Begelman Does Not Purport to Conduct a Scientific Study, But
                 Instead Permissibly Based His Opinions on His Experience and
                 Review of Relevant Materials. ................................................................... 12
           B.    Begelman's Knowledge of LSC's Compliance Systems Is More
                 than Sufficient Given the Scope of His Expert Opinion. ........................... 13
      IV.   BEGELMAN'S OPINIONS WILL ASSIST A JURY IN
           UNDERSTANDING THE ADEQUACY OF LSC'S COMPLIANCE
           PROGRAM ......................................................................................................... 14

CONCLUSION .............................................................................................................................. 16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arista Records LLC v. Lime Grp. LLC*,
   No. 06 CV 5936 (KMW), 2011 WL 1674796 (S.D.N.Y. May 2, 2011) ..........................6, 7

*Barbaro v. United States ex rel. Fed. Bureau of Prisons FCI Otisville*,
   No. 05 CV 6998, 2006 WL 3161647 (S.D.N.Y. Oct. 30, 2006) (Cote, J.) ..........................5

*In re Blech Sec. Litig.*,
   No. 94 CIV 7696 (RWS), 2002 WL 31356498 (S.D.N.Y. Oct. 17, 2002) ........................16

*CFTC v. Oystacher*,
   No. 15 CIV 9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016) ...................................9, 10

*Cruz v. Barnhart*,
   No. 04 CV 9794, 2006 WL 547681 (S.D.N.Y. Mar. 7, 2006) (Cote, J.) .............................5

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ...............................................................................................................6

*DiBella v. Hopkins*,
   403 F.3d 102 (2d Cir. 2005) ..................................................................................................6

*In re Gen. Elec. Co. Sec. Litig.*,
   856 F. Supp. 2d 645 (S.D.N.Y. 2012) (Cote, J.) ...................................................................5

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
   No. 04 CIV 7369 (LTS), 2006 WL 2128785 (S.D.N.Y. July 28, 2006) .............................6

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   691 F. Supp. 2d 448 (S.D.N.Y. 2010) .................................................................................13

*Peoples v. Fischer*,
   898 F. Supp. 2d 618 (S.D.N.Y. 2012) ...................................................................................5

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*,
   988 F. Supp. 2d 395 (S.D.N.Y. 2013) ...........................................................................12, 13

*RJE Corp. v. Northville Indus. Corp.*,
   329 F.3d 310 (2d Cir. 2003) ..................................................................................................5

*United States v. Coscia*,
   177 F. Supp. 3d 1087 (N.D. Ill. 2016) ...........................................................................9, 10

*Valentin v. New York City*,
    No. 94 CIV 3911 (CLP), 1997 WL 33323099 (E.D.N.Y. Sept. 9, 1997*)*............................6

*Wechsler v. Hunt Health Sys., Ltd.*,
    381 F. Supp. 2d 135 (S.D.N.Y. 2003)................................................................................7

*In re Zyprexa Prods. Liab. Litig.*,
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) ...............................................................................6

**Rules and Statutes**

Fed. R. Evid. 702 ...........................................................................................................6, 7, 12

**Other Authorities**

17 C.F.R. § 240.15c3-5(b) ...........................................................................................3, 4, 15

Defendants Lek Securities Corporation ("LSC") and Samuel Lek (together, the "Lek Defendants") respectfully submit this Memorandum of Law in Support of their Motion for Reconsideration of the Court's Opinion and Order entered April 8, 2019 [Dkt. No. 355] (the "Opinion" or "Op.") excluding the testimony and opinions of Roger Begelman.

## PRELIMINARY STATEMENT

The Lek Defendants request reconsideration of the Court's exclusion of Roger Begelman's testimony. The Opinion appears to be based largely on claims made by the Securities and Exchange Commission ("SEC") that ignore and marginalize key, relevant experience in Begelman's past, including but not limited to, his 15-year employment as the Co-Head of the Compliance Surveillance and Strategy Group at a national broker-dealer. During that time and later at the bank affiliated with the broker-dealer, Begelman was instrumental in creating multiple market surveillance systems that addressed a whole variety of manipulative trading practices, including *layering and spoofing in the equities markets*, and was a crucial liaison with federal regulators. Even if Begelman had *no experience* pertaining to layering or spoofing, he would nevertheless be qualified to offer his opinions concerning LSC's compliance framework and communications with regulators and exchanges.

