UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>     v.<br><br>LEK SECURITIES CORPORATION, SAMUEL LEK, VALI MANAGEMENT PARTNERS d/b/a AVALON FA LTD, NATHAN FAYYER, and SERGEY PUSTELNIK a/k/a/ SERGE PUSTELNIK,<br><br>          Defendants. | 17-cv-01789 (DLC) |

### DEFENDANTS LEK SECURITIES CORPORATION AND SAMUEL LEK'S REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION

Steve M. Dollar
David B. Schwartz
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019
Tel.: (212) 318-3000
Fax: (212) 318-3400
steve.dollar@nortonrosefulbright.com
david.schwartz@nortonrosefulbright.com

Kevin J. Harnisch (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, District of Columbia 20001
Tel.: (202) 662-4520
Fax: (202) 662-4643
kevin.harnisch@nortonrosefulbright.com

Ronald D. Smith (*pro hac vice*)
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel.: (214) 855-8000
Fax: (214) 855-8200
ron.smith@nortonrosefulbright.com

*Attorneys for Defendants
Lek Securities Corporation and Samuel Lek*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................................ ii
PRELIMINARY STATEMENT ......................................................................................................... 1
ARGUMENT ....................................................................................................................................... 1

    I.    THE COURT SHOULD RECONSIDER ITS RULING THAT BEGELMAN IS NOT QUALIFIED TO TESTIFY AS AN EXPERT ................. 1

        A.    The Court Applied the Legal Standard for Evaluating Expert Qualifications Too Narrowly. ................................................................ 1

        B.    Exclusion of Begelman's Testimony In Spite of His Extensive Relevant Experience Would Result In Manifest Injustice. ......................... 2

        C.    Begelman's Opinions Are Highly Relevant and Would be Helpful for the Jury Even If Begelman Did Not Have Experience with Layering or Spoofing ................................................................................. 6

    II.    THE COURT SHOULD RECONSIDER ITS RULING THAT BEGELMAN'S OPINIONS LACKED A SUFFICIENT BASIS ......................... 7

        A.    Begelman's Experience Is An Appropriate Basis for His Opinions .......... 7

        B.    Begelman Had Sufficient Knowledge And Considered Sufficient Facts in Preparation of His Report ............................................................ 8

    III.    THE COURT SHOULD RECONSIDER ITS RULING THAT BEGELMAN'S OPINIONS WOULD NOT BE HELPFUL TO THE JURY ................................................................................................................. 10

CONCLUSION .................................................................................................................................. 10

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Arista Records LLC v. Lime Grp. LLC*,
    No. 06 CV 5936 (KMW), 2011 WL 1674796 (S.D.N.Y. May 2, 2011) ................................... 1

*Daubert v. Merrill Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ............................................................................................................... 2

*Grant v. City of Syracuse*,
    No. 5:15 CV 445, 2018 WL 4778901 (N.D.N.Y. Oct. 3, 2018) ............................................. 3

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................................................... 7

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*,
    988 F. Supp. 2d 395 (S.D.N.Y. 2013) ................................................................................ 7, 8

*Schwarz v. ThinkStrategy Capital Mgmt. LLC*,
    No. 09 CV 9346 (PAE), 2012 WL 2026365 (S.D.N.Y. May 31, 2012) ................................. 7

*United States v. Tin Yat Chin*,
    371 F.3d 31 (2d Cir. 2004) ..................................................................................................... 2

*Wechsler v. Hunt Health Sys., Ltd.*,
    381 F. Supp. 2d 135 (S.D.N.Y. 2003) .................................................................................... 2

*In re Zyprexa Prods. Liab. Litig.*,
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) .................................................................................... 1

**Rules and Statutes**

Fed. R. Evid. 702 ............................................................................................................................ 2

**Other Authorities**

17 C.F.R. § 240.15c3-5(b) ........................................................................................................... 10

Defendants Lek Securities Corporation ("LSC") and Samuel Lek (together, the "Lek Defendants") respectfully submit this Reply Memorandum of Law in Support of their Motion for Reconsideration of the Court's Opinion and Order entered April 8, 2019 [Dkt. No. 355] (the "Opinion" or "Op.") excluding the testimony and opinions of Roger Begelman.

