UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                      :      17cv1789 (DLC)

SECURITIES AND EXCHANGE COMMISSION,   :

                                        :      <u>OPINION AND ORDER</u>

                   Plaintiff,        :

                                        :

          -v-                        :

                                        :

LEK SECURITIES CORPORATION, SAMUEL    :
LEK, VALI MANAGEMENT PARTNERS d/b/a   :
AVALON FA, LTD., NATHAN FAYYER, and   :
SERGEY PUSTELNIK a/k/a SERGE         :
PUSTELNIK,                              :

                                        :

                  Defendants.       :

                                        :
--------------------------------------X

APPEARANCES

For plaintiff Securities and Exchange Commission
David J. Gottesman
Olivia S. Choe
Sarah S. Nilson
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

For defendants Lek Securities Corporation and Samuel Lek:
Steve M. Dollar
David B. Schwartz
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10103

Kevin J. Harnisch
Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001

Ronald D. Smith
Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201

DENISE COTE, District Judge:

An Opinion of April 8, 2019 granted the SEC's motion to exclude the expert testimony of Roger Begelman ("Begelman"). SEC v. Lek Sec. Corp., 17cv1789(DLC), 2019 WL 1512713 (S.D.N.Y. Apr. 8, 2019) ("Begelman Opinion"). Familiarity with the Begelman Opinion is assumed. The Lek Defendants[1] have moved for reconsideration of the ruling. For the following reasons, that motion is denied.

The standard for granting a motion for reconsideration is "strict." Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012) (citation omitted). "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." Id. (citation omitted). "A motion for reconsideration should be granted only when the defendant identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr., 729 F.3d 99, 104 (2d Cir. 2013) (citation omitted). It is "not a vehicle for relitigating old issues, presenting the case under new theories,

---

[1] The Lek Defendants are Lek Securities Corporation ("Lek Securities") and Samuel Lek.

securing a rehearing on the merits, or otherwise taking a second bite at the apple." Analytical Surveys, 684 F.3d at 52 (citation omitted). The decision to grant or deny the motion for reconsideration is within "the sound discretion of the district court." Aczel v. Labonia, 584 F.3d 52, 61 (2d Cir. 2009) (citation omitted).

The Lek Defendants first seek reconsideration of the ruling that Begelman was not qualified to give an opinion about the adequacy of a broker-dealer's systems and procedures to detect and prevent manipulative layering, which is also referred to as spoofing. Begelman has extensive and impressive experience in the securities industry. That experience, however, did not provide him with a basis to judge the adequacy of Lek Securities' compliance program, including as a system to detect layering or spoofing.

And, indeed, his report does not actually do so, at least directly. For instance, he does not describe how a broker-dealer goes about constructing a surveillance program for the detection of layering, what the characteristics of a program that meets industry standards are, or how the Lek Securities' program stacked up against those standards. Despite the representation in this motion for reconsideration that through his prior work Begelman "became familiar with" methodologies of

reviewing trading for manipulative spoofing, his report did not describe those methodologies.

Begelman's deposition is highly revealing.  It showed that he does not possess experience with or knowledge relevant to the processes that underpin the general observations he makes in his report.  Despite repeated efforts to obtain a description from him, Begelman was unable to describe the methodologies his team used at Goldman Sachs to detect or surveil for layering or spoofing.  He couldn't even explain some of the passages in his own report and was not familiar with documents on which his expert report relied.[2]  Of the many examples that could be given, one will suffice.  When asked to identify the criteria that one would use to determine whether the practices at a broker-dealer such as Lek Securities are consistent with a compliance framework to prevent potential manipulative trading, Begelman responded that he wouldn't be able to answer that "sitting here right now."

In making their argument that he is a qualified expert, the Lek Defendants do not grapple with how poorly Begelman's experience aligns with the tasks that they asked him to perform.  Nor do they describe the Begelman Opinion accurately or

---

[2] Begelman spent about thirty hours on this engagement before submitting his nineteen-page report on March 16, 2018.  The report contains 58 footnotes.

acknowledge the deficiencies it identified.  For instance, the
Lek Defendants assert that the Begelman Opinion held that
Begelman was not qualified because he did not provide a "data-
driven methodology."  Not so.  If Begelman possessed relevant
experience for the opinions he expressed, that would have been
sufficient to qualify him as an expert to render those opinions.
Begelman Opinion, 2019 WL 1512713, at *4.

