## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                   Plaintiff,<br><br>v.<br><br>LEK SECURITIES CORPORATION, et al.,<br><br>                 Defendants. | Civil Action No. 17-CV-1789 (DLC) |

**DEFENDANTS AVALON FA LTD'S, NATHAN FAYYER'S, AND SERGEY PUSTELNIK'S
PRETRIAL MEMORANDUM OF LAW**

James M Wines
SDNY Bar. No. JW5859
**Law Office of James M Wines**
1802 Stirrup Lane
Alexandria, VA 22308
202.297.6768
winesj@wineslegal.com


Steven Barentzen
**Law Office of Steven Barentzen**
17 State Street, Suite 400
New York, NY 10004
Phone: (917) 476-0953
Fax:    (202) 888-6268
Steven@barentzenlaw.com

Attorneys for Defendants Avalon FA LTD,
Nathan Fayyer, and Sergey Pustelnik

## Table of Contents

I.    The SEC Will Not Meet Its Burden To Prove The Elements Of Market Manipulation ..... 1

    A.  The SEC Cannot Meet Its Burden On So-Called Layering Loops .......................... 1

        1.   SEC Cannot Prove Avalon Traders' Fraudulent Intent .................................... 1

        2.   The SEC Cannot Show Artificial Market Impact ............................................. 2

        3.   The SEC Cannot Prove Injection of False Information Into the Marketplace .. 6

        4.   The SEC Cannot Identify A Manipulative Act ................................................. 8

    B.  The SEC Cannot Meet Its Burden To Show That "Cross Market" Orders Are Manipulative ....................................................................................................... 10

II.   The SEC Will Not Meet Its Burden To Establish Primary Liability Against Fayyer Or Pustelnik ................................................................................................................ 13

III.  The SEC Will Not Meet Its Burden To Establish Control Person Liability ........... 15

IV.   The SEC Will Not Meet Its Burden To Establish Aiding And Abetting Liability . 17

V.    The SEC's Disgorgement Calculations Are Flawed and Grossly Overstate Defendants' Profits From Contested Trades ........................................................... 19

    A.  Hendershott Overstates Trading Revenue ................................................................ 19

    B.  Hendershott And Pearson Greatly Overstate Avalon's Profits .............................. 21

    C.  The SEC Overstates Mr. Pustelnik's Profits .......................................................... 21

    D.  The SEC Is Not Entitled To Interest On The Money Frozen By This Court .......... 22

## Table of Authorities

**Cases**

*Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs.*, No. 1:17-CV-1235-GHW, 2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ........................................................................................ 15

*Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir. 1983) ............................................................... 18, 19

*ATSI Communications v. Shaar Fund*, 493 F.3d 87 (2d. Cir. 2007) .................................... 1, 8, 15

*Buckley v. Deloitte & Touche USA LLP*, No. 06-civ-329, 2007 WL 1491403 (S.D.N.Y. May 22, 2007) ...................................................................................................................................... 16

*Central Bank v. First Interstate Bank*, 511 U.S. 164 (1994) ...................................................... 14

*CFTC v. Nav Sarao Futures Limited PLC,* 1:15- cv-03398 (N.D. Ill.) ........................................... 9

*CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233 (S.D.N.Y. 2012) ......................................... 10

*CFTC v. Wilson,* 2018 WL 6322024 (S.D.N.Y. 2018) ..................................................... 6, 10, 13

*Chee v. Marine Midland Bank, N.A.*, No. 88 CIV. 0557, 1991 WL 15301 (E.D.N.Y. Jan. 29, 1991) ...................................................................................................................................... 19

*Continental Bank & Trust Co. of Salt Lake City v. Garfinkle*, 292 F. Supp 709 (S.D.N.Y. 1968) ................................................................................................................................................ 14

*ECA, Local 134 IBEW v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) .......................... 17

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ....................................................................... 1

*Friedman v. JP Morgan Chase & Co.*, No. 15-CV-5899, 2016 WL 2903273 (S.D.N.Y. May 18, 2016) ...................................................................................................................................... 15

*GFL Advantage Fund v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) ...................................................... 1

*Hershey v. Energy Transfer Partners*, 610 F.3d 239 (5th Cir. 2010) ............................................ 3

*In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013) ............................ 3

*In re CBI*, 529 F.3d 432 (2d Cir. 2008) ....................................................................................... 16

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004) ........... 15, 16

*In re Motel 6 Sec. Litig.*, 161 F. Supp. 2d 227 (S.D.N.Y. 2001) ................................................... 15

*In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444 (S.D.N.Y. 2009) .............................................. 16

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017) ......................................................................... 19

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ................................................................ 18

*S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98 (2d Cir. 2009)..................................... 17

*S.E.C. v. Tecumseh Holdings Corp.*, No. 03 CIV 5490 (SAS), 2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009) ................................................................................................ 17

*Savino v. E.F. Hutton & Co.*, 507 F. Supp. 1225 (S.D.N.Y. 1981) ............................................ 14

*SEC v. de Maison*, No. 18-2564, 2019 WL 4127328 (2d Cir. Aug. 30, 2019)............................. 19

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ................................................ 13, 14

*SEC v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007) ....................................................... 18

*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) ................................................ 14

*SEC v. Mudd*, No. 11 CIV 9202 (PAC), 2016 WL 815223 (S.D.N.Y. Feb. 29, 2016)................. 18

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013) ............................................................... 23

*SEC v. Texas Gulf Sulphur Co.*, 312 F. Supp. 77 (S.D.N.Y. 1970).......................................... 19

*SEC v. Texas Gulf Sulphur*, 446 F.2d 412 (1987).......................................................... 19

*Trane Co. v. O'Connor Sec.*, 561 F. Supp. 301 (S.D.N.Y. 1983)............................................. 14

*Tull v. United States*, 481 U.S. 412 (1987) .................................................................. 19

*United States Sec. & Exch. Comm'n v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) ................... 14

*Unity House, Inc. v. N. Pac. Inv., Inc.*, 918 F. Supp. 1384 (D. Haw. 1996)................................ 18

*Universal Heritage Investments Corp.,* 47 S.E.C. 839 (1982) ................................................ 14

*U.S. v. Coscia*, 866 F.3d 782 (7th Cir. 2017)........................................................... 12, 13

*Wight v. BankAmerica Corp.*, 219 F.3d 79 (2d Cir. 2000).................................................... 16

*Yoshikawa v. SEC*, 192 F.3d 1209 (9th Cir. 1999) ........................................................ 7

**Statutes**

15 U.S.C. § 78i(a)(2)..................................................................................................... 14

15 U.S.C. § 78t(e) ......................................................................................................... 17

I.      **The SEC Will Not Meet Its Burden To Prove The Elements Of Market Manipulation**

For open market orders to constitute manipulation under the federal securities laws, the SEC must prove: (i) that Avalon's traders had an intent to defraud,[1] (ii) a manipulative act,[2] (iii) artificial price impact,[3] and (iv) that false information was injected into the marketplace.[4] The SEC will not meet its burden with respect to any of those elements.

