IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

LEK SECURITIES CORPORATION, et al.,

        Defendants.

Civil Action No. 17-CV-1789 (DLC)

**DEFENDANTS AVALON FA LTD'S, NATHAN FAYYER'S, AND SERGEY PUSTELNIK'S MEMORANDUM OF LAW IN SUPPORT OF MOTION *IN LIMINE* TO PROHIBIT THE SEC FROM EQUATING SO CALLED "LAYERING" WITH MANIPULATION**

James M Wines
SDNY Bar. No. JW5859
**Law Office of James M Wines**
1802 Stirrup Lane
Alexandria, VA 22308
202.297.6768
winesj@wineslegal.com

Steven Barentzen
**Law Office of Steven Barentzen**
17 State Street, Suite 400
New York, NY 10004
Phone: (917) 476-0953
Fax:    (202) 888-6268
Steven@barentzenlaw.com

Attorneys for Defendants Avalon FA LTD,
Nathan Fayyer, and Sergey Pustelnik

**Table of Contents**

ARGUMENT ................................................................................................................ 1

    I. THE SEC MUST PROVE "MANIPULATION" IN VIOLATION OF THE FEDERAL SECURITIES LAWS, NOT MERELY SO-CALLED "LAYERING". 1

    II. SHERILYN BELCHER AND ANDREW GORDON SHOULD BE PRECLUDED FROM TESTIFYING THAT LAYERING IS MANIPULATIVE .......................... 9

CONCLUSION ........................................................................................................... 10

# Table of Authorities

**Cases**

*CP Stone Fort Holdings, LLC v. Does(s)*, No. 16 C 4991, 2017 WL 1093166 (N.D. Ill. Mar. 22, 2017) .................................................................................................................................. 1, 2

*General Electric Co. v. Joiner* 522 U.S. 136 (1997) ....................................................................... 8

*Kunzho Tire Co., Ltd., v. Carmichael, et al.*, 526 U.S. 137 (1999) ................................................. 8

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977) ...................................................................... 2

**Rules**

FINRA Rule 5210 ............................................................................................................................ 3

**Regulations**

17 C.F.R. 242 at 48-49 .................................................................................................................... 2

SEC Release No. 34-61358 ............................................................................................................ 2

The SEC intends to present Professor Terrence Hendershott ("Hendershott") as an expert witness to present his conclusion that less than 5% of Avalon's trading activity "was consistent with . . . 'layering'." *See e.g.,* Ex. A, Hendershott 2017 Report at 3. However, so-called "layering" is not a cause of action recognized under the federal securities laws, and as Hendershott has defined "layering," it does meet the elements necessary to prove actionable market manipulation. The SEC should be precluded from confusing the jury and avoiding its burden of proof by falsely equating "layering" with manipulation.

## ARGUMENT

### I. THE SEC MUST PROVE "MANIPULATION" IN VIOLATION OF THE FEDERAL SECURITIES LAWS, NOT MERELY SO-CALLED "LAYERING"

Throughout this case, the SEC has sought to equate so-called "layering" with the federal securities law violations alleged in the Complaint. For example, in the Joint Pre-Trial Order, the SEC's witness summaries suggest that it will elicit testimony regarding "the manipulative strategy known as layering." The SEC's tactic is a bait and switch designed to confuse the jury – repeatedly stating inaccurately to the jury that so-called "layering" is an illegal trading strategy and *de facto* manipulation, and then have its expert characterize trading as meeting his definition of "layering" without ever actually proving the elements of manipulation. In reality, there is no statute or rule under the federal securities laws that prohibits or even mentions "layering" in U.S. equity markets. Likewise, no prior court or administrative judge has ever before examined and condemned the conduct at issue – entering double sided equity orders and cancelling orders that are not filled.[1]

---

[1] The Court has previously cited *CP Stone Fort Holdings, LLC v. Does(s)*, No. 16 C 4991, 2017 WL 1093166, at 4* (N.D. Ill. Mar. 22, 2017) as an example of a federal court recognizing Section 10(b) liability for "layering." ECF No. 101 at 17. However, the so-called "layering" scheme described in *CP Stone Fort* is nothing like the alleged

1

As the Supreme Court has explained: "Manipulation is virtually a term of art when used in connection with the securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977). The trading conducted by Avalon traders does not meet this traditional concept of "manipulation." There are no allegations of wash sales, no pump and dump, no boiler room; nothing other than the posting of actual orders and actual transactions between unaffiliated participants in the open market.

