UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                      Plaintiff,<br><br>         v.<br><br>LEK SECURITIES CORPORATION,<br>SAMUEL LEK,<br>VALI MANAGEMENT PARTNERS dba<br>   AVALON FA LTD,<br>NATHAN FAYYER, and<br>SERGEY PUSTELNIK a/k/a SERGE<br>   PUSTELNIK,<br>                      Defendants. | CASE NO. 17-CV-1789 (DLC) |

**PLAINTIFF SEC'S REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR ENTRY OF JUDGMENT INCLUDING REMEDIES
<u>AGAINST DEFENDANTS AVALON, FAYYER AND PUSTELNIK</u>**

David J. Gottesman
Olivia S. Choe
Sarah S. Nilson
U.S. Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549
Tel.: (202) 551-4470 (Gottesman)
Fax: (202) 772-9292
Email:  gottesmand@sec.gov

*Counsel for Plaintiff*

Dated:  February 7, 2020

**TABLE OF CONTENTS**

Introduction ........................................................................................................................ 1

Argument ........................................................................................................................... 1

    I.   The SEC Has Sufficiently Proven That Disgorgement of $4,495,564 Plus Prejudgment Interest Should Be Awarded .................................................................................... 1

        A.  Disgorgement, With Prejudgment Interest, Remains an Available Remedy ................... 1

        B.  The Facts Establish the Avalon Defendants' Ill-Gotten Gains ........................................ 2

           1.  Professor Hendershott Established the Ill-Gotten Gains From Avalon's Layering ..... 2

           2.  Professor Pearson Established the Ill-Gotten Gains From Avalon's Cross-Market Scheme ................................................................................................................ 4

           3.  The SEC Has Shown a Reasonable Approximation of Ill-Gotten Gains ..................... 5

    II.  Penalties of $13.8 Million Against Each Defendant Are Appropriate ................................ 6

        A.  The Facts and Circumstances Support the Penalties Sought ............................................ 6

        B.  Calculating Penalties Based on the Number of Months Is Appropriate .......................... 9

Conclusion ........................................................................................................................ 10

# TABLE OF AUTHORITIES

**Cases**

*In re J.S. Oliver Cap. Mgt., LP*, SEC Rel. No. 4431, 2016 WL 336116 (Jun. 17, 2016) ............. 13

*In re PHLO Corp.*, 90 SEC Docket 961, 2007 WL 966943 (Mar. 30, 2007) .............................. 12

*In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412 (E.D. Pa. 2015) ........................ 5

*Kokesh v. SEC,* __ U.S. __, 137 S. Ct. 1635 (2017) ....................................................................... 4

*SEC v. Alpine Sec. Corp.*, No. 17cv4179(DLC), 2019 WL 4686716 (S.D.N.Y. Sept. 26, 2019) 12

*SEC v. Alternative Green Techs.*, No. 11 Civ. 9056(SAS), 2014 WL 7146032
    (S.D.N.Y. Dec. 15, 2014) ......................................................................................................... 11

*SEC v. Amer. Growth Funding II, LLC*, No. 16-CV-828 (KMW), 2019 WL 4623504
    (S.D.N.Y. Sept. 24, 2019) ......................................................................................................... 8

*SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376 (S.D.N.Y. 2010) ........................................... 10

*SEC v. Enrenkrantz King Nussbaum, Inc.*, No. CV 05-4643(MKB), 2013 WL 831181
    (E.D.N.Y. Feb. 14, 2013) ........................................................................................................ 10

*SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450 (2d Cir. 1996) ........................................................ 7

*SEC v. Kane*, No. 97 Civ. 2931(CBM), 2003 WL 1741293 (S.D.N.Y. Apr. 1, 2003) ................. 10

*SEC v. Liu*, 754 F. App'x 505 (9th Cir. 2018) (unpublished) ......................................................... 4

*SEC v. Lorin,* 76 F.3d 458 (2d Cir. 1996) ...................................................................................... 8

