UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- X
                                    :
SECURITIES AND EXCHANGE COMMISSION, :
                                    :
                        Plaintiff,  :      17cv1789 (DLC)
                                    :
            -v-                     :      OPINION AND
                                    :      ORDER
LEK SECURITIES CORPORATION, SAMUEL  :
LEK, VALI MANAGEMENT PARTNERS dba   :
AVALON FA LTD, NATHAN FAYYER, and   :
SERGEY PUSTELNIK,                   :
                                    :
                        Defendants. :
                                    :
----------------------------------- X

APPEARANCES

For the plaintiff:
David J. Gottesman
Olivia S. Choe
Sarah S. Nilson
U.S. Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549

For the defendants:
James M. Wines
Law Office of James Wines
1802 Stirrup Lane
Alexandria, VA 22308

DENISE COTE, District Judge:

    Following a jury verdict in its favor on November 12, 2019,

plaintiff United States Securities and Exchange Commission

("SEC") seeks a permanent injunction, disgorgement jointly and

severally in the amount of $4,495,564 plus prejudgment interest,

and civil penalties in the amount of $13.8 million against each

of the defendants Vali Management Partners dba Avalon FA Ltd ("Avalon"), Nathan Fayyer ("Fayyer") and Sergey Pustelnik ("Pustelnik") (collectively, the "Defendants"). The Defendants oppose the imposition of any obligation to disgorge their revenue and contend that civil penalties should be limited to $300,000 for Fayyer and Pustelnik and $1,450,000 for Avalon. For the following reasons, disgorgement is ordered, jointly and severally, in the amount requested by the SEC, with interest, and civil penalties are assessed in the amount of $5 million for each defendant, subject to an increase as described below.[1]

## Background

Much of the factual background for this litigation is described in the Motion to Dismiss Opinion issued in August 2017 and the Opinion on the Motions to Exclude Expert Testimony issued in March 2019. See Sec. & Exch. Comm'n v. Lek Sec. Corp., 370 F. Supp. 3d 384, 389 (S.D.N.Y. 2019) ("Daubert Opinion"); Sec. & Exch. Comm'n v. Lek Sec. Corp., 276 F. Supp. 3d 49, 54 (S.D.N.Y. 2017). Familiarity with those Opinions is assumed and they are incorporated by reference.

---

[1] The Defendants do not oppose an injunction permanently prohibiting them from violating Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 thereunder, and Section 17(a) of the Securities Act of 1933. Accordingly, that relief is granted as well.

The SEC sued Lek Securities Corporation ("Lek Securities"), its principal Samuel Lek ("Lek") (collectively, the "Lek Defendants"), and the Defendants on March 10, 2017. On the same day, the SEC obtained an Order freezing $5.5 million in assets held in Avalon accounts.

Lek Securities is a broker-dealer based in New York. Avalon is a foreign day-trading firm whose hundreds of traders were based primarily in Eastern Europe and Asia. Avalon relied on registered broker-dealers such as Lek Securities to trade in U.S. markets. Fayyer was Avalon's principal. Pustelnik was a co-owner of, and exercised control over, Avalon during the entire period at issue. For a large portion of that time Pustelnik was also the registered representative at Lek Securities who worked on the Avalon account.

The Lek Defendants settled with the SEC on October 1, 2019. Lek Securities was enjoined from having foreign customers that engage in intra-day trading for a period of three years, ordered to retain an independent entity to monitor compliance with the injunction on foreign intra-day trading, permanently enjoined from further securities law violations, ordered to disgorge $419,623 along with prejudgment interest in the amount of $106,269, and assessed a civil penalty of $1 million. Lek was permanently enjoined from further securities violations, barred

from the securities industry for ten years, and assessed a civil penalty of $420,000.