With respect to the issue of admissibility, the Court relies upon the SEC's arguments that Begelman's opinions concerning industry standards and practices must reflect a data-driven methodology or that minor critiques of Begelman's knowledge render the entirety of his testimony inadmissible. Neither argument is correct. The Lek Defendants therefore respectfully ask the Court to reconsider its Opinion because the exclusion of Begelman's expert testimony, which would be helpful to the jury, is based on erroneous arguments made by the SEC and will result in manifest injustice during the trial.

**STATEMENT OF FACTS**

**I.    BEGELMAN'S EXPERIENCE**

Prior to his retirement in 2016, Roger Begelman worked in the securities and banking industries for 28 years—first as a prosecutor and securities regulator, then for 15 years in securities compliance functions at a national broker-dealer, Goldman Sachs, and then finally for eight years at Goldman Sachs Bank USA ("GS Bank"). (*See* Begelman Rpt., Attm. 1.)[1]  Begelman has held multiple supervisory securities licenses (*Id.* ¶ 6, Attm. 1; Begelman Dep. Tr. at 92:03-15)[2] and is a former member of the Supervisory and Self-Regulation Committee of the Securities Industry and Financial Markets Association ("SIFMA") and the NYSE Hearing Panel Board. (*See* Begelman Rpt. ¶ 6.)

From 1993 to 2008, Begelman served as Co-Head of the Compliance Surveillance and Strategy Group at Goldman Sachs, a broker-dealer, were he was responsible for the development of a proprietary surveillance architecture to capture, review, and analyze trading activity for market manipulation, including "spoofing." (*Id.* ¶ 3, Attm. 1; *see* Begelman Dep. Tr. at 124:16-126:09; Declaration of Roger Begelman, dated November 1, 2018, Dkt. No. 288 ("Begelman Decl."), ¶ 5.) This was before the term "layering" became a common term to describe similar activity. (Begelman Decl. ¶ 6).[3]  The surveillance architecture, among other tasks, automatically recognized deviations from established trading patterns and triggered exception reviews. (Begelman Rpt. ¶ 3,

---

[1]  The Begelman Report is attached as Exhibit 1 to the Declaration of David J. Gottesman, dated October 5, 2018, Dkt. No. 251.

[2]  Relevant excerpts of the Begelman Deposition Transcript are attached as Exhibit 1 to the Declaration of Steve M. Dollar, dated November 2, 2018, Dkt. No. 287.

[3]  The SEC and its experts have used the terms "layering" and "spoofing" interchangeably or to describe substantially similar activity in this case. (*See* Compl. ¶ 35 ("Avalon repeatedly manipulated the markets of U.S. stocks by engaging in a manipulative trading strategy typically referred to as 'layering' or 'spoofing' (hereafter, 'layering').")); Expert Report of Terrence Hendershott, Dkt. No. 210-1, ¶ 13, n.6 ("Layering is often used to refer to spoofing when multiple spoofing orders are used.").)

Attm. 1.)  Begelman became familiar with common methodologies of reviewing for spoofing and observed that parameters for reviewing for potentially manipulative activity, including spoofing, evolved over time.  (Begelman Decl. ¶ 6.)

After spending 15 years as a senior compliance officer at a broker-dealer, Begelman served as GS Bank's Managing Director and Co-Chief Compliance Officer between 2008 and 2016.  In that role, he (1) created and implemented GS Bank's compliance infrastructure, (2) served as the primary liaison with multiple regulators for all legal and compliance reviews, and (3) oversaw the design and implementation of controls and surveillance procedures that monitored transactions for potential manipulation, including spoofing.  (*See* Begelman Rpt. ¶ 2, Attm. 1; Begelman Dep. Tr. at 102:07-19; 107:8-108:17.)  While the specific products at issue when Begelman was at GS Bank were not equities, many manipulative behaviors, including spoofing, occurred in other markets surveilled by the bank and Begelman was again instrumental in developing approaches for surveilling for those types of manipulative activities.  (Begelman Decl. ¶ 8.)