## PRELIMINARY STATEMENT

In their motion for reconsideration, the Lek Defendants request that the Court review certain key facts and issues relating to its Opinion excluding Begelman's testimony and opinions. In its Opposition ("Pl. Br."), the SEC does nothing to undermine the Lek Defendants' arguments that (1) Begelman is qualified based on his extensive experience with market manipulation surveillance, including surveillance for layering and spoofing in equities markets; (2) the bases for his opinions are sound; and (3) his testimony would be an essential aid for jurors to understand relevant industry customs and practices. The record supports reconsideration of the Opinion to take into account overlooked facts and prevent manifest injustice. The Lek Defendants request that the Court reconsider its previous ruling and grant the relief requested.

## ARGUMENT

### I. THE COURT SHOULD RECONSIDER ITS RULING THAT BEGELMAN IS NOT QUALIFIED TO TESTIFY AS AN EXPERT

#### A. The Court Applied the Legal Standard for Evaluating Expert Qualifications Too Narrowly.

The SEC does not dispute the applicable legal standard stated in the motion for reconsideration. The SEC does not dispute, for example, that within the Second Circuit, while courts are to serve as "gatekeeper[s]" for proposed expert testimony, they are not to impose too narrow test of an expert's own qualifications, *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936 (KMW), 2011 WL 1674796, at *1-3 (S.D.N.Y. May 2, 2011), which can include "experiential qualifications in a general field closely related to the subject matter." *See In re*

*Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007).  The SEC does not dispute that an expert need not possess the most ideal qualifications to testify, *see Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 144 (S.D.N.Y. 2003), or that those qualifications broadly include "knowledge, skill, experience, training or education."  *See* Fed. R. Evid. 702.  Nor does the SEC attempt to distinguish the case law upon which these propositions are grounded.  (*See* Pl. Br. at 4.)

Instead, the SEC states in a conclusory fashion that the Court correctly applied the legal standard for qualifying an expert witness.  (*Id.*)  While *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) articulate the broadly applicable test for qualifying an expert, simply re-citing to them does not address whether the standard was inappropriately applied based upon the SEC's arguments in its original *Daubert* briefing.  (*See* SEC *Daubert* Br., Dkt. 249.)  Rather, the SEC leaves unchallenged the specific examples of when the Opinion reflected too narrow of an application of Fed. R. Evid. 702 and *Daubert*.  (*See* Defs. Br., Dkt. 366, at 7.)

### B. Exclusion of Begelman's Testimony In Spite of His Extensive Relevant Experience Would Result In Manifest Injustice.

The SEC does little to refute the specific arguments raised concerning Begelman's qualifications.  The SEC argues that the Lek Defendants took "language from the Court's opinion out of context and overlook[ed] the Court's direct discussion of Begelman's work with the broker-dealer component."  (Pl. Br. at 5.)  The SEC claims that the Court "fully considered Begelman's work regarding Goldman Sachs' broker-dealer operations," (*id.*), while quoting from a portion of the Opinion that the Lek Defendants previously indicated was inaccurate or misrepresented Begelman's experience.  For example, the SEC presents a segment of the Opinion stating that Begelman's work as "Global Head of Control Rooms and Regulatory Reporting did not involve detection or surveillance for layering or spoofing in the equities markets."  (*See id.* (quoting Op.

at 4).) The Lek Defendants, however, do not claim that Begelman's role as head of control rooms would involve manipulative trading detection surveillance, *nor would such a claim be sensible* given Begelman's work as Co-Head of the Compliance and Surveillance Strategy Group.[1]

The Lek Defendants ask this Court to reconsider its previous Opinion based upon the evidence of this distinction between Begelman's two roles at Goldman Sachs' broker-dealer and that Begelman was able to describe in his deposition how parameters for surveillance of spoofing and layering were developed and changed over time. (*See* Defs. Br. at 8, n.7.) The SEC does not dispute that Begelman worked at a broker-dealer for 15 years or that during that time he acquired substantial relevant experience as Co-Head of the Compliance and Surveillance Strategy Group.[2] The SEC does not dispute that in that role, Begelman was responsible for the development of a proprietary surveillance architecture to capture, review, and analyze trading activity for spoofing.