In their reply, the Lek Defendants principally rely on one
page of the Begelman deposition as evidence that he had the
necessary experience to opine on how the parameters for
surveillance of spoofing and layering were developed and changed
over time.[3]  Begelman's report does not describe those
parameters, much less explain how they were developed or how
they changed over time.  In the portion of his deposition to
which they cite, Begelman explained that between 1993 and 2008
Goldman Sachs used a daily post hoc report to detect problematic
activity, which he believed must have included exceptions for
some type of spoofing or manipulation.  But he could not
describe what parameters or "exceptions" Goldman Sachs used to
detect spoofing.  In sum, there is no basis, having reviewed his
report and his deposition once again, to find that Begelman is
qualified as an expert to give an opinion about the adequacy of

---

[3] The Lek Defendants rely on page 128.

a broker-dealer's systems and procedures to detect and prevent manipulative layering.

The Lek Defendants argue that Begelman is in any event qualified to offer at least two of the three opinions contained in his expert report.[4]  They describe the first of these two opinions as the opinion that Lek Securities' Q6 Layering Control system "was consistent with a compliance framework to prevent potential manipulative trading."  They explain that this overarching statement includes the opinions that no compliance system is "fool proof" and compliance functions "undergo a series of controls and reviews."[5]

Begelman has no expertise to equip him to assess the extent to which Lek Securities' Q6 Layering Control system was or was

---

[4] The Lek Defendants assert that Begelman provided three opinions in his report.  They do not assert, however, that he can give the third of these opinions unless found to have the relevant expertise.  They describe the third opinion as his statement that Lek Securities' controls were consistent with industry standards for controls to manage the risk of manipulative trading.  As the Begelman Opinion noted, Begelman's report did not describe any industry standard for compliance systems aimed at detecting and controlling for layering or spoofing, and therefore, provided no basis for assessing the extent to which the Lek's own controls met that industry standard.  Id. at *5.

[5] In his report, Begelman opined that, in his experience, "no front end control or back end surveillance or review is fool proof" and "revisions and updates to compliance programs -- particularly newly-created programs designed to address newly-identified potentially manipulative behavior -- are common in the securities industry as compliance professionals see the new programs in action."

not consistent with the industry standard for such controls.  As
already noted, his report does not describe that industry
standard and he was unable during his deposition to describe
even the one used by his own firm during the period prior to
2008, which is the only period in which he might have gleaned
experience relevant to his proffered testimony.  Moreover,
despite including citations in his report to Lek Securities
documents describing the parameters of its controls, his
deposition showed that he was unfamiliar with the documents and
could not use them to explain the Q6 Layering Control system.
And, as explained in the Begelman Opinion, his assertion that
"revisions and updates to compliance programs . . . are common"
is tangential to the issues in dispute and would not help the
jury -- at least in the absence of testimony setting forth an
industry standard of what these revisions and updates should be.
Id. at *5.  The same holds true for the commonplace observation
that no compliance system is fool proof.

Finally, the Lek Defendants describe Begelman's second
opinion, which they contend he may offer even if not qualified
as an expert on compliance systems for the detection of layering
or spoofing, as the opinion that Lek Securities' controls "were
not in conflict with communications from regulators and
exchanges."  They assert that such testimony would help the jury
understand whether the Lek Defendants had acted in good faith;

they do not assert that those communications provide the legal standard against which Lek Securities' actions must be judged. The motion does not describe the context in which Begelman rendered this particular opinion or recite the full opinion rendered by Begelman in his report.

In his report, Begelman spent several pages summarizing what he considered to be the pertinent communications between Lek Securities and regulators and exchanges.  In setting out this summary, Begelman was highly critical of the regulators. For instance, Begelman asserted that FINRA never provided specific guidance, never audited Lek Securities' surveillance system, never appeared to conclude that Lek Securities had violated the law, and took too long to act on the Lek Securities' Wells' notices.  Begelman concluded, "Under the circumstances, with no additional input from FINRA or other exchanges as to what its settings should be, my experience leads me to conclude that the settings put in place in Lek's Q6 Layering Controls were not in conflict with regulator and exchange communications."

As explained in the Begelman Opinion, this narrative of Lek Securities' communications with regulators is not admissible expert testimony.  Id. at *4.  Nor, as explained above and in the Begelman Opinion, does Begelman have the knowledge and expertise regarding layering controls generally or Lek

8

Securities' Q6 Layering Control system specifically to make an assessment about the latter's adequacy.  Therefore, even if it were relevant and appropriate for an expert to assess and criticize a regulator's communications with a defendant, Begelman isn't equipped to give admissible testimony about the extent to which Lek Securities' controls were "not in conflict" with the regulator or exchange.

## Conclusion

The Lek Defendants' April 22, 2019 motion for reconsideration is denied.


Dated:    New York, New York
          May 8, 2019

                              _____
                                   DENISE COTE
                         United States District Judge