### A.  The SEC Cannot Meet Its Burden On So-Called Layering Loops

#### 1.  SEC Cannot Prove Avalon Traders' Fraudulent Intent

The jury will not hear testimony from any of the Avalon traders who actually placed the orders challenged by the SEC. The SEC's expert Professor Terrence Hendershott ("Hendershott") has conceded that he has no knowledge regarding the intent of any of those traders – he has not spoken to any of them or reviewed transcripts of any interviews of those traders. Ex. A, Hendershott 2017 Tr. at 354-56.  Hendershott conceded that he does not know what any of the Avalon traders intended. *Id.* at 374-75.

Hendershott's analysis labels orders as "non-bona fide" if they exhibit a cancellation ration of 3 to 1, which Hendershott equates with an intent not to execute those orders. However, Hendershott has ignored the fact that the SEC's own research has found that over *95% of all limit orders* entered on US equity markets are canceled without execution.[5] The SEC also found

---

[1] *See, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976) (holding that there must be an intent to defraud and not mere negligence to establish a violation of an anti-fraud statute); *ATSI Communications*, 493 F.3d at 101 (holding that market manipulations requires *inter alia* scienter).

[2] *See, e.g. ATSI Communications v. Shaar Fund,* 493 F.3d 87, 101 (2d. Cir. 2007); *GFL Advantage Fund v. Colkitt*, 272 F.3d 189, 209 (3d Cir. 2001).

[3] *ATSI,* 493 F.3d at 100 (the "critical question" is whether it "artificially affects a security's price in a deceptive manner.").

[4] *GFL Advantage Fund,* 272 F.3d at 205 (3d Cir. 2001) ("[T]he essential element of claim for manipulation under the federal securities laws "is that *inaccurate* information is being injected into the marketplace.") (emphasis in original); *see also*, *ATSI*, 493 F.3d at 100 ("courts generally ask whether a transaction sends a false pricing signal to the market.")

[5] *See, e.g.,* Equity Market Speed Relative to Order Placement, March 19, 2014 (available at https://www.sec.gov/marketstructure/research/highlight-2014-02.html#.WuDUiGYlTUI); The Speed of Equity

that approximately 46% of those cancellations occurred within one second and that over 23% of those cancellations occurred within 50 milliseconds; *i.e.* 5 one-hundredth of a second.[6] Fast cancellation of a vast majority of resting limit orders is a hallmark of U.S. equities markets, not an indication of fraudulent intent.

Most of the examples of purported layering loops cited by Hendershott evidence an intent by those Avalon traders ***to execute the challenged orders***. Most of the limit orders that the SEC and Hendershott characterize as "non bona fide" were priced better than, at, or near the NBBO, where the SEC's own research has indicated orders are most likely to be executed.[7] Hendershott agreed that aggressively pricing your orders at or near the inside evidences a traders' intent to execute. Ex. A, Hendershott 2017 Tr. at 329, 331. Avalon traders placing orders priced better than, at, or near the NBBO thus evidenced an objective intent to have those orders executed.

Still the SEC's studies have found that even orders priced *better than* the NBBO only had a cancel-to-execition ration of 4.6:1.[8] Orders priced at the NBBO had a cancel-to-execution ratio of 9.8:1; while orders priced within 0.5% of the NBBO had a cancel-to-execution ratio of 79:1.[9] Orders priced further away from the inside – *i.e.* the vast majority of all limit orders – had a cancel-to-execution ratio of 117:1.[10] The SEC would have the jury make the impermissible inference of manipulative intent from a cancel-to-execution ratio of just 3:1 – *i.e.* a rate lower than any observed by the SEC in the market.

### 2.   The SEC Cannot Show Artificial Market Impact

To prevail on its market manipulation claims, the SEC must also establish by a

---

Markets October 9, 2013 (available at https://www.sec.gov/marketstructure/research/highlight-2013-05.html#.WuDigWYlTUI).

[6] Speed of Equity Markets, see note 5, *supra.*
[7] *See* Equity Market Speed Relative to Order Placement, see note 5, *supra.*
[8] *See* Equity Market Speed Relative to Order Placement, note 5, *supra*
[9] *Id.*
[10] *Id.*

preponderance of the evidence that: "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; (4) Defendants specifically intended to cause the artificial price." *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 183 (2d Cir. 2013) (*quoting Hershey v. Energy Transfer Partners*, 610 F.3d 239, 247 (5th Cir. 2010)).

The criteria used by Hendershott to identify so-called "layering loops" do not necessarily show an impact on market price, much less the "artificial market impact" required to prove market manipulation. Ex. A, Hendershott 2017 Tr. at 58 ("no, it is not part of the criteria"). Hendershott conceded that orders that have no price impact, which by definition could not be manipulative, could nonetheless be identified as "layering loops" under his analysis. *Id.* at 59-60.

The SEC did not even provide Hendershott with market price data regarding the vast majority of the so-called "layering loops" identified by his analysis, i*d.* at 59-60, making it impossible for Hendershott to determine whether any of the orders in those loops had the requisite manipulative price impact necessary to constitute a violation of the federal securities laws. In today's modern markets, price movements in highly liquid stocks often occur in pennies or even a penny in a millisecond or even microsecond (one millionth of a second) increments as thousands of orders compete to achieve disparate trading objectives through varying strategies. Hendershott conceded that "activities of other traders in the market" could contribute to any observed price movement around the orders placed in the Avalon account. *Id.* at 89. Nonetheless, Hendershott's analysis does not account for these external market factors. *Id.* at 96, 87-88.