Indeed, there is not even a consistent definition within the industry of what conduct to which the term "layering" refers. In January 2010, at the start of the trading now challenged by the SEC, the SEC itself defined "layering" as a perfectly legal and normal part of the legitimate trading strategy known as market making:

> Passive market making involves the submission of non-marketable orders (bids and offers) that provide liquidity to the marketplace at specified prices. While the proprietary firm engaging in passive market making may sometimes take liquidity if necessary to liquidate a position rapidly, the primary sources of profits are from earning the spread by buying at the bid and selling at the offer and capturing any liquidity rebates offered by trading centers to liquidity-supplying orders. If the proprietary firm is layering the book with multiple bids and offers at different prices and sizes, this strategy can generate an enormous volume of orders and high cancellation rates of 90% or more. The orders also may have an extremely short duration before they are cancelled if not executed, often of a second or less."

SEC Release No. 34-61358, 17 C.F.R. 242 at 48-49 (emphasis added).

Plaintiff's witness, Adam Nunes, an industry professional with over 20 years of experience, testified that "the early 2010s," "it was pretty common for people to say, like, I sent multiple layers of orders or 'I layered the book,' meaning I sent multiple price levels of bids and

---

"layering" in this case, and, if anything, highlights the inappropriateness of using such a mercurial term as short hand for manipulation. In *CP Stone Fort*, the defendant was alleged to have manipulated the U.S. Treasury market by placing large amounts of orders comprising 200% of the market at prices far inferior to existing market prices. *Id.* at *1, 3. The Court ruled that "parking" large deceptive orders deep in the order book that were incapable of being executed could constitute manipulative activity. *Id.* at 3. In contrast, the orders challenged by Hendershott are typically small hundred lot orders placed at or near the inside market were even Hendershott admits they are subject to immediate execution risk. Ex. B, Hendershott 2017 Tr. at 340-42.

offers." Ex. C, Nunes Dep. Tr. at 62:6-23. Indeed, in 2010, Mr. Nunes stated at a CFTC Staff Roundtable:

> On the equities market where you may be trading across, you know, a dozen or well over that venues, and you're **layering the book** to provide liquidity across multiple venues, you could have one hundred or hundreds of bids and offers out and as you're adjusting your position based on related products moving, based on that product moving, based on your risk position, you can end up with a relatively low order to execution or a relatively high order to execution ratio, you know, for legitimate reasons just because you have a lot of risk out there and a lot of orders out there because as a liquidity provider, you don't know where the next order's going.

Ex. D at 32-33 (emphasis added).

On November 15, 2016, over a month after the last so-called "layering loop" identified by the SEC as part of this action, the SEC approved the first ever FINRA rule on disruptive quoting practices similar to those that the SEC describes as "layering." Ex. E, Supplementary Material .03 to FINRA Rule 5210. The FINRA Rule described such quoting as "disruptive" not manipulative. *Id.* In its statement for the purpose of the rule change, FINRA wrote:

> FINRA recognizes that the proposed rule change lowers the threshold necessary to stop activity consistent with the patterns described above and suspend member firms engaging in such activity. Accordingly, in developing this proposal, FINRA considered the possibility that the lower threshold may result in **actions taken against firms for activity that is not manipulative**.