*SEC v. Markusen*, No. CV 14-3395(MJD/TNL), 2016 WL 1629267
    (D. Minn. Apr. 25, 2016) .......................................................................................................... 5

*SEC v. Milan Capital Group, Inc.*, No. 00 Civ. 0108 (DLC), 2001 WL 921169
    (S.D.N.Y. Aug. 14, 2001) ....................................................................................................... 12

*SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319 (S.D.N.Y. 2007) .................................................. 10

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) ....................................................................................... 7

*SEC v. Pentagon Cap. Mgt. PLC*, 725 F.3d 279 (2d Cir. 2013) ................................................... 12

*SEC v. Savino*, No. 01 CV 2438 (GBD), 2007 WL 3120441 (S.D.N.Y. Oct. 19, 2007) ............... 8

*SEC v. Softpoint, Inc.,* 958 F. Supp. 846 (S.D.N.Y. 1997) ............................................................... 9

*SEC v. Wyly*, 56 F. Supp. 3d 394 (S.D.N.Y. 2014) ............................................................................ 9

*United States v. Bilzerian,* 926 F.2d 1285 (2d. Cir. 1991) ................................................................. 5

Plaintiff United States Securities and Exchange Commission ("SEC") respectfully submits this reply to the "Memorandum in Opposition to Plaintiff SEC's Motion for Judgment Including Remedies" ("Defendants' Opposition" or "Def. Opp."), filed by Defendants Avalon FA Ltd, Nathan Fayyer and Sergey Pustelnik (collectively, the "Avalon Defendants").

## Introduction

The SEC's Memorandum of Law in Support of its Motion for Judgment Including Remedies ("SEC Mem.") set forth the facts showing the egregious fraud and subsequent cover-up and lies by the Avalon Defendants. Notably missing from the Avalon Defendants' Opposition is any challenge to the accuracy or relevance of those facts. Yet they seek to avoid the consequences of their illegal conduct.

The Avalon Defendants seek to avoid disgorgement by distorting the testimony of the SEC's expert witnesses, Professors Hendershott and Pearson, who clearly established the specific trading activity that was wrongful and the amounts of ill-gotten gains generated from that activity. The Avalon Defendants further seek to avoid significant penalties, but they fail to cite any relevant authority that supports such an outcome on the facts of this case, and they fail to show a valid reason for the Court to allow them to escape severe penalties.

## Argument

I. **The SEC Has Sufficiently Proven That Disgorgement of $4,495,564 Plus Prejudgment Interest Should Be Awarded**

   A. **Disgorgement, With Prejudgment Interest, Remains an Available Remedy**

As set forth in the SEC's opening brief, *Kokesh v. SEC,* __ U.S. __, 137 S. Ct. 1635 (2017), does not preclude disgorgement in SEC cases. SEC Mem. 4 & n.3. The Supreme Court explicitly stated that it was not rendering a decision on that point, and the Second Circuit has

ruled that *Kokesh* does not overturn existing precedent permitting disgorgement.[1]  *See id.*  For the same reasons, precedent allowing prejudgment interest also remains valid.  *See* SEC Mem. 4.  The Avalon Defendants point to no authority overruling these governing decisions.

### B.   The Facts Establish the Avalon Defendants' Ill-Gotten Gains

The Avalon Defendants erroneously argue that the SEC did not "show which profits were caused by" the violative conduct.  Def. Opp. 2.  The testimony of Professors Hendershott and Pearson showed exactly that.

#### 1.   Professor Hendershott Established the Ill-Gotten Gains From Avalon's Layering

Professor Hendershott testified that he "found 675,504 instances of trading [sic] active trading and order activity that was consistent with layering," which he termed "Layering Loops."  Trial Tr. 614:18-24.[2]  He further testified that the Layering Loops "have the properties of layering" (*id.* 712:21) and "meet the criteria" for layering (*id.* 713:4-5).  Moreover, he testified that "in all of my tests the evidence was that the strategy looked consistent with layering and is not consistent with market making."[3]  *Id.* 707:2-4.  This evidence was more than enough to prove that each of the Layering Loops reflected wrongful activity.