On October 21, the SEC proceeded to trial on its claims against the Defendants. The jury rendered its verdict on November 12 and found that the Defendants violated several anti-fraud and anti-manipulation provisions of the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act"). The jury found that each Defendant violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, which together prohibit manipulative practices in connection with the purchase or sale of securities. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. The jury also found that the Defendants violated both Section 17(a)(1) and Section 17(a)(3) of the Securities Act, which proscribe fraudulent conduct in connection with the offer or sale of securities. 15 U.S.C. §§ 77q(a)(1) and (3). Avalon and Fayyer were also found liable for directly violating Section 9(a)(2) of the Exchange Act, which proscribes "creating active or apparent trading" in securities "for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. §§ 78i(a)(2), 78i(f). The jury found that Fayyer and Pustelnik knowingly or recklessly provided substantial assistance to each other and to Avalon to facilitate the market manipulation. 15 U.S.C. §§ 77t(b) and (d), 77o(b); 15 U.S.C. §§ 78u(d)(1) and (3), 78t(e). Finally,

the jury found that Avalon and Fayyer were liable pursuant to
Section 20(a) of the Exchange Act when they acted as "control
persons" of Avalon and its traders in connection with their
fraud and market manipulation.  It similarly found Pustelnik
liable as a control person of Avalon.  15 U.S.C. § 78t(a).

These myriad violations stemmed from two schemes to
manipulate U.S. securities markets, each separately found by the
jury.  See Lek Sec. Corp., 370 F. Supp. 3d at 390-93, 396-400.
The first manipulative scheme, referred to as "layering,"
involved placing multiple orders to buy (or sell) a given stock
at increasing (or decreasing) prices, to move the price of the
security without intending to execute those orders.  These are
referred to as the loud-side orders.  The loud-side orders
created the appearance of an artificially inflated level of
demand (or supply) for a stock.  In conjunction with the loud-
side orders, the trader would place a smaller number of orders
on the opposite side of the market to sell (or buy) the same
stock.  These are referred to as the quiet-side orders.  Once
the stock reached the desired price, the trader canceled the
loud-side orders.

Defendants also engaged in a manipulative scheme known as
the Cross-Market Strategy.  That involved a trader buying (or
selling) a stock in order to influence the price of a
corresponding option.  The trader would purchase (or sell) the

stock, causing the price of the option to rise (or fall).  The
trader would then establish an options position that would
benefit from the stock returning to its price before the trader
placed the stock trades.  Then the trader reversed the stock
position, causing the option to revert to its prior price.
Although the trader would lose money on the stock trades, the
trader would recoup this amount and more through the profits
from buying or selling the option at artificially set prices.
The jury entered a special verdict finding that Avalon's trading
constituted layering and the Cross-Market Strategy and that both
schemes manipulated the securities markets.

The evidence adduced at trial demonstrated Defendants'
widespread and longstanding use of layering and the Cross-Market
Strategy.  Defendants employed these schemes for more than five
years, from 2012 through 2016.[2]  During that time, they engaged
in more than 675,000 instances of layering and 668 instances of
Cross-Market trading.  Both practices were also highly
lucrative: Defendants generated over $21 million in revenue
through layering, along with $8.1 million in revenue from the

---

[2] This action was filed on March 10, 2017.  The five-year statute
of limitations period runs from March 12, 2012.  Although the
schemes preceded March 12, 2012, the revenue figures cited in
this Opinion are for the manipulative trading that followed
March 12, 2012.

Cross-Market scheme.  Almost $4.5 million of this amount was retained by the three Defendants; approximately $25 million was distributed to Avalon's traders.[3]

The SEC submitted its Motion for Judgment Including Remedies on December 20, 2019.  The motion became fully submitted on February 7, 2020.

## Discussion

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies."  SEC v. Frohling, 851 F.3d 132, 138 (2d Cir. 2016) (citation omitted).  For the following reasons, the SEC's request for relief is granted in part.