## II.   BEGELMAN'S OPINIONS

In his expert report, Begelman provides three opinions based upon his extensive experience in the securities and compliance industry, after considering roughly 470 documents—including LSC's Risk Control System Manual and Written Supervisory Procedures, internal LSC memoranda, communications with and guidance from regulators, and deposition testimony[4]—and based upon his assessment of Commission Rule 15c3-5 (the "Market Access Rule").[5]

---

[4]  Begelman consulted LSC compliance policy documents; internal compliance related communications; audit and exit meeting documentation from regulators; copies of written information requests from regulators and LSC's responses; publicly available guidance from FINRA and the SEC; and prior deposition testimony of LSC personnel such as Samuel Lek, Nicolas Louis, Andrew Shapiro, and Jeffrey Brandt.  (*See* Begelman Rpt., Attm. 2.)

[5]  Commission Rule 15c3-5 requires a broker-dealer to "establish, document, and maintain a system of risk management controls and supervisory procedures reasonably designed to manage the financial, regulatory,

First, Begelman determines that LSC's proprietary "Q6" layering control was consistent with a compliance framework to prevent potential manipulative trading. As Begelman describes, LSC implemented and adjusted its Q6 layering controls, including adding additional restrictions and a trade review tool to replicate the timing and sequence of orders entered and cancelled. (*See* Begelman Rpt. ¶¶ 36-38.) Begelman concludes that such actions were reasonable because, within the securities industry, the development of a compliance framework is typically incremental, based on trial-and-error, and may still elicit inquiries from regulators about continuing instances of potentially manipulative activity. (*See id.* ¶¶ 34, 37-39.)

Second, Begelman determines that LSC's controls were not in conflict with communications from regulators and exchanges based on his experience that "interactions with regulators are a frequent occurrence for compliance professionals" and "recommendations as to changes in controls" from regulators are "not unreasonable and not uncommon." (*See id.* ¶¶ 42, 45.) Based upon his review, Begelman determines that, "with no additional input from FINRA or other exchanges as to what its settings should be, my experience leads me to conclude that the settings put in place in Lek's Q6 Layering Controls were not in conflict with regulator and exchange communications." (*Id.* ¶ 50.) When FINRA provided additional guidance in the form of its monthly Cross Market Report identifying potential manipulative trading, LSC imposed new restrictions meant to curb the potentially manipulative trading, which Begelman concluded was "precisely the sort of action that a compliance department should undertake in such circumstances." (*See id.* ¶¶ 51-54.)

---

and other risks" of its business. (*Id.* ¶ 13, Attm. 2; 17 C.F.R. § 240.15c3-5(b); *see also* Begelman Dep. Tr. at 60:1-19.)

Finally, Begelman opines that LSC's controls were consistent with industry standards for controls to manage risks, which "requires broker-dealers to adhere to a standard of reasonableness when managing risks" including "utiliz[ing] reasonable controls to prevent improper trading." (*Id.* ¶ 55.) Begelman ultimately concludes that LSC's controls were consistent with industry standards specifically to surveil "for a novel form of potential[ly] manipulative activity." (*Id.* ¶ 56.)

## ARGUMENT

### I.     STANDARD FOR RECONSIDERATION

A motion for reconsideration may be granted if "the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 651 (S.D.N.Y. 2012) (Cote, J.) (internal citations omitted). Reconsideration is particularly appropriate when necessary "to correct a clear error or prevent manifest injustice." *Peoples v. Fischer*, 898 F. Supp. 2d 618, 623 (S.D.N.Y. 2012) (internal citations omitted). This includes instances when a court's decision is based upon errors of law. *See Cruz v. Barnhart*, No. 04 CV 9794, 2006 WL 547681, at *2 (S.D.N.Y. Mar. 7, 2006) (Cote, J.) ("[I]t may be an abuse of discretion to let stand an error of law brought to its attention in a timely manner.") (citing *RJE Corp. v. Northville Indus. Corp.,* 329 F.3d 310, 316 (2d Cir. 2003)). Reconsideration may also be justified if facts or issues raised in briefing are absent from the court's ultimate opinion. *See, e.g.*, *Barbaro v. United States ex rel. Fed. Bureau of Prisons FCI Otisville*, No. 05 CV 6998, 2006 WL 3161647, at *2 (S.D.N.Y. Oct. 30, 2006) (Cote, J.).