When confronted with evidence that Begelman actually had experience with surveillance of spoofing or layering in the equities market at a broker-dealer, the SEC attempts to marginalize it by claiming *for the first time* that the Lek Defendants "make no showing that broker-dealer standards or practices in 2008 or earlier were still relevant in 2010 or later." (Pl. Br. at 5, n.2.) This is emblematic of the SEC's attempts to impose an overly narrow test upon Begelman's qualifications with arbitrary and unsupported speculation that decades of experience are irrelevant

---

[1]   *See also* Lek Defendants' Opposition to the Plaintiff's *Daubert* Motion to Exclude the Testimony and Opinions of Roger Begelman ("*Daubert* Opp."), Dkt. 286, at 10 (previously identifying Begelman's different responsibilities for each role).

[2]   The Lek Defendants do not dispute that an expert must be judged by his qualifications; however, the positions or titles an expert has held reflect the focus and depth of the expert's prior experience. Contrary to the SEC's argument, Begelman's work as Co-Head of Goldman Sachs' broker dealer's Compliance and Surveillance Strategy Group reflects his "actual qualifications," not a "mere title" lacking substance. (*See* Pl. Br. at 6; *see also* Defs. Br. at 2-3 (addressing Begelman's specific roles and responsibilities as Co-Head).) The SEC's cited authority is unavailing. *See Grant v. City of Syracuse*, No. 5:15 CV 445, 2018 WL 4778901, at *2 (N.D.N.Y. Oct. 3, 2018) (denying motion to preclude expert testimony from former police officer concerning use of force).

after two years.  As Begelman opined in his report, a supplemental declaration, and his deposition testimony, his knowledge of detection and surveillance systems for market manipulation developed over the course of his career at Goldman Sachs, beginning at the broker-dealer and continuing on during his time at GS Bank.[3]  (*See* Defs. Br. 2-3 (citing Expert Report of Roger Begelman ("Begelman Rpt."), Dkt. No. 251-1, ¶¶ 2-6, Attm. 1; Declaration of Roger Begelman ("Begelman Decl."), Dkt. No. 288, ¶¶ 5-6, 8; Deposition of Roger Begelman ("Defs Begelman Dep. Tr."), Dkt. No. 287-1, at 92:03-15, 102:07-19, 107:8-108:17, 124:16-126:09).)

The Lek Defendants have provided detailed explanations as to how Begelman's experience qualifies him to opine as an expert in this case.  (*See* Defs. Br. at 7-11.)  In response, the SEC attempts, yet again, to make hay out of selective citations to Begelman's deposition responses to the SEC's limited and misleading questions.  (*See, e.g.*, Pl. Br. at 6-7.)  These are unavailing given the experience reflected in Begelman's report, declaration, and elsewhere in his deposition.  When confronted with the fact that Goldman Sachs' broker-dealer selected and changed parameters used to detect spoofing, the SEC simply cites a single passage from Begelman's deposition in which he could not recall a specific answer to the SEC's question.  (*See* Pl. Br. at 6 (citing Deposition of Roger Begelman ("SEC Begelman Dep. Tr."), Dkt. No. 251-3, at 127:24-128:2).)[4]  Moreover, the passage itself lacks any context as the transcript reveals a lengthy exchange in which Begelman discusses how Goldman Sachs' post-hoc surveillance differed from LSC's upfront and more

---

[3] The SEC has repeatedly attacked Begelman's qualifications acquired while working at GS Bank.  (*See* SEC *Daubert* Br. at 6-8; Pl. Br. at 5, 7-8.)  These critiques are misplaced and do not diminish Begelman's work at Goldman Sachs' broker dealer and, in particular, in creating surveillance and detection systems for spoofing in the equities markets.  (Defs. Br. at 9.)