Hendershott has previously recognized that a "vector auto- regression ("VAR") analysis" is the standard industry method for confirming that observed price impacts are not the result of such external market factors. *See Id.* at 103-04, 108, 154. But Hendershott did not perform a

3

VAR analysis in this case, *see id.* at 103-104, 108, even though the only previous time that he

testified regarding so-called "layering," he did perform a VAR analysis (*id.* at 108); and the

paper written by Hendershott that purports to review the price impact of limit orders featured a

VAR analysis (*id.* at 154; Ex. B, Brogaard and Hendershott, "Price Discovery Without Trading:

Evidence From Limit Orders" at 31 (Sept. 2015). The paper cited in Hendershott's report for the

proposition that limit orders can impact price also included a VAR analysis (Ex. C, Hendershott

2017 Report at 5, n.4); as did a more recent paper by the same authors (Ex. A, Hendershott Tr. at

163; Hautsch and Huang, "Limit Order Flow, Market Impact and Optimal Order Sizes: Evidence

from NASDAQ TotalView- ITCH Data" (Aug. 2011)).

      Exhibit 5 to Hendershott's initial report is what he describes as a "simple" price impact

analysis on a small portion of the identified "layering loops." Ex A., Hendershott 2017 Tr. at

108-113. Hendershott conceded that this simplistic analysis, at best, confirms the natural

tendency of price movements to coincide with order imbalances. Ex. C, Hendershott 2017 Report

at 12; Ex. A, Hendershott 2017 Tr. at 100.  But it does not identify the supposed price impact of

any of the specific orders alleged to manipulative, as is necessary to find them manipulative.

      The analysis summarized in Exhibit 5 to Hendershott's report shows that the orders

identified as so-called "layering loops" by Hendershott's criteria had slightly ***less of a price impact***

than the orders that did not meet the "layering loops" criteria.  In other words, Hendershott

concluded that "layering loops" had an insignificant, ***albeit slightly less*** price impact than the

Avalon orders deemed consistent with legitimate market making. *See* Ex. D, SEC Document

Production z-06568207; Ex. A, Hendershott 2017 Tr. 114-16. This evidence refutes the argument

that the orders identified by Hendershott as "layering loops" had the requisite price impact.

      Hendershott even fails to establish that a vast number of challenged orders even had the

ability to affect market prices. According to Hendershott, approximately 44% of the orders he identified were priced away from the NBBO. Ex. E, Hendershott Reply to Bodek at 8. Hendershott's and other academics' VAR analyses have concluded that limit orders priced one or more price levels away from the NBBO have a negligible impact on market price. Ex. A, Hendershot 2017 Tr. at 153, 155, 159; Ex. B at 12 ("price impacts that are often not statistically significantly different from zero.") This finding caused Hendershott to opine that: "If you were thinking about 'spoofing' . . . it looks like any spoofing you'd have to do – right, you place an order and you want it to have a price impact – would have to occur at the best price." Ex. F, Transcript of Hendershott "Impulse Response Functions" Speech.[11] Hendershott's current analysis ignores the relationship of Avalon's orders to the NBBO. Ex. A, Hendershott Tr. at 169-71, 173 ("the imbalance criteria does not account – does not measure where the orders are placed relative to the NBBO."). Thus, Hendershott's analysis miscounts as "layering loops" hundreds of thousands of orders one or more price levels away from the NBBO, which Hendershott's academic research has proven have no impact on market price and thus cannot be manipulative.

Hendershott's prior research also reveals a fundamental paradox in the novel theory advanced by the SEC. Hendershott acknowledges that traders more likely intend to execute, and in fact do execute, marketable orders placed at or inside the NBBO – negating the inference of any manipulative intent or effect for such orders. Ex. A, Hendershott 2017 Tr. at 329; *see also* Ex. G, *Disclosure of Order Execution and Routing Practices*, Exchange Act Release No. 43590 at 15 ("Particularly for inside-the-quote and at-the-quote limit orders, the submitter of the order reasonably may expect that the order should be executed relatively quickly"). On the other hand, Hendershott's research also confirms that orders placed one or more price levels away from the

---

[11] The actual video can be found at: https://www.dropbox.com/s/bw60h07t84i7f3l/Avalon%20Ex.%20427%20-%20Video%2C%20Impulse%20Response%20Function%2C%20by%20Hendershott.m4v?dl=0.

NBBO cannot have any manipulative impact on prices. Ex. A, Hendershott Tr. at 153, 155, 159; Ex. B at 12-13. This paradox demonstrates the logical impossibility of manipulating the market through so-called "layering" as alleged by the SEC.

The SEC's theory suffers from another logical fallacy: if the so-called "quiet side" orders were somehow "artificially" too high or too low, as Hendershott contends, then why did other market participants not simply execute against those artificially favorable prices? If for example, Avalon traders are offering to purchase shares at higher prices in order to be able to execute their "quite side" sell order at higher prices, why did the market consistently not recognize those buy orders were priced too high and execute against them? The answer is simple. It is because the market, which is the final arbiter of such things, did not consider those prices artificially high (or low). Those open market prices were "the result of free competition, since sophisticated market participants would have surely accepted Defendants' open bids if they thought they were above market value." *CFTC v. Wilson,* 2018 WL 6322024, *14 (S.D.N.Y. 2018). "That, after all, is how markets work, and the [SEC's] failure to articulate any theory as to why the market was inefficient, or why would-be counterparties, were prevented from enforcing market discipline by hitting [Defendant's] allegedly inflated bids, is ultimately fatal to its claim." *Id.*

### 3.  The SEC Cannot Prove Injection of False Information Into the Marketplace

Hendershott has conceded that his analysis does not identify any false information injected in the marketplace by any of the orders he labels as "non-bona fide" as is necessary to prove market manipulation. Ex. A, Hendershott 2017 Tr. at 369-70 ("the analysis is not based on individual loops . . . so, no.). Hendershott's attempt to create an analogy between the so-called "layering" at issue here and shill bidders in rigged auctions highlights this flaw in his analysis. Ex. C, Hendershott 2017 Report at ¶13.