*Id.*

In anticipation of the above rule change, in 2016 FINRA began identifying instances of "potential layering" as part of the monthly report cards distributed to member firms. *See* FINRA, Cross Market Equity Supervision Report (available at: https://tools.finra.org/reportcenterhelp/ #Cross_Market_Equity_Supervision_Reports.htm). When comparing the 93,787 so-called "layering loops" that Hendershott identified between March 2016 and September 2016 to the FINRA report cards issued to Lek for the same period, 77,056, or 86%, of Hendershott's layering loops do not appear on the FINRA report cards. In other words, the criteria for identifying so

3

called "layering loops" invented by Hendershott captures gigantic swaths of trading activity that Lek's primary regulator did not identify as even non-manipulative "potential layering."

Thus "layering," depending on which of the varying definitions offered by the SEC and other regulators, is either a part of a legal and legitimate market making strategy or a disruptive trading practice prohibited by FINRA – but only with respect to trades after all of the trading at issue in this case occurred. What is not, however, is a violation of any of the federal securities laws under which the SEC has brought suit. This Court should not allow the SEC to take a short cut and confuse the jury by falsely equating so-called "layering" with the elements necessary to prove a violation of those securities laws.

Hendershott, will testify that less than 5% of Avalon's equity trading volume comprised so-called "layering loops." "Layering loops" is a term invented by Hendershott that does not appear in any federal securities law, rule, or regulation or in any prior court or administrative opinions. The criteria used by Hendershott do not align with any of the "layering" definitions previously exposed by the SEC or other regulators. Rather, Hendershott admitted that he made up the criteria used by his analysis to supposedly identify "layering loops." Ex. B, Hendershott 2017 Tr. at 25. Indeed, he or his team invented the entire concept of "layering loops," and "loud side" and "quite side" orders as part of this exercise. *Id.* at 44-45. The methodology invented by Hendershott does not appear in any scholastic articles within his field of expertise and has never been subjected to any peer review. *Id.* at 27-28. Most importantly, there are no statutes, rules or regulations that attempt to define layering, or anything else, using Hendershott's criteria. *Id.* at 28-30. Hendershott repeatedly testified that he was unconcerned whether his analysis misidentified as "layering loops" instances that did not, in fact, constitute so-called "layering." *Id.* at 33-35; 39-40 ("it's not a problem"). Hendershott suggested that a 50 percent failure rate for

4

his criteria might be acceptable. *Id.* at 35-36. Hendershott also conceded that he is unaware of anyone who has ever used his methodology to attempt to identify so-called "layering," and admitted that his methodology was not a generally accepted technique in the industry. *Id.* at 31.

Hendershott does not even contend that any one of the over 675,000 so-called "layering loops" identified by his criteria actually constitutes an instance of "layering" as alleged in the SEC's complaint:

> **A:** We – so I don't have – I don't reach opinions about individual loops in general. I look at the pattern of evidence across all of them. So I don't have an opinion about this particular loop, just like I don't have any opinion about most of the other loops . . . .
>
> **Q:** So using your layering expertise, I would like you to bring it to bear and explain to me whether or not in that expert opinion you think that this is an example of layering and, if so, why.
>
> **A:** So you want me to reach an opinion about any individual loop?
>
> **Q:** Yes.
>
> **A:** It's very difficult to reach an opinion about any individual loop. I don't have an opinion about the specifics of most of the loops. It's what's – the systematic pattern of evidence in the data. So you asked me, do I have an opinion about this loop now. Do I have an opinion about other loops? No, I don't.

Ex. B, Hendershott 2017 Tr. at 431; *see also id.* at 36, 38 ("They look like layering. Is any individual one, that's what's hard to know."). Thus, there is no evidence that even a single one of the 675,506 alleged "layering loops" is actually even an example of so-called "layering," much less illegal manipulation:

> So any individual example is not really what my opinion is based on. It's based on the systematic patterns and the data. So a particular example might not – you know if it had unusual characteristics that, upon further reflection, might seem less consistent with layering, then that would just be one of 675,000.

*Id.* at 33.