---

[1] As noted in the SEC's opening memorandum (at 4 n.3), the Supreme Court has granted certiorari in *SEC v. Liu*, 754 F. App'x 505 (9th Cir. 2018) (unpublished), *cert. granted sub nom*. *Liu v. SEC*, ––– U.S. –––, 2019 WL 5659111 (U.S. Nov. 1, 2019) (No. 18-1501), but this Court should follow prevailing precedent in this Circuit while the *Liu* case is pending.

[2] Filed herewith is the Declaration of David J. Gottesman, dated Feb. 7, 2020 ("Gottesman 2/7/2020 Decl."), to which are attached Exhibit 1 (Trial Transcript excerpts cited herein), Exhibit 2 (Hendershott 2017 deposition excerpts cited herein), and Exhibit 3 (Plaintiff's Trial Exhibit 261).  Copies of the remaining trial exhibits cited herein were filed along with the SEC's opening memorandum.  *See* ECF No. 564.

[3] It is sufficient for an expert witness to opine that the conduct was "consistent" with the illegitimate behavior.  *See United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d. Cir. 1991) (expert testimony was admissible only as to industry practice, but not the legality of conduct); *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412 424 (E.D. Pa. 2015) ("An economic expert may permissibly testify as to whether certain conduct is consistent with collusion or … self-interest"); *SEC v. Markusen*, No. CV 14-3395(MJD/TNL), 2016 WL 1629267 at *11 (D. Minn. Apr. 25, 2016) ("The SEC's expert opined that the pattern of trades by [defendants] is consistent with an attempt to mark the close.").

Hendershott further established that the Layering Loops he identified generated revenue totaling $21,629,088. SEC Trial Exhibit ("PX") 68 & Trial Tr. 707:23-708:11; PX 64 & Trial Tr. 680:4-20. The revenues generated after March 12, 2012 (five years before the SEC filed its Complaint in this case) were $21,089,398. PX 64. The SEC seeks disgorgement of the portion of that amount that Avalon retained, which according to Avalon's own calculations, was $2,457,073. *See* SEC Mem. 5 n.8.

The Avalon Defendants argue that Hendershott did not opine on whether any particular Layering Loop reflected layering. As support, they selectively quote snippets of testimony taken out of context. *See* Def. Opp. 2-3. For example, they quote Hendershott as saying that "what one might hypothesize about one individual loop doesn't really tell you anything" and "you can't look at any individual 'Layering Loop' and reach too many conclusions because a lot of things are happening in the market." Def. Opp. at 2-3. But as shown by his ***full*** answers to the questions posed, Hendershott was merely pointing out that it would be difficult to draw conclusions from looking at only one loop in isolation, but one can (and, as shown above, he did) draw valid conclusions from looking at many loops together and finding patterns.[4]

The Avalon Defendants also distort Hendershott's 2017 deposition testimony. Def. Opp. 3-4.[5] Hendershott simply made the point that it is difficult to draw conclusions from looking at

---

[4] *See* Trial Tr. 934:20-935:1 ("what one might hypothesize about one individual loop doesn't really tell you anything. In one particular instance there are lots of possible explanations, ***but that's why I construct my analysis to do a bunch of different tests on all of the data to try and conclude whether or not the activity looks more like market making or looks more like layering***") (emphasis added).

*See also* Trial Tr. 873:19-874:3 ("you can't look at any individual [loop] and reach too many conclusions because a lot of things are happening in the market. ***That's why you form a set of hypotheses, and you try to characterize the activities across all the loops*** in a way that allows you to capture all of them because you can't look at 675,000 and keep them all in mind and remember what they are. ***So you reduce it to a set of patterns that are a way to test your theory***. And then, you know, ***if you see the patterns, that helps you understand what's happening in the individual ones***.") (emphasis added).