I.   Disgorgement

The SEC requests that the Defendants be disgorged of the revenue they reaped from the layering and Cross-Market schemes.  Disgorgement "is a well-established remedy in the Second Circuit, particularly in securities enforcement actions."  S.E.C. v. Cavanagh, 445 F.3d 105, 116 (2d Cir. 2006).  Once a securities violation has been found, the court may order the wrongdoer to surrender the profits derived from the illegal venture.  S.E.C. v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013), as amended (Nov. 26, 2013).

---

[3] Pursuant to Avalon's contracts with its traders, Avalon retained between 1% and 14% of trading profits.

Because disgorgement "is a method of forcing a defendant to give up the amount by which he was unjustly enriched, . . . the party seeking disgorgement must distinguish between the legally and illegally derived profits." Id. (citation omitted). The proper measure of disgorgement is the profit wrongdoers made and "the size of a disgorgement order need not be tied to the losses suffered by defrauded investors." Official Committee of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 81 (2d Cir. 2006) (citation omitted). Courts may require disgorgement "regardless of whether the disgorged funds will be paid to . . . investors as restitution." Kokesh v. SEC, 137 S. Ct. 1635, 1644 (2017) (citation omitted). Where a plaintiff seeks disgorgement "for combined profits on collaborating or closely related parties," a court may hold those parties jointly and severally liable for the combined profits. S.E.C. v. AbsoluteFuture.com, 393 F.3d 94, 97 (2d Cir.), supplemented, 115 F. App'x 105 (2d Cir. 2004).

"The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." SEC v. Contorinis, 743 F.3d 296, 301 (2d Cir. 2014) (citation omitted). Recognizing that the precise amount of a defendant's illegal proceeds might be impossible to determine, courts have held that a party seeking disgorgement need only provide "a reasonable

approximation of profits causally connected to the violation."
Id. at 305 (citation omitted).  To calculate disgorgement, the
district court engages in "factfinding . . . to determine the
amount of money acquired through wrongdoing," and then issues
"an order compelling the wrongdoer to pay that amount plus
interest."  Cavanagh, 445 F.3d at 116.  Furthermore, "any risk
of uncertainty in calculating disgorgement should fall upon the
wrongdoer whose illegal conduct created that uncertainty."
Contorinis, 743 F.3d at 305 (citation omitted).  The SEC bears
the burden "of establishing a reasonable approximation of the
profits causally related to the fraud," but once it has met this
burden, "the burden shifts to the defendant to show that his
gains were unaffected by his offenses."  Razmilovic, 738 F.3d at
31 (citation omitted).  A defendant may not avoid disgorgement
by arguing that the gains did not "personally accrue" to him.
Contorinis, 743 F.3d at 306.

    In addition to the base disgorgement amount, an award of
prejudgment interest is within the discretion of the court.
Razmilovic, 738 F.3d at 35-36; S.E.C. v. First Jersey Sec.,
Inc., 101 F.3d 1450, 1475-76 (2d Cir. 1996).  Generally, "an
award of prejudgment interest may be needed in order to ensure
that the defendant not enjoy a windfall as a result of its
wrongdoing."  Slupinski v. First Unum Life Ins. Co., 554 F.3d
38, 54 (2d Cir. 2009).

> In deciding whether an award of prejudgment interest
> is warranted, a court should consider (i) the need to
> fully compensate the wronged party for actual damages
> suffered, (ii) considerations of fairness and the
> relative equities of the award, (iii) the remedial
> purpose of the statute involved, and/or (iv) such
> other general principles as are deemed relevant by the
> court.

First Jersey, 101 F.3d at 1476 (citation omitted). Where, as here, the case is "an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance." First Jersey, 101 F.3d at 1476. As for the interest rate to be applied, the Second Circuit has approved the use of the "IRS underpayment rate" as the baseline interest rate because it "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the Defendants received from its fraud." Id.