## II.     THE COURT SHOULD RECONSIDER ITS FINDING THAT BEGELMAN IS NOT QUALIFIED TO TESTIFY AS AN EXPERT

The Lek Defendants respectfully request that the Court reconsider its ruling that Begelman was "unqualified to give an opinion about the adequacy of a broker-dealer's systems and procedures to detect and prevent manipulative layering." (Op. at 8.)

### A.     The Standard for Expert Qualifications Is Not Overly Narrow.

In the Opinion, the Court recites the standard for the admissibility of an expert's testimony and opinions, including that an "individual must 'be qualified as an expert by knowledge, skill, experience, training or education,'" (Op. at 7 (quoting Fed. R. Evid. 702)); that her testimony "must be relevant and rest on a reliable foundation," (*id.* at 7 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)); and will be helpful if "it assists the jury in 'comprehending and deciding issues beyond the understanding of a layperson'" (*id.* at 8 (quoting *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005)). While the Court's role is to serve as a judicious "gatekeeper" for proposed expert testimony, *Daubert* 509 U.S. at 597, the law does not impose upon an expert the burden of having experience in the identical field or subject matter as the topic of his opinions, be professionally active during a specific time, or work for a specific kind of employer. Rather, courts in the Second Circuit have concluded that an expert "should not be required to satisfy an overly narrow test of his own qualifications." *Arista Records LLC v. Lime Grp. LLC,* No. 06 CV 5936 (KMW), 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011); *see Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 CIV 7369 (LTS), 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006); *Valentin v. New York City*, No. 94 CIV 3911 (CLP), 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997*).* Furthermore, if an expert has "experiential qualifications in a general field closely related to the subject matter" on which the expert is opining, his opinions will be allowed. *See In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282

(E.D.N.Y. 2007). A proffered expert does not need to possess perfect or ideal qualifications to testify. *See Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 144 (S.D.N.Y. 2003) (determining that whether expert "is more or less qualified . . . than an ideal expert in this case[] does little to justify excluding his testimony" but rather goes to "the weight, rather than admissibility" of expert's testimony).

The SEC urges the Court to apply a much narrower test for expertise than the one accepted by courts in the Second Circuit. (*Compare* Memorandum of Law in Support of Plaintiff's Motion to Exclude the Testimony and Opinions of Roger S. Begelman, Dkt. No. 249, ("SEC Begelman Brief") at 5-9*, with Arista Records*, 2011 WL 1674796, at \*3.) By agreeing with the SEC's arguments, the Opinion ultimately excludes Begelman's testimony *in its entirety* based on an overly narrow test of applicable qualifications. (*See* Op. at 8-9 (discussing lack of experience in equities markets), 9-10 (discussing Begelman's experience as "Global Head of Control Rooms and Regulatory Reporting," which comprised only part of his responsibilities that also included serving as the broker-dealer's "Co-Head of the Compliance Surveillance and Strategy Group.") Federal Rule of Evidence 702, *Daubert* and their progeny do not impose such a narrow test.

### B. Begelman's Work Experience Provides Ample Expertise to Qualify Him as an Expert.

In light of the legal standard, the Lek Defendants respectfully request that the Court reconsider its previous ruling, in which it excludes Begelman based on his perceived lack of expert qualification concerning (1) his experience at a broker-dealer (2) with manipulation scheme detection systems (3) used in the equities market.