[4] The SEC's continued emphasis on Begelman's recall of specific parameters used by Goldman Sachs over a 20-year span entirely misses the point.  (*See*  Pl. Br. at 7.)  Begelman's opinion evaluates the process the Lek Defendants' undertook to build a system to surveil and block potential layering and spoofing given the available regulator guidance.  He does not evaluate the Lek Defendant's Q6 system by comparing its specific parameters to those utilized by Goldman Sachs.

conservative approach of outright blocking of potentially manipulative trades.  (Defs. Begelman Dep. Tr. at 125:11-129:25; SEC Begelman Dep. Tr. at 130:1-24.)  Finally, the SEC argues that Begelman's experience should be discredited because he responded to some of the SEC's questions "in the passive voice and collective 'we,'" (Pl. Br. at 7 n.4.), which attempts to draw conclusions and infer intent without any support.  The unremarkable fact is that Begelman often worked on a team to create compliance structures—indeed, he *led* the team.[5]  Arguments based on the grammar of Begelman's deposition testimony do nothing to undermine the facts reflected in Begelman's *curriculum vitae*, his report, and deposition testimony demonstrating that he had his own personal experience with spoofing or layering detection.  (Begelman Rpt. ¶¶ 2-3, Attm. 1; Defs. Begelman Dep. Tr. at 102:07-19, 107:8-108:17, 124:16-126:09.)

Begelman's experience with asset types other than equities bolsters his qualifications to testify.  The SEC does not dispute that "spoofing and layering in the commodities and equities markets are direct analogues."  (Defs. Br. at 9.)  Begelman's experience with spoofing in both markets[6] is not mutually exclusive, nor does experience in the latter undermine the former.  Rather, Begelman's application of what he learned in both markets in evaluating LSC's compliance and risk controls is no different from Hendershott and Pearson's creation and application of novel methodologies in their expert reports.  The SEC does not dispute that both of its experts apply their experiences gained across subject matter in creating their respective layering and cross-market manipulation analyses.  (Pl. Br. at 8 & n.5.)  Begelman's wide-ranging experience, including but not limited to 15 years at a national broker dealer and with direct experience in surveillance and

---

[5] *See, e.g.*, Defs. Begelman Dep. Tr. at 125:21-126:1 ("I built with others the entire system from the ground up.  We had subject matter experts.  We had technologists.  We had coders.  We had people breaking down different activities and all sorts of things for which I ran the entire thing.")

[6] The SEC claims that Begelman failed to establish his experience in commodities.  (Pl. Br. at 7-8.)  Just as with questions pertaining to Begelman's work at GS Bank in the equities market, Begelman's perceived lack of experience is due to the questions that the SEC asked during Begelman's deposition.

detection for spoofing in the equities market, qualifies Begelman to opine on those topics included in his report and proposed testimony.

### C. Begelman's Opinions Are Highly Relevant and Would be Helpful for the Jury Even If Begelman Did Not Have Experience with Layering or Spoofing.

Begelman's opinions regarding the reasonableness of LSC's compliance, surveillance, and risk controls, or its communications with regulators and exchanges, should not be excluded as they would help the jury understand the context and appropriateness of LSC's development and refinement of its compliance systems. The SEC does not dispute that Begelman has 23 years of experience designing compliance systems, dealing with novel compliance issues as they arose over time, and a detailed, first-hand history with regulatory communications that serve as the basis for his opinions. (Begelman Rpt. ¶¶ 2, 10, 42-54, Attm. 1; Begelman Decl. ¶ 8.)

In response, the SEC simply argues that Begelman's opinions are "not relevant to this case unless it is grounded in expertise in how broker-dealers detect and prevent layering and spoofing," and reflect information that "the jury is capable of understanding . . . on its own." (Pl. Br. at 9.) These criticisms add nothing on reconsideration, but instead simply reflect the SEC's indulgence in skimming over the facts, confusing issues, and presenting quotes from the Lek Defendants' motion for reconsideration and the Opinion absent context. (*See id.*) The SEC argues that lay jurors could understand the significance of communications with regulators encapsulated in Begelman's testimony, while also arguing that the testimony is "just an advocate's argument." (*See id.*) In reality, Begelman does neither. He opines on the importance of the communications within the securities industry, which is critical to counteract the SEC's implication that regulatory communications were red flags and that the Lek Defendants should have shut down Avalon's account in response to receiving them. (*See, e.g.*, Complaint, Dkt. No. 1, ¶¶ 64-65; SEC Summary Judgment Opp., Dkt. 250, at 6-8, 10.) Making such a determination requires expertise, which

- 6 -

centrally stems from experience in the regulated industry. Preventing a clearly qualified expert, with significant experience interacting with regulators, from opining on industry context would result in manifest injustice.