A shill bidder works in concert with the auctioneer – that is the fraudulent information concealed from the auction participants. The shill places phony bids knowing that he does not have to actually pay for the item should he not be outbid. Like the fake trades in a traditional wash sale scheme recognized by courts to constitute market manipulation, the shill's non-bona fide bids are protected from any economic risk through his collusion with the fraudulent auctioneer. There is no comparable collusion alleged in this case. There is no undisclosed secret arrangement that protects the contested orders. Each of the challenged orders entered by Avalon traders were subject to real economic risk of being executed by unaffiliated market participants. That those unaffiliated market participants chose, on their own, not to execute those orders, does not, in hindsight, make those legitimate open-market orders fraudulent. *See, e.g., Yoshikawa v. SEC*, 192 F.3d 1209, 1220 (9th Cir. 1999) (critical question is whether defendant's trades were "genuine, bona fide trades in which the economic consequences of ownership were meant to fall upon the buyer's account.").

Hendershott's criteria are supposed to distinguish so-called "layering loops" from legitimate market making strategies. Ex. A, Hendershot 2017 Tr. at 48. Hendershott claims that his third criteria – that three times more "quiet side" shares execute than "loud side" shares – does this.  Ex. C, Hendershott 2017 Report at 9, n.15. Ex. A, Hendershott 2017 Tr. at 235, 227-28 ("Whether or not a so-called 'loop' is designated layering or not layering [thus] depends on whether or not unaffiliated market participants execute Avalon traders' 'loud-side' orders in sufficient quantities.") Thus, the determinative factor of whether or not orders are "layering," according to Hendershott, are events out of the Avalon traders' control that cannot be determined until after the fact. According to Hendershott's flawed theory, traders' intent on engaging in legitimate market making commit illegal manipulation when, after the fact, other market

participants over which they have no control decide to execute more of their orders on one side of the market than on the other. *Id.* at 84. This is so, according to Hendershott, even if the trader did not have the intent to layer. *Id.*

Hendershott conceded that "God himself cannot know whether or not there is an execution imbalance of 3 to 1 until after the executions take place." *Id.* at 237. Thus, under Hendershott's flawed theory, traders could only know if they were engaged in unlawful manipulation after the fact by looking at how the market reacts to their orders. The only way to avoid possible liability under this enforcement paradigm would be to not engage in legitimate market making – a strategy that both the SEC and Hendershott have endorsed as beneficial to the market.

### 4. The SEC Cannot Identify A Manipulative Act

Hendershott has not shown that Avalon traders engaged in any "manipulative acts" – *i.e.* the "something more" required to transform open market orders into unlawful manipulation. *ATSI Communications,* 493 F.3d at 101 ("To be actionable as a manipulative act, [open market transactions] must be willfully combined *with something more* to create a false impression of how market participants value a security.") (emphasis added). The SEC has not alleged, and Hendershott has not demonstrated, that Avalon's traders did anything to prevent their orders from executing.

Hendershott conceded that he was unaware of anything that the Avalon traders were doing to prevent execution of their orders. Ex. A, Hendershott 2017 Tr. at 228, 336 ("nothing jumps out"). Hendershott did list three things that traders could do to cause their orders to be *more likely* to be executed – make the orders visible, priced aggressively and routed to active exchanges. *Id.* at 329. All of the orders labeled by Hendershott as "non-bona fide" were visible

and routed to active exchanges. *See, e.g. Id.* at 330-37. Hendershott also conceded that a majority of all of those orders were aggressively priced at or better than the NBBO. Ex. E, Hendershott Reply to Bodek at 8.

The trading at issue in this case stands in stark contrast to the behavior challenged in another case in which Hendershott provided expert testimony, *CFTC v. Nav Sarao Futures Limited PLC*, 1:15- cv-03398 (N.D. Ill.) ("*Sarao*"). The defendant in *Sarao* was accused of manipulating the futures market using a layering algorithm that placed large orders away from the inside market. In that case, Hendershott opined that Mr. Sarao's orders were non bona fide because they were placed well away from the inside price where they were unlikely to be executed, and then as prices moved, his algorithm automatically modified those orders to continually maintain their distance from the inside so as to prevent their execution.[12] Here, Hendershott has conceded that there was no evidence that Avalon traders were doing anything to prevent their orders from being executed and that, instead, his opinion that those orders are non bona fide is based solely on the fact  that the "orders don't execute." Ex. A, Hendershott 2017 Tr. at 233, 228, 336.

The trading in this case can also be contrasted with the defendants conduct in *U.S. v. Coscia*, the first criminal conviction under the CEA's anti-spoofing provision. In that case, the government introduced evidence of the trader's intent to cancel his non-bona fide orders in the form of two algorithmic trading programs that automatically canceled those orders (usually within milliseconds) to avoid execution. 866 F.3d 782, 788-89 (7th Cir. 2017). Here, neither the SEC nor Hendershott identify anything that Avalon traders were doing to avoid execution of their orders, and thus the SEC cannot meet its burden to establish that those open market orders

---

[12] Ex. H, Declaration of Terrence Hendershott in *CFTC v. Nav Sarao Futures Limited PLC*, 1:15-cv-03398 ("Hendershott Sarao Decl.") at 104-05; Ex. A, Hendershott Tr. at 232.

were manipulative.

### B. The SEC Cannot Meet Its Burden To Show That "Cross Market" Orders Are Manipulative

The so-called "cross market strategy" trades challenged by the SEC's other expert, Professor Neil Pearson ("Pearson"), also do not evidence the artificial price movement necessary to prove manipulation. In market manipulation cases, "an artificial price is a price that 'does not reflect basic forces of supply and demand.'" *CFTC v.* Wilson, No. 13 Civ. 7884 (RJS), 2018 WL 6322024 at *13 (S.D.N.Y. Nov. 30, 2018) (*quoting CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012)). "[A] price is artificial when it has been set by some mechanism which has the effect of 'distorting those prices" and "preventing the determination of those prices by free competition alone.'" *Id.*

The equity and option price movements challenged by the SEC were triggered by actual equity trades executed in the open market by unaffiliated traders. These price movements are not artificial and instead reflect the basic forces of supply and demand. There is no allegation of collusion, insider information, or any other factor that would render these open market equity transactions between willing buyers and sellers fraudulent. That trades executed for large quantities of shares on one side of the equity markets were accompanied by corresponding price movements is a fundamental interaction of supply and demand – not evidence of nefarious activity. The SEC's other expert, Hendershott has said as much. Ex, C, Hendershott 2017 Report at 12; Ex. A, Hendershott 2017 Tr. at 100. As a trader purchases more and more shares of an underlying security those purchases exhaust the available supply at higher and higher price levels. The more shares the trader attempts to purchase the greater the per share price they can expect to have to pay in order to attain their total desired inventory. So long as shares are changing hands between unaffiliated market participants, as is the case here, there is nothing

"artificial" about those resulting price movements. That movement is simply the reflection of actual increased demand (or supply) for that security.