> **Q:** [Y]our opinion is not that each of these 675,506 instances actual examples of layering. That's not your expert opinion?
>
> **A:** As I said, my opinion is that the patterns in the those sets of loops are consistent with layering. . . . My opinion is about the pattern of evidence across all of them. So every – so it's a probabilistic statement about, yes, all of these are consistent with layering. They look like layering. Is any individual one, that's what's hard to know.

*Id.* at 36, 38.

The SEC cannot prove manipulation through window-dressed statistical analysis performed by an expert who is unable to identify even a single instance of alleged misconduct he was tasked with uncovering. If he cannot point to even a single instance of "layering," then how can this Court ascertain whether Hendershott, or anyone for that matter, knows what so-called "layering" looks like? What we do know is that Hendershott cannot tell this Court that *any* of the so-called "layering loops" identified by his analysis are actual examples of "layering" as alleged by the SEC. We also know that Hendershott has not even attempted to establish the elements necessary to prove manipulation under the federal securities laws.

For example, the "thesis of a layering strategy" is that the so-called "loud orders induce the marketplace to provide better execution to the quiet orders." *Id.* at 276; *see also id.* at 15 ("So if a loud order came after the last -- after all the quiet orders were gone, it wouldn't have an obvious purpose in the way that the layering strategy is described."). However, Hendershott has knowingly misidentified as "layering" thousands of orders that were placed *after* the executions they supposedly influenced. Ex. F, Hendershott Suppl. Report at 7; Ex. B., Hendershott 2017 Tr. at 179-80. Although he conceded these orders could not have gone back in time to artificially influence prior executions, Hendershott stubbornly maintained these are nonetheless still "layering loops" merely because they satisfy his faulty criteria. Ex. B, Hendershott 2017 Tr. at 179-80. Because Hendershott's "analysis" is nothing more than him assigning a made-up

definition to his results, it admittedly identified as "layering loops" orders that are indisputably not "layering:"

> **Q:** There were no loud orders that influenced the execution price of any quiet orders. Right? That did not happen?
>
> **A:** So in this case I don't see that happening.
>
> **Q:** Right. But even though that did not happen, which is the sine qua non of so-called layering, your analysis identified this as a layering loop?
>
> **A:** So my analysis identified this as a layering loop because there are – it meets the criteria.

*Id.* at 181-82.

> So this is going to be a description of how it meets my criteria, and then how my criteria relate to my description of layering. Because I talk about things being consistent with layering. This meets the criteria, so it's consistent for the reason that all the layering loops that meet the criteria are consistent with the criteria.

*Id*. at 428.

> **Q:** Did you look at any examples of loops identified by your criteria that, upon further review by you, turned out to not be layering, in your opinion?
>
> **A:** So, I mean, my opinion about whether or not something is layering, it's not that the individual character -- so the individual loops that would have -- that are called layering loops, would have to meet the criteria that were -- are laid out in my report. And in terms of, you know, looking at any individual one, that's not really the purpose of the analysis. So the -- anything that was identified as a layering loop had the characteristics that are consistent with layering. So I don't know how I would conclude that it wasn't layering.

*Id.* at 19-20.

> **Q:** [S]o then, you are not offering an expert opinion that any individual so-called loop is an actual example of layering?
>
> **A:** So, I mean, my opinion would be that the individual loops are consistent with layering; and that my opinion -- my opinion about the behavior as a whole is based on all of the evidence across all of the loops.

7

**Q:** All right. And so -- and when you say it's consistent with layering, all you mean is that it meets the criteria in your report. Is that correct?

**A:** It meets the criteria.

*Id.* at 21-22.