[5] The Avalon Defendants' memorandum cites a "Wines Decl." (Def. Mem. 3-4), but no such declaration was filed.

3

one loop in isolation, so he instead "look[s] at the pattern of evidence across all of them" and that "[i]t's a probabilistic statement about, yes, all of these are consistent with layering" (quoted at Def. Opp. 3).[6] Hendershott made clear in that deposition that all of the Layering Loops he identified were consistent with layering.[7]

### 2. Professor Pearson Established the Ill-Gotten Gains From Avalon's Cross-Market Scheme

Professor Pearson fully established the amount of ill-gotten gains attributable to the cross-market strategy. He identified a total of 668 loops that are consistent with the cross-market strategy,[8] which he termed "Cross Market Loops." Trial Tr. 1865:10-11 (identified 636 Cross Market Loops in the Avalon data) & 1874:4-9 (identified another 32 Cross Market Loops in the Lime data). He then conducted tests from which he concluded that there was no legitimate economic rationale for the trading in the Cross Market Loops, and that the trading was manipulative, deceptive and harmful to the securities markets. Trial Tr. 1836:25-1837:4. Pearson determined the revenue generated by the Cross Market Loops totaled $8,153,965. *See* SEC Mem. 5 n.4; *see also* PX 310 & Trial Tr. 1967:7-17; PX 311 & Trial Tr. 1968:12-1969:5. According to Avalon's own calculations, Avalon retained $2,038,491 in revenues from the Cross Market Loops. *See* SEC Mem.5 n.8.

The Avalon Defendants distort Pearson's testimony when they quote him as saying his

---

[6] *See also* Gottesman 2/7/2020 Decl., Ex. 2 (Hendershott's 2017 deposition excerpts) at 370:20-24 ("the evidence is based on looking across all the loops. To look at any individual one and reach conclusions is always a challenge. So the question is what's the systematic pattern of evidence in the data.").

[7] *See* Gottesman 2/7/2020 Decl., Ex, 2, at 20:11-14 ("**anything that was identified as a layering loop had the characteristics that are consistent with layering**. So I don't know how I would conclude that it wasn't layering"), 22:3-5 ("**my opinion would be that the individual loops are consistent with layering**") (emphasis added).

[8] *See* Trial Tr. 1836:18-24 (Pearson found 636 loops in the Avalon data, and 32 loops in the Lime data, all of which were consistent with the cross market strategy).

4

criteria were "very broad" and "not that carefully designed to identify cross market loops." Def. Opp. 4. As Pearson fully explained, he used such broad criteria in the first phase of his analysis merely to identify the set of loops that he then would subject to a series of rigorous tests in the second phase. The tests in that second phase of his analysis showed that the activity in the Cross Market Loops was consistent with manipulation, i.e., it injected false information and resulted in artificial prices. Trial Tr. 2100:15-2101:14; *see also* 1875:17-1877:16, 1942:19-1943:9.

### 3. The SEC Has Shown a Reasonable Approximation of Ill-Gotten Gains

Hendershott's and Pearson's analyses provide a "reasonable approximation" of the amount to be disgorged, and "any risk of uncertainty . . . should fall on wrongdoer whose illegal conduct created that uncertainty." *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995); *see also SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1474-1475 (2d Cir. 1996). The Avalon Defendants erroneously assert that those principles apply only to assessment of the *amount* of ill-gotten gains, such as "where markets [sic] prices may have been affected by the fraud," and that such principles cannot be applied to determining "the instances of fraud for which disgorgement is warranted." Def. Opp. 4.