The SEC seeks disgorgement in the amount of $4,495,564 plus prejudgment interest in the amount of $131,750. Based on the Defendants' revenue analysis as well as the evidence presented during trial, those sums are a reasonable approximation of the extent to which the Defendants profited from their fraudulent activities.[4] The SEC has demonstrated that between March 2012 and September 2016, Defendants' layering scheme generated

---

[4] Assuming without conceding that they were liable for the manipulative trading activity identified by the SEC's experts at trial, the Defendants prepared a Payout Analysis to calculate the revenue from that trading that was distributed to Avalon's traders. The SEC has accepted those calculations.

$2,457,073 in net revenue and the Cross-Market scheme generated $2,038,491 in net revenue for the Defendants.

Defendants raise several objections to the SEC's disgorgement request.  First, Defendants contend that disgorgement is not an available remedy following the Supreme Court's decision in Kokesh.  137 S. Ct. 1635 (2017).  As the Second Circuit has noted, Kokesh classified disgorgement as "a 'penalty' for purposes of 28 U.S.C. § 2462, which imposes a five-year statute of limitation."  United States v. Brooks, 872 F.3d 78, 91 (2d Cir. 2017); see also Kokesh v. SEC, 137 S. Ct. 1635, 1644 (2017).[5]  Kokesh did not decide whether a court is deprived of its authority to impose disgorgement.  The Kokesh Court itself observed that its holding "should [not] be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context."  Kokesh 137 S. Ct. at 1642 n.3.  Until this issue is decided differently by the Supreme Court,[6] this Opinion follows the current law in the Second Circuit.

---

[5] 28 U.S.C. § 2462 imposes a five–year statute of limitations applies to any "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise."  28 U.S.C. § 2462.

[6] The Supreme Court recently granted certiorari to address whether, after Kokesh, district courts have the authority to

Second, Defendants argue that the SEC has failed to show which specific transactions were manipulative, and therefore which profits are properly disgorged.  Defendants' objection is premised on the alleged inability of the SEC's expert witnesses, Professors Hendershott and Pearson, to identify any single trade as manipulative.  Defendants misunderstand the professors' testimony and the nature of manipulative trading schemes.

The jury found that the Defendants intended to manipulate the securities markets and engaged in two distinct schemes to do so.  The jury specifically found that orders Avalon placed constituted layering and the Cross-Market Strategy and that those schemes were manipulations of the securities markets.  Furthermore, the jury found that Avalon did so while under the control of Fayyer and Pustelnik.  Together, the schemes involved hundreds of thousands of separate instances of manipulative trading.  In each instance, there were multiple orders placed in the market and executed by the Defendants to achieve their goal of market manipulation.  During the statute of limitations period, Professor Hendershott found 675,504 separate instances

_____

order disgorgement.  See SEC v. Liu, 754 F. App'x 505 (9th Cir. 2018) (unpublished), cert. granted sub nom. Liu v. SEC, --- U.S. ---, 2019 WL 5659111 (U.S. Nov. 1, 2019) (No. 18-1501). Defendants have not requested a stay of this motion pending a decision in Liu.  In any event, the law of this Circuit is that disgorgement is an available remedy in SEC enforcement cases. See, e.g., Frohling, 851 F.3d at 138-39; Contorinis, 743 F.3d at 301.

of layering.  Professor Pearson found 668 separate instances of trading consistent with the Cross-Market Strategy, none of which had an alternative, legal economic rationale.

As described in detail in the Daubert Opinion, the SEC experts used rigorous and conservative criteria to identify the trading involved in the two schemes.  Lek Sec. Corp., 370 F. Supp. 3d at 391-92, 397-98.  They then conducted further analyses to confirm that they had correctly identified manipulative trading.  Id. at 392-93, 398-400.  Given the conservative measures they applied, this Court has no hesitation using the numbers presented by the experts at trial.  The cross examination of the SEC experts provided no basis to question these numbers and neither does the Defendants' opposition to this motion.