Contrary to the Opinion's statement that "Begelman's experience is grounded in his work at a wholesale bank; he does not have relevant experience at a broker-dealer," (Op. at 8), Begelman

has ample *relevant* experience at a broker-dealer.[6]  Begelman worked the broker-dealer arm of Goldman Sachs for 15 years where he served, among other positions, as the Co-Head of the Compliance and Surveillance and Strategy Group.  (Begelman Rpt., Attm. 1.)  During those 15 years at the Goldman Sachs broker-dealer, Begelman acquired substantial experience with methodologies used to surveil for spoofing, and how parameters for surveilling for spoofing evolved over time.  (Begelman Decl. ¶ 6.)  Likewise, Begelman has experience with systems used to detect and prevent market manipulation schemes.  (*See* Begelman Rpt., Attm. 1; Begelman Decl. ¶ 8.)

Begelman developed and oversaw from their inception multiple surveillance systems at both Goldman Sachs broker-dealer and bank to capture, review, and analyze trading activity for market manipulation.  (*See* Begelman Rpt., Attm. 1; Begelman Decl. ¶ 8.)  Specifically, as Begelman testified:  (1) he oversaw development of Goldman Sachs' systems, including how detection parameters in systems surveilling for potentially manipulative trading were developed;[7] (2) how tracking for manipulation was coded into the respective systems; (3) how the systems looked for trading activity anomalies; and (4) how analysts he supervised reviewed exceptions.  (Begelman Dep. Tr. at 125:17-129:21.)  This experience provide apt qualifications for an expert comparing the overall process of manipulation detection parameter selection.[8]

---

[6] At his deposition the SEC almost exclusively confined its questions concerning Begelman's surveillance experience to his time at GS Bank, (*see* Begelman Dep. Tr. at 107:18-114:07), which presents an incomplete and inaccurate picture of the breadth and relevance of that experience.  Nevertheless, the Lek Defendants continue to assert that Begelman's experience at GS Bank is highly relevant to his proposed testimony in this case.  Begelman's experience at GS Bank, as reflected elsewhere in the Motion, include years of experience developing a surveillance regime targeted at spoofing, among other forms of market manipulation.

[7] Begelman, in fact, testified specifically as to how parameters were "focused on through research and activity," set to "activity in the marketplace," and his team would "amend it and change it over time".  (Begelman Dep. Tr. at 128:13-20.)

[8] Begelman is only being offered to opine as to this comparison—not one that identifies and evaluates LSC's Q6 parameters compared to what Goldman Sachs' changing parameters were over a 20 year span.

Importantly, Begelman's background includes experience related to the detection and surveillance of layering and spoofing in the equities markets. (*See* Begelman Dep. Tr. at 124:16-125:4.) During Begelman's deposition, counsel for the SEC pointedly asked him: "Specifically, were you involved in any surveillance systems to detect layering or spoofing in the equities markets?" (Begelman Dep. Tr. at 124:16-18). Begelman's response not only was an unequivocal "Yes," and he further explained that he "created a firm-wide surveillance system which focused on numerous activities, including market manipulation and different types of market manipulation, including spoofing, putting floors on the market, ceilings, market close activities of other types of manipulation." (*Id.* at 124:19-125:2.)

Even if he had no such equities experience, the requirement that Begelman show experience specifically in the equities markets is misplaced, as both parties have acknowledged that spoofing and layering in the commodities and equities markets are direct analogues. Spoofing, whether it be in equities or other markets, involves similar behavior. (Begelman Decl. ¶ 8.) The SEC concedes as much by relying extensively on authority concerning spoofing, layering, and market microstructure outside of equities markets.[9] (*See, e.g.*, SEC's Memorandum of Law in Opposition to Motion to Dismiss, Dkt. No. 89 ("Pl. Opp. MTD"), at 21 (relying on *United States v. Coscia*, 177 F. Supp. 3d 1087, 1092 (N.D. Ill. 2016), a commodities case, to describe characteristics common to spoofing, such as the use of "large (though illusory) quote orders" to "drum[] up interest on one side of the [] market"); *id.* at 14, n.6 (comparing commodities law and securities law to argue that both cover layering and spoofing); Memorandum of Law in Opposition Motion to Exclude Terrence Hendershott, Dkt. No. 238, at 12 (citing *CFTC v. Oystacher*, No. 15

---

[9] In its Reply in support of its *Daubert* motion, the SEC offered no response to this point. *See* SEC's Reply Memorandum of Law in Support of its Motion to Exclude Roger S. Begelman, Dkt. No. 303.