## II. THE COURT SHOULD RECONSIDER ITS RULING THAT BEGELMAN'S OPINIONS LACKED A SUFFICIENT BASIS

The SEC once more attempts to graft Begelman's proposed testimony onto the structure of a science-based expert witness report. (Pl. Br. at 10-11.) While *Daubert* applies to non-scientific expert witnesses, *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the SEC misstates both the required bases for testimony of an expert like Begelman and what Begelman relies on.

### A. Begelman's Experience Is An Appropriate Basis for His Opinions.

The SEC argues that Begelman lacked a reliable basis for his opinions despite evidence that Begelman had decades of relevant experience and explained how he applied his experience to the facts of this case. The SEC does not contest that Begelman was not required to perform "specific data analysis or consideration of peer-reviewed literature" as part of his analysis or that he "need not rely upon a 'scientific method.'" (Pl. Br. at 10 (quoting Defs. Br. at 12-13).) The SEC further concedes that "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." (*Id.* (quoting *Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404-05 (S.D.N.Y. 2013)).) The SEC instead argues that the fault in Begelman's analysis is that he adopts a "my experience is my experience" approach based upon a single cite to case law. *See Reach Music*, 988 F. Supp. 2d at 404-405.

The SEC does not take issue with Begelman's methodology *per se*, which is consistent with admissible expert testimony relating to industry standards concerning due diligence. *See Schwarz v. ThinkStrategy Capital Mgmt. LLC*, No. 09 CV 9346 (PAE), 2012 WL 2026365, at *8-9

(S.D.N.Y. May 31, 2012).[7] Instead, the SEC objects to how Begelman explains how he arrived at his conclusions, including the bases of those opinions. (Pl. Br. at 10-11.) Yet, throughout his report, Begelman "'explain[s] how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" [8] (*See* Pl. Br. at 10 (quoting *Reach Music*, 988 F. Supp. 2d at 404-405).) In his report, Begelman identifies and explains an industry standard or custom—which he acquired through his experience—and then applies it to LSC's actions. (*See* Begelman Rpt. ¶¶ 34, 37-39, 41-42, 48-50, 53-56.) Begelman's knowledge of LSC's actions are in turn derived from his review of public and private compliance related communications, conversations with LSC compliance staff, and review of prior deposition testimony. (*See* Begelman Rpt. at Attm. 2.)

### B. Begelman Had Sufficient Knowledge And Considered Sufficient Facts in Preparation of His Report.

The Lek Defendants requested that the Court reconsider its finding that Begelman did not have an "adequate understanding of Lek Securities' layering controls" because he could not "understand or interpret" the computer code text printouts of RTR files communicating LSC Q6 system settings. (Defs. Br. at 13 (quoting Op. at 10-11).) The SEC does not dispute the accuracy of the LSC Q6 systems settings data presented in Begelman's report, including the "specific

---

[7] The Lek Defendants have previously described Begelman's "straightforward and uncontroversial" methodology. (*See Daubert* Opp. at 16-17 ("(1) Begelman was a compliance officer in the securities industry with intimate knowledge of, inter alia, how broker-dealers surveil and control for manipulative trading, respond to inquiries from regulators, and address risk; (2) as a result of his extensive experience, he came to understand industry customs and practices relevant to this case; and (3) he is able to opine on the reasonableness of LSC's actions by applying those industry customs and practices that be acquired over the course of his career when evaluating LSC's compliance controls.").)

[8] The SEC's unsupported claim that Begelman "evaded the questions and talked in circles," (Pl. Br. at 10), during his deposition is factually inaccurate and nothing but an ad hominem attack to impugn the credibility of a qualified expert witness. (*See Daubert* Opp. at 15-19.)

layering controls in place at particular times." (Pl. Br. at 11.) The SEC also does not argue that Begelman's analysis of that information is wrong.

In light of these concessions, Begelman's inability to read computer code—when he is not being proffered as an expert in computer code—does not reflect a fatal lack of knowledge or failure to consider sufficient data. Moreover, the SEC provides no evidence to support its claim that Begelman "failed to make sure that he learned the information reflected in the documents," but instead relies on the same inapplicable assertion included in its *Daubert* motion. (*See* SEC *Daubert* Br. at 22 (claiming broadly that Begelman "failed to find out or even consider in how many instances" ministerial errors occurred in applying Q6 controls to Avalon subaccounts).) The SEC's assertion is a bald attempt, once more, to draw inferences where no such inferences can validly be drawn based on the facts in this case.