Nor is there anything "artificial" about the corresponding movement in the prices for the options in those underlying securities. Options are derivatives.[13] Price changes in the underlying equity are the primary driver of changes in the prices of options – especially those at or near the money like those at issue here.[14] Of course the prices of those options move when the prices of the underlying move. There is, however, a disconnect between the prices and size quoted in the options and those quoted in the equities markets in these examples that creates the opportunity for arbitrage.

Options market makers typically quote contracts amounting to significantly more share equivalents – *i.e.* "delta" – than is readily available in market for the underlying security.[15] The spread between the bid and the ask for options is typically larger than that for the underlying security. This increased spread is referred to as the options market maker's "edge" and is intended to compensate the option market maker for the risks associated with the generally greater size quoted on the options versus the equity markets.[16] A risk-adverse options market maker seeking to remain delta neutral after executing an options transaction may need to trade through one or more price levels to establish the offsetting position in the equity market. The additional spread in the options market, if priced and sized efficiently, should adequately compensate the option market maker for that additional hedging cost.[17]

---

[13] *See, e.g.,* Ex. I, Deposition Transcript of Gene DeMaio at 360 ("The option is derivative. It's pricing off the equity.").

[14] *See, e.g.,* Ex. J, Pearson Report at 7 ("changes in the price of call and put options are driven primarily by changes in the prices of their underlying stocks."); Ex. K, Nitzov Tr. at 83 (the price of the underlying security is "a primary factor" in determining option prices).

[15] *See, e.g.* Ex. K, Nitzov Tr. at 198-199.

[16] *See, e.g. Id.* at 213-214 ("It's my opinion that the spread of the options market exist to partially compensate options market participants for the levered nature of the security that is being traded against.")

[17] *See, e.g. Id.* at 210-213 (describing the higher spreads observable in the options versus the equity markets).

In the challenged transactions, the Avalon traders tested the available liquidity in the equity markets and determined that spreads quoted in the corresponding options were too narrow (or, conversely, the quoted size was too large) and did not accurately reflect the true delta risk associated with those quotes. In the opinion of the Avalon traders, the options were inaccurately priced, which created a legitimate trading opportunity.

It was the option market makers' failure to accurately price their options to account for the liquidity disparity quoted in options market and that available in underlying market that accounts for the profits earned on the trades challenged by the SEC.[18] There is nothing "artificial" about any of those prices. The option market makers voluntarily offered to trade those amounts of securities at those prices. That those quoted prices in hindsight were unprofitable for those market makers does not preclude the Avalon traders from executing against those quotes. Indeed, it is the legitimate goal of any trader to attempt to trade against prices believed to inaccurately reflect conditions in the market.[19] Such trading should, if anything, be encouraged as it eliminates market inefficiencies and leads to more accurate market pricing.[20]

Pearson is demonstrably wrong to state there is "no legitimate economic rational"[21] for the trading activity the SEC has labeled the "cross market strategy." The economic rational was to profit from the disconnect between the large amount of liquidity instantaneously available in the options market versus the limited liquidity available in the underlying equities markets. The prices quoted by the options market makers did not adequately factor in this delta hedging risk and created a legitimate arbitrage opportunity.

---

[18] *See, e.g.,* Ex. I, DeMaio Tr. at 359-360 (acknowledging that options market makers may execute all of the deltas at the new price without regard to the slippage costs displayed in the equities market).
[19] Ex. K, Nitzov Tr. at 223 (Q: "[I]s arbitrage a bona fide reason for executing options trades, in your opinion?" A: "I believe that pursuing arbitrageable gains between options is a valid trading strategy.")
[20] *See, e.g., Id.* at 109-10, 118 (describing how the so-called cross market strategy forced option market makers to widen their spreads and limit their size to properly account for delta hedging risk).
[21] Ex. J, Pearson Report at 6.

Nor can the SEC prove manipulation by showing that Avalon traders intended for their equities trades to impact the corresponding options prices. Contrary to prior suggestions by the Court, intent alone is insufficient to convert otherwise legitimate open market transactions into manipulation.  This would "read out the artificial price element of the *Amaranth* test by collapsing it into the subjective intent requirement." *CFTC v. Wilson*, 2018 WL 6322024 at *15. "Artificiality is not proven or disproven by intent." *Id.* Second Circuit Court Judge Sullivan dismissed as circular the entire basis of Pearson's "artificiality" opinion: "Your theory, it seems to me, is that [Defendants] had intent to affect the prices, and because they had intent to affect the prices, that means that [the] prices were illegitimate, which means that the prices were artificial, [but that] is . . . circular." *Id.* (alterations in original). The SEC's only argument for why the option prices were "artificial" is because Avalon traders' equity trades affected the price of the options and Avalon traders' intended as much. "Clearly, that is insufficient to establish the existence of an artificial price." *Id.*

## II.    The SEC Will Not Meet Its Burden To Establish Primary Liability Against Fayyer Or Pustelnik

"'Any person or entity . . . who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under [federal securities law], assuming all of the requirements for primary liability . . . are met.'" *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996) (*quoting Central Bank v. First Interstate Bank*, 511 U.S. 164, 191 (1994)) (alterations in original). Primary liability may only be imposed "on those who had knowledge of the fraud and assisted in its perpetration." *Id.* Here, the SEC will be unable to prove that either Mr. Fayyer or Mr. Pustelnik "intentional[ly] and knowing[ly] acquiesce[d]" in any manipulative activity.