Most importantly, Hendershott has not opined that the "layering loops" identified by his analysis constitute a violation of any of the securities laws under which Plaintiffs has brought suit. Ultimately, Hendershott's analysis is of no probative value as it is completely circular. The opinion he is offering is simply that the Avalon orders identified using his criteria generally meet those criteria. *Id*. at 22 (Q: "[W]hen you say it's 'consistent with layering,' all you mean is that it meets the criteria in your report. Is that correct?" A: "It meets the criteria."). He then arbitrarily assigns orders meeting that criteria the made-up name "layering loops." Because they are not part of his criteria, orders can constitute "layering loops" without trader intent (*id.* at 239-40), when they do not artificially impact market price (*id.* at 59-60), inject no false information into the marketplace (*id.* at 369-71), or involve no manipulative acts (*id.* at 228, 336) – all elements that must be met to establish a legitimate claim of manipulation under the law.

Hendershott's opinion is an example of the sort of "because I say so" ipse dixit by expert that the Supreme Court has repeatedly cautioned courts to ignore. *Kunzho Tire Co., Ltd., v. Carmichael, et al.*, 526 U.S. 137, 157 (1999); *citing General Electric Co. v. Joiner* 522 U.S. 136 ,146 (1997) ("nothing in either *Daubert* or the Federal Rules of evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Even if Hendershott were able to conclusively establish that each of the 675,000 trades constituted a trading strategy called "layering," this conclusion would be completely irrelevant because "layering" is not manipulative or illegal. The Court should not permit the SEC to prove that Avalon's traders engaged in "layering" and instead should require them it to prove the

8

elements of manipulation or else the jury will be confused by the use of the ill-defined term "layering."

## II. SHERILYN BELCHER AND ANDREW GORDON SHOULD BE PRECLUDED FROM TESTIFYING THAT LAYERING IS MANIPULATIVE

In its Joint Pre-Trial Statement, the SEC proffers that Sherilynn Belcher is a FINRA official who it claims will testify about, among other things, "how layering works and why layering is manipulative and harmful to markets." Andrew Gordon, an official with Bats, will purportedly testify concerning "the nature of layering and why it is deceptive and harmful to the markets." They should be precluded from doing so.

First, unlike Hendershott, they are not experts in market micro-structure and have not studied and analyzed the trades at issue in this case. They are not qualified to render such an expert opinion. Second, like Professor Filler and the other defense experts that the Court previously struck, they may not testify as to the legal conclusion that "layering" or the trading at issue in this case is manipulative. What's good for the goose is good for the gander.

Moreover, for the reasons stated above, the SEC should not be permitted to take this evidentiary short-cut: (1) present testimony that some ill-defined practice it calls "layering" is manipulative; (2) argue that Avalon's traders engaged in this ill-defined "layering"; and (3) thus try and confuse the jury into thinking that Avalon's traders engaged in manipulation because there hired gun has determined that their trading is "consistent with layering." That's not how it works. The SEC must prove that Avalon trader's trading was manipulative and due some by proving each of the elements of that cause of action. Waltzing out a series of unqualified witnesses who have not analyzed the trades to provide prejudicial legal conclusion about the term "layering" which has never been defined before Professor Hendershott invented his criteria

9

for this case, is not relevant and will do nothing but confuse the jury. The SEC should not be permitted to conflate the term "layering," whatever that means, with manipulation.

## **CONCLUSION**

For these reasons, the Court should enter an Order (1) precluding the SEC from using the term "layering" to confuse the jury and conflate that term with prohibited manipulative trading; (2) prohibiting Sherilynn Belcher from testifying about "why layering is manipulative" and (3) granting such further relief as the Court deems just and proper.

Dated: September 13, 2019

_____
James M Wines
SDNY Bar. No. JW5859
**Law Office of James M Wines**
1802 Stirrup Lane
Alexandria, VA 22308
202.297.6768
winesj@wineslegal.com

Steven Barentzen
**Law Office of Steven Barentzen**
17 State Street, Suite 400
New York, NY 10004
Phone: (917) 476-0953
Fax:    (202) 888-6268
Steven@barentzenlaw.com

Attorneys for Defendants Avalon FA LTD, Nathan Fayyer, and Sergey Pustelnik