In fact, courts have relied on those very same principles in determining the particular transactions for which disgorgement will be ordered. *See, e.g.*, *SEC v. Lorin,* 76 F.3d 458, 462 (2d Cir. 1996) (in holding that defendant would be required to disgorge profits on all of his trades, not just some, the court relied on the principles that the trial court "must be given wide latitude" in assessing disgorgement, that "any risk of uncertainty . . . should fall on the wrongdoer," and that the "**burden shifts to [the] wrongdoer** to show what transactions were unaffected by his offenses." *Id.* (emphasis added; internal quotation marks and citations

5

omitted).[9]  The SEC has provided a reasonable approximation of the disgorgement amount. Even if there were any uncertainty, it should be resolved against the Avalon Defendants.

II. **Penalties of $13.8 Million Against Each Defendant Are Appropriate**

A. **The Facts and Circumstances Support the Penalties Sought**

As the Avalon Defendants acknowledge, the amount of civil money penalties should be based upon the "facts and circumstances" of the case.  Def. Opp. 5.  The SEC's Memorandum recounts the egregious conduct of the Avalon Defendants that fully justifies penalties of $13.8 million against each of them.  SEC Mem. 10-23.  Notably, the Avalon Defendants do not challenge the accuracy or significance of any of those facts and circumstances.  Rather, they ignore the facts of this case and their own conduct and instead point to general statistics and cases that are plainly inapposite.  *See* Def. Opp. 6-7.

For example, the Avalon Defendants point to figures showing overall amounts and median amounts of penalties and disgorgement ordered collectively in all SEC enforcement cases over the past few years.  Def. Opp. 6.  Those figures provide no benchmark for the Court's determination of appropriate penalties in *this* case.

The Avalon Defendants also miss the mark in pointing to the civil penalties to which the Lek Defendants agreed in settling with the SEC before trial.  Def. Opp. 6.  The Avalon Defendants and the Lek Defendants were not similarly situated, so the penalties to which the Lek Defendants agreed provide no cap on penalties.  The Avalon Defendants recruited a group of

---

[9] *See also SEC v. Savino*, No. 01 CV 2438 (GBD), 2007 WL 3120441, at *1-2 (S.D.N.Y. Oct. 19, 2007) (where defendant participated in illegal fee-splitting arrangement with Shen, he was required to disgorge commission profits from all trading, not just trades with Shen; court relied on principles of "reasonable approximation" and "risk of uncertainty falls on wrongdoer"); *see also SEC v. Amer. Growth Funding II, LLC*, No. 16-CV-828 (KMW), 2019 WL 4623504, at *2 (S.D.N.Y. Sept. 24, 2019) (in determining whether full amount of commissions would have to be disgorged, court relied on principles of "reasonable approximation," and that "[u]ncertainty is resolved against the defendant").

foreign traders who engaged in manipulation of the U.S. securities markets on a massive scale for over five years, and conducted illegal trading that generated over $28 million in ill-gotten gains. To cover up their schemes, Fayyer and Pustelnik failed to produce key documents and then repeatedly lied under oath – including throughout the SEC investigation and during the trial. SEC Mem. 10-23. This brazen conduct differentiates the Avalon Defendants from the Lek Defendants, and justifies the penalty of $13.8 million for each of the Avalon Defendants.[10]

The Avalon Defendants next argue that the Court should not award the requested penalties because other relief, including an injunction and disgorgement, will have the necessary deterrent effect.[11] Def. Opp. 7. But while those other remedies are useful and important, they are not sufficient by themselves.[12] Disgorgement merely deprives Avalon of the ill-gotten gains it received; it leaves the Avalon Defendants no worse off than if they had not committed fraud. An injunction provides an expeditious remedy for future violations, but in a case involving such brazen conduct as that of the Avalon Defendants, an injunction likely is not sufficient by itself to deter. Significant monetary penalties are needed to fully deter future violations.

The Avalon Defendants argue that penalties should be reduced because "the conduct at issue was not clearly prohibited at the time . . . ." Def. Opp. 8 n.3. But the evidence at trial showed that the Avalon Defendants knew they were engaging in deception. SEC Mem. 14-22.