After identifying the trades that fit the profile of either manipulative practice, the professors calculated the gross revenue produced by the trades in each instance of market manipulation.  Avalon used those figures to calculate the share of revenues it retained.  Those sums are the proceeds the SEC now seeks to be disgorged.  The SEC has therefore provided a "reasonable approximation" of the profits that the Defendants gained from their illegal practices.  Contorinis, 743 F.3d at 305.

Any risk of uncertainty related to those sums falls on
Defendants, who bore the burden of "show[ing] what transactions
were unaffected by [their] offenses." SEC v. Lorin, 76 F.3d
458, 462 (2d Cir. 1996). Defendants' conclusory assertion that
the SEC failed to carry its burden to show a causal connection
between illegality and disgorged profits is rejected.

In addition to disgorgement, Defendants should pay
prejudgment interest to prevent them from obtaining what is
essentially an interest-free loan from their illegal activity.
The SEC calculated prejudgment interest running from the date of
Defendants' last instance of each respective strategy through
March 10, 2017, the date Avalon's funds were frozen. This sum
amounts to $131,750.[7]

II. Civil Penalties

The SEC also seeks civil penalties of $13.8 million for
each Defendant. Pursuant to the Securities Act and the Exchange
Act, a court may impose three tiers of civil penalties.

> Under each statute, a first-tier penalty may be
> imposed for any violation; a second-tier penalty may
> be imposed if the violation involved fraud, deceit,
> manipulation, or deliberate or reckless disregard of a
> regulatory requirement; a third-tier penalty may be
> imposed when, in addition to meeting the requirements
> of the second tier, the violation directly or
> indirectly resulted in substantial losses or created a

---

[7] Defendants oppose the imposition of prejudgment interest on the
same ground that they resist disgorgement generally; namely,
that Kokesh deprived district courts of the authority to order
it. For the reasons detailed above, this argument is rejected.

> significant risk of substantial losses to other
> persons.

Razmilovic, 738 F.3d at 38 (citation omitted); 15 U.S.C. §
77t(d)(2); 15 U.S.C. § 78u(d)(3).  At each tier, "for each
violation, the amount of penalty shall not exceed the greater of
a specified monetary amount or the defendant's gross amount of
pecuniary gain."  Razmilovic, 738 F.3d at 38 (citation omitted).
For individual defendants, the maximum amounts specified at the
first, second, and third tier are $7,500, $75,000, and $150,000,
respectively.[8]  17 C.F.R. 201.1001.  Entities are liable in the
maximum amount of $75,000, $375,000, and $725,000 at each tier.
Id.

Aside from the maximum statutory restrictions, the
appropriate civil penalty is within "the discretion of the
district court."  Razmilovic, 738 F.3d at 38 (citation omitted).
Because monetary penalties are levied as a deterrent against
securities law violations, SEC v. Palmisano, 135 F.3d 860, 866
(2d Cir. 1998), courts have broad discretion to fashion relief
"in light of the facts and circumstances" surrounding the
violations.  15 U.S.C. § 78u(d)(3).  To aid this inquiry, courts

---

[8] These rates are adjusted periodically pursuant to the Debt
Collection and Improvement Act of 1996 and associated SEC
regulations.  Defendants' conduct spans three rate regimes.  The
SEC proposes using the amounts listed in the earliest schedule
of the penalty rates in which Defendants' illegal activity
occurred.

in this Circuit have considered the following factors -- often described as the Haligiannis factors -- in assessing civil penalties:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

Sec. & Exch. Comm'n v. Rajaratnam, 918 F.3d 36, 44 (2d Cir. 2019); S.E.C. v. Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007). Those factors are neither exhaustive nor "to be taken as talismanic." Rajaratnam, 918 F.3d at 45. Other relevant considerations include "a defendant's financial condition, a defendant's failure to admit wrongdoing, and a defendant's lack of cooperation with authorities." United States Sec. & Exch. Comm'n v. Alpine Sec. Corp., 413 F. Supp. 3d 235, 245 (S.D.N.Y. 2019) (citation omitted). Finally, the "brazenness, scope, and duration" of the fraudulent conduct may dictate "a significant penalty." Rajaratnam, 918 F.3d at 45.