CIV 9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016), a commodities case, for the proposition that "courts have accepted expert testimony using similar criteria in other spoofing cases" and *Coscia*, 177 F. Supp. 3d at 1095 for the same proposition); Pl. Opp. MTD at 14, n.6 (citing *Oystacher* again for the definition of market microstructure)).  The issue of whether Begelman's experience was gained outside of the equities market, to the extent it is relevant, goes to weight and not admissibility.

Finally, requiring Begelman to rely solely upon his knowledge of layering acquired in the equities markets imposes a higher standard than the Court imposed upon either Terrence Hendershott or Neil Pearson's testimony.  Hendershott applied criteria to find "Layering Loops"— a term he invented—in a way that no one ever had before.  (*See* Hendershott Dep. Tr. at 30:16-21 (answering "at a specific level no" to whether "in any way, in any paper, any discussion, any presentation, in anyway *has anyone*" used Hendershott's criteria for analyzing potential layering).)[10]  Pearson had never analyzed the purported "cross market" strategy before this case, and he first learned of it when "Mr. Gottesman described it in sort of very general terms." (Pearson Dep. Tr. at 60:15-21; *see also id.* at 66:10-19 (admitting that "this is the first time I have analyzed the cross market strategy").)[11]  As such, both Hendershott and Pearson had to apply their experience, gained from their other work, to new issues, and the Court found their testimony admissible.  (*See* Opinion and Order, dated Mar. 14, 2019, Dkt. No. 349.)  To, in turn, exclude Begelman's testimony on the grounds that he should not be permitted to apply what he learned

---

[10] Relevant excerpts of the Hendershott Deposition Transcript are as Exhibit 2 to the Declaration of Steve M. Dollar, dated August 24, 2018, Dkt. No. 210.

[11] Relevant excerpts of the Pearson Deposition Transcript are attached as Exhibit 2 to the Declaration of Steve M. Dollar, dated August 24, 2018, Dkt. No. 213, and Exhibit 3 to the Declaration of Steve M. Dollar, dated November 2, 2018, Dkt. No. 293.

about spoofing or layering outside of the equities context would be fundamentally unfair and result in manifest injustice.

> **C.     Begelman Would Be Qualified to Offer His First Two Opinions Even If He Did Not Have Any Experience with Layering or Spoofing.**

Even assuming *arguendo* the SEC is correct that Begelman has no relevant spoofing or layering experience, it still would not merit exclusion of Begelman's opinions regarding the reasonableness of LSC's compliance, surveillance, and risk controls, or its communications with regulators and exchanges.  For example, Begelman first opines that LSC's compliance, surveillance and risk controls were consistent with a compliance framework to prevent potential manipulative trading.  (Begelman Rpt. ¶¶ 33-41.)  Begelman's specific conclusions, such as that "no front end control or back end surveillance or review is fool proof" (*id.* ¶ 39) or securities compliance functions "undergo[] a series of controls and reviews" (*id.* ¶ 41) are based on his 23 years of experience designing compliance systems from the ground-up and dealing with novel compliance issues as they arose.  (*See, e.g., id.*, Attm. 1; Begelman Decl. ¶ 8.)

Those well-informed opinions would be very helpful to the jury in understanding the Lek Defendants' actions in context and whether they were undertaking appropriate steps in designing a system.  This is critically important as the SEC will be arguing the opposite to the jury in support of their aiding and abetting allegations that the Lek Defendants acted knowingly or recklessly.  It would be manifestly unjust to not permit the Lek Defendants to use Begelman's opinion on these topics to counter the SEC's arguments.  The jury would benefit from his perspective formed over decades of overseeing the implementation of systems to prevent and detect novel manipulation schemes.