With regard to "depth control," the Lek Defendant asked the Court to reconsider its conclusion that Begelman's description of "depth control" was evidence that "Begelman's report does not reflect any expert knowledge that he possesses." (Op. at 11, n.2.) The SEC continues to misstate what happened in Begelman's deposition, including how its own improperly phrased questioning confused Begelman (and would have confused anyone who properly understood that depth control uses part of Q6). (Pl. Br. at 12.) The SEC, however, does not dispute either that: (1) Begelman's report specifically discusses LSC's implementation of the control following specific guidance from FINRA in 2016, (*see* Begelman Rpt. ¶ 53); or (2) any issue with Begelman's specific understanding of depth control does not taint his other proffered opinions, much less preclude them. As such, the Lek Defendants reiterate their request to reconsider exclusion of Begelman's testimony based on the Q6 depth control.

### III. THE COURT SHOULD RECONSIDER ITS RULING THAT BEGELMAN'S OPINIONS WOULD NOT BE HELPFUL TO THE JURY

The Lek Defendants requested that the Court reconsider its exclusion of Begelman's opinions because the Court did not consider how Begelman's testimony concerning industry standards would aid jurors in understanding the nuances of the underlying records and lay testimony. Both the Opinion and the SEC's Opposition are silent to the argument that, while a juror may understand the basic facts presented, he would not fully grasp the import of those facts absent expert testimony as to context. (Op. at 12-13; Pl. Br. at 13.) The SEC claims that Begelman offers a "running commentary on the communications [with regulators], which amounts to mere advocacy." (Pl. Br. at 13 & n.7). The examples the SEC provides, however, are precisely the kind of testimony that would assist a jury in deciding *inter alia* the Lek Defendants scienter and good faith defenses. A lay juror will likely have no experience interacting with financial institution regulators and absent expert testimony as to standard industry practices and customs could conclude that a regulatory inquiry or public notice is a definitive red flag. The same juror also plausibly would not know what a Wells notice is, or—even more likely—will not know what the typical response from either the recipient or regulator would be after the Wells notice is issued. Begelman's testimony, which concerns whether LSC's responses or compliance systems were objectively "reasonable," (*see* Begelman Rpt. ¶ 13; *see also* 17 C.F.R. § 240.15c3-5(b)), provides jurors with the appropriate perspective to evaluate the Lek Defendants actions.[9]

### CONCLUSION

For the foregoing reasons, the Lek Defendants respectfully request that the Court grant their Motion for Reconsideration.

---

[9] The SEC reiterates its earlier argument that Begelman does not provide a reliable basis for his opinion about the reasonableness of the Lek Defendants' compliance systems and interactions with regulators. (Pl. Br. at 13.) That argument is meritless. (*See Daubert* Opp. at 19-23.)

| | |
|---|---|
| Dated: New York, New York<br>May 3, 2019 | NORTON ROSE FULBRIGHT US LLP<br><br>By: /s/ Steve M. Dollar<br>     Steve M. Dollar<br>     David B. Schwartz<br>1301 Avenue of the Americas<br>New York, New York 10019<br>Tel.: (212) 318-3000<br>Fax: (212) 318-3400<br>steve.dollar@nortonrosefulbright.com<br>david.schwartz@nortonrosefulbright.com<br><br>Kevin J. Harnisch (*pro hac vice*)<br>799 9th Street NW, Suite 1000<br>Washington, District of Columbia 20001-4501<br>Tel.: (202) 662-4520<br>Fax: (202) 662-4643<br>kevin.harnisch@nortonrosefulbright.com<br><br>Ronald D. Smith (*pro hac vice*)<br>2200 Ross Avenue, Suite 3600<br>Dallas, Texas  75201<br>Tel.: (214) 855-8000<br>Fax: (214) 855-8200<br>ron.smith@nortonrosefulbright.com<br><br>*Attorneys for Defendants Lek Securities Corporation and Samuel Lek* |