*Universal Heritage Investments Corp.,* 47 S.E.C. 839, 844 (1982).[22]

It is undisputed that neither Defendant entered or directed entry of any of the orders challenged by the SEC. All of the orders were executed by independent contractors of Avalon directly through Lek's systems. Neither Mr. Fayyer nor Mr. Pustelnik monitored, or for that matter could monitor, any of that trading or was aware that it was manipulative. To the contrary, both men reasonably relied on Lek, a U.S. registered broker dealer for compliance screening of all of the Avalon trader's orders. Rule 15c3-5 under the Securities Exchange Act (the "Market Access Rule") explicitly makes such broker dealers "legally responsible" for all trading activity through their accounts. As FINRA has explained, under the Market Access Rule, "the compliance burden rests with the broker-dealer," which is legally responsible for "apply these controls on a pre-trade basis" to ensure all orders comply with the federal securities laws. Ex. L, FINRA Market Access Rule Overview.

The evidence will show that both Defendants reasonably believed that Lek was actively screening Avalon trader's orders to prevent any securities law violations. Indeed, Lek repeatedly told both men, and provided the supporting opinion of outside counsel, that Avalon's trading did not violate the federal securities laws.

---

[22] Essentially the same elements for liability are required under Section 17(a)(1)-(3) as are required under section 10(b) and Rule 10b-5. *See, e.g.*, *SEC v. Monarch Funding Corp*., 192 F.3d 295, 308 (2d Cir. 1999); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *Savino v. E.F. Hutton & Co.*, 507 F. Supp. 1225, 1231 (S.D.N.Y. 1981) ("Since 17(a), like Section 10(b) sounds in fraud, similar allegations are required to state claim under that section."). A broker-dealer may incur scheme liability if it "*committed a manipulative or deceptive act . . . in furtherance of the alleged scheme to defraud.*" *See United States Sec. & Exch. Comm'n v. Wey*, 246 F. Supp. 3d 894, 915–16 (S.D.N.Y. 2017) (emphasis added). However, "it is clear from the wording of the provision and subsequent enforcement policies that Section 17 applies only to fraud by *sellers* of securities." *Continental Bank & Trust Co. of Salt Lake City v. Garfinkle*, 292 F. Supp 709, 711-712 (S.D.N.Y. 1968). Thus, Rule 17(a) cannot apply to approximately half of Hendershott's "layering loops" where the so-called "quite side orders" were purchases of securities.  Section 9(a)(2) requires a similar allegation of manipulation. *Trane Co. v. O'Connor Sec.*, 561 F. Supp. 301, 304, n.1 (S.D.N.Y. 1983) (quoting 15 U.S.C. § 78i(a)(2)).

### III.      The SEC Will Not Meet Its Burden To Establish Control Person Liability

"In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant." *In re Motel 6 Sec. Litig.*, 161 F. Supp. 2d 227, 238 (S.D.N.Y. 2001). To be liable as a control-person, "the defendant [must be], in some meaningful sense, a culpable participant in the controlled person's fraud." *See ATSI*, 493 F.3d at 108. The control person can "rebut the presumption [of culpable participation] with a good faith defense." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 273 (S.D.N.Y. 2004).

Even assuming the SEC proves that Avalon committed primary violations, the SEC cannot establish Mr. Fayyer's or Mr. Pustelnik's control over the actions that constitute those primary violations. *See Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs.*, No. 1:17-CV-1235-GHW, 2018 WL 1627266, at *20 (S.D.N.Y. Mar. 30, 2018) (observing "it is not sufficient for [a plaintiff] to allege that [a defendant] has control person status; instead, [the plaintiff] must assert that [the defendant] exercised actual control over the matters at issue") (alterations in original) (quotations omitted); *Friedman v. JP Morgan Chase & Co.*, No. 15-CV-5899, 2016 WL 2903273, at *11-12 (S.D.N.Y. May 18, 2016) (granting motion to dismiss Section 20(a) claim because "the complaint does not plausibly allege any facts that show [defendant] had specific control over the actions that are the basis of the securities violations by [the primary violators]").

There is no evidence that Mr. Pustelnik exercised any control over any of the Avalon traders. The SEC will attempt to prove that Mr. Pustelnik received gifts, loans and payments for back office software development from a U.S. entity owned by Mr. Fayyer; but it will present no evidence, because there is none, that Mr. Pustelnik exercised any control over any of the trading

at issue.

While Mr. Fayyer is the principal of Avalon, and thus has control person "status;" he did not control the Avalon traders who were independent contractors directly entering their orders through Lek. Mr. Fayyer did not direct those traders or monitor their trades. Instead, he relied in good faith on Lek's real time compliance review systems to ensure all orders complied with the federal securities laws. *See, e.g., In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. at 273 (a "reasonable and proper system of supervision and internal control[s]" established good faith defense); *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 457 (S.D.N.Y. 2009) (noting that compliance review system establishes good faith).

Nor can the Avalon traders' knowledge or intent to engage in manipulative trading, if any, be imputed to Mr. Fayyer. An agent's acts and knowledge are not imputed to his principal if the agent is not acting: (i) within the scope of his agency and (ii) for the benefit of the principal. *See Buckley v. Deloitte & Touche USA LLP*, No. 06-civ-329, 2007 WL 1491403, at *6 (S.D.N.Y. May 22, 2007); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000) (A "fundamental principle of agency" is that employees' misconduct "*within the scope of their employment* will normally be imputed to the corporation.") (emphasis added and internal quotations removed). The "adverse interest" exception bars imputation if the agent "acted entirely in his own interests and adversely to the interests of the" principal. *In re CBI*, 529 F.3d 432, 449-53 (2d Cir. 2008). "[T]he 'total abandonment' standard looks principally to the intent of the [agent] engaged in misconduct" not whether the principal "actually benefitted" from the fraud. *Id.* at 451 (emphasis removed).

Here, the group leader contracts that governed the relationship between Avalon and the independent contractor traders, each included the following provision:

> Subcontractor is not obligated to trade in any particular manner and may utilize any lawful strategy not otherwise prohibited under this Agreement. Subject to paragraphs C, D, and E below, Avalon affords independent subcontractors complete discretion over trading strategy and investment decisions. Accordingly, Subcontractor is responsible for ensuring that its strategies and decisions adhere to applicable laws, regulations, guidelines, rules, agreements, and customs, and to any other relevant authority.[23]

Any Avalon trader who acted in violation of the federal securities laws was acting in violation and outside the scope of their agreement with Avalon and their knowledge and intent cannot be imputed to Mr. Fayyer.