---

[10] Thus, cases such as *SEC v. Softpoint, Inc.,* 958 F. Supp. 846, 868 (S.D.N.Y. 1997) are inapposite. In that case, the court expressed concern over higher penalties against one defendant when other defendants whose conduct was about as serious received much lower penalties.

[11] The Avalon Defendants do not contest the imposition of the injunctive relief sought by the SEC.

[12] The cases cited by the Avalon Defendants (Def. Opp. 7-8) are distinguishable. For example, defendants mistakenly assert that in *SEC v. Wyly*, 56 F. Supp. 3d 394, 433 (S.D.N.Y. 2014), the court stated that "$4.9 million" was a "staggering disgorgement," and thus did not order penalties. Def. Opp. 7. In fact, the court in *Wyly* ordered over $187 million in disgorgement. 56 F. Supp. 3d. at 434. In *SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 391 (S.D.N.Y. 2010), and *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 332 (S.D.N.Y. 2007), the defendants were incarcerated. Those facts are not present here.

Equally specious is the Avalon Defendants' argument that their penalties should be reduced because they did not previously violate the securities laws. Def. Opp. 8 n.3. That fact is overcome by the length of the fraud that they committed in this case (over five years), the multiple schemes in which they engaged (layering and cross-market), and their multiple acts of deception in covering up and lying under oath.

Nor should the Avalon Defendants escape severe penalties because of their alleged current lack of funds. *See* Def. Opp. 8. First, even if the Court accepts the defendants' representations regarding their financial status, inability to pay is not a sufficient basis to avoid a significant penalty. *See SEC v. Enrenkrantz King Nussbaum, Inc.*, No. CV 05-4643(MKB), 2013 WL 831181, at *6 (E.D.N.Y. Feb. 14, 2013) (defendant's "largely undisputed claim of poverty cannot defeat the imposition of a civil penalty, as imposing no penalty would not serve the purposes of the securities laws . . . .The circumstances of this case cry out for the imposition of a significant civil penalty." (internal quotation marks and citation omitted)).

As stated in *SEC v. Kane*, No. 97 Civ. 2931(CBM), 2003 WL 1741293, at *4 (S.D.N.Y. Apr. 1, 2003):

> Even if [defendant's] proffered representations concerning his bleak financial condition are complete and accurate, his financial problems, including his inability to work again as a stock broker, are the natural consequences of his fraudulent conduct. [Defendant's] predicament is shared by many defendants in similar cases, and if given the weight that [defendant] urges, a defendant's impecuniosity could preclude the imposition of a meaningful penalty in even those cases involving the most egregious fraud.

Second, even if Pustelnik's and Fayyer's affidavits showed an inability to pay a substantial penalty now, they fail to establish that they will not in the future be able to pay. *Id.* ("the court agrees with the Commission that it should not ignore the possibility that a defendant's fortunes will improve, and that one day the SEC will be able to collect on even a severe

8

judgment"). Fayyer and Pustelnik are approximately 38 years old.[13] They thus have decades in which they can work and acquire assets. They were able to turn Avalon into a business with hundreds of traders and which generated tens of millions of dollars in revenue. There is no basis to conclude now that they will be unable to acquire substantial assets in the future.

Third, the Avalon Defendants have failed to prove that they genuinely lack resources. They have made no showing whatsoever of Avalon's financial status. Pustelnik and Fayyer filed affidavits, but they say nothing about Avalon's finances, so there is no basis to conclude that Avalon is unable to pay. *See SEC v. Alternative Green Techs.*, No. 11 Civ. 9056(SAS), 2014 WL 7146032, at *5 (S.D.N.Y. Dec. 15, 2014) (holding there was no showing of company's inability to pay where CEO's declaration merely stated the company was non-operational and had no assets). Indeed, substantial doubt exists about any alleged lack of resources. The record of this case already shows that Avalon has made loans to and has interests in various businesses, yet the Avalon Defendants fail to explain or account for any of that. *See* SEC's Opposition to Avalon's Motion to Access Frozen Funds (ECF No. 33), at 8-10. Moreover, there remains substantial doubt about Pustelnik's claimed lack of assets. For example, the evidence at trial showed that Pustelnik and his company, Algo Design, received over $1.5 million between March 2015 and September 2016. PX 261; Trial Tr. 1441:2-1442:3. Yet Pustelnik's affidavit fails to explain what became of that money.