As to the unit of calculation, it is within a court's discretion to treat each fraudulent transaction as a discrete violation. See, e.g., S.E.C. v. Pentagon Capital Mgmt. PLC, 725 F.3d 279, 288 n.7 (2d Cir. 2013) ("[W]e find no error in the district court's methodology for calculating the maximum penalty

16

by counting each late trade as a separate violation."); <u>SEC v.</u>
<u>Milan Capital Grp., Inc.</u>, No. 00 Civ. 108(DLC), 2001 WL 921169,
*3 (S.D.N.Y. Aug.14, 2001) (imposing penalty for each of 200
defrauded investors).

The SEC requests maximum third-tier penalties against each
defendant, calculated using the maximum penalty rate for natural
persons of $150,000 per violation.  The SEC requests that each
month in which Defendants engaged in either manipulative
practice be treated as a separate violation.  This amounts to
fifty-four months for the layering scheme and thirty-eight
months for the Cross-Market Strategy, for a total of ninety-two
months and a total penalty per Defendant of $13.8 million.

The record demonstrates that the Defendants' conduct falls
into the third tier of penalties because it involved fraud and
created a significant risk of substantial losses to other
investors.  The Defendants do not disagree that the third-tier
of penalties is the correct tier for assessing penalties against
them.  Nor could they.  The Defendants were the central figures
in two separate years-long schemes to defraud the securities
market.  Their manipulation was intentional.  Furthermore, as
the trial established, Defendants' manipulation distorted the
market and caused significant losses for other traders.
Layering, for instance, induced other market participants to
purchase a stock at the trader's desired price, a price that was

17

higher or lower than what the other participant otherwise would pay.  Similarly, while Avalon reaped the proceeds of the artificial options prices from the Cross-Market Scheme, other investors ended up trading at unfavorable prices.  Finally, both schemes fostered uncertainty in the market.  As a hedge against that uncertainty, the bid/ask spreads widened and other traders had to either pay more to purchase a security or accept less to sell one.

Turning to the first Haligiannis factor, the Defendants' conduct was egregious.  Defendants engaged in market manipulation on a massive scale.  Defendants' participation in layering and the Cross-Market Scheme was endemic; they recruited other traders to assist in the fraud over the course of many years and millions of trades.  Fraud of that scope and duration is plainly egregious.  Nor were Defendants bit players in the schemes.  Fayyer, Pustelnik, and Avalon coordinated nearly every facet of the plan to manipulate the market.  The Defendants facilitated both schemes by enlisting and organizing traders, arranging technology upgrades to better execute the manipulation, and assisting traders to circumvent the meager internal controls Lek Securities implemented to detect layering.  Taken together, these facts are more than sufficient to demonstrate that the Defendants' conduct was egregious.

The next factor in determining the appropriate penalty is
Defendants' degree of scienter.  Defendants' fraudulent behavior
was intentional.  As early as September 2012, they learned of a
FINRA inquiry into trades they were conducting through Lek
Securities.[9]  Armed with this knowledge, Defendants increased
their use of layering.  Defendants' scienter is also illustrated
by their efforts to conceal their activity and connections to
the schemes.  See United States v. Triumph Capital Grp., Inc.,
544 F.3d 149, 160 (2d Cir. 2008) ("[E]fforts to obstruct the
investigation evidence a consciousness of guilt. . . .").
During the SEC administrative investigation, Defendants failed
to produce highly incriminating emails despite subpoenas
directing them to do so.  Later, Fayyer and Pustelnik tried to
conceal Pustelnik's ties to Avalon and Fayyer.