Likewise, Begelman is more than sufficiently qualified to offer the second opinion stated in his report:  that LSC's controls were not in conflict with communications from regulators and

exchange.  (Begelman Rpt. ¶¶ 10, 42-54.)  Begelman relied upon his experience both as GS Bank's primary liaison with regulators for all legal and compliance reviews, (*id.* ¶ 2, Attm. 1.) and earlier, *inter alia*, as a Global Head of Regulatory Reporting for Goldman Sachs to opine on the nature and relevance of communications between compliance professionals and regulators (*id.* ¶¶ 42-54).  As the SEC intends to argue that the Lek Defendants did not react properly to communications from regulators (without any support on industry custom), it would be manifestly unjust to not permit the Lek Defendants to counter the SEC's supposition with testimony from someone who has a detailed, first-hand, decades-long history with regulatory communications like the ones at issue in this case.  His testimony would be very helpful in determining whether the Lek Defendants acted in good faith.  Neither his first or second opinions explicitly require experience with layering or spoofing and, as such, his opinions should not be excluded based upon any concerns regarding his qualifications on those topics.

### III.   THE BASES FOR BEGELMAN'S OPINION ARE SOUND

#### A.   Begelman Does Not Purport to Conduct a Scientific Study, But Instead Permissibly Based His Opinions on His Experience and Review of Relevant Materials.

The Lek Defendants respectfully request that the Court reconsider its Opinion excluding Begelman's opinions and testimony because Begelman "compiled no data," "did not contact any broker-dealers," and "is not supported by citations to peer-reviewed literature."  (Op. at 10-11.)  These critiques of Begelman's testimony are unfounded, as his experiential expert opinions do not require specific data analysis or consideration of peer-reviewed literature.  Nor must they in order to be admissible evidence, as "[s]ome types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise.'"  *Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013) (quoting Advisory Committee Notes to Fed. R.

- 12 -

Evid. 702). Courts routinely recognize that an expert's experience may reliably lead her to conclude specific industry customs and practices exist. *See id.* at 404-05; *cf. Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 691 F. Supp. 2d 448, 464 (S.D.N.Y. 2010) ("Industry practices are not like scientific hypotheses, which can be tested through trial and error"). Begelman bases his opinions concerning the reasonableness of LSC's compliance systems on his review of over 470 documents and applying his 28 years of experience in the securities and compliance industry—during which time he oversaw the construction and enhancement of sophisticated approaches to combatting a variety manipulative activity, including spoofing. Finding that Begelman's process does not satisfy *Daubert* effectively leaves no room for experiential expert testimony, which undermines the purpose of *Daubert* and its application.

### B. Begelman's Knowledge of LSC's Compliance Systems Is More than Sufficient Given the Scope of His Expert Opinion.

The Lek Defendants respectfully request that the Court reconsider its reliance on factually erroneous arguments made by the SEC as to Begelman's knowledge of features of LSC's compliance systems. For example, the Court concludes that Begelman did not have an "adequate understanding of Lek Securities' layering controls" because he could not "understand or interpret the very documents that he cited in his report," (Op. at 10-11), which were computer code text printouts of RTR files communicating LSC Q6 system settings. (SEC Begelman Brief' at 19-22.) The inability of an expert witness to interpret computer code on the spot at his deposition without assistance is not disqualifying for an someone who has *neither professed* to be an expert in, *nor offered opinions directly concerning*, computer code. Begelman was forthright in his deposition that he had previously seen RTR printouts, but had received assistance in interpreting them. (Begelman Dep. Tr. at 201:21-202:2.) What matters is that Begelman was able to apply the

information that came from the Q6 system, namely the settings related to layering, to render his opinion about the reasonableness of the controls implemented.

The Court also relies upon the SEC's argument that Begelman's description of "depth control" is evidence that "Begelman's report does not reflect any expert knowledge that he possesses." (Op. at 11, n.2.) The record shows otherwise. First, the SEC's depiction does not reflect what actually occurred at Begelman's deposition, in which the SEC erroneously referred to depth control as a distinct and separate system in its questioning, referring to "any control system of surveillance system at Lek called the depth control." (Begelman Dep. Tr. at 261:23-262:01, 263:23-264:21.) The SEC's improperly phrased questions understandably confused Begelman, who properly viewed depth control as part of the Q6 system. (*Id.*) The SEC should not be permitted to benefit from confusion it created by its own incorrect understanding of the facts of this case. Second, it ignores that Begelman's report specifically discusses LSC's implementation of the control following specific guidance from FINRA in 2016. (*See* Begelman Rpt. ¶ 53.) Lastly, depth control was just one of many facets of LSC's overall compliance structure on which Begelman could opine. As such, any issue with Begelman's specific understanding of depth control does not taint his other proffered opinions, much less preclude them.