## IV.    The SEC Will Not Meet Its Burden To Establish Aiding And Abetting Liability

"The Second Circuit requires the SEC to prove three elements to establish aiding and abetting liability: '(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation.'" *S.E.C. v. Tecumseh Holdings Corp.*, No. 03 CIV. 5490 (SAS), 2009 WL 4975263, at *3 (S.D.N.Y. Dec. 22, 2009) (citation omitted). Under Section 20(e), scienter for aiding and abetting requires proof of actual knowledge or recklessness. 15 U.S.C. § 78t(e). Recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotations and citations omitted). Recklessness is an extremely high standard "defined as 'at the least . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *ECA, Local 134 IBEW v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). Proof of "substantial assistance" requires a showing that

---

[23] *See, e.g.,* Ex. M, Avalon Independent Subcontractor Trading Agreement at 3.

defendants actively and consciously assisted in the commission of the specific violation. *See SEC v. Mudd*, No. 11 CIV. 9202 (PAC), 2016 WL 815223, at *6 (S.D.N.Y. Feb. 29, 2016). Mere awareness and even approval of the primary violation is insufficient. *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983).

There is no evidence that Mr. Fayyer or Mr. Pustelnik had actual knowledge or were reckless in believing that Avalon's orders complied with federal securities laws. Lek, a registered U.S. broker dealer with both the legal compliance burden and a sophisticated real-time compliance system repeatedly confirmed to them that Avalon's orders were in compliance with the law. Nor did either defendant provide "substantial assistance" to the trading at issue. Mr. Pustelnik was Avalon's account representative at Lek and had no supervisory or compliance responsibilities for the account under Lek's written supervisory procedures. He processed no orders and monitored no trading. He introduced the account to Lek, which then conducted its own compliance procedures to determine to open the account and processes the trades. Mr. Pustelnik did not exercise control and did not provide any substantial assistance to those Lek processes.[24]

Mr. Fayyer also provided no substantial assistance. His role was forwarding the account opening paperwork to Lek to for it to review and determine whether to assign trader ids to the Avalon traders. After that, he was out of the process as Avalon's traders submitted their orders

---

[24] Even broker dealers like Lek are generally not liable for aiding and abetting merely for executing trades. *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) (stating that "we are not prepared to hold that a broker who merely executes an investment manager's orders for improper purchases or sales can be held liable as an aider and abettor of the investment manager"). Where the broker's role is "non- discretionary," such as where the customer decides on its own what trades to make and the broker does not recommend trades, merely executing a client's trades has not constituting aiding and abetting. *See SEC v. Masri*, 523 F. Supp. 2d 361, 375 (S.D.N.Y. 2007) (granting motion to dismiss where executing broker purchased shares "without discretion" after being directed by his principal); *Unity House, Inc. v. N. Pac. Inv., Inc.*, 918 F. Supp. 1384 (D. Haw. 1996) (granting motion for summary judgment in favor of executing brokers, finding, as a matter of law, that executing brokers were not secondarily liable for churning of customer accounts). Neither Mr. Pustlenik nor Mr. Fayyer had any role in the execution of the trades at issue and thus are even less culpable than the broker dealers routinely found non-liable for aid and abetting.

directly to Lek, which then pre-screened them for compliance and forwarded them to the marketplace. Mr. Fayyer had zero role in the order entry and execution process and thus did not provide any substantial assistance necessary for aiding and abetting liability. *See Armstrong*, 699 F.2d at 91; *see also Chee v. Marine Midland Bank, N.A*., No. 88 CIV. 0557, 1991 WL 15301, at *4 (E.D.N.Y. Jan. 29, 1991) (rejecting aiding and abetting liability for primary violation of Section 10(b) and Rule 10b–5 that would "impose a duty on brokers to monitor the independent investment decisions of their clients [as] [s]imilar policy-based claims have been rejected" earlier).

## V.   The SEC's Disgorgement Calculations Are Flawed and Grossly Overstate Defendants' Profits From Contested Trades

"Generally, disgorgement is a form of '[r]estitution measured by the defendant's wrongful gain.'" *Kokesh v. SEC*, 137 S. Ct. 1635, 1640 (2017) (*citing* Restatement (Third) of Restitution and Unjust Enrichment § 51, Comment a, p. 204 (2010)). "Beginning in the 1970's, courts ordered disgorgement in SEC enforcement proceedings in order to 'deprive . . . defendants of their profits in order to remove any monetary reward for violating' securities laws." *Id.* (*quoting SEC v. Texas Gulf Sulphur Co.*, 312 F. Supp. 77, 92 (S.D.N.Y. 1970).[25]

### A.   Hendershott Overstates Trading Revenue

First, as previously noted, Hendershott has admitted that he cannot confirm whether any of the over 675,000 so-called "layering loops" identified by his criteria are examples of manipulative misconduct. Hendershott refused to identify any individual "layering loop" as

---

[25] The Supreme Court's decision in *Kokesh* that disgorgement in SEC enforcement cases is a "penalty" raises the potential that disgorgement is not a remedy available to the SEC. The SEC's access to disgorgement has been historically rooted in equity, not statute. *See, e.g., SEC v. Texas Gulf Sulphur*, 446 F.2d 412, 422 (1987). Equitable relief does not include penalties. *See Tull v. United States*, 481 U.S. 412, 422 (1987). Thus, under the Supreme Court's reasoning in *Kokesh* and *Tull*, disgorgement is no longer a remedy available to the SEC.

A three judge panel of the Second Circuit has deferred ruling on this issue until addressed by that court sitting *en banc* or the Supreme Court, *SEC v. de Maison*, No. 18-2564, 2019 WL 4127328 at *1 (2d Cir. Aug. 30, 2019), and this Court is currently bound by that decision. Defendants, however, make the argument to preserve the issue for further appeal if necessary.

layering, and instead claimed that his opinion was solely a "probabilistic statement" about "patterns." Ex A, Hendershott 2017 Tr. at 36, 38, 240, 431. Yet, his revenue analysis counts as "wrongful" every one of the "layering loops" to arrive at a profit amount that the SEC adopts for disgorgement. Hendershott cannot have it both ways – having refused to opine that any individual "loop" is wrongful, he cannot assume they are all wrongful for purposes of calculating disgorgement.