### B. Calculating Penalties Based on the Number of Months Is Appropriate

The Avalon Defendants object to calculating penalties based on the number of months in which the improper trading activity occurred. Def. Mem. 9-10. They propose instead that each scheme (layering and cross market) should be treated as one violation for purposes of calculating

---

[13] Trial Tr. 2120:1-4 (Fayyer was 9 years old in 1991), 2121:4-12 (Fayyer and Pustelnik were in the same grade in school).

penalties. But even using the maximum per-violation figure of $189,427 (for natural persons) (*see* SEC Mem. 9) would yield penalties of only $378,854 for Fayyer and Pustelnik. That is an absurdly low penalty in light of their egregious conduct. The Court has broad discretion and should exercise that discretion to impose penalties that reflect the immense size and scope of the fraud in order to achieve an appropriate deterrent in this type of case.

The Avalon Defendants cite a number of decisions in SEC administrative proceedings in which a series of actions was treated as a single violation. Def. Opp. 9-10. But the Avalon Defendants make no showing that the facts of those cases are in any way comparable to the facts of the present case. Moreover, a number of cases and SEC administrative decisions have treated each instance of conduct,[14] or each month in which the conduct occurred,[15] as a separate violation for purposes of calculating penalties. Accordingly, multiplying the statutory penalty amount times the number of months in which violations occurred is appropriate.

## Conclusion

For the foregoing reasons, the SEC respectfully requests that the Court enter judgment for the SEC and provide the remedies requested in the SEC's opening memorandum.

Dated: February 7, 2020

Respectfully submitted,

/s/ David J. Gottesman
David J. Gottesman
Olivia S. Choe
Sarah S. Nilson

---

[14] *See SEC v. Pentagon Cap. Mgt. PLC*, 725 F.3d 279, 288 n.7 (2d Cir. 2013)(court noted approval of district court's methodology for calculating penalties by counting each late trade as a separate violation); *SEC v. Alpine Sec. Corp.*, No. 17cv4179(DLC), 2019 WL 4686716, at n.27 (S.D.N.Y. Sept. 26, 2019)(imposing penalty of $12 million, which was roughly equivalent to a tier-1 penalty of $5,000 for each deficient report), *appeal docketed*, No.19-3272 (2d Cir. Oct. 10, 2019); *SEC v. Milan Capital Group, Inc.*, No. 00 Civ. 0108 (DLC), 2001 WL 921169, at *3 (S.D.N.Y. Aug. 14, 2001) (imposing $10 million penalty, based on statutory penalty of $50,000 per violation times 200, because there was a least one violative transaction with regard to each of 200 investors).

[15] *See In re PHLO Corp.*, 90 SEC Docket 961, 2007 WL 966943, at *15 (Mar. 30, 2007)(imposing tier-2 penalty for each month in which respondent aided and abetted violations); *In re J.S. Oliver Cap. Mgt., LP*, SEC Rel. No. 4431, 2016 WL 336116, at *17 (Jun. 17, 2016)(imposing penalties for each of 15 months in which cherry picking occurred).

> U.S. Securities and Exchange Commission
> 100 F Street N.E.
> Washington, D.C. 20549
> Tel.: (202) 551-4470 (Gottesman)
> Fax: (202) 772-9292
> Email: gottesmand@sec.gov
>
> *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2020, a true and correct copy of the above document was served on all counsel of record by filing this document using the CM/ECF system.

          /s/ David J. Gottesman