In addition to withholding incriminating information,
Fayyer and Pustelnik gave false testimony under oath during the
SEC investigation and at trial.  And, while the schemes were
ongoing, they assured Lek that they were not engaging in
layering, even while recruiting traders to do just that.  United
States v. Anderson, 747 F.3d 51, 60 (2d Cir. 2014) (citation
omitted) (noting that "acts that exhibit a consciousness of

---

[9] FINRA, or the Financial Industry Regulatory Authority, is a
self-regulatory organization that supervises broker-dealers.
See Fiero v. Financial Industry Regulatory Auth., Inc., 660 F.3d
569, 571 & n.1 (2d Cir. 2011).

guilt, such as false exculpatory statements, . . . may also tend to prove knowledge and intent of a conspiracy's purpose"). Defendants' specious attempts to excuse their behavior continued at trial, where Fayyer and Pustelnik testified that they thought layering was merely the legal practice of trading on both sides of the market. That contention was transparently wrong and is also belied by Defendants' written statements to their traders. Avalon explained to traders that it charged higher fees to engage in layering because traders had few other brokers who would accept such orders.

As to the third factor, as already described, Defendants' malfeasance resulted in substantial losses to other market participants who traded at unfavorable prices due to the manipulative practices. As for the fourth factor, Defendants' conduct was not intermittent; it was recurrent behavior meant to cheat the market. From 2012 to 2016, Defendants took aggressive measures to evade the securities law. Their illicit activities persisted -- and indeed increased -- when Defendants came under regulatory scrutiny.

The final Haligiannis factor, Defendants' current and future financial statuses, does not offset the need to impose a significant penalty. In opposition to the SEC's motion for remedies, the Defendants submitted affidavits describing Fayyer and Pustelnik's current assets and liquidity. Those affidavits

represent that Fayyer and Pustelnik have limited resources.  The

Defendants have submitted no evidence of Avalon's current

financial state.  Fayyer and Pustelnik have decades of their

working lives ahead of them.  They were instrumental in building

a company that produced millions of dollars in revenue.  When

weighed against the clear need to assess a substantial civil

penalty, Defendants' current financial position is not a bar to

the imposition of significant civil penalties.

Defendants contend that the SEC's proposed civil penalties

are excessive.  Defendants first object that the penalties would

be disproportionate to the disgorged amount, an outcome

Defendants argue is inconsistent with the SEC's historical

disgorgement-to-civil penalty ratio.  Those general trends,

however, have little to do with the penalty appropriate for the

Defendants, which must be determined based on "the facts and

circumstances" of the Defendants' violations.  15 U.S.C. §

78u(d)(3) & 77t(d).  In particular, in this case the

disgorgement sought by the SEC is only a fraction of the total

profits made through Defendants' market manipulation.[10]

Defendants also argue that the disgorgement and injunctive

relief the SEC seeks necessitate smaller civil penalties.

---

[10] The expert testimony established that the manipulative schemes
generated more than $29 million in revenue, most of which was
distributed to Avalon's traders.  The SEC seeks approximately
$4.5 million in disgorgement.

Defendants conflate the aims of the different remedies available for securities law violations. As the SEC notes, disgorgement deprives defendants of their ill-gotten gains and an injunction facilitates speedier enforcement if the Defendants violate the securities laws again. Neither of those remedies carries the same deterrent effect as a robust civil penalty. Disgorgement and injunctive relief are meant to ensure that defendants do not profit from their illegal conduct; SEC civil penalties are, by contrast, designed to effect general deterrence and to make securities law violations a money-losing proposition. See Rajaratnam, 918 F.3d at 44.

Defendants' appeal to the penalties negotiated with the Lek Defendants is similarly unavailing. Defendants were responsible for recruiting traders to execute the fraudulent schemes and then took extensive steps to cover their trail. Defendants repeatedly concealed their participation in the layering scheme from the Lek Defendants during the investigation. The latter's settlement does not, therefore, limit the Court's discretion to assess harsher penalties on the Defendants.