## IV. BEGELMAN'S OPINIONS WILL ASSIST A JURY IN UNDERSTANDING THE ADEQUACY OF LSC'S COMPLIANCE PROGRAM

In the Opinion, the Court concludes that the "heart of Begelman's report is little more than a narrative of Lek Securities' communications with regulators and its adjustments to the Q6 Layering Control system." (Op. at 12.) Of course Begelman recites various facts in his report, such as the limited public guidance available to broker dealers from regulators until 2016 and LSC's specific requests for more information from BATS, Direct Edge, and FINRA. (*See, e.g.*, Begelman Rpt. ¶¶ 21-28, 43.) Such factual recitation is necessary to establish the bases for specific

expert opinions that Begelman then offers. For example, Begelman specifically opines as to whether LSC's controls were not in conflict with communications from regulators and exchanges. (*Id.* ¶ 50.) Begelman's statements about those communications—such as whether they are "not unreasonable and not uncommon"—serve as a basis for his opinion about LSC's controls. (*Id.* ¶ 45.) Business records and lay witnesses may in fact be one appropriate vehicle for providing historical evidence to the jury, but Begelman's opinions should not be excluded simply because they are based in fact.

Moreover, Begelman's opinions concern issues well "beyond the ken of a layperson." (Op. at 12.) A lay juror undeniably can read the guidance LSC received from regulators, understand how limited the volume of that guidance was, see LSC's repeated attempts to contact regulators for additional guidance, and consider whether LSC made changes to its compliance system over time. However, as Begelman's report clearly states, the industry standard at issue is whether LSC's responses or compliance systems were objectively "reasonable." (*See* Begelman Report ¶ 13; *see also* 17 C.F.R. § 240.15c3-5(b) (Market Access Rule requires a broker-dealer to "establish, document, and maintain a system of risk management controls and supervisory procedures *reasonably* designed to manage the financial, regulatory, and other risks" of its business) (emphasis added).) A lay juror, presumably with no experience in the securities industry or compliance, is not able to determine what a reasonable response to regulator inquiries would be or what a reasonable compliance system would necessarily look like.

Determining reasonableness instead requires an expert with extensive industry experience who can consider a full panoply of facts to arrive at an opinion. Such testimony is permissible, and indeed often essential for evaluation of certain claims and defenses, such as the aiding and abetting allegations that the Lek Defendants' acted knowingly or recklessly and LSC's good faith

defense to control person liability, both of which require the specific fact-based inquiry Begelman engages in. *See, e.g.*, *In re Blech Sec. Litig.*, No. 94 CIV 7696 (RWS), 2002 WL 31356498, at *22 (S.D.N.Y. Oct. 17, 2002) (testimony of industry experts relevant to control person liability and good faith defense). Excluding Begelman's testimony, therefore, would result in manifest injustice.

## CONCLUSION

For the foregoing reasons, the Lek Defendants respectfully request that the Court grant their Motion for Reconsideration.

Dated: New York, New York
April 22, 2019

NORTON ROSE FULBRIGHT US LLP

By: /s/ Steve M. Dollar
Steve M. Dollar
David B. Schwartz
1301 Avenue of the Americas
New York, New York 10019
Tel.: (212) 318-3000
Fax: (212) 318-3400
steve.dollar@nortonrosefulbright.com
david.schwartz@nortonrosefulbright.com

Kevin J. Harnisch (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, District of Columbia 20001-4501
Tel.: (202) 662-4520
Fax: (202) 662-4643
kevin.harnisch@nortonrosefulbright.com

Ronald D. Smith (*pro hac vice*)
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel.: (214) 855-8000
Fax: (214) 855-8200
ron.smith@nortonrosefulbright.com

*Attorneys for Defendants Lek Securities Corporation and Samuel Lek*