Moreover, Hendershott's revenue calculation is fundamentally flawed because it makes no attempt to isolate wrongful gains from those resulting from unrelated market forces. As noted above, Hendershott was not given market pricing data for the vast majority of orders at issue and did not perform a valid price impact analysis on any of the individual contested orders. Thus, Hendershott did not, because he could not, distinguish profits made from allegedly manipulative price impacts versus profits earned through unrelated market movements, and he improperly treated all profits as if they resulted from manipulation.

For example, in the two TV examples cited in his initial report, all of the price movement captured by Hendershott's revenue calculations occurred before any of the so-called non bona fide orders were ever placed.[26] Thus, every penny of the $420 that Hendershott attributed to those so-called "loops" was demonstrably generated by market factors unrelated to the orders that Hendershott deemed wrongful and thus are not subject to disgorgement.

Hendershott's revenue calculations also determine trading profits by pairing off long and short positions established sometimes minutes, other times hours, apart from each other. During those intervening time periods it is not alleged that there are any manipulative orders in the market. Yet, Hendershott's revenue calculations wrongly attribute all price movement during

---

[26] Ex. A, Hendershott 2017 Tr. at 364-69 (Q: "Price movement happens before there are any loud orders in the market." A: "Uh-huh."); Ex. N, z-006568206.

those intervening time periods to the alleged misconduct. Because Hendershott's revenue analysis does not distinguish between wrongful gains and those attributable to unrelated market movements, it cannot be used as a basis for calculating disgorgement.

### B.  Hendershott And Pearson Greatly Overstate Avalon's Profits

Additionally, the SEC, Hendershott and Pearson all wrongly assume that Avalon retained all of the profits from these trades. To the contrary, Lek extracted substantial per share commissions and other fees from every trade executed through the Avalon account.[27] Any attempt to calculate Avalon's purported "wrongful gains" must subtract the amounts paid to Lek in commissions and fees – money that Avalon never received.

Moreover, all of trades at issue were executed by the Avalon traders - independent contractors who contractually retained the profits from those trades. Per those contractual agreements, Avalon retained only a percentage of those profits – weighted average of approximately 15% for all of the challenged trades.  Thus, any calculation of the wrongful gain earned by Avalon on the contested trades must be reduced by approximately 85% to reflect the portion of those profits that were actual gains by Avalon. Applied to even the SEC's faulty and overinflated revenue calculations, this reduces Avalon's purported illegal gains from $29.2 million to less than $5 million.

### C.  The SEC Overstates Mr. Pustelnik's Profits

Mr. Pustelnik was not paid commissions on any of Avalon's trading though Lek.[28] Instead, Lek split the commissions it earned on Avalon's trading with another Lek sales

---

[27] *See*, *e.g.*, Complaint at ¶ 78.
[28] The SEC will attempt to show gifts, payments and loans from Mr. Fayyer's U.S. entity to Mr. Pustelnik as purported evidence of Mr. Pustelnik's control of the Avalon. However, such payments, which the SEC claims came originally from Avalon cannot be counted as disgorgement from Mr. Pustelnik. To do so, would double count the amount gained, first by Avalon and then again by Mr. Pustelnik. The only additional money the SEC claims that Mr. Pustelnik gained beyond any gains earned by Avalon are the amounts paid to Mr. Pustelnik by Lek.

representative who is not a party to this action, Alexander Lubetsky. For some time, Lek paid Mr. Pustelnik half of the ECN savings it received – *i.e.* the additional aggregate volume rebate that Lek received from ECNs that were not passed through to Lek's clients. But these ECN savings were calculated on a per trade basis ***and not*** as a percentage of revenues for those trades. And Lek stopped paying Mr. Pustelnik for the ECN savings for the Avalon account starting in December 2013. Mr. Pustelnik was thus not paid anything on the Avalon account from December 2013 until he quit working at altogether in January 2015.

Of the 675,507 so-called "Layering Loops" identified by Hendershott, 500,722 of them, or 74%, were executed during periods when Mr. Pustelnik was either not getting paid on Avalon's trades or was not even working at Lek at all. Of the 636 "Cross Market Loops" executed through Lek and identified by Pearson, 281, or 44%, were executed during periods when Mr. Pustelnik was not getting paid on Avalon's trades or was not even working at Lek.[29]

According to Lek's records, Mr. Pustelnik was paid a total of $817,619.90 in ECN rebates for all of Avalon's trading during the relevant time period. That includes ECN rebates earned on the approximately 95% of Avalon's trades that are challenged by neither Hendershott nor Pearson. If one were to conservatively estimate that 5% of all of the Avalon ECN rebates paid to Mr. Pustelnik related to trades challenged by the SEC, then Mr. Pustelnik gained only approximately $40,881 from the alleged conduct.

### D.  The SEC Is Not Entitled To Interest On The Money Frozen By This Court

 "[I]t is within the discretion of a court to award prejudgment interest on the disgorgement amount for the period during which a defendant had the use of [her] illegal profits," and an award

---

[29] Mr. Pearson also identified 32 additional "Cross Market Loops" that Avalon executed at another broker-dealer, Lime Securities. Mr. Pustelnik was never employed by Lime and received no payments related to the Avalon trades executed through Lime.

of prejudgment interest covering funds subject to an asset freeze "would be inappropriate"

because "the defendant has already, for that period, been denied the use of those assets." *SEC v.*

*Razmilovic*, 738 F.3d 14, 36 (2d Cir. 2013).


Dated: September 13, 2019

_____

James M Wines
SDNY Bar. No. JW5859
**Law Office of James M Wines**
1802 Stirrup Lane
Alexandria, VA 22308
202.297.6768
winesj@wineslegal.com

Steven Barentzen
**Law Office of Steven Barentzen**
17 State Street, Suite 400
New York, NY 10004
Phone: (917) 476-0953
Fax:     (202) 888-6268
Steven@barentzenlaw.com

Attorneys for Defendants Avalon FA LTD,
Nathan Fayyer, and Sergey Pustelnik