Defendants also object to the manner in which the SEC calculated civil penalties. Defendants propose treating each scheme as a single violation, yielding civil penalties of $300,000 for Fayyer and Pustelnik, and $1,450,000 for Avalon, if the maximum fines for a third-tier violation are used. The SEC

argues for a measurement that reflects the longevity of the
schemes and seeks the maximum fine per month of illegality,
counting each of the two schemes separately.  The SEC points out
that there were identifiable instances of layering and the
Cross-Market Scheme in ninety-two separate months from 2012 to
2016.  Defendants do not dispute the accuracy of the
calculation.[11]

Defendants' preferred method -- a single penalty per
manipulative scheme -- would deliver grossly inadequate
deterrence for the scope of this illegal activity.  Their
proposal results in penalties that pale in comparison to the
extent of their misconduct, including their obstruction of
justice.  The breadth and duration of Defendants' violations are
well established; violations of that magnitude require a
correspondingly severe penalty.  Defendants' proposal does not
meet that requirement.  It would recognize no distinction
between a violator who engaged in a single episode of market
manipulation and one who continued the manipulation year after
year even after they were alerted that regulators were

---

[11] SEC administrative bodies have adopted a monthly definition of
statutory violations where, as here, discrete instances of
prohibited conduct occurred in individual months and alternative
metrics to measure violations could justify larger penalties.
See, e.g., J.S. Oliver Cap. Mgt., LP, SEC Rel. No. 4431 (Jun.
17, 2016); Phlo Corp., James B. Hovis, & Anne P. Hovis, 90 SEC
Docket 961, 2007 WL 966943, at *15 (Mar. 30, 2007).

suspicious of their trading activity. It bears emphasis that the Defendants accelerated their market manipulation after regulators put them on notice of their concerns. During the investigation and litigation of this matter, the Defendants continued to obfuscate and conceal evidence of their unlawful conduct. Even now, in opposition to this motion, the Defendants attempt to excuse their behavior based on their alleged ignorance of the relevant law. A "course of conduct" measure for a civil penalty would not promote deterrence.

The other alternative measure of counting violations, wherein each transaction or series of transactions is counted as a violation, shows the reasonableness of the monthly measure. In light of the millions of transactions at issue, and the many separate instances of manipulation, using transactions or even instances of manipulation as a measure would produce a staggering penalty. A penalty measured in terms of months is a reasonable intermediate metric that fulfills the need to impose significant fines while honoring the value of proportionality.

Weighing all of the factors discussed above, a third-tier civil penalty of $5 million is assessed against each of the three Defendants. Although this penalty is significant, it corresponds to the extent and brazenness of the Defendants' conduct and the need to deter those practices in the future. It is also a fraction of the maximum tier-three penalties available

and substantially less than the penalty the SEC has requested. This figure is set based at least in part on the assumption that the amount already seized by the SEC, or at least most of that amount, will be used to satisfy Defendants' duty to disgorge their profits from their schemes.[12]

## Conclusion

The SEC's December 20, 2019 motion for remedies is granted in part. A judgment of disgorgement in the amount of $4,495,564 plus prejudgment interest in the amount of $131,750 is imposed jointly and severally against each of the Defendants: Avalon, Fayyer, and Pustelnik. Each Defendant is also assessed a civil penalty in the amount of $5 million.[13] Lastly, each Defendant will be permanently enjoined from violating Sections 9(a)(2) and 10(b) of the Exchange Act, Rule 10b-5 thereunder, and Section

---

[12] This Order relies on the Defendants' commitment, expressed in their memorandum in opposition the SEC's motion and counsel's letter of March 13, 2020, that they largely consent to the application of the $5.5 million seized by the SEC to be used to satisfy their obligation to pay disgorgement.

[13] In the event that no order of disgorgement may be enforced, the civil penalty assessed against each Defendant shall be increased to $7.5 million.

17(a) of the Securities Act.

Dated:     New York, New York
           March 20, 2020

_____
               DENISE COTE
       